| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | WESTERN DISTRICT OF WASHINGTON |

```
                    ───────────────────────────────────────────
 3
     KATHERINE MOUSSOURIS, HOLLY   )
 4   MUENCHOW, and DANA            )
     PIERMARINI, on behalf of      )
 5   themselves and a class of     )
     those similarly situated,     )
 6                                 )
              Plaintiffs,          )   No. 2:15-cv-01483-JLR
 7                                 )
                                   )
 8        vs.                      )   Seattle, WA
                                   )
 9   MICROSOFT CORPORATION,        )
                                   )   Status Conference
10            Defendant.           )   September 7, 2016

11   ───────────────────────────────────────────────────────────

12                 VERBATIM REPORT OF PROCEEDINGS
              BEFORE THE HONORABLE JUDGE JAMES L. ROBART
13                  UNITED STATES DISTRICT COURT

14   ───────────────────────────────────────────────────────────

15   APPEARANCES:

16   FOR THE PLAINTIFFS:   KELLY M. DERMODY
                           Leiff Cabraser Heimann & Bernstein
17                         275 Battery Street, 29th Floor
                           San Francisco, CA 94111
18                         kdermody@lchb.com

19                         MICHAEL C. SUBIT
                           Frank Freed Subit & Thomas
20                         705 Second Avenue, Suite 1200
                           Seattle, WA 98104-1729
21                         msubit@frankfreed.com

22   FOR THE DEFENDANT:    MARK STEVEN PARRIS
                           Orrick Herrington & Sutcliffe LLP
23                         701 Fifth Avenue, Suite 5600
                           Seattle, WA 98104
24                         mparris@orrick.com

25
```

1   Andrea Ramirez, CRR, RPR
    Official Court Reporter
2   United States District Court
    Western District of Washington
3   700 Stewart Street, Suite 17205
    Seattle, WA 98101
4   andrea_ramirez@wawd.uscourts.gov

5   Reported by stenotype, transcribed by computer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE CLERK:  Case C15-1483, Katherine Moussouris vs.

2  Microsoft.

3    Counsel, please make your appearances for the record.

4      MS. DERMODY:  Good morning, Your Honor.  Kelly

5  Dermody, from Leiff Cabraser, for the plaintiffs.

6      THE COURT:  Thank you.

7      MR. SUBIT:  Mike Subit, for the plaintiffs, Your

8  Honor.

9      MR. PARRIS:  Good morning, Your Honor.  Mark Parris,

10  on behalf of Microsoft.

11      THE COURT:  Counsel, you're back again, which doesn't

12  make me very happy, but here you are.  And as a result, you're

13  going to get your ruling today.

14    I appreciated the stipulated statement of the class

15  discovery issue, although I must admit it took me three times

16  reading it before I figured out that -- I think it's an

17  independent clause at the end.  The question that was submitted

18  to the Court was, "Did the Court's June 6, 2016, order,

19  establishing January 2010 as the beginning date for

20  class-related discovery, require Microsoft to provide employee

21  data from its personnel databases for U.S. technical employees

22  employed at Microsoft between the start of the class-related

23  discovery, on January 1, 2010, and September 16, 2012, if those

24  employees did not also work at Microsoft during what Microsoft

25  argues" -- interesting word -- "is the WLAD liability period

1  (i.e. September 16, 2012 to present)?"

2      That implies to me that you all have worked out a working

3  definition for U.S. technical employees; is that correct,

4  Counsel?

5          MS. DERMODY:  Yes, Your Honor.  For the discovery

6  purposes, we have.

7          THE COURT:  Mr. Parris?

8          MR. PARRIS:  Yes, Your Honor.

9          THE COURT:  All right.  We're going to do this a

10  little bit differently.  I realize that there are two issues

11  that you asked me to address today.  One is the discovery

12  issue; and then secondly, you also have done what I asked,

13  which was to confer regarding the scope and format of

14  Microsoft's privilege logs.  And you were unable to reach an

15  agreement, and you asked, therefore, that I also rule on that.

16      I'll hear from Microsoft first, and I have read your

17  briefing.  I have views on the three arguments that you make

18  regarding discovery.  And I may or may not need to hear from

19  the plaintiffs at the conclusion of this.

20      So Mr. Parris, to the lectern, please.

21          MR. PARRIS:  Thank you, Your Honor.

22      So let me begin by putting it in context, Your Honor, and

23  touch briefly on what Microsoft has produced, and the history

24  and consistency of Microsoft advising plaintiffs of our

25  position.

1      THE COURT:  I think I've read all of that.  You give

2  me three reasons why I shouldn't, frankly, sanction your

3  client.  And I'd like you to explain those reasons to me, so I

4  make sure I understand them before I rule.

5      MR. PARRIS:  Yes, Your Honor.

6  So with respect to any question about the interpretation,

7  Your Honor, our view and our understanding was that this was a

8  discovery ruling, and it related to discovery time period.

9  What we did, Your Honor, from day one, in fact, beginning in

10  January of this year, on five separate occasions, we advised

11  plaintiffs that our position was that we were providing

12  information, documentation, the data, related to those people

13  who were employed from September 16, 2012, to the present.  We

14  informed them of that on January 21, on April 15, on July 12.

15  We produced documents on July 15 that were consistent with

16  that, and we advised them on August 8.  It wasn't until after

17  advising them on August 8 that, for the first time, they raised

18  this issue and said, "Our understanding was that you were going

19  to provide us information relating to all employees, technical

20  employees, irrespective of whether they were employed during

21  what we believe is the putative class period."

22      THE COURT:  Why should that make any difference to

23  me?  Either you complied with the Court's ruling, or you

24  didn't.

25      MR. PARRIS:  Well, Your Honor, first of all, I think

Moussouris v. Microsoft, 9/7/16

1   we did comply.  But again, I understand the Court is the final

2   arbiter on that.

3        But from a standpoint of good faith, Your Honor, it was

4   our good-faith belief that we had complied.  And we

5   consistently stated what our position was.  We advised them,

6   "Here's what we're going to provide," and we provided them

7   exactly that.  There was no issue about us trying to hide the

8   ball or anything like that.  We were directly up front and

9   said, "Here's what we're going to provide."  We put it in

10  writing, we provided that, we reiterated it, we provided it

11  again.

12            THE COURT:  Let me ask you again, why should that

13  matter to me?  I understand your argument about good faith, but

14  why should that matter to me?

15            MR. PARRIS:  Well, Your Honor, I think it should

16  matter to you for two reasons, one of which is, I believe -- if

17  I can just take a moment and step back and explain what we have

18  produced and why that relates to the overall context of what

19  we're talking about here.

20       What Microsoft has produced is all policy documents back

21  to 2010; all data, again, with respect to what we believe are

22  putative class members; and all comparators, men and women, who

23  were employed from September 16, 2012, to the present.  We

24  provided that information back to 2010.

25       In addition to that, Your Honor, we went beyond the

1    Court's order, and we actually provided information of what's

2    called "on-hire information" before 2010.  So, for example, if

3    an employee who fit within that category was first employed

4    before 2010, we -- despite it not being part of the Court's

5    order, we produced all on-hire information; in other words, the

6    day they started, their salary information, from that point

7    forward, all the way up to the present.  So we went beyond what

8    we thought was within the spirit or, in fact, the letter of the

9    Court's order.

10            THE COURT:  Well, I have the transcript in front of

11   me, and I'm having a very hard time seeing how there is any

12   ambiguity about what I said.  And, in fact, in your briefing,

13   you say there was no ambiguity.  What I said was, "I'm ruling

14   on a fairly narrow discovery question.  The plaintiffs, at some

15   point, suggest that I have already decided some of these

16   statute of limitations questions.  I don't agree with that."  I

17   don't know how I could have made it any clearer that we were

18   talking about the discovery motion.  You have pending a

19   different motion.

20       Quoting from the opinion again, "As I indicated earlier,

21   it's not my intention to lay down a bright line" -- it says

22   bright light, but bright line -- "ruling on the question of the

23   statute of limitations.  I see this as a dispute about

24   discovery."  And in the last paragraph of the Court's remarks,

25   I said, "So it is the decision of the Court that you may use

1    January 1, 2010, as the point that discovery should commence

2    from."  And I talk about I believe that's a sufficient

3    peek-back.

4        Mr. Parris, what you just said to me, you add a very

5    important clause in there.  You say what -- you used the word

6    "we" -- but what Microsoft believes are people who are class

7    members.  In discovery, you don't get to rule on who's in the

8    class.  You produce information.  You don't get to self-select.

9    Now, I agree with you, and it's the only thing, frankly, that's

10   saving you, is, I didn't state specifically, "Oh, and you have

11   to produce everything about this potential class."  But to

12   self-select, which is what you did, and then say, "Well, we

13   were completely within the bounds of the Court's order," is

14   just not proper.

15       MR. PARRIS:  I understand, Your Honor.  I will just

16   tell you that our intent was not to, in any way, avoid or not

17   comply with the Court's order.

18       Again, when this was raised, as you'll recall, it was

19   raised in the context of what pre-liability-period discovery

20   would be allowed.  And what the Court ordered was that the

21   pre-liability-period discovery would go back to January 1 of

22   2010.  And typically in these cases, as you're well aware, what

23   that means is, you provide discovery relating to those people

24   who are part of the liability class for some period before.

25       So in this particular situation, much unlike some other

1  cases, Your Honor, in this particular situation, we've provided

2  data for 66,000 employees, which includes all men and women

3  that are technical employees, again, who are employed at any

4  time on or after September '16 [sic].  That more than enables

5  the plaintiffs to accomplish what their stated goal is, which

6  is to have sufficient information to enable plaintiffs to

7  conduct a statistical analysis to compare members of the

8  protected category, women, with similarly situated comparators,

9  men, to determine whether regression control differences exist.

10       And, Your Honor, what ends up happening in this type of

11  scenario is, instead of actually comparing apples and apples,

12  in other words, those putative class members with their

13  comparators, now we're potentially being asked to produce

14  information of non-putative class members and comparators

15  there.  For what reason, I'm not sure, Your Honor.

16       But again, I'm not trying to re-argue those merits.  I'm

17  just explaining the context of, we thought we were complying,

18  and we thought we were certainly enabling the plaintiffs.  We

19  were truly acting in good faith.  And in our view, we didn't

20  read the order in the same way that you are telling us that

21  order should be read.

22            THE COURT:  Well, it is clear that I do not speak

23  Orrick.  It is also clear to me, at this point, that the Orrick

24  firm doesn't speak English.  This is the second time that

25  you've been in here having parsed out something that's been

1  said, and it's said, "Oh, we have a huge misunderstanding."

2  And we've spent, what is it now, eight months -- I guess we're

3  into nine -- producing documents, and we proceeded on us

4  deciding who were the class members, as opposed to -- and I

5  specifically have reserved that question. It's not before me,

6  at this point. And I made it absolutely clear in my remarks

7  that we were talking about the statute of limitations' impact

8  on the discovery.

9      And I'm still dumbstruck that somehow, somewhere, I assume

10  some very clever and well-educated associate said, "Aha, a

11  loophole." Because that seems to be what you've done.

12      MR. PARRIS: Well, my apologies, Your Honor. That

13  was not our intent.

14      And as you know, we are now going to be addressing this

15  specific issue about the statute of limitations, being

16  briefed -- the brief is being filed today, with a noting date

17  for September 30. And so that will finally answer this

18  question about who is a putative class member or not.

19      THE COURT: And in the meantime, we've wasted nine

20  months of discovery?

21      MR. PARRIS: Well, Your Honor, in our view, we raised

22  that on a few occasions. We moved to dismiss. The Court

23  denied that particular motion, said it needed additional

24  briefing. We raised it again in conjunction with the June 6

25  order. The Court decided that it should hear -- and I'm not

1    arguing whether it should or should not -- but it should hear

2    it as a discovery motion; so it was briefed, during that time

3    period, and actually argued, to a certain point.  And now

4    what's happened is, we were on a call, as you'll recall, Your

5    Honor, in which we said, we need to have this decided.  We need

6    to have it decided before class certification, because it does

7    affect discovery, it does affect other aspects of the case.  So

8    we moved as efficiently as we could to get that teed up with

9    the Court, and that's what's now being teed up.

10             THE COURT:  You have pending motions before this

11   Court that are way overdue.  And they're way overdue because we

12   haven't gotten to them.  And part of the reason why we haven't

13   gotten to them is this continuing trickle-in of discovery

14   motions that, frankly, you lose, because your positions are not

15   well-taken.  So, I mean, I'm aware of the fact that we've got

16   pending motions.  And I suspect that if we were trying to deal

17   with this case all the time on, frankly, other issues, we could

18   get around to doing some of those.

19        But I go back to what I said before.  How -- in what

20   context can you self-select who are the class members and say,

21   "That's what we're going to produce as discovery"?  I've never

22   seen that done.

23             MR. PARRIS:  Well, Your Honor, again, to put this in

24   the overall context, the discovery came in and started with a

25   request that we produce all documents from January 1, 2008.

Moussouris v. Microsoft, 9/7/16

1   Our response to that was, "We're not going to produce those

2   documents."  We began the procession of saying what our

3   position was.  And we did that in January, January 21.  Flash

4   ahead to April 15, we've now concluded five months of

5   negotiations with the plaintiffs over these issues.  We

6   announce to them again, "This is what we're going to produce,

7   this particular period."  Flash ahead to July 12, we told them

8   again that very thing.  Flash ahead to July 15, we produced

9   those documents, with that in mind.

10          Your Honor, I understand where we are.  And again, all I

11  can do is apologize and swallow hard.  But I will tell you that

12  from day one, we were not trying to do anything other than be

13  completely up front with the plaintiffs, and be consistent and

14  comply with what we understood the Court's order was.  And if

15  we misunderstood the Court's order, I understand that, and we

16  have to scramble and get these documents out as quickly as we

17  can.

18          THE COURT:  All right.  Let's talk about your

19  privilege log.

20          You make the following statement:  "Categorical privilege

21  logs are appropriate in situations, such as this, where

22  documents are," quote, "presumptively privileged," closed

23  quote.

24          That came out of a law review article?

25          MR. PARRIS:  That, I believe, is a comment by a law

Moussouris v. Microsoft, 9/7/16

1    review article that was co-written by a judge and a student or

2    professor.  I can't remember right offhand, Your Honor.

3            THE COURT:  Do you have any case law, as opposed to

4    law review articles by professors?

5            MR. PARRIS:  Not handy, Your Honor.

6        And as you know, a lot of these -- most all of these

7    matters are handled at the district court level, without

8    necessarily reported decisions.

9            THE COURT:  I know you don't have your rules up

10   there.  But 26(b)(5)(A)(ii), requires that a party withholding,

11   quote, "information otherwise discoverable, by claiming that

12   the information is privileged, describe the nature of the

13   documents, communications, or tangible things not produced or

14   disclosed, and do so in a manner that, without revealing

15   information itself privileged or protected, will enable other

16   parties to assess the claim."

17       Is it your position that that's not applicable to this

18   case?

19           MR. PARRIS:  No, Your Honor.  Our position is that

20   that is the base law.

21       But on top of that, Your Honor, you layer in the issue

22   about proportionality and otherwise, and what makes sense.  Is

23   the gain worth the candle to actually go through each document

24   and comply with that iteration?  Or does it make more sense to

25   do it categorically, which is envisioned by the local rules

1   with respect to ESI?

2       So then the question becomes, what categories are

3   appropriate, at what level?  Can you have a category that is

4   overbroad or under-broad?  Certainly.  Can you have a category

5   that is adequately conclusive enough to provide the plaintiffs,

6   or the other party, an opportunity to challenge it?  And that's

7   what the goal is with respect to that, Your Honor.  It's not to

8   hide the ball, or anything like that.  It's to advise, here's a

9   category of documents, all of these documents fit within it,

10  here's a description of those, and here's the basis for why

11  those would be privileged.

12              THE COURT:  Give me an example.  You've got three

13  points of disagreement.  Tell me about one of them.

14              MR. PARRIS:  So, for example, Your Honor, when you're

15  talking about what they'll refer to as "audits," in those types

16  of situations, what you have is a category of documents that

17  are, in essence, attorney-client privileged communications,

18  between outside counsel and inside counsel.  That's a category

19  of documents which should be presumptively privileged, because

20  it's counsel to counsel, and certainly it's legal advice.  One

21  would think that you could create a category there, and decide,

22  from a category standpoint, can we address that?

23              THE COURT:  And how will they know if they've been

24  properly -- they, being the plaintiffs -- properly included in

25  that category?

Moussouris v. Microsoft, 9/7/16

1     MR. PARRIS:  Well, Your Honor -- well, it's not much
2   different than an individualized log, Your Honor.
3     Let's picture this.  Let's assume you have an individual
4   log, and it's Law Firm A communicating with Company B.  And
5   what the description would say is, "Lawyers from Law Firm A
6   communicating with Law Firm B re this."  And that's what it
7   would say.  And that would not be much different.  All that
8   we're talking about, really, in some ways, is not having to go
9   through that effort, which is a time-consuming and expensive
10  effort, to go through each document and create that legend;
11  rather, to put them and group them together, so you can look at
12  that as the capture, and deal with them that way.
13    You know, another process to do it, Your Honor, would be
14  to allow those categories to go, and to provide samples, or
15  something like that, within them, to the Court.
16    THE COURT:  How many documents are in the three
17  disputed categories?
18    MR. PARRIS:  I don't know the answer to that, Your
19  Honor.
20    THE COURT:  All right.  I'm going to hear from the
21  plaintiffs.
22    MR. PARRIS:  Thank you.
23    THE COURT:  Ms. Dermody, specifically, two subjects.
24  One, you knew from January -- I forgot the rest -- January,
25  February, April, July, and you led Mr. Parris down the rosy

1  path of thinking, apparently, you acquiesced. And I'd like to

2  hear your response to that argument. And then secondly, where

3  are we on the privilege log question?

4      MS. DERMODY: Yes, Your Honor.

5      With respect to the first question, we just disagree with

6  the recitation of the history about the meet-and-confer around

7  the date of production. We were concerned about getting a

8  limited amount of discovery, because we had dispute about the

9  discovery start date. And we brought that issue before the

10  Court on June 1. So whatever was said to us was Microsoft's

11  position prior to June 1, we clearly rejected that, because it

12  was a live dispute. The Court issued its order on June 6,

13  agreeing that there's a liability period and a discovery

14  period, and the two things are separate. And for purposes of

15  discovering the case, the discovery period goes back to

16  January 1, 2010.

17      We would agree with Microsoft's characterization that we

18  missed the cover letter to the data, in July, that told us that

19  they were not going to give us all the discovery back to 2010.

20  We missed that, because we weren't looking for that particular

21  clarification in their production, because we had a court order

22  telling us what the start date was; so it slipped by. But

23  within a few weeks, on the next data production, we did notice

24  the cover letter. And we did raise it immediately with

25  Microsoft to say, "Hey, is there a misunderstanding here?"

1  Because we thought possibly someone had just stated something

2  that was incorrect.  Right away, we were told by Microsoft, in

3  a meet-and-confer, that was the way it was going to be, there

4  would be no negotiation, it was already decided.  And we

5  started issuing a series of letters and calls to Microsoft to

6  say, "No, we don't agree to that.  There is a court order.  We

7  have a dispute."  And finally, about ten days after we started

8  raising these concerns, we, together, called the Court to bring

9  it to the Court's attention and find out what would be the best

10 way to present the issue.  So we don't think that there is a

11 credible waiver argument.

12     We do agree that we missed, frankly, a cover letter in

13 July, but I think we had a good-faith reason to not be looking

14 to confirm Microsoft wasn't following a court order.  That

15 seemed not realistic for us to be constantly ferreting that

16 out.  But when we did become aware of it, we immediately raised

17 the issue, and we immediately brought it to the Court's

18 attention, when we realized we weren't going to work it out

19 informally.

20     That's issue number one, Your Honor.  I don't know if you

21 have more questions about that.

22         THE COURT:  Oh, I have many, but go ahead.  Go on to

23 two.

24         MS. DERMODY:  Okay.  Thank you, Your Honor.

25     With respect to the privilege logs -- so there are a

1  couple of points.  We think that in our joint statement the

2  plaintiffs have attempted to come to a compromise position that

3  would allow for actually some categorical logging of certain

4  types of information that is not providing facts or data

5  analysis or other material information that we think is

6  discoverable, and that all of these studies, and what have you,

7  are really part of the business function of Microsoft.

8      So if they have communications that they claim are

9  privileged here, that don't fall within these compromise offers

10  of categorical log, that those should be individually logged,

11  because we do not credit the claim of privilege.  We think it

12  should be supported in a proper log, under Rule 26(b)(5).  We

13  think that this Court has actually weighed in, in other cases,

14  about what an appropriate log would look like individually, and

15  that that's reasonable for us to seek here.

16      And the Court has asked a question that we have asked,

17  which is, how many documents are we actually talking about?

18  What is the burden here?  We have no basis to believe that

19  there are just so many documents, just huge number of documents

20  have to be logged, that there is something about this project

21  that's different than other discovery projects where logging

22  happens.  And because of that, we think that we've made what we

23  hope is a pretty good case here, that either the documents be

24  produced, or they be individually logged, unless they fall into

25  a very small category where there could be no, in our view,

1    valuable information that is not otherwise privileged.

2        If Your Honor has more questions about any of the specific

3    studies, I'd be happy to also address those.

4        I think the one thing I do want to say about the pay

5    study, Microsoft has offered this proposal that there was a

6    period of time before they decided to release the pay study to

7    the public, and that before they decided to release it to the

8    public, that that should be sheltered from production.  We

9    disagree with that line drawing.  We don't think that the

10   decision to make the study public is what changed it from a

11   business project -- from a legal project.

12       We think that -- there was a statement that we put in the

13   record, actually, in Docket 106.  It's an earlier brief.  And

14   it's reciting, on Page 5, a statement by the CEO, that was

15   released in connection with the pay study itself, where the CEO

16   said, a year and a half before the study was released, that

17   this particular search for equal pay was one of the company

18   priorities.  That, to me, suggests that this was centrally a

19   business decision to study the equal pay.  And notwithstanding

20   that they might have outsourced some of this to outside counsel

21   doesn't change that business purpose into something different.

22   So we would just ask that the Court not adopt that line of

23   making the study public, but rather to look at the purpose of

24   the study, when the CEO issued a statement the day the study

25   was released.

1          THE COURT:  All right.  The rulings of the Court are

2     going to be as follows.

3          I began this hearing by reading the issue which you

4     presented to the Court.  And I must say, my ability to see the

5     qualification that arises at the very end of this raises

6     questions about -- that my seventh grade English teacher would

7     love to diagram.

8          But I believe that the answer to your issue is, yes,

9     Microsoft is required to provide the data.  And so to clarify

10    that so that we don't have any further communications, I am

11    granting the -- or I'm siding with the plaintiff in regards to

12    that issue.  And by the way, I appreciate you having reached a

13    working solution to the Microsoft's technical employee

14    definition.

15         In regards to the question of the privilege log, I warned

16    you the last time you were here that I was going to adopt

17    something close to the baseball arbitration approach.  And I'm

18    going to accept the plaintiff's proposed solution.  I note that

19    plaintiffs make several nuanced concessions regarding the

20    categorical log, and those should be adopted and incorporated

21    into Microsoft's obligation to peruse an individualized

22    privilege log of the three disputed categories of information.

23         That rules on the issue that you brought before me.  I,

24    however, am not going to stop at that point.

25         I'm going to change -- or I'm going to suspend the local

Moussouris v. Microsoft, 9/7/16

1    rule in regards to contacting the Court by phone or by letter.

2    If you want me to rule on something, you are to provide the

3    Court with a joint letter -- joint means signed by both of

4    you -- setting forth the issue which you want the Court to take

5    up.  Having looked at that issue, we will then advise you if we

6    think we can do it orally, or if we need to have a formal

7    briefing.  I do that because, one, you're -- I won't say

8    wasting -- but you're expending a great deal of the Court's

9    time, and the Court doesn't have that to expend, and secondly,

10   the apparent inability for us to communicate with each other in

11   a common language.

12       I am sincere in my concern over the frequency with which

13   Microsoft has placed this Court in having to go back and remedy

14   situations which appear to me to be the result of

15   overly-aggressive lawyering.  I found, in a prior Microsoft

16   case, myself in a similar situation.  And I've thought about

17   the tools that are available to me to deal with that.  I

18   rarely, if ever, fine or sanction people.  But when I examined

19   the question of sanctions, I found that almost always they were

20   financial, and my $5,000 or $10,000 sanction against a company

21   that at that point had, I believe it was, $42 billion in the

22   bank didn't seem to be very serious.

23       Therefore, I looked at the next level up, which has to do

24   with sanctions such as striking portions of answers or

25   defenses.  And the case law on that is quite clear that it is

1  universally greeted by, "Oh, Judge, don't punish my client for

2  bad lawyering on my part."

3      I've found a very effective way to deal with that, which I

4  am going to now order to take place in this case.  That is that

5  any communication to the Court be signed by the chief legal

6  officer of Microsoft, who I think is still Brad Smith -- I'm

7  not sure about that.  I know he now has other

8  responsibilities -- by the director of litigation for

9  Microsoft, and I'm not sure if that position even exists,

10  because the website doesn't help me, but there seems to be a

11  director of human resources litigation.  One of those

12  individuals will, henceforth, sign all communications to the

13  Court, in addition to the lawyers.  It doesn't have to be an

14  in-hand signature.  It simply says that they read it, and they

15  agree to it.  And the meaning of that will be that this is a

16  position -- the position communicated in that communication is

17  the position adopted by Microsoft, and may be considered as

18  authorized to have been made to the Court.  That should put, to

19  borrow one of my golfing friend's favorite term, that Microsoft

20  has some "skin in this game."

21      Counsel, is there anything else the Court can do for you

22  today?

23          MR. PARRIS:  Your Honor, if I could -- I apologize,

24  but I want to make sure I'm absolutely understanding this.

25      So you indicated there are three individuals, the chief

1   legal officer, the director of litigation, the human resource
2   director.  One of those three needs to sign off on each
3   communication; is that right?
4           THE COURT:  That's right.
5           MS. DERMODY:  And, Your Honor, a clarification about
6   the submission of the joint letter, I assume that's ECF filing,
7   not sent to your chambers in a separate way?
8           THE COURT:  Whatever gets it here first.
9           MS. DERMODY:  Okay.  Yes, Your Honor.  Thank you.
10          THE COURT:  If that's by messenger -- if things go
11  into ECF, we get a screen that shows all ECF files, but it's
12  the next day, and many times there are 20-plus entries on
13  there.  It may be more expedient to you to take that joint
14  letter and simply have it delivered to chambers.  And if you do
15  that, you likely will have a better chance of getting it to us,
16  because we don't go through the ECF filings every day.
17          MS. DERMODY:  Yes, Your Honor.
18          THE COURT:  Ms. Condon, do you have a suggestion on
19  where it should go?
20      All right.  I've just been told that we are so diligent
21  that filing on ECF is better.
22          MS. DERMODY:  Thank you, Your Honor.
23          THE COURT:  All right.  Anything else?
24          MR. PARRIS:  No, Your Honor.
25          THE COURT:  All right.  Counsel, thank you, and we

1    are in recess.

2                      (Adjourned)

3

4              (End of requested transcript)

5                    *   *   *

6      I certify that the foregoing is a correct transcript from

7    the record of proceedings in the above matter.

8

9    Date:  September 12, 2016          /s/ Andrea Ramirez

10                                  _____

11                                 Signature of Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25