1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9         WESTERN DISTRICT OF WASHINGTON

10              SEATTLE DIVISION

11  KATHERINE MOUSSOURIS, HOLLY
    MUENCHOW, and DANA PIERMARINI,
12  on behalf of themselves and a class of those       Case No. 2:15-cv-01483-JLR
    similarly situated,
13                                                **MICROSOFT'S OPPOSITION TO**
                  Plaintiffs,                     **PLAINTIFFS' MOTION FOR CLASS**
14                                                **CERTIFICATION**
        v.
15                                                **NOTE ON MOTION CALENDAR:**
    MICROSOFT CORPORATION,                        **FEBRUARY 9, 2018**
16
                  Defendant.                      **ORAL ARGUMENT REQUESTED**
17
18                                                **PUBLIC**
19
20
21
22
23
24
25
26
27

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-CV-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 4

ARGUMENT .............................................................................................................. 15

    I.    Plaintiffs Have Not Established Commonality Under Rule 23(a)(2) .............. 15

        A.    Plaintiffs' Disparate Impact Claim Does Not Satisfy
Commonality .................................................................................... 15

                1.    Plaintiffs' disparate impact claim is predicated on
discretion ............................................................................. 17

                2.    Plaintiffs' limited authority shows why commonality
does not exist ....................................................................... 22

                3.    Plaintiffs' statistics show why a class should not be
certified ................................................................................ 23

                        i.    Dr. Farber's aggregate statistics are legally
irrelevant ................................................................... 23

                        ii.    Plaintiffs' own data shows the class cannot be
certified ..................................................................... 24

                4.    Plaintiffs' declarations are insufficient to show
commonality .......................................................................... 28

        B.    Plaintiffs' Disparate Treatment Claim Does Not Satisfy
Commonality .................................................................................... 29

                1.    Plaintiffs provide no significant proof that discrimination
is the usual practice at Microsoft ......................................... 29

                2.    Plaintiffs provide no significant proof that Microsoft
sponsored or directed intentional discrimination ................... 33

    II.    Plaintiffs Do Not Meet The Requirements of Rule 23(a)(3)-(4) ..................... 37

        A.    Plaintiffs Have Not Demonstrated Typicality ..................................... 37

        B.    Plaintiffs Cannot Demonstrate Adequacy ......................................... 39

    III.    Plaintiffs Do Not Meet The Requirements Of Rule 23(b)(3) .......................... 42

        A.    Plaintiffs Have Not Shown Predominance ......................................... 42

        B.    Plaintiffs Have Not Shown Superiority ............................................. 46

    IV.    Plaintiffs Do Not Meet The Requirements Of Rule 23(b)(2) .......................... 47

        A.    Plaintiffs' Proposed Rule 23(b)(2) Class Is Not Cohesive ................... 47

        B.    Plaintiffs' Proposed Injunction Is Too General To Satisfy Rule
65(d) And Would Address A Now Defunct Process ............................ 48

        C.    Injunctive Relief Is Inappropriate For The Class As A Whole ............ 49

    V.    Plaintiffs Have Not Satisfied The Requirements Of Rule 23(c)(4) ................. 50

CONCLUSION ........................................................................................................... 50

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-CV-01483-JLR

- ii -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
   133 S. Ct. 2304 (2013) .....................................................................................................15

*Amaro v. Gerawan Farming, Inc.*,
   2016 WL 3924400 (E.D. Cal. May 20, 2016) .....................................................................49

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ...........................................................................................39, 42, 47

*Am. Title Ins. Co. v. Lacelaw Corp.*,
   861 F.2d 224 (9th Cir. 1988) ............................................................................................14

*Appleton v. Deloitte & Touche L.L.P.*,
   168 F.R.D. 221 (M.D. Tenn. 1996) ...................................................................................40

*Arabian v. Sony Elecs., Inc.*,
   2007 WL 627977 (S.D. Cal. Feb. 22, 2007) ......................................................................49

*Arnett v. Am. Nat'l Red Cross*,
   78 F.R.D. 73 (D.D.C. 1978) ..............................................................................................40

*Bacon v. Honda of Am. Mfg., Inc.*,
   205 F.R.D. 466 (S.D. Ohio 2001) .....................................................................................40

*Barraza v. C. R. Bard Inc.*,
   2017 WL 3976720 (D. Ariz. Sept. 11, 2017) .....................................................................47

*Barrett v. Option One Mortg. Corp.*,
   2012 WL 4076465 (D. Mass. Sept. 18, 2012).....................................................................24

*Beck v. Boeing Co.*,
   203 F.R.D. 459 (W.D. Wash. 2001)...................................................................................46

*Bell v. Lockheed Martin Corp.*,
   2011 WL 6256978 (D.N.J. Dec. 14, 2011) ........................................................................24

*Bennett v. Nucor Corp.*,
   656 F.3d 802 (8th Cir. 2011)..............................................................................................24

*Bolden v. Walsh Constr. Co.*,
   688 F.3d 893 (7th Cir. 2012)..............................................................................................24

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-CV-01483-JLR

- iii -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

*Brown v. Nucor Corp.*,
  785 F.3d 895 (4th Cir. 2015) ................................................................30

*Bushbeck v. Chicago Title Ins. Co.*,
  2011 WL 13100725 (W.D. Wash. Aug. 15, 2011) ................................37

*C.O. v. Coleman Co.*,
  2008 WL 820066 (W.D. Wash. Mar. 25, 2008) ....................................32

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ..................................................................50

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .........................................................................44, 45

*Diaz v. Ashcroft*,
  301 F. Supp. 2d 112 (D.P.R. 2004) .......................................................29

*Donaldson v. Microsoft Corp.*,
  205 F.R.D. 558 (W.D. Wash. 2001) ...........................................3, 39, 41

*Dukes v. Wal-Mart Stores, Inc.*,
  964 F. Supp. 2d 1115 (N.D. Cal. 2013) ..................................... *passim*

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  2006 WL 1530166 (N.D. Cal. June 5, 2006) .........................................42

*E. Texas Motor Freight Sys. Inc. v. Rodriguez*,
  431 U.S. 395 (1977) ..............................................................................37

*Easterling v. Conn. Dep't of Corr.*,
  278 F.R.D. 41 (D. Conn. 2011) .............................................................45

*Ellis v. Costco Wholesale Corp.*,
  285 F.R.D. 492 (N.D. Cal. 2012) ............................................... *passim*

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ..................................................... *passim*

*Evers v. Alliant Techsystems, Inc.*,
  241 F.3d 948 (8th Cir. 2001) ................................................................20

*Fiandaca v. Cunningham*,
  827 F.2d 825 (1st Cir. 1987) .................................................................41

*Fosmire v. Progressive Max Ins. Co.*,
  277 F.R.D. 625 (W.D. Wash. 2011) ..........................................38, 47, 48

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-CV-01483-JLR

- iv -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

*Gen. Tel. Co. of the Nw., Inc. v. EEOC,*
    446 U.S. 318 (1980) ...........................................................................42

*Gen. Tel. Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982) ....................................................................15, 29

*Gonzales v. Comcast Corp.,*
    2012 WL 10621 (E.D. Cal. Jan. 3, 2012)..........................................49

*Gonzalez v. Brady,*
    136 F.R.D. 329 (D.D.C. 1991) ..........................................................40

*Grant v. Morgan Guar. Tr. Co. of N.Y.,*
    548 F. Supp. 1189 (S.D.N.Y. 1982) ..................................................40

*Graves v. State of Colo.,*
    31 Fed. R. Serv. 2d 1480 (D. Colo. 1980).........................................40

*Greenfield v. Am. W. Airlines, Inc.,*
    2005 WL 756602 (N.D. Cal. Mar. 31, 2005) ....................................20

*Grosz v. Boeing Co.,*
    2003 WL 22971025 (C.D. Cal. Nov. 7, 2003) ..................................43

*Gulino v. Bd. of Educ. of the City Sch. Dist,*
    2013 WL 4647190 (S.D.N.Y. Aug. 29, 2013) ..................................45

*Haley v. Medtronic, Inc.,*
    169 F.R.D. 643 (C.D. Cal. 1996) ......................................................46

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992)........................................................37, 38

*Hartman v. United Bank Card Inc.,*
    2012 WL 4758052 (W.D. Wash. Oct. 4, 2012)............................38, 43

*Herskowitz v. Apple, Inc.,*
    301 F.R.D. 460 (N.D. Cal. 2014) .................................................47, 48

*Hoffman v. Securitas Sec. Servs.,*
    2008 WL 5054684 (D. Idaho Aug. 27, 2008) ...................................31

*Hurley v. U.S. Healthworks Med. Grp. of Wash., P.S.,*
    2006 WL 1788994 (E.D. Wash. June 27, 2006) ...............................31

*Intellicheck Mobilisa, Inc. v. Wizz Sys. L.L.C.,*
    173 F. Supp. 3d 1085 (W.D. Wash. 2016)........................................50

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-CV-01483-JLR

\- v -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

*Jones v. Nat'l Council of Young Men's Christian Ass'ns*,
    34 F. Supp. 3d 896 (N.D. Ill. 2014) ...................................................................18

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011)..........................................................................48

*Kayes v. Pac. Lumber Co.*,
    51 F.3d 1449 (9th Cir. 1995)..........................................................................41

*Khadera v. ABM Indus. Inc.*,
    701 F. Supp. 2d 1190 (W.D. Wash. 2010) .........................................................31

*Kibler v. G.M.C.*,
    1996 WL 767417 (W.D. Wash. July 9, 1996)....................................................34

*King v. Enter. Rent-A-Car Co.*,
    231 F.R.D. 255 (E.D. Mich. 2004)...............................................................40, 41

*Kohen v. Pac. Inv. Mgmt. Co., LLC*,
    571 F.3d 672 (7th Cir. 2009) ..........................................................................25

*Lambert v. Nutraceutical Corp.*,
    870 F.3d 1170 (9th Cir. 2017) ........................................................................45

*Lienhart v. Dryvit Sys., Inc.*,
    255 F.3d 138 (4th Cir. 2001)..........................................................................45

*Lucas v. Breg, Inc.*,
    212 F. Supp. 3d 950 (S.D. Cal. 2016) ..............................................................50

*MAI Sys. Corp. v. Peak Computer, Inc.*,
    991 F.2d 511 (9th Cir. 1993)..........................................................................49

*Mamo v. BP P.L.C.*,
    2006 WL 269056 (E.D. Va. Jan. 30, 2006)........................................................50

*Martinez v. Brown*,
    2011 WL 1130458 (S.D. Cal. Mar. 25, 2011)....................................................48

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012)..........................................................................25

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    672 F.3d 482 (7th Cir. 2012)..........................................................................22

*Millenkamp v. Davisco Foods Int'l, Inc.*,
    562 F.3d 971 (9th Cir. 2009)..........................................................................32

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- vi -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

*Moore v. Apple Inc.*,
    309 F.R.D. 532 (N.D. Cal. 2015) ...................................................................................25

*In re N.D.Cal. Dalkon Shield IUD Prods. Liability Litig.*,
    693 F.2d 847 (9th Cir. 1982)........................................................................................50

*Nguyen v. Super. Ct.*,
    2014 WL 4467850 (N.D. Cal. Sept. 9, 2014).............................................................23

*O'Connor v. Boeing N. Am., Inc.*,
    197 F.R.D. 404 (C.D. Cal. 2000) ................................................................................37

*Oliver v. Pac. Nw. Bell Tel. Co.*,
    106 Wash. 2d 675 (1986) ............................................................................................15

*Oseman-Dean v. Illinois State Police*,
    2012 WL 1280226 (N.D. Ill. Apr. 12, 2012) ..............................................................31

*Parra v. Bashas', Inc.*,
    291 F.R.D. 360 (D. Ariz. 2013) ..................................................................................22

*Puffer v. Allstate Ins. Co.*,
    255 F.R.D. 450 (N.D. Ill. 2009) ...........................................................................31, 43

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015)........................................................................................44

*Randall v. Rolls-Royce Corp.*,
    637 F.3d 818 (7th Cir. 2011)........................................................................................40

*Rhodes v. Cracker Barrel Old Country Store, Inc.*,
    213 F.R.D. 619 (N.D. Ga. 2003) .................................................................................43

*Richards v. City of Seattle*,
    2008 WL 2570668 (W.D. Wash. June 26, 2008).......................................................32

*Rix v. Lockheed Martin Corp.*,
    2011 WL 890744 (S.D. Cal. Mar. 14, 2011)...............................................................31

*Rollins v. Traylor Bros.*,
    2016 WL 258523 (W.D. Wash. Jan. 21, 2016)......................................................30, 31

*Rollins v. Traylor Bros., Inc.*,
    2016 WL 5942943 (W.D. Wash. May 3, 2016).....................................................45, 46

*Ross v. Lockheed Martin Corp.*,
    2017 WL 3242237 (D.D.C. July 28, 2017)......................................................21, 22, 25

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-CV-01483-JLR

- vii -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

*Schmidt v. Lessard,*
    414 U.S. 473 (1974) ...........................................................................48

*Schulken v. Wash. Mut. Bank,*
    2012 WL 28099 (N.D. Cal. Jan. 5, 2012) ...................................49

*Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso,*
    543 F.3d 597 (10th Cir. 2008) ..........................................................48

*Sprague v. General Motors Corp.,*
    133 F.3d 388 (6th Cir. 1998) ...........................................................37

*Stiller v. Costco Wholesale Corp.,*
    673 F. App'x 783 (9th Cir. 2017) .....................................................19

*Sullivan v. Dollar Tree Stores, Inc.,*
    623 F.3d 770 (9th Cir. 2010) ...........................................................34

*Sweet v. Pfizer,*
    232 F.R.D. 360 (C.D. Cal. 2005) .....................................................47

*Teamsters v. United States,*
    431 U.S. 324 (1977) ...................................................................30, 42

*Troy v. Kehe Food Distribs., Inc.,*
    276 F.R.D. 642 (W.D. Wash. 2011) ................................................18

*Tyson Foods, Inc. v. Bouaphakeo,*
    136 S. Ct. 1036 (2016) ..............................................................25, 42

*United States v. Bortnovsky,*
    879 F.2d 30 (2d Cir. 1989) ..............................................................32

*United States v. Microsoft Corp.,*
    154 F. Supp. 3d 1134 (W.D. Wash. 2015) ......................................50

*Valerino v. Holder,*
    283 F.R.D. 302 (E.D. Va. 2012) ................................................18, 24

*Valentino v. Carter-Wallace, Inc.,*
    97 F. 3d 1227 (9th Cir. 1996) ..........................................................50

*Vaquero v. Ashley Furniture Indus., Inc.,*
    824 F.3d 1150 (9th Cir. 2016) .........................................................44

*Vasquez v. Cty. of L.A.,*
    349 F.3d 634 (9th Cir. 2003) ...........................................................38

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- viii -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

*Vuyanich v. Republic Nat'l Bank of Dallas*,
  82 F.R.D. 420 (N.D. Tex. 1979) ...................................................................41

*Wagner v. Taylor*,
  836 F.2d 578 (D.C. Cir. 1987) .....................................................................40

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................... *passim*

*Walsh v. Nevada Dep't of Human Res.*,
  471 F.3d 1033 (9th Cir. 2006) .....................................................................49

*Young v. James Green Mgmt., Inc.*,
  327 F.3d 616 (7th Cir. 2003)........................................................................32

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir.) ...............................................................................46

*Zottola v. City of Oakland*,
  32 F. App'x 307 (9th Cir. 2002).................................................................34

*Zuniga v. Bernalillo Cty.*,
  319 F.R.D. 640 (D.N.M. 2016) ...................................................................19

**Statutes**

Title VII, 42 U.S.C. §§ 2000e *et seq.* .............................................3, 15, 16, 39

Washington Law Against Discrimination, RCW §§ 49.60.010, *et seq.*...................16

**Rules**

Fed. R. Civ. P. 23 ...........................................................2, 15, 25, 42, 43, 44

Fed. R. Civ. P. 23(a)......................................................................................15

Fed. R. Civ. P. 23(a)(2).................................................................................16

Fed. R. Civ. P. 23(a)(3).................................................................................37

Fed. R. Civ. P. 23(a)(4).................................................................................39

Fed. R. Civ. P. 23(b)......................................................................................15

Fed. R. Civ. P. 23(b)(2)........................................................................ *passim*

Fed. R. Civ. P. 23(b)(3)........................................................................ *passim*

Fed. R. Civ. P. 23(c)(4).................................................................................50

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-CV-01483-JLR

- ix -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

Fed. R. Civ. P. 23(g)..............................................................................................41

Fed. R. Civ. P. 65(d)............................................................................................48

**Other Authorities**

https://blogs.microsoft.com/blog/2017/11/14/strengthening-culture-inclusion/.......................10

https://news.microsoft.com/facts-about-microsoft/.....................................................4

https://support.microsoft.com/en-us/allproducts .......................................................4

https://www.microsoft.com/en-
us/diversity/programs/digigirlz/digigirlzday.aspx ............................................................11

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-CV-01483-JLR

- X -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

# INTRODUCTION

In over twenty years of committed diversity and inclusion efforts, Microsoft has learned that diversity is not a finite goal, but a process that requires constant self-assessment and re-commitment.  Microsoft is keenly aware of the gender imbalance in the tech industry and is deeply invested in improving it.  To that end, Microsoft has allocated more than $55 million per year to innovative diversity and inclusion programs, implemented mandatory company-wide unconscious bias training, and created a robust internal investigation process to address employee concerns.  These efforts exceed legal requirements and reflect Microsoft's commitment to maintaining a diverse and inclusive workplace.  One can debate how best to address this important societal issue—but the class allegations here are not the right vehicle for that debate.

Plaintiffs' claims are simply not the stuff of which class actions are made.  They seek to certify a class of extraordinary breadth: over 8,600 women scattered across offices in dozens of subdivisions throughout Microsoft's multiple business units.  Although they claim Microsoft discriminated against this entire class, they do not challenge an identifiable discriminatory practice.  Abandoning the "stack ranking" theory they put forward to salvage their amended complaint, Plaintiffs now concede there is no disparity in performance ratings between men and women.  Nor do they challenge the animus of a small group of leaders.  Instead, they attack "calibration" and "people discussions," two different employee review processes involving input from a wide range of people, including peers, supervisors, and higher-level managers.  These reviewers exercise discretion and apply their individual judgments to Microsoft's general performance evaluation framework in making individual pay and promotion decisions.  And although Microsoft set non-discriminatory criteria for these otherwise discretionary review processes, Plaintiffs do not identify a common mode of exercising discretion (as required to certify a class); rather, Plaintiffs seek certification for precisely the opposite reason: "lack of standardization."  Mot. 6.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 1 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

1   The Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), however,

2   made clear that a class cannot be certified where its proposed members have been subjected to

3   varied conduct resulting in dissimilar outcomes based on the decisions of a "kaleidoscope of

4   supervisors (male and female)." *Id.* 359.  As in *Dukes*, this class cannot satisfy Rule 23's

5   stringent requirements, for the following reasons:

6   ***Commonality: Disparate Impact.***  To certify a disparate impact class, Plaintiffs must

7   show there is "a common answer to the crucial question *why was I disfavored*." *Dukes*, 564 U.S.

8   at 352.  Here, the answer to the dispositive question will vary by employee, depending on the

9   managers and others who assessed her.  "[D]emonstrating the invalidity of one manager's use of

10  discretion will do nothing to demonstrate the invalidity of another's." *Id.* 355-56.  Neither

11  statistics nor social science evidence solves that problem.  Plaintiffs' flawed statistical model—

12  even if credited—exposes the sort of isolated disparities the Ninth Circuit has found inadequate

13  to certify a class.  Further, pointing to numbers showing gender disparities and attributing them

14  to calibration or people discussions does not show a common answer to the causation question.

15  As this Court recognized, Plaintiffs must show a nexus *between* the two, i.e., a common

16  explanation for how the challenged processes cause thousands of managers consistently to arrive

17  at allegedly biased pay and promotion decisions.  Plaintiffs cannot show such a classwide nexus.

18  ***Commonality: Disparate Treatment.***  Certification of a disparate treatment claim

19  requires even more.  Plaintiffs must show *intentional* discrimination—specifically, they must

20  provide "significant proof" that corporate leaders "operated under a general policy of

21  discrimination." *Id.* 353.  Plaintiffs' evidence falls far short.  In any organization of over

22  115,000 individuals, some employees inevitably fail to live up to standards.  Those failures are

23  unacceptable, which is why Microsoft has a team of full-time investigators to consider

24  allegations of policy violations and mandates diversity training for all employees.  Plaintiffs'

25  hearsay anecdotes (most from non-class members), even if true, do not qualify as "significant

26  proof" of "a general policy of discrimination." *Id.*

27  ***Typicality and Adequacy.***  Katie Moussouris's and Holly Muenchow's individual claims

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 2 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

will turn on their unique circumstances, as there are non-discriminatory explanations for their pay and promotion experiences. Their claims and the absent class members' claims will not rise or fall together—the hallmark of typicality. Moreover, Moussouris actively participated as a manager in the reviews Plaintiffs now attack, as did thousands of other class members who also served as managers. A class cannot consist of both supervisors who participated in an allegedly discriminatory process and those they evaluated, as that poses an irreconcilable intra-class conflict and defeats adequacy. *See Donaldson v. Microsoft Corp.*, 205 F.R.D. 558, 568 (W.D. Wash. 2001).

 ***Predominance and Superiority.*** To certify a Rule 23(b)(3) damages class, Plaintiffs must prove that common issues will predominate at trial—a more demanding standard than commonality. Here, *individual* issues would dominate, requiring employee-by-employee decisions on liability (was the class member subjected to discrimination?), causation (did the conduct or other, business-related factor(s) affect her pay or promotions?), and damages (did she lose money due to the alleged discrimination and, if so, how much?). Plaintiffs' trial plan *admits* the need for thousands of mini-trials to resolve these issues. Mot. 43. Because they cannot be "resolve[d] ... in one stroke," *Dukes*, 564 U.S. at 350, their presence defeats predominance. Given these complexities and varying, individual facts, a class action is not a superior method of proceeding, especially since allegedly aggrieved employees have individual remedies under Title VII, including the right to recover attorneys' fees.

 ***Injunctive Relief.*** A class seeking injunctive relief under Rule 23(b)(2) must be cohesive, i.e., it must seek a single, indivisible remedy addressing a uniform practice. But Plaintiffs' claims turn on the allegation that the proposed class was not subjected to any one practice; instead, Plaintiffs condemn managers' pay and promotion decisions on the theory that they varied significantly from team to team and manager to manager. For this reason, Plaintiffs ask the Court to certify a class to pursue an injunction at a meaningless level of generality: preventing any "meetings" where "managers compare employees within a peer group." Mot. 5. Courts properly deny class certification in these circumstances. This Court should do the same.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR
  - 3 -
  ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

**BACKGROUND**

Microsoft employs over 115,000 employees worldwide.  Domestically, employees are spread across dozens of offices and multiple business units—each with subdivisions. https://news.microsoft.com/facts-about-microsoft/.  Plaintiffs seek to certify a class of women in Stock Levels 59-67 in the Engineering and/or I/T Operations Professions since September 16, 2012—a class that sweeps across Microsoft's U.S. locations, business units, and subdivisions.[1]

***Microsoft's Discretionary Pay and Promotions Processes Reflect Its Evolving Corporate Structure And Varied Workforce***

Microsoft's discretionary pay and promotion processes reflect the diverse technological spheres in which it operates.  As one of the world's largest technology companies, Microsoft produces hundreds of products and services, including those for Windows, Office (O365, PowerPoint), Email/Communications (Outlook, Skype, Yammer), Cloud & Online Services (Azure, OneDrive), Hardware & Multimedia (Surface, Xbox, HoloLens), and Internet (Internet Explorer, Bing).  *See* https://support.microsoft.com/en-us/allproducts.  To bring these technologies to market, Microsoft organizes itself into business units, which are subdivided into groups, divisions, and distinct, autonomous teams.  Whittinghill Dec. ¶21, Ex. B.  These groupings are in a constant state of flux, as the company develops new products and services.[2]

Each business unit employs an array of personnel, whose Standard Titles range from data scientists and software engineers to game designers and interface developers to artists and program managers.  *Id.*  But positions with the same Standard Title often involve widely varied work—just as the position "doctor" covers many different practice areas and specializations.[3]

---

[1] As Plaintiffs note, Microsoft's job taxonomy classifies employees first into Professions, then into Disciplines, and then into Standard Titles. Mot. 3-4.  Plaintiffs have defined the proposed class according to Profession.

[2] For example, in 2013, Microsoft had six primary business units, including Server & Tools.  MSFT65921, Whittinghill Dec. ¶24.  Server & Tools included four groups.  MSFT65921.  That group had 12 teams, which housed numerous subteams.  Plaintiff Muenchow was a developer on one of those 12 teams, "Test – VS Platform Tools." MSFT22037.  By 2016, however, Microsoft had ten business units, which no longer included Server & Tools. MSFT10976; Whittinghill Dec. ¶25; *see id.* Ex. B.  At that time, Muenchow worked in the Customer Engagement subteam of the Visual Studio and .NET team within the Cloud and Enterprise Engineering group.  MSFT3334.

[3] Two job postings for a Software Engineer II position illustrate the variations within Standard Titles.  The Azure Internet of Things team seeks engineers with "[e]xperience developing applications hosted on top of Azure, AWS or other similar Cloud Platforms" and values "[s]olid knowledge of data structures and algorithms."  Whittinghill Dec.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 4 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

1  Plaintiffs' proposed class covers over 8,300 unique positions. *Id.* ¶33, Ex. B.

2  Given the specialized nature of its employees' work, Microsoft recognizes that individual

3  managers are best suited to assess employees' performance based on their respective team's

4  unique objectives. *Id.* ¶42. Thus, while adopting systems and providing training for assessing

5  employee performance in a non-discriminatory manner, Microsoft necessarily delegates

6  discretion to thousands of managers to evaluate and make individual pay and promotion

7  decisions. *Id.* As detailed below, this policy of delegated discretion has taken two different

8  forms during the class period. For both forms, Plaintiffs allege the systems permitted managers

9  to exercise their discretion in a way that violates company policies. That allegedly unbridled

10 discretion forms the core of their case.

11 ***Pay And Promotion Decisions From 2011 To 2013***

12 From 2011 to 2013, Microsoft made pay decisions using a performance evaluation

13 approach focused on employee contributions relative to peers. The annual cycle had three

14 phases: a commitment planning phase to set objectives for the year; a mid-year check-in on

15 development plans and commitments; and an assessment phase at the end of the fiscal year.

16 MSFT2267.[4] Plaintiffs allege no shortcomings in the first two phases. Instead, they challenge

17 one aspect of the third phase: "calibration meetings" in which peer employee performance was

18 compared and ratings addressed. Mot. 5.

19 Before calibration meetings, employees summarized their own performance and

20 identified colleagues to provide input. MSFT1595, 2267. Their direct managers would then add

21 feedback from other potential reviewers familiar with their work, review input, recommend a

22 performance rating, and determine what to include in the review. MSFT1595. Managers'

23 recommended ratings focused on: results over the year (the "what"), how the employee delivered

24

---

25 ¶40. Microsoft's Xbox team is also looking for a Software Engineer II—but although the position has the same
26 label, *that* candidate must have "5+ years in professional development experience (C++, C#), XML, JSON,
   multithreading, and OOP," as well as a "[e]xcellent design and coding skills." *Id.* ¶41; *see also* Jantz Dec. ¶¶5-10.

27 [4] All documents bates stamped as "MSFT_MOUSSOURIS" are referenced in this brief through the use of "MSFT"
   followed by the page number. All bates-stamped documents and transcripts are attached to the Parris Declaration.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    - 5 -
CASE NO. 2:15-cv-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

those results (the "how"), and the employee's proven capability over time.  MSFT881, 2278;

Coleman Tr. 100:20-101:3; Helf Dec. ¶4; Mao Dec. ¶5.

Microsoft provided general guidance regarding evaluation of the "what" and "how" of

employee performance.  MSFT2278-79.  Beyond that, managers had discretion to evaluate

performance based on the factors relevant to their team's goals.  Helf Dec. ¶¶8-9 (managers have

significant discretion to assess performance); Shepherd Dec. ¶5 (managerial discretion to

implement HR processes); Wilson Dec. ¶¶9, 11-13.  This sometimes resulted in teams adopting

their own unique approaches.  Helf Dec. ¶¶16-19.  Managers ultimately recommended a

performance rating for each employee, ranging from a high of "1" to a low of "5."  MSFT2279.

Ratings followed an approximate distribution—set by budget and varying by business unit.  *Id.*

Once the manager completed the initial evaluation and rating recommendation, an

employee's assessment moved into the only phase Plaintiffs challenge: "Calibration Meetings,"

i.e., the "process in which managers compare employees within peer groups."  Mot. 5.  This so-

called "Calibration Process" is the *one* "specific employment practice" Plaintiffs claim causes a

disparate impact.  *Id.* 1.  Despite its centrality to their claim, Plaintiffs devote just one paragraph

to describing the process.  *Id.* 5-6.  Because the details matter, Microsoft elaborates.

Managers met during a "calibration meeting" to discuss the performance of employees

reporting to them ("direct reports") who performed similar functions—at which time managers

could adjust recommended ratings based on a comparison of employees to larger groups.

MSFT2283-85.  A recommended range of employees to be considered together was 50 to 100

individuals.  MSFT2290.  But, as Plaintiffs' expert notes, there was a "lack of standardization" in

both "the types of information serving as inputs into compensation and promotion decisions" as

well as "the specific procedures for discussing and making compensation and promotion

decisions."  Mot. 6.  Thus, rather than use a single uniform "Calibration Process," each team

handled it differently.  No two calibration meetings were the same.  Helf Dec. ¶16; Coleman Tr.

22:3-18 (describing varied approaches); 23:24-24:4 (describing various documents used in

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

different meetings); 30:25-31:2, 31:16-21 ("great deal of flexibility" in calibration depending on team and individuals involved); DeCaprio Dec. ¶¶9-10.

As Microsoft instructed HR leaders and managers, the assessment was not formulaic but required thoughtful individual judgment, taking into account the employee's role. MSFT2278; *see* Wilson Dec. ¶21; DeCaprio Dec. ¶¶7-8. Managers were expected to review preliminary feedback and provide honest assessments of performance relative to peers. Helf Dec. ¶8. Some teams used paired comparisons to other employees in the peer group. MSFT1955. Others compared performance to an agreed benchmark. MSFT1955-56. Others ranked employees. MSFT1955. Microsoft did not dictate how to run a meeting or what records to generate. Coleman Tr. 31:16-21; Ritchie Tr. I 162:11-164:5. Managers at various levels participated in the meetings. Helf Dec. ¶20. Some were new to the process, others veterans. *Id.* The performance rating—arrived at through the Calibration Process—determined an employee's raise, bonus, and stock award. Ritchie Tr. II 428:16-429:25.

During the meetings, a potential promotion could be discussed if an employee's direct manager recommended one. MSFT2280; Helf Dec. ¶28; *but see* Mao Dec. ¶9 (describing group's process for considering non-recommended promotions). Promotion discussions differed from performance rating discussions. Whether a promotion was recommended and approved turned on (1) employee readiness, (2) business need, and (3) available budget. MSFT2235. Promotions at lower levels, such as 59 and 60, occurred more frequently. MSFT1984. Promotions would "vary across levels… and professions," as well as by year. *Id.* For instance, in 2013, the budget supported about one in three employees being promoted in the Engineering and Research professions. *Id.* Reasons for promotion decisions were not always memorialized and were highly individualized. Saad Rpt. ¶¶161-65 & n.125, 188-92.

Pay and promotion decisions at the initial calibration meeting rolled up to another meeting with higher level managers, and roll-ups could happen several times. Helf Dec. ¶21 (calibration meetings cascaded upwards); Wilson Dec. ¶24. But the process remained decentralized. Each organization had an executive vice president as the formal "final approver"

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

for pay and promotion decisions. MSFT4283; Helf Dec. ¶¶27, 29. In practice, those people did not make individual decisions regarding the thousands of lower-level employees. Helf Dec. ¶27; Shepherd Dec. ¶¶12-13. Even subapprovers, those one level below "final approver," generally focused on the budget for a particular group, not the merits of individual evaluation decisions. Helf Dec. ¶27 (leader focused on budget, not individual decisions made in earlier calibration meetings); Wilson Dec. ¶24. "[T]he Vice President … does not have specific, detailed conversations" about employees below Level 64; rather, the Vice President's direct reports are authorized to "make the effective final decisions." Shepherd Dec. ¶25. Thus, thousands of managers in different disciplines across Microsoft made pay and promotion decisions for the proposed class. Direct managers—men and women—had the most influence as they recommended ratings and explained performance at calibration meetings. Ku Dec. ¶9; DeCaprio Dec. ¶16. Thousands of these managers are putative class members. Saad Rpt. ¶¶16-17.

### Pay And Promotion Decisions From 2014 To The Present

In 2014, Microsoft fundamentally redesigned its pay and promotions approach to prioritize collaboration and contributions to others' and the company's overall success over individual evaluation vis-à-vis peers. MSFT4130; Underwood Tr. 85:11-24 (describing new approach as "very different"). The process allowed for even greater managerial discretion. Shepherd Dec. ¶18. To that end, Microsoft replaced its 1 to 5 rating system. Instead of considering an employee "relative to other individuals in his or her organization," managers evaluate employees' impact. Helf Dec. ¶31; *see also* Shepherd Dec. ¶18. Microsoft eliminated calibration meetings and instead implemented "people discussions," which occur at different levels, in different ways, with different formats and levels of formality. Helf Dec. ¶¶31-32; Jarvis Dec. ¶¶10-11, 13-14. Before a people discussion, managers engage in "Connects"—i.e., get-togethers throughout the year—with their direct reports to share feedback with each employee on their impact. Shepherd Dec. ¶17; Mao Dec. ¶7.

The format and content of people discussions varies depending on managers' familiarity with their employees, goals for the discussion, and leadership style. Wilson Dec. ¶15; DeCaprio

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 8 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

Dec. ¶14. Sometimes leaders prefer holistic talent discussions and to discuss all employees; others are more data-oriented and segment employees by responsibility. Helf Dec. ¶42. In some cases, people discussions are a roundtable where the leader listens to and considers feedback from attendees (including male and female managers); in other cases, the leader drives the discussion and managers talk about the employee to the leader (not with each other). *Id.* ¶43.

In addition to the freedom to structure people discussions, managers have discretion to develop their own frameworks for reward distribution. For example, one team imposed a "'top rewards' target that aim[ed] to have a certain percentage of rewards fall[] within the top two rewards pay points." *Id.* ¶38. Another first identified performance attributes and distinguished between low and high performers, reviewing team members accordingly. Watterson Dec. ¶14.

Individual managers also address promotions during people discussions. DeCaprio Dec. ¶¶14-15; Calla Dec. ¶7. Though the general promotion criteria focus on performance, business need, and budget availability, the promotion analysis is viewed through the lens of the employee's impact.[5] MSFT2235. It generally takes longer to get promoted to higher levels as employees acquire the necessary skills and experience to perform positions with greater scope and responsibility. *See, e.g.*, MSFT1984; Ritchie Tr. II, 476:4-477:2; Helf Dec. ¶30; Liuson Dec. ¶14; Mao Dec. ¶10.

***Microsoft's Policies Prohibit Discrimination and Harassment***

Microsoft has robust Equal Employment Opportunity (EEO) policies overlaying its compensation and promotion processes. MSFT58110-11. Microsoft makes clear that "[g]lobal diversity and inclusion is an integral and inherent part of our culture, fueling our business growth while allowing us to attract, develop, and retain the best talent." MSFT824522. Its commitment to diversity allows Microsoft to be "more innovative in the products and services we develop, in the way we solve problems, and in the way we serve the needs of an increasingly global and

---

[5] The software that facilitates people discussions prompts managers to provide a rationale for promotions. Helf Dec. ¶39. "Managers have complete discretion as to what to write in this box, and it ranges from very little to an exhaustive list of everything about the individual being recommended for promotion." *Id.*; Coleman Tr. 82:17-85:3 (explaining possible entries). These justifications are highly individualized. *See, e.g.*, Helf Dec. ¶39.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 9 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

diverse customer and partner base." *Id.* Under the EEO Policy, "[a]ll employees share in the responsibility for fulfilling Microsoft's commitment to equal employment opportunity." MSFT867. The policy, applicable to all employees, prohibits discrimination on the basis of sex (including pregnancy) or any other protected characteristic, as well as sexual harassment and retaliation. MSFT58110-11. Senior managers oversee EEO compliance by engaging in "behavior and treatment of employees' consistent with … company policies," "communicat[ing] the company's policy to … subordinates," "prevent[ing] and correct[ing] [policy] violations," and "ensuring that positive, good faith efforts are being made to achieve" affirmative action goals and "fully implement [the company's] commitment to EEO." MSFT58111.

Microsoft also has an Employment Relations Investigation Team ("ERIT") to investigate EEO policy issues and provide training to HR. DeLanoy Tr. 31:2-8, 48:19-25. Each ERIT investigator is a licensed attorney with years of investigation experience and training. *Id.* 30:17-31:1; 102:20-103:7; 132:24-133:7; 175:4-25. Microsoft publicizes various ways to raise concerns on its internal portals, providing for anonymous submission if preferred, and takes action upon receiving concerns. *Id.* 57:6-59:14; 129:7-130:3; Young Rpt. ¶¶30-57.

***Microsoft's Diversity and Inclusion Initiatives***

Microsoft invests heavily in programs to enhance diversity and inclusion ("D&I"). Its annual budget is slated to increase to $55.4 million per year through 2020. MSFT835961; Dhillon Dec. ¶6. These resources are devoted to furthering an inclusive culture, recruiting and retaining diverse talent, and enhancing equal pay and advancement opportunities.[6] Recognizing that this is a long-term problem it must work on continually, MSFT616198, Microsoft frequently creates new initiatives to retain its diverse talent and recruit from communities historically underrepresented in the tech industry. *See, e.g.*, https://blogs.microsoft. com/blog/2017/11/14/strengthening-culture-inclusion/.

---

[6] MSFT616197; 822318 (outlining diversity focuses); 835961 (annual spends for D&I); 822250 (aspirational vision for 2020); 822530 (outreach strategy for female technical employees).

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 10 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

Microsoft takes a multi-layered approach to diversity. Its 25-person Global D&I team works with leaders to develop plans tailored to each unique group of employees, and creates detailed strategies for executing on these plans. *See, e.g.*, Dhillon Dec. ¶¶7, 16 (describing Engineering 5-Point Plan and self-assessment program for managers to track diversity acumen); MSFT306526. The company offers customized D&I training courses for all levels of employees, such as "Building an Inclusive Culture: Understanding Conscious and Unconscious Bias" (mandatory for all employees), "Managing Inclusion," and "Cultural Dexterity." MSFT642357. And Senior Managers are expected to spread knowledge of these resources, including as a means of "improv[ing] our female technical representation." MSFT123433. "Whether senior leaders have achieved diversity within their organizations impacts their overall compensation in the form of bonuses." Dhillon Dec. ¶7. Microsoft also has established a Tech Executive Leadership Development Program for L65-70 leaders to increase executive-level diversity. MSFT835962; MSFT123433 ("Senior Leaders … required to mentor technical female talent" to "grow women to take on critical roles in the organization."); *see also* MSFT822254 (instructing managers to "[e]nsure women…are not overlooked for key growth opportunities").

Microsoft has taken steps to address underrepresentation in the industry at large, including creating a "Women's Pipeline" to promote the development of women in technical roles at all levels. MSFT822325. That plan begins as early as kindergarten by "empowering girls to consider CS/tech education" through "investment in teacher training and development," and initiatives such as Girls Who Code and DigiGirlz. *Id.*; Dhillon Dec. ¶18. DigiGirlz includes Microsoft-sponsored free all-day events to "provide high school girls with a better understanding of what a career in technology is all about" by interacting with Microsoft employees. https://www.microsoft.com/en-us/diversity/programs/digigirlz/digigirlzday.aspx; MSFT822325. Microsoft's initiatives continue with internships, award competitions, and mentoring programs, such as Women's TechConnect. MSFT824523. The company's $277 million D&I commitment through 2020 will help support each of its "K-12 pipeline," "Colleges and Universities" and

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-CV-01483-JLR

- 11 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

"Employees at Microsoft" programs, as well as internships that have increased the number of women hired into core technical jobs at Microsoft. MSFT835961, 835963.

### The Named Plaintiffs

***Katie Moussouris***. Microsoft hired Moussouris in 2007 as a Security Program Manager in its Trustworthy Computing Group. Her role—providing security for Microsoft products and services—was unique; she is unaware of anyone who did similar work. Moussouris Tr. 276:17-24, 279:2-17. Microsoft promoted her in 2008, when she was seven months pregnant, and again in 2010. *Id.* 29:15-30:5. Microsoft also gave Moussouris salary increases and top "exceeded" performance ratings, including a "1" in 2011. *Id.* 29:4-11; 70:11-14; 71:3-13.

For all the accolades Moussouris received for her results (the "what"), she knew the "how"—i.e., communication and collaboration skills—was just as important. *Id.* 26:6-27:4. But she struggled in this area. Female employees she supervised were "unhappy" with her treatment of them. *Id.* 147:18-151:3. And even though Moussouris eventually relinquished her managerial duties, *id.* 247:12-249:6, her manager secured executive coaching for her—generally reserved for more senior employees—hoping to position her for future promotions. *Id.* 51:19-54:1.

Because her results and "how" issues varied from year to year, Moussouris's rating was "3" in 2012 (met expectations) and "2" in 2013 (exceeded expectations). *Id.* 68:12-17. Moussouris believes her initial performance rating in 2012 moved from a 2 to a 3 during the calibration process because her manager, whom she cannot confirm was even present for the final decision, told her he initially recommended a higher performance rating. *Id.* 93:8-94:9. Despite her promotion, raises, and favorable ratings, Moussouris contends Microsoft judged her performance more harshly than her male peers, and that every review she received—including her maximum performance rating of "1"—was affected unfairly by her gender. *Id.* 259:6-7; 260:9-15. Yet, she was *the* highest paid employee in her cost center in 2012 and 2014, and (just barely) the second highest in 2013. Saad Rpt. ¶¶41-42. That meant Moussouris was paid more than not just men on her team, but also her male manager. *Id.*

Further, in her role as manager, Moussouris actively participated in the very Calibration

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 12 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

Process she now attacks by reviewing employees and the quality of their work. Moussouris Tr. 103:16-23; 104:9-21; 119:7-18. Moussouris could point to only one allegedly "gendered" comment in the meetings in which she participated: a discussion about how her direct report should work on her collaboration skills (*id.* 129:16-131:9), which was an explicit criterion of the rating system and something Moussouris had coached her on in the past (*id.* 131:20-132:6). She conceded this was not an issue limited to women: Moussouris was aware men were critiqued for how they collaborated as well. *Id.* 140:18-23; 141:4-18.

**Holly Muenchow.** Muenchow does not identify an issue with *any* adjustment made to her performance ratings or pay during calibration.[7] Muenchow Tr. 108:14-22. While Muenchow believes she should have been promoted faster, she could not identify when any promotion should have occurred or any facts to suggest the failure to promote her was based on gender, much less had any connection to calibration meetings. *Id.* 49:13-18; 59:16-61:25; 94:6-18. Muenchow was promoted five times—two of them shortly after maternity leaves. *Id.* 42:3-8; 44:23-25; 49:20-25; 157:23-158:2. On her return from leave, she used Microsoft's flexible work arrangements for new parents. *Id.* 149:2-151:7.

Muenchow admits her managers treated each employee "uniquely"; she simply assumes gender played a role "because men and women are different." *Id.* 52:18-55:15; 55:25-56:20; 70:16-72:23. Muenchow recognized a core competency for her role was communicating expectations to her team (*id.* 113:22-114:6; 118:4-23; 172:16-23), but contends her managers applied that requirement to her in a biased way. *Id.* 172:16-173:6. She believes her performance would have received Microsoft's highest rating had she not been evaluated as having deficiencies in her communication skills. *Id.* 177:1-9. And she contends gender bias affected every piece of feedback from her managers—male and female—with which she did not agree. *Id.* 131:8-23; 132:12-25; 141:1-142:23; 152:9-153:2; 191:5-192:13.

---

[7] Because none were present for their own calibration meetings, Plaintiffs' nine declarants likewise have no basis for concluding whether their recommended pay or promotion decisions were adjusted during calibration meetings and, if so, the basis for the adjustment. *See, e.g.*, Hutson Tr. 66:15-17 (does not know whether "score was changed during the calibration process"); Boeh Tr. 61:15-62:11 ("never been in th[e] room" for calibrations; speculation admittedly based on "hearsay").

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 13 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

Muenchow does not generally know the feedback that her male colleagues received, but she "perceived" they were treated more favorably. *Id.* 83:10-18; 90:2-11; 131:7-132:5. To the extent she knew of her colleagues' reviews, she admits managers also criticized their communicative tone and assertiveness; she simply says she received this feedback more, speculating it was because of gender. *Id.* 63:5-21; 65:19-66:24; 70:16-72:23; 83:2-84:17.

### *Procedural History*

Plaintiffs' First Amended Complaint challenged Microsoft's obsolete 1-5 rating method for evaluating performance, which they inaccurately called "stack ranking." *See* Dkt. 8 ¶¶25-29. The Court dismissed that claim because Plaintiffs did not "identif[y] any reason that the stack ranking process would systematically rank women lower than men." Dkt. 52 at 22. Plaintiffs' Second Amended Complaint still targeted so-called "stack ranking" but added details to support their performance-rating theory, *see* Dkt. 55 ¶¶26-41, which, according to this Court, "'nudge[d]' Plaintiffs' claims—particularly the disputed element of causation—'across the line from conceivable to plausible'" for purposes of a motion to dismiss. Dkt. 134 at 10. Plaintiffs' claims rested on the theory that performance review scores were the discriminatory culprit. Dkt. 71 at 3. This Court recognized that "Plaintiffs' disparate impact claim *relies on* the theory that Microsoft's *stack ranking process* led to arbitrary differentiations between technical employees' evaluations" and that the "flawed performance evaluations form the basis of compensation and promotion decisions." Dkt. 134 at 11 & n.8 (emphasis added).

But the words "stack ranking" now appear *nowhere* in Plaintiffs' Motion. Even though the allegations in their complaint are "conclusively binding," *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988), Plaintiffs no longer argue that pay and promotions flow from review scores—they say the opposite: "[j]ob performance, as measured by Microsoft's performance review process … does not explain pay and promotion decisions." Mot. 6. And Plaintiffs now admit their statistics show that "men's and women's performance review scores are roughly equal." *Id.* 7. But they show no alternate cause of the alleged gender disparity. In

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

short, Plaintiffs seek class certification to pursue a different claim than the one they pled—and abandon the causation theory that nudged them past early dismissal.

## ARGUMENT

Parties seeking certification must meet all Rule 23(a) requirements and at least one Rule 23(b) requirement. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011).[8] "Rule 23 does not set forth a mere pleading standard. A party seeking class certification … must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350. The Rule does not "establish an entitlement to class proceedings for the vindication of statutory rights"; instead, it "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309-10 (2013). A court must conduct a "rigorous analysis" of those stringent requirements in deciding class certification. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). And in conducting that rigorous analysis, the court "must consider the merits if they overlap with the Rule 23(a) requirements." *Ellis*, 657 F.3d at 981.[9]

## I. Plaintiffs Have Not Established Commonality Under Rule 23(a)(2)

Rule 23(a)(2) requires the putative class representative to demonstrate the existence of "questions of law or fact common to the class" the "truth or falsity" of which will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 349-50. In a Title VII case, commonality requires that "all the class members' claims for relief" must "produce a common answer to the crucial question *why was I disfavored*." *Id.* 352.

### A. Plaintiffs' Disparate Impact Claim Does Not Satisfy Commonality

The Supreme Court's 2011 decision in *Dukes* forecloses any finding of commonality here. In *Dukes*, Wal-Mart's pay and promotion decisions were "generally committed to local managers' broad discretion, which [was] exercised 'in a largely subjective manner.'" *Id.* 343

---

[8] The Ninth Circuit's *Ellis* decision will be referred to as *Ellis* and the district court's decision on remand as *Ellis II*. *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012).

[9] Plaintiffs offer no independent certification analysis as to their state-law WLAD claim. Mot. 29 (citing *Oliver v. Pac. Nw. Bell Tel. Co.*, 106 Wash. 2d 675, 678 (1986)). Microsoft responds in kind.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 15 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

(citation omitted).  Plaintiffs argued "local managers' discretion over pay and promotions is exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees." *Id.* 344.  But the Court held that Wal-Mart's "policy" of discretion is "a very common and presumptively reasonable way of doing business—one that … raise[s] no inference of discriminatory conduct." *Id.* 355 (internal quotation marks and citation omitted).  Although delegating "discretion to lower-level supervisors *can be* the basis of Title VII *liability*," the Court explained, it does not necessarily "lead to the conclusion that every employee in a company using a system of discretion has such a claim in *common*." *Id.*  That is because there is a "wide gap" between "an individual's claim that [s]he has been denied a promotion" and "the existence of a class of persons who have suffered the same injury as that individual." *Id.* 352-53 (citation omitted).  The Court posited a hypothetical company where some managers act on a sex-neutral basis with no disparity, others look for attributes that unintentionally produce a disparate impact, and others intentionally discriminate. *Id.* 355-56.  Even though, on average, women may be treated less favorably at that company, a plaintiff "will be unable to show that all the employees' Title VII claims will in fact depend on the answers to common questions,"—i.e., *why was I disfavored* will yield different answers. *Id.* 356.  Finding plaintiffs had, at most, proved that pay and promotion decisions at Wal-Mart were akin to this hypothetical company, the Court reversed an order certifying both a disparate impact and disparate treatment class.

Class certification of a disparate impact claim based on the exercise of discretion is appropriate only when a putative class can prove "a common mode of exercising discretion." *Id.* A common mode may arise if the putative class proves "discriminatory bias on the part of the *same supervisor*." *Id.* 350 (emphasis added).  But as the number of decisionmakers grows, the burden of showing they collectively exercised their discretion in a common way becomes more difficult. *Ellis II*, 285 F.R.D. at 509 ("[T]he larger the class size, the less plausible it is that a class will be able to demonstrate a common mode of exercising discretion.").  Accordingly, such a class is more easily sustained where it involves a small group of managers responsible for individuals who perform "closely-related" jobs. *Id.*

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 16 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

1    Here, Plaintiffs have, at most, described the hypothetical company in *Dukes*. Their class

2    claims place at issue tens of thousands of discretionary decisions by thousands of managers

3    about thousands of employees performing thousands of unique jobs without identifying a

4    common mode of discretion reflected in pay and promotion decisions generally.

5    **1.      Plaintiffs' disparate impact claim is predicated on discretion**

6    Plaintiffs identify the common question for their disparate impact claim as "whether

7    Microsoft's Calibration process has a disparate impact on women in pay and promotions."[10]

8    Mot. 32. But that question does not go far enough. Plaintiffs effectively ask only whether the

9    challenged process is "an unlawful employment practice," which is "not sufficient to obtain class

10   certification." *Dukes*, 564 U.S. at 349. Commonality requires proving class members suffered

11   the same injury from a common practice. *Id.* 349-50. That means a party "*must* pose a question

12   that will produce a common answer to the crucial question *why was I disfavored*." *Ellis*, 657

13   F.3d at 981 (emphasis added) (internal quotation marks and citation omitted). Here, it does not.

14   Like in *Dukes*, Microsoft delegates discretion to thousands of managers to make pay and

15   promotion decisions. Plaintiffs' disparate impact claim rests on the premise that those tens of

16   thousands of individual decisions—i.e., annual decisions for each of the 8,000+ putative class

17   members over the course of several years—can be deemed discriminatory (or not) "in one

18   stroke" based on the propriety of a set of practices Plaintiffs call the "Calibration Process."[11]

19   Mot. 5. But they concede that Calibration's "structural features *preclude* consistent decision-

20   making." Mot. 1-2 (emphasis added). Plaintiffs and their experts repeatedly assert that

21   Microsoft managers *varied* in how they applied substantive criteria to make decisions:

22   - "Calibration Managers did not follow a reliable standard for ensuring consistency of
         review and comparison across performers." Dkt. 55 ¶31.

---

[10] Plaintiffs also propose a second question of "whether the practice is based on business necessity" and a third of "whether there is a less discriminatory alternative." Mot. 32. Those questions are conditioned on the first question satisfying commonality and so will rise or fall with that one. In any event, Plaintiffs present no evidence or argument regarding those questions and therefore they necessarily fail to satisfy commonality.

[11] Plaintiffs' use of the term "Calibration Process" captures features of two distinct evaluation systems: calibration meetings (2011–2013) and people discussions (2014–present). *Supra* at 5-9; Mot. 5.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    - 17 -
CASE NO. 2:15-cv-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

- There is a "lack of standardization in the types of information serving as inputs into compensation and promotion decisions." Mot. 6.
- "[D]ecision makers" "apply variable standards" in making comp awards. *Id.*
- "Microsoft did not prescribe weights to the underlying criteria." *Id.*
- "[E]valuators were free to weight criteria for pay and promotions." *Id.*
- Microsoft "does not" instruct "on how to weigh" job-related criteria. *Id.* 7.
- Microsoft "does not take steps" to ensure "managers apply the same standards consistently with each other." *Id.*

Plaintiffs and their experts likewise allege that different Microsoft managers handled the meetings themselves differently:[12]

- There is a "lack of standardization in … the specific procedures for discussing and making compensation and promotion decisions." *Id.* 6.
- "Meetings were inconsistent in terms of whether direct supervisors attended, how it was determined which employees were compared to each other, and what information was available when recommendations were made." *Id.*
- Discussions, inputs, and process "were not consistently recorded." *Id.*

Thus, Plaintiffs rest their claims on the very proposition that a uniform "Calibration Process" does not exist, and their expert admitted that calibration meetings "were not uniform." Ryan Tr. 109:20-110:22. By Plaintiffs' account, multiple processes comprising thousands of unique discussions annually vary among hundreds of teams depending on a multitude of individual factors and produce thousands of different outcomes. Plaintiffs' concession that Calibration "*preclude[s]* consistent decision-making," Mot. 1-2 (emphasis added), is enough to defeat certification because "a common mode of exercising discretion" is precisely what Plaintiffs need to show to succeed. *Dukes*, 564 U.S. at 356. Without that, *Dukes* prohibits class certification where "individualized, discretionary decisions of individual supervisors [a]re at issue." *Troy v. Kehe Food Distribs., Inc.*, 276 F.R.D. 642, 651 (W.D. Wash. 2011) (Robart, J.).[13]

---

[12] Whether, for instance, HR presence may chill discriminatory conduct in calibration meetings or direct managers' presence increases the likelihood of discrimination during the meetings is itself highly individualized.

[13] Other courts have come to similar conclusions in applying *Dukes*. *See, e.g.*, *Valerino v. Holder*, 283 F.R.D. 302, 314 (E.D. Va. 2012) (commonality not met just because there is "some common structure governing promotion" because a court still "must assess the specific thing that a plaintiff claims creates bias and understand the way in which it is common to the class"); *Jones v. Nat'l Council of Young Men's Christian Ass'ns*, 34 F. Supp. 3d 896, 906

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 18 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

1    In short, the Calibration Process is "just the opposite of a uniform employment practice that

2    would provide the commonality needed for a class action." *Dukes*, 564 U.S. at 355.

3            Plaintiffs cannot avoid *Dukes* by simply affixing a single label with capital letters (i.e.,

4    "Calibration Process") to highly individualized procedures.  It does no more to alter the

5    discretionary and non-uniform nature of the processes than if Wal-Mart had required all

6    managers to justify pay and promotion decisions on blue paper:  Even though a single "blue

7    paper policy" applied, the reason for each employment decision would still depend on each

8    manager, and so *why was I disfavored* would still yield different answers.  The *Dukes* plaintiffs

9    tried to repackage their arguments in a similar way on remand, challenging "uniform" promotion

10   guidelines requiring managers to consider "vague criteria" such as "interpersonal skills,"

11   "adaptability," and "leadership ability." *Dukes v. Wal-Mart Stores, Inc.*, 964 F. Supp. 2d 1115,

12   1126-27 (N.D. Cal. 2013) (*Dukes II*).  Like Plaintiffs here, the *Dukes II* plaintiffs argued that,

13   because of these vague guidelines, managers "were left without meaningful guidance in applying

14   the impossibly vague criteria" and therefore "fell back on their own stereotyped views of women

15   in making pay and promotion decisions." *Id.* 1127; *see also* Ryan Tr. 218:13-21 (managers left

16   "without meaningful guidance in applying vague criteria" but no opinion about discrimination).

17           But the court in *Dukes II* rejected this as "Repackaged Delegated Discretion." *Dukes II*,

18   964 F. Supp. 2d at 1126-27.  The theory left "Plaintiffs right back where they started:

19   challenging Wal-Mart's practice of delegating discretion to local managers, which the Supreme

20   Court specifically held" did not "supply[] a common question sufficient to certify a class." *Id.*

21   1127.  As *Dukes II* makes clear, substance, not form, guides the certification determination.  No

22   matter the label, without proof of a common mode of exercising discretion, a claim attacking a

23   policy of discretion lacks commonality—because the reason for each employment decision still

24

25   (N.D. Ill. 2014) (even where "supervisors evaluate candidates according to specific, but subjective, factors" that
     "does not make the decisions produced by the process meaningfully less discretionary" under *Dukes*); *Zuniga v.*
26   *Bernalillo Cty.*, 319 F.R.D. 640, 689 (D.N.M. 2016) (no commonality where plaintiffs argued defendant's
     "employee selection policies readily lends itself to bias" by allowing "the top criterion used in making selective
27   decisions [to be] the 'personal preference of the interviewer'"); *see also Stiller v. Costco Wholesale Corp.*, 673 F.
     App'x 783, 784 (9th Cir. 2017) (no commonality where policy was "not implemented and applied uniformly").

depends on each manager, and so *why was I disfavored* still yields different answers. Calibration meetings therefore cannot be the "glue" which holds the "reasons for all those decisions together." *Dukes*, 564 U.S. at 352.

For this reason, the criticisms of the Microsoft "process" leveled by Plaintiffs' expert, Dr. Ryan, are beside the point. Courts do not "sit as a super-personnel department to second guess the wisdom of a business's personnel decisions." *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 957 (8th Cir. 2001) (internal quotation marks omitted); *Greenfield v. Am. W. Airlines, Inc.*, 2005 WL 756602, at *11 (N.D. Cal. Mar. 31, 2005) (same). Dr. Ryan admits her report does not "contain any conclusion that women [we]re unfairly evaluated," "denied promotion," or "paid at Microsoft based on their gender." Ryan Tr. 25:19-22, (evaluated); 26:4-8 (promotion), 26:14-18 (paid). Nor does she offer any opinion regarding whether gender bias exists at Microsoft, *id.* 27:3-13, or, *a fortiori*, provide any common way of proving discrimination, as *Dukes* requires. It is unsurprising then that she "cannot answer" the "percentage of women" who were allegedly "denied a promotion on the basis of gender." *Id.* 238:22-239:7.

Dr. Ryan is therefore even less helpful for Plaintiffs than the expert in *Dukes* who said the company was "'vulnerable' to 'gender bias'" but did "nothing to advance [the plaintiffs'] case" because he, like Dr. Ryan, could not determine "whether 0.5 percent or 95 percent of the employment decisions" were due to gender which was "the essential question" on which "commonality depends." *Dukes*, 564 U.S. at 354. Dr. Ryan highlights the undisputed fact that managers had significant discretion, and exercised it by using different processes and substantive criteria. *See, e.g.*, Ryan Tr. 204:5-205:6 (managers "*free to* weight competencies"), 209:2-6 (managers "*free to* apply and weight criteria"); 209:14-210:5 (managers "*free to* weigh factors" such as "key results"); 212:20-213:6 ("*free to* make decisions while considering different types of information") (emphases added). Her main objections are the ways in which the so-called "Calibration Process" is "not uniform." *Id.* 109:20-110:22. But while Dr. Ryan criticizes this "lack of standardization," Mot. 6, "permitting discretionary decisionmaking" is a "very common and presumptively reasonable way of doing business" and not susceptible to class certification.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 20 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

*Dukes*, 564 U.S. at 353, 355.

Plaintiffs' other expert, Dr. Farber, also concedes that his model does not support the conclusion that "differences in promotion rates were due specifically to calibration meetings" or "people discussions." Farber Tr. 264:13-24. Because neither expert links calibration meetings or people discussions to any alleged disparity, Plaintiffs cannot show that the answer to *why was I disfavored* was the same "calibration" or "people discussion" process for *any* class member, let alone that it is the common answer for *every* class member. That Plaintiffs never explain how calibration caused any alleged disparities is to be expected given that, during calibration, ratings were rarely changed, and on average, women benefited from score changes more than men. Saad Rpt. ¶80 (in 2013, only 4% of ratings changed during calibration); ¶¶81-87.

Plaintiffs' inability to identify a common cause here is precisely the problem that befell another group of plaintiffs in their effort to certify a class challenging a similar calibration system in *Ross v. Lockheed Martin Corp.*, 2017 WL 3242237 (D.D.C. July 28, 2017). Under Lockheed's system, like the pre-2014 one at issue here, individual managers made evaluations through written comments and numerical (1 to 5) ratings, which a group of managers further reviewed in "calibration sessions" where final decisions were made. *Id.* *4. "[N]otwithstanding Plaintiffs' vigorous efforts to characterize Lockheed's performance appraisal system as a 'companywide evaluation method' and to assert that several common elements of that system [we]re 'flawed,'" the court refused to certify a settlement class because plaintiffs had "taken no steps whatsoever toward" demonstrating "how that examination [system] operated in a biased way." *Id.* *15 (brackets and citations omitted). Bare statistics, the court explained, are insufficient to show causation. *Id.* *16. And, in contrast to challenges to centralized performance evaluation processes, plaintiffs' challenge to Lockheed's decentralized evaluation process could not identify a "common contention" central to each class members' claim that was susceptible to classwide resolution. *Id.* *16-17. Here, Plaintiffs likewise offer no "account of how the common features of the performance appraisal system led to … disparate outcomes (other than by enabling discretionary decisions by individual supervisors)." *Id.* *17.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 21 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

## 2.  Plaintiffs' limited authority shows why commonality does not exist

Plaintiffs never come to grips with *Dukes*.  Instead, they argue commonality for their disparate impact claim in two paragraphs citing three readily distinguishable cases.  Mot. 32-33.

In *Ellis II*, the court held *Dukes* did not preclude class certification for three reasons, none of which exists here.  *First*, the *Ellis II* class comprised only 700 people—not 8,600+—and "the larger the class size, the less plausible it is that a class will be able to demonstrate a common mode of exercising discretion."  285 F.R.D. at 509; *see* Farber Rpt. ¶11 (asserting pay class is 8,630 women, while promotions class is 8,037 women).  *Second*, the *Ellis II* class involved "only two closely-related, management-level positions"—Assistant General Manager and General Manager—"that share a uniform job description across the class."  *Id.*  The proposed class here involves employees in thousands of different roles being evaluated against role-specific criteria.  *Third*, plaintiffs identified "a common mode of guided discretion directed from the top levels of the company."  *Id.*  The CEO himself was "directly involved in the process of recruiting and selecting candidates for promotion" and personally "provide[d] instructions to his staff as to criteria for promotion."  *Id.* 499.  Unlike *Dukes*, pay and promotion decisions were governed by a common mode of discretion.  In stark contrast, Plaintiffs argue the top levels of Microsoft do *not* provide direction and the thousands of managers making pay and promotion decisions have *too much* discretion.  *Supra* at 17-18; *see also* Ryan Rpt. ¶¶13(i), 15, 19, 25(i), 41.

Plaintiffs' other two cases likewise involve different circumstances.  In *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012), the proposed class involved only 700 persons in a single job position.[14]  And *Parra v. Bashas', Inc.*, 291 F.R.D. 360, 366, 374-75 (D. Ariz. 2013), certified a class on a challenge to a "written, *non-discretionary*, centralized wage scale" which was "common for all [the defendant's] employees and provided for different pay for similar jobs based only on the store where the employee

---

[14] *McReynolds* distinguished *Dukes* on the ground that discretion was exercised "by brokers, not managers."  *Id.* 489; *see also id.* ("[T]o the extent that these regional and local managers exercise discretion regarding the compensation of the brokers whom they supervise, the case is indeed like *Wal-Mart*."); *id.* (defendant gave "authorization to brokers, rather than managers").  That does not apply here.  And, as the court found in *Ross*, unlike the evaluation system at issue there (and here), the "teaming" policy in *McReynolds* supplied the certification "glue" (beyond a mere policy of discretion).  2017 WL 3242237, at *16.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 22 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

worked." (emphasis added). Both cases are inapposite.

### 3. Plaintiffs' statistics show why a class should not be certified

Lacking case support, Plaintiffs turn to a lengthy expert report addressing statistical disparities. But their statistics show why a class cannot be certified. When evaluating expert opinions at class certification, it is not enough to determine whether they are admissible under *Daubert*; instead, courts must "judg[e] the persuasiveness of the evidence" and "resolve any factual disputes necessary to determine whether there was a common pattern and practice that could affect the class as a *whole*." *Ellis*, 657 F.3d at 982-83 (emphasis added). Here, Dr. Farber impermissibly aggregates data, contrary to Supreme Court and Ninth Circuit precedent. When disaggregated, his data shows an *absence* of pay and promotion disparity throughout the proposed class—i.e., there is no common answer to *why was I disfavored*. Further, Dr. Farber admits he cannot link his statistics to the challenged Calibration Process, meaning that he has no common answer on the issue of causation.[15] These flaws foreclose a finding of commonality.

### i. Dr. Farber's aggregate statistics are legally irrelevant

The Supreme Court has rejected Dr. Farber's aggregate approach. In *Dukes*, the Court observed that "information about disparities at the regional and national level does not establish the existence of disparities at individual stores, let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." 564 U.S. at 356-57 (citation omitted). The reason is simple: A disparity in the aggregate "may be attributable to only a small set of Wal-Mart stores, and cannot by itself establish the uniform, store-by-store disparity upon which the plaintiffs' theory of commonality depends." *Id.* 357. Suppose ten streams feed into a lake. Finding toxicity in the lake says nothing about the toxicity of each stream. It could be that one stream is highly polluted while nine are pristine. Here, Plaintiffs must show not only that class members were discriminated against in the aggregate, but that they were all discriminated against in the same way. If they cannot show "whether 0.5

---

[15] Dr. Farber also impermissibly compares employees who are not similarly situated, *see, e.g.*, *Nguyen v. Super. Ct.*, 2014 WL 4467850, at *3 (N.D. Cal. Sept. 9, 2014). Microsoft will address this issue in its *Daubert* motion.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 23 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

percent or 95 percent of the employment decisions … might be determined by stereotyped thinking," the class cannot be certified—the streams are relevant, not the lake.  *Id.* 354 (citation omitted); *see also Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896 (7th Cir. 2012) ("If Walsh had 25 superintendents, 5 of whom discriminated in awarding overtime, aggregate data would show that black workers did worse than white workers—but that result would not imply that all 25 superintendents behaved similarly, so it would not demonstrate commonality.").[16]

The Ninth Circuit made the same point in *Ellis*.  The lower court did not resolve a dispute over statistical variations among regional stores.  *Ellis*, 657 F.3d at 983.  Costco argued that any gender disparities were confined to only two of eight regions.  *Id.*  If that were true, the Court explained, the class could not be certified:  "A disparity in only 25% of the regions … would not show that discrimination manifested itself in promotion practices in the same general fashion throughout Costco—which is *necessary to show commonality* in a nationwide class."  *Id.* (internal punctuation, citation omitted; emphasis added).  The Court should disregard Dr. Farber's aggregate statistics—as many courts have done in similar circumstances.[17]

### ii.    Plaintiffs' own data shows the class cannot be certified

Dr. Farber's report actually shows a *lack* of commonality:

**Promotions.**  Dr. Farber asserts that out of 23,170 promotion opportunities for women,

---

[16] Even properly disaggregated statistics would not suffice because (as *Dukes* observed) some managers may have gender-neutral explanations for the disparity, and different managers may be using different criteria.  *Id.* at 357.

[17] *See also Bennett v. Nucor Corp.*, 656 F.3d 802, 815-16 (8th Cir. 2011) ("[B]ottom-line analysis is insufficient to demonstrate that any disparate treatment or disparate impact present in one department was as common to all the others."); *Dukes II*, 964 F. Supp. 2d at 1120 (rejecting certification where plaintiffs' statistics showed statistically significant results in 19 of 42 districts, or 45%); *Barrett v. Option One Mortg. Corp.*, 2012 WL 4076465, at *2 (D. Mass. Sept. 18, 2012) ("*Wal-Mart* disapproves the use of aggregate, nationwide statistics to prove a common method of exercising discretion at the local level."); *Valerino v. Holder*, 283 F.R.D. 302, 315 (E.D. Va. 2012) (The data is not specific to the 94 offices or headquarters, nor can nationwide figures alone demonstrate commonality of issue."); *Bell v. Lockheed Martin Corp.*, 2011 WL 6256978, at *8 (D.N.J. Dec. 14, 2011) ("Plaintiffs seek damages based on aggregate statistical analyses" which is "substantially the same statistical … evidence that the *Dukes* Court rejected.").  *Ellis II* used aggregate statistics, but only because the number of promotions in each region was too small for a useful sample and nationwide statistics conformed to the level of decision for the challenged practices. 285 F.R.D. at 522-23.  Those issues are not present here (putting aside whether the *Ellis II* analysis is correct).  Dr. Saad's method of presenting Dr. Farber's model by supervisor is not susceptible to sample size problems.  Saad Rpt. ¶¶34, 45.  And for the disaggregations where sample size is relevant, Dr. Saad was able to calculate a statistical significance for 95%-99% of the female population, depending on the analysis.  *Id.* ¶168 n.133-34; Appx. 2 pp. 33-36.  And unlike in *Ellis II* where most of the sample sizes were "under 20, and frequently under 10," 285 F.R.D. at 522, here the sample sizes are often 300 or more (up to 3,000).  Saad Rpt ¶33, ¶168 (notes to charts); Appx. 2 at pp. 33-36.

---

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 24 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

1   there were 518 improper promotion decisions.  Farber Rpt. ¶77, Tbl. 7; Farber Tr. 270:7-24.

2   Dr. Farber thus concluded only 2.2% of promotion decisions regarding women were attributable

3   to gender.  *Id.* 272:12-19.  But two of the five years of data Dr. Farber used fell outside the class

4   period, which he included for no other reason than Plaintiffs' counsel provided that data.  *Id.*

5   35:23-37:9.  He admits that if his analysis were limited to the class period "there would be fewer

6   women" purportedly denied promotions.  *Id.* 129:21-130:7.  In fact, the 518 figure drops to 337.

7   Saad Rpt. ¶89.  Taking their "evidence" at face value, Plaintiffs admit the answer to *was I*

8   *disfavored* will be "no" for the vast majority of the class and potentially "yes" for only a few—

9   and the allegedly aggrieved class members could be identified only after individual fact-finding,

10  requiring assessment of legitimate business reasons for each decision.

11          In these circumstances, Rule 23 prohibits class certification.  "Article III does not give

12  federal courts the power to order relief to any uninjured plaintiff, class action or not."  *Tyson*

13  *Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, J., concurring); *see also*

14  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) ("[N]o class may be certified

15  that contains members lacking Article III standing.").  The inclusion of admittedly uninjured

16  individuals in the class—according to Dr. Farber, at *least* 95.8% of the promotions class (7,770

17  of 8,037 women, or all but 337)—shows its overbreadth and the "individualized inquiries that

18  would be necessary to determine whether a class member has suffered any injury in the first

19  place."  *Moore v. Apple Inc.*, 309 F.R.D. 532, 542-43 (N.D. Cal. 2015) (citing *Kohen v. Pac. Inv.*

20  *Mgmt. Co.*, LLC, 571 F.3d 672, 677 (7th Cir. 2009)); *Ross*, 2017 WL 3242237, at *17 (refusing

21  to certify impermissibly "broad" settlement class, which contained "no limitation that ensure[d]

22  all class members have suffered the same adverse action or have otherwise been personally

23  affected by [the employer's] performance appraisal system").  Thus, Dr. Farber's analysis

24  *affirmatively* demonstrates why the Court should not certify Plaintiffs' proposed class.

25          Moreover, Dr. Farber's data shows large areas where no promotion disparity exists at

26  all—not the sort of disparity across decisionmakers that might suggest a common practice.  To

27  be clear, Dr. Farber's model is critically flawed.  But even using Dr. Farber's data and controls,

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    - 25 -
CASE NO. 2:15-cv-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

the promotion decisions lack the uniformity required for commonality. To gauge uniformity, *Dukes* and *Ellis* require assessing the disparity within each relevant decisionmaking unit, rather than simply compiling an aggregate number for the entire class (as Dr. Farber does). Here, those units are the managers making individual pay and promotion decisions. While executive vice presidents are "final approvers" ("Level 1"), they focus on budget and do not make any individual pay and promotion decisions for lower-level employees, particularly those in Plaintiffs' proposed class. *Supra* at 8. The same is true for subapprovers—those one level below "final approver" ("Level 2"). Nevertheless, even looking at the decisions at that attenuated sub-approver level, *Dr. Farber's model* shows that only 3 of 47 supervisors (6%) have a statistically significant promotion disparity adverse to women in 2015.[18] That disparity is even more isolated than in *Ellis*, where the pockets of disparity included 25% of Costco's regions. Saad Rpt. ¶44. The numbers drop even further here when examined at the levels where individual pay and promotion decisions are *actually* made: Level 3 supervisors (3%) and Level 4 supervisors (1%). *Id.* These results are essentially the same for any year in the class period. *Id.* Appx. 1 at pp.15-30. *Ellis* held that a class *cannot be certified* if a disparity manifests itself in only a few areas of the class, which is precisely what Plaintiffs' own statistics show. 657 F.3d at 983.

Nor can Dr. Farber opine at all on the fundamental issue of causation, much less show that causation produces a common answer across the class. While *Plaintiffs* claim Dr. Farber "describes statistically significant and meaningful gender-based pay differentials *caused by* the Calibration Process," Mot. 2 (emphasis added), Dr. Farber admits he did *no such thing*: his model provides no "support for the conclusion that differences in promotion rates were due specifically to calibration meetings" or "people discussions." Farber Tr. 264:13-24. He did not do "anything to determine how pay or promotion decisions changed during the calibration meetings and people discussions from the manager's initial recommendation." *Id.* 314:11-16.[19]

---

[18] To be clear, as Dr. Farber noted, even this disparity does not demonstrate discrimination. *Infra* at 27. Individualized determinations would be required to assess the actual cause of these alleged disparities.

[19] Further, Dr. Farber failed to distinguish between promotions during the annual calibration process and those that occur outside it. Dr. Saad, shows that, in fact, under Dr. Farber's own model, there is no significant disparity as to promotions during the calibration process—the *only* process Plaintiffs challenge. Saad Rpt. ¶¶104-05.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

\- 26 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

Just as the *Dukes* expert could not tell "whether 0.5 percent or 95 percent of the employment decisions" were actionable, 564 U.S. at 354, Dr. Farber does not know what percentage of the 8,037 women in the promotion class were allegedly denied a promotion due to gender other than it was "some number less than 518" (actually some number less than 337), Farber Tr. 316:22-317:20, even though this is "the essential question" on which "commonality depends." *Dukes*, 564 U.S. at 354. Likewise, Dr. Farber could not state whether "any particular woman" was discriminated against, which would be an "entirely different analysis." Farber Tr. 189:15-190:4. Plaintiffs want to certify a class to obtain a "presumption of individualized harm for each [of the 8,600+] class member[s]," Mot. 40, when their own expert's data, taken at face value, suggests that at most only a fraction of the requested class may have been improperly denied a promotion based on gender—and identifying that small fraction (assuming it exists) would require detailed evidence at individual hearings. As for Plaintiffs' half-page pyramid, Mot. 5, Dr. Farber explained it is irrelevant. It lacks "any controls" and does not say "anything statistically significant." Farber Tr. 259:2-12. Unsurprisingly then, Dr. Farber testified his "opinion isn't based" on that chart. *Id.* 321:3-4.

**Pay.** Dr. Farber's pay analysis fares no better than his promotion analysis. Only 7.8% of the pay decisions in Dr. Farber's model indicate a woman earned statistically significantly less than predicted that year. Saad Rpt. ¶29. And 5.9% earned significantly *more* than predicted. *Id.* The vast majority (86.3%) earned within Dr. Farber's predicted range. *Id.*

In analyzing pay, Dr. Farber does not factor in stock level because he concludes it is a "tainted variable." Farber Rpt. ¶48. Controlling for stock level means comparing only employees at the same level. Without that control, an entry-level female in an L59 role could be compared to an experienced male in an L65 role, as Dr. Farber does. Accounting for it, L59 female pay would be compared against only L59 male pay. Farber. Tr. 229:11-230:6. The pay disparity Dr. Farber identifies therefore builds upon his promotion disparity—i.e., how much women were paid less because they were not promoted at equal rates to men. Mot. 9-10; Farber Tr. 231:18-232:8 (pay and stock level "amount to the same statement"); 232:17-23 (difference

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 27 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

between the two is "just a labeling issue"—"different labels for the same general company HR decision"). Dr. Farber acknowledges his analysis "does not show how women would be paid relative to men if women and men were promoted at equal rates." Farber Tr. 227:2-8. Because his promotions analysis does not show commonality, neither does his pay analysis.

Nevertheless, Microsoft's expert Dr. Saad again followed Dr. Farber's approach (including not controlling for stock level) but shown by sub-approver. And the results once again show that *under Dr. Farber's* faulty model, at worst only isolated pockets of pay disparity exist. For example, at Level 2 during 2015, 25% of supervisors significantly underpay more women than they significantly overpay. Saad Rpt. ¶35. Similar results can be found for Level 3 supervisors (25%) and Level 4 supervisors (22%). *Id.* Many supervisors pay *every single* female employee within the range of what Dr. Farber's model would predict. *See, e.g., id.* (398 of Level 4 managers, or 58%). And had Dr. Farber controlled for stock level—which would show the pay disparity isolated from any promotion disparity—the same pockets still exist: in 2015, only *five* Level 2 supervisors (10%) show a statistically significant disparity, and seven Level 3 supervisors (3%). *Id.* ¶168. No matter how the data is sliced, Plaintiffs' *own* statistics show a lack of commonality under *Dukes* and *Ellis*.

### 4. Plaintiffs' declarations are insufficient to show commonality

Plaintiffs offer conclusory anecdotes from nine declarants, which appear to be relevant only to their disparate treatment claim, as they barely refer to the so-called "Calibration Process." For example, several declarants claim they suffered discrimination when they were first hired by Microsoft years ago and were purportedly paid less than men. *See, e.g.,* Smith Tr. 96:3-97:16; Vaughn Tr. 102:5-105:21; Warren Tr. 82:24-88:17. But calibration and people discussions do not occur at hire. As a result, these anecdotes have no bearing on Plaintiffs' disparate impact claim and are discussed below under disparate treatment. Even if the declarations go toward the disparate impact claim, they are too few to move the needle on commonality under *Dukes*, as discussed below.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 28 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

**B.**     **Plaintiffs' Disparate Treatment Claim Does Not Satisfy Commonality**

Plaintiffs' disparate treatment claim differs from their disparate impact claim in that it requires proof of *intentional* discrimination. But their motion to certify a class for that claim has many of the same flaws as their motion on the disparate impact claim.

A "wide gap" exists between an individual discrimination claim and "the existence of a class of persons who have suffered the same injury as that individual." *Dukes*, 564 U.S. at 352-53 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). To bridge that gap, the Supreme Court explained, plaintiffs seeking certification of a disparate treatment claim must provide "*[s]ignificant proof* that an employer operated under a *general policy* of discrimination." *Id.* 353 (emphasis added, citation omitted). In addition, the discrimination must have "manifested itself in … promotion practices in the same general fashion." *Id.* To justify a class, Plaintiffs must show not only that discrimination was "the regular rather than the unusual practice," but also that Microsoft directed and approved discrimination as its "standard operating procedure." *Id.* 352 n.7 (citation omitted); *see Dukes II*, 964 F. Supp. 2d at 1122 (plaintiffs must prove "discrimination against women was actually directed by Wal-Mart"). "In the systemic disparate treatment context, the focus shifts from the individual decisionmaker to the employer as an entity." *Diaz v. Ashcroft*, 301 F. Supp. 2d 112, 115 (D.P.R. 2004). Ultimately, Plaintiffs have the high burden of showing significant proof that a company is so rife with discrimination, that the company *intentionally* created a de facto policy to discriminate. The commonality inquiry for disparate treatment therefore "necessarily overlaps with [any] merits contention that [an employer] engages in a *pattern or practice* of discrimination." *Dukes*, 564 U.S. at 352.

**1.**     **Plaintiffs provide no significant proof that discrimination is the usual practice at Microsoft**

"If there is no evidence that *the entire class* was subject to the same allegedly discriminatory practice, there is no question common to the class." *Dukes II*, 964 F. Supp. 2d at 1121 (quoting *Ellis*, 657 F.3d at 983). Here, Plaintiffs' own statistics, even accepted at face value, negate any inference of a common policy of discrimination. According to Dr. Farber,

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 29 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

Microsoft made non-discriminatory promotion decisions as to at least 7,700 of the 8,037 class members—95.8%. *Supra* at 24-25. Further, Dr. Farber's analysis of alleged pay disparities adds nothing to his promotions analysis. *Supra* at 27-28. And when separated by supervisor, his data shows no pay disparities across broad swaths of Microsoft. *Id.* at 24-28. Accordingly, the Court should have "little difficulty concluding that the statistics … do not reflect 'significant proof' of a 'general policy of discrimination.'" *Dukes II*, 964 F. Supp. 2d at 1121 (quoting *Dukes*, 564 U.S. at 353).

Aside from Dr. Farber's flawed analysis, Plaintiffs offer only declarations from a few class members and anecdotes from internal HR complaints. Neither meets their burden to prove a general policy of discrimination. And Dr. Ryan is no help on that front because her opinion says nothing about discrimination at all. *Supra* at 20. Though there is no established cutoff for the number of declarations required to show "significant proof," *Dukes* approvingly cited the roughly 1 to 8 ratio between affidavits and class size in *Teamsters*, *see Dukes*, 564 U.S. at 358 (citing *Teamsters v. United States*, 431 U.S. 324, 337 (1977)), where the plaintiffs coupled anecdotes with evidence that defendant had *zero* African-Americans among its 1,828 line drivers. *See also Dukes*, 564 U.S. at 358 (1 in 12,500 insufficient); *Dukes II*, 964 F. Supp. 2d at 1124 (1 in 1,745 insufficient). Here, Plaintiffs offer only 9 declarants, representing 0.1% of the putative class—fewer declarants than testify about positive, non-discriminatory experiences at Microsoft.[20] Even "if every single one of [Plaintiffs' declarants'] accounts is true," *Dukes*, 564 U.S. at 358, this evidence would show only that 1 out of every 959 class members potentially encountered discrimination over the course of five years—far short of a policy. Plaintiffs' proof pales in comparison to the evidence in the cases on which they rely, where anecdotal evidence exceeded the volume deemed sufficient in *Teamsters*. *See* Mot. 34 (citing *Brown v. Nucor Corp.*, 785 F.3d 895, 913 (4th Cir. 2015) (evidence from 1 in 6.25 class members); *Rollins v.*

---

[20] *See discussion* Appel Dec. ¶5; Calla Dec. ¶¶4, 11-12; Easterbrook Dec. ¶¶6, 12; Freshour Dec. ¶13; Kunes Dec. ¶¶5, 11; Lee Dec. ¶12; Mahalati Dec. ¶¶11-12; Shariff Dec. ¶¶8-9; Sones Dec. ¶7, 10; Waheed Dec. ¶¶6-7; Watterson Dec. ¶¶11-12, 19; Alvarez Dec. ¶¶7-10; Iyer Dec. ¶¶5, 9; Ku Dec. ¶14; Liuson Dec. ¶¶8-9, 19; Lockard Dec. ¶10; Mao Dec. ¶¶11-12.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 30 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

*Traylor Bros.*, 2016 WL 258523, at *5, 7-8 (W.D. Wash. Jan. 21, 2016) (1 in 5)).

Further, the 0.1% of the class who submitted declarations did not even all testify that *in their experiences* discrimination is the norm; they agreed it depends on the manager. *See* Muenchow Tr. 63:5-21 (managers have no "standard way of treating people"); Underwood Tr. 198:19-199:3 ("discriminating on the basis of gender is event-specific and person-specific"); Alberts Tr. 76:9-20 (approach of male manager personality-dependent). Plaintiffs' declarations are thus "too weak to raise any inference that all the individual, discretionary personnel decisions are discriminatory."[21] *Dukes*, 564 U.S. at 358.

Unable to support certification from their declarations, Plaintiffs point to a hodgepodge of statements and incidents intended to show an "atmosphere" or "culture" hostile to women. Mot. 19-26. But Plaintiffs not only need to show "significant proof" of a "general policy of discrimination," they must also "*link* the alleged culture of gender bias to the challenged pay and promotion decisions"—i.e., they must show they can prove causation on a classwide basis. *Dukes II*, 964 F. Supp. 2d at 1119-20 (emphasis added); *see also Oseman-Dean v. Illinois State Police*, 2012 WL 1280226, at *14 (N.D. Ill. Apr. 12, 2012) (requiring link between alleged culture and discrimination). They have not done so. Plaintiffs offer notably few examples of pay and promotion issues among the class. For instance, despite protesting that the ERIT team

---

[21] The declarations suffer from many other evidentiary problems. They are riddled with multiple layers of hearsay, to which no exception applies. *E.g.*, Muenchow Dec. ¶6 ("when [women] speak up in meetings, they receive negative criticism for being too aggressive, but men routinely interrupt or talk over women without criticism"). They are conclusory and lack foundation. *E.g.*, Boeh Dec. ¶6 (stating belief that pay inequity is "a systemic problem at Microsoft" based on her experience and one other where man allegedly offered more money than woman); Dove Dec. ¶5 ("I believe I was discriminated against in the calibration process because someone had to receive zero rewards, and that someone became me because of my gender."). They even contradict their own deposition testimony. *Compare, e.g.*, Alberts Dec. ¶8 (stating human resources never got back to her) *with* Alberts Tr. 170:3-172:9 (admitting she specifically asked HR not to take any action) and Smith Dec. ¶7 (men drank together and excluded her) *with* Smith Tr. 112:13-20 (men usually invited her to go drinking with them). The Rules of Evidence apply to class certification determinations and the Court should strike this inadmissible evidence. *See, e.g., Khadera v. ABM Indus. Inc.*, 701 F. Supp. 2d 1190, 1196 n.2 (W.D. Wash. 2010) (criticizing plaintiffs for "brazenly argu[ing]" that evidence rules do not apply at this stage); *Hoffman v. Securitas Sec. Servs.*, 2008 WL 5054684, at *12 (D. Idaho Aug. 27, 2008) (striking hearsay in class certification declarations); *Rix v. Lockheed Martin Corp.*, 2011 WL 890744, at *3 (S.D. Cal. Mar. 14, 2011) (striking declaration at certification stage that "NISPON is the bible, it governs everything" on basis that "[a] declaration should not be argument") (citation omitted); *Hurley v. U.S. Healthworks Med. Grp. of Wash., P.S.*, 2006 WL 1788994, at *1-2 (E.D. Wash. June 27, 2006) (striking declarations not based on personal knowledge or which reflected legal conclusions); *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 467 (N.D. Ill. 2009) (bare allegations of "boys' club culture" are "too vague").

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 31 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

1    determined only one gender-related concern was "founded" during the relevant timeframe, Mot.

2    24, they cite *not one* example of a *pay/promotion* concern for which they contend ERIT should

3    have found a violation of company policy. Instead, Plaintiffs cobble together isolated instances

4    of claimed harassment or retaliation that are not limited to class members and have essentially no

5    relevance to their pay and promotion allegations.[22]

6         Even if Plaintiffs could link their evidence to pay and promotions, it suffers from two

7    further critical flaws. First, the "proof" falls far short of what evidence rules require. The

8    statements consist of gossip from message boards, one-sided accounts of alleged incidents that

9    occurred years earlier, and multiple levels of inherently unreliable hearsay,[23] which should be

10   stricken.[24] Second, Plaintiffs ignore that the incidents (even if accepted as true) must be

11   considered in the context of millions of daily interactions within a workforce of tens of

12   thousands of employees during the proposed class period. While Plaintiffs have shown isolated

13   reports of purported inappropriate behavior, their evidence falls far short of the necessary

14   "significant proof" that discrimination is the norm to the point where it reflects Microsoft policy.

15

16

17

18

---

[22] Take one of Plaintiffs' examples: where a manager touched a female employee's leg at a team dinner. Mot. 22 (citing MSFT818175). ERIT investigated the incident by interviewing *ten* employees—those also at the table. The investigation determined the male employee's "account and denial were not credible" and concluded he violated policy. While no doubt inappropriate, that manager's leg-touching—which Microsoft did not tolerate—says nothing about any alleged impact on the complainant's pay and promotion history.

[23] Some statements, even if true, lack an explanation as to how they show gender bias (such as using a popular song as a project name or a shirt depicting one Microsoft team (AppEx) eating another team (MSN)). Mot. 20.

[24] These hearsay statements are inadmissible even if they appear within business records, as they constitute hearsay within hearsay. *See C.O. v. Coleman Co.*, 2008 WL 820066, at *2 (W.D. Wash. Mar. 25, 2008) (underlying hearsay also must fit within hearsay exception); *United States v. Bortnovsky*, 879 F.2d 30, 34 (2d Cir. 1989) (citing Ninth Circuit cases) (hearsay in business records inadmissible when person providing information had no business duty to report). Nor are these hearsay statements party admissions. *See, e.g., Richards v. City of Seattle*, 2008 WL 2570668, at *9 n.15 (W.D. Wash. June 26, 2008) (statements concerning reasons for adverse employment action admissible only if declarant was involved in decision); *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 622–23 (7th Cir. 2003) (statements of former employee inadmissible against employer because they were made in the context of terminating his employment, placing him in an "adversarial relationship" with employer). Plaintiffs' reliance on settlement demand letters, *see* Mot. 24-27 (citing MSFT59215, 64918, 64978, 64984, 859406, 865592), is also improper under FRE 408. *See Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 980 (9th Cir. 2009) (barring settlement negotiations offered to prove liability).

### 2. Plaintiffs provide no significant proof that Microsoft sponsored or directed intentional discrimination

Plaintiffs offer no evidence that any alleged discrimination "was actually directed by" senior leadership. *Dukes II*, 964 F. Supp. 2d at 1122. Rather, the record shows Microsoft leadership is mindful of workplace bias issues, devotes substantial resources to programs combatting it, and holds leaders accountable. *Supra* at 9-12. Microsoft prohibits gender discrimination and provides remedies to aggrieved employees. *Id.* Its 25-person D&I team educates employees on issues such as unconscious bias. Dhillon Decl. ¶¶7-8. Nothing in the record suggests this substantial investment is mere "window-dressing," as Plaintiffs argue. *See* Mot. 27-28. And the communications Plaintiffs point to among D&I employees show nothing more than that Microsoft was constantly *striving to do even better. Id.*

Further, to justify certification of their disparate treatment claim, Plaintiffs must show senior management's actual participation in an intentionally discriminatory policy. For example, in *Ellis II*, "[t]op management's involvement in the promotion process [wa]s … consistent, and pervasive, classwide," to the point that the list of individuals eligible for promotion and the criteria for promotion was maintained and approved by senior management. 285 F.R.D. at 511-12. Here, by contrast, high-level management delegated implementation of Microsoft's pay and promotion system to lower-level managers who conducted annual reviews and made pay and promotion decisions—and even Plaintiffs concede many of those managers acted fairly.

Nonetheless, Plaintiffs argue that Microsoft's top executives *implicitly* adopted a contrary general policy of intentional discrimination by ignoring evidence of disparate impact as reflected by: (1) Microsoft's internal reviews of pay and promotion decisions (which Plaintiffs refer to as self-audits), (2) OFCCP audits, (3) inquiries from employees following Microsoft's equal pay announcements, (4) ERIT complaints, and (5) training. None of this shows the intent Plaintiffs claim; moreover, the "evidence" is based on faulty assumptions.

**Microsoft Internal Reviews.** Plaintiffs argue Microsoft "must be aware [of] the disparities in compensation and promotion identified" by Plaintiffs, because Microsoft "slices and dices ... data six ways to Sunday." Mot. 11. As an initial matter, this is conjecture, not

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 33 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

evidence, as Plaintiffs acknowledge. *Id.* More importantly, as Dr. Saad explains, when the factors available in the data are taken into account, the alleged disparities identified by Plaintiffs are not practically significant. Saad Rpt. ¶¶9-13 & n.7, 167, 176.

**OFCCP.** OFCCP regularly audits government contractors. During the proposed class period, OFCCP conducted and closed audits of 18 Microsoft locations *without any adverse findings*—even though, according to Plaintiffs' theory, all of these establishments had the same policies and procedures Plaintiffs challenge. Parris Dec. Ex. 19. Ignoring those 18 other audits, Plaintiffs urge the Court to rely—as an evidentiary matter—upon OFCCP's notice of violation as to the Redmond facility, which focuses solely on certain Software Engineering positions. Mot. 11 (citing MSFT65719, 801714). But a "notice of violation" is not evidence. It is tantamount to a demand letter, issued by the agency *before* receiving Microsoft's position on the merits and *before* the OFCCP shares information regarding the basis for its views. OFCCP has not begun a lawsuit, and the parties are discussing the alleged violations and related statistical models. Even if the OFCCP files suit, its complaint will consist of allegations—allegations that will only then be addressed on the merits. OFCCP's preliminary and untested allegations are not evidence, much less "significant proof." The Court should not rely on them.[25]

**Employee Inquiries.** Plaintiffs point to comments from employees after Microsoft's equal pay announcements expressing a belief that Microsoft should have focused on promotions rather than pay within level.[26] Mot. 13-16. But these comments did not put Microsoft on notice that meaningful disparities *in fact* existed. It makes no difference that some employees thought a

---

[25] OFCCP's legal conclusions are not admissible. *See Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 777 (9th Cir. 2010). Nor are OFCCP's alleged factual findings admissible in the absence of adversarial testing. *Id.* at 778 (rejecting DOL report where, *inter alia*, investigator's experience could not be determined and no hearing held); *Kibler v. G.M.C.*, 1996 WL 767417, at *2 (W.D. Wash. July 9, 1996) (report untrustworthy absent cross-examination and ability to examine documents underlying report). OFCCP's conclusions rest on inadmissible hearsay (e.g. employee interviews) and opinions from witnesses not testifying as experts. OFCCP has not provided details of its expert report to test its reliability, and its "expert" has not been offered as an expert here. *See Zottola v. City of Oakland*, 32 F. App'x 307, 312 (9th Cir. 2002) (prohibiting non-expert testimony on statistical analyses).

[26] These, too, are inadmissible hearsay statements and lay opinions. *Supra* at n.21.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 34 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

1  different analysis would produce a different result—and it certainly is not the "significant proof"

2  of a discriminatory policy required to justify certification.[27]

3      **ERIT.**  Plaintiffs suggest Microsoft became aware of pervasive discrimination and

4  declined to address it by pointing to the number of complaints brought to ERIT's attention,

5  declaring that the number (out of millions of employee interactions) "is shocking."[28]  Mot. 23-

6  26.  But Plaintiffs offer no support for the implication that complaints of that volume over

7  several years is even unusual for a company this size.  *Compare* Young Rpt. ¶¶56-57.  Moreover,

8  Plaintiffs equate allegations (many of which were unfounded) of policy violations with proof of

9  legally actionable conduct.  ERIT's findings of harassment in violation of company policy,

10  which is broader than the law, often led to concrete action, which Plaintiffs ignore.  *See id.* ¶¶24,

11  55.  And even when ERIT finds no policy violation after an investigation, Microsoft often *still*

12  takes proactive steps such as counseling and further training.  *Id.* ¶¶24, 55, 57; *see also, e.g.*,

13  MSFT632384; 721342; 812609; 812064.  Plaintiffs' selective statistics and anecdotes[29] offer no

14  basis for undermining ERIT's efficacy,[30] particularly when Microsoft's expert Rhoma Young

15  states that ERIT conducts investigations that are "thorough, timely, accurate, objective, and well-

16  documented, and target thoughtful and reasoned conclusions."  Young Rpt. ¶37; *see also id.* ¶24;

17  DeLanoy Tr. 157:6-13; 157:21-159:3; 159:16-24.

18      **Training.**  All employees must complete unconscious bias training.  MSFT642362.  Over

19  100,000 people have completed that training and have moved on to supplemental programs.

20  MSFT238537.  Plaintiffs, however, attack Microsoft's training based on (a) hearsay that one

---

21  [27] In any event, whatever notice Plaintiffs contend Microsoft received, their own expert's statistical analysis shows,

22  at worst, isolated pockets of discrimination—not evidence of the sort of endemic discrimination necessary to justify class certification of a disparate treatment claim.

23  [28] Though 29 of these complaints identified a policy violation, that does not mean, as Plaintiffs imply, no wrongdoing was found as to the other complaints or no corrective action was taken.

24  [29] One declarant, for example, inaccurately surmised that ERIT was not doing anything because she "did not see

25  [ERIT] take any action to address the discrimination."  Underwood Dec. ¶9.  In fact, ERIT did investigate her complaint, but Underwood left Microsoft before the investigation concluded.  MSFT640143.

26  [30] Plaintiffs suggest that because Microsoft does not brand the subjects of complaints with a scarlet letter ("repeat offenders" as Plaintiffs call them), its processes are "troubling[]."  Mot. 25.  But the standards of workplace investigations do not mandate a presumption of guilt based on a report without adverse finding.  In any event,

27  Microsoft maintains complaint files and can account for prior histories if another complaint arises.  DeLanoy Tr. 82:17-83:4; 89:4-14; 89:17-23; 90:23-92:4; 91:23-92:4; 92:14-93:24; 94:10-16; 167:22-25.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    - 35 -
CASE NO. 2:15-cv-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

participant (out of 100,000) perceived one session facilitator "tended" to ignore less outspoken women in that audience, and (b) Muenchow's view that the training hasn't made a noticeable difference to her. Mot. 21. But Microsoft offers a portfolio of customized diversity and inclusion training courses for all levels of employees and leaders. MSFT642357-94; Dhillon Dec. ¶8. In the face of these initiatives, neither one anonymous criticism of the quality of one training session nor Muenchow's view of the training's impact rises to the level of "significant proof" of an intentional companywide discriminatory policy requiring classwide treatment.

**Other Evidence.** The only other "evidence" Plaintiffs offer regarding senior executive involvement in discrimination involves communications emphasizing the company's continued focus on gender issues. Mot. 16-18. But Plaintiffs disregard that the very communications on which they rely arose out of Microsoft hiring a consultant to "shed new light, consider new perspectives, and leave [the company] with actionable pathways forward for positively impacting the complex challenge of gender inclusion and diversity in the technical field." MSFT677331 at 3 (emphasis omitted); *see also id*. at 8 (noting that women "expressed their thanks" and thought this demonstrated "Microsoft's commitment to enhance the efforts to advance and retain women"). Plaintiffs likewise misrepresent the other documents they cite, which reflect Microsoft's commitment to creating a diverse and inclusive workplace. *See, e.g.*, MSFT17963 (Microsoft CEO, stating "I am personally fully committed to these [D&I] efforts [at the core of our culture and company] and so is the rest of the Senior Leadership Team."); MSFT22539-40 (telling employees, "[I]f you think there is an issue – Raise It. . . . [I]f you believe you know an example of [a] pay gap, please bring it up."). Microsoft should not be punished, as Plaintiffs propose, for being proactive in creating a more diverse and inclusive workplace.

Plaintiffs cite only one post-*Dukes* case—*Ellis II*—in which a court found "significant proof" of a general policy of intentional discrimination. But there, "the CEO and other top executives" were directly involved in the employment decisions at issue and "employ[ed] stereotyped thinking regarding women's roles in society." *Ellis II*, 285 F.R.D. at 520. Further, the company's culture "foster[ed] and reinforce[d] stereotyped thinking, which allow[ed] gender

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 36 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

bias to infuse the promotion process from the top down." *Id.* Plaintiffs present *no* such evidence at Microsoft. Rather, the evidence shows Microsoft—mindful of complaints raised within its walls—is self-reflective and forward-thinking on gender issues.

## II. Plaintiffs Do Not Meet The Requirements of Rule 23(a)(3)-(4)

### A. Plaintiffs Have Not Demonstrated Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Its premise is simply stated: "'as goes the claim of the named plaintiff, so go the claims of the class.' Where the premise does not hold true, class treatment is inappropriate." *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 412 (C.D. Cal. 2000) (citing *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (en banc)). For that reason, a plaintiff who "suffered no injury as a result of the alleged discriminatory practices" is "not eligible to represent a class of persons who did allegedly suffer injury." *E. Texas Motor Freight Sys. Inc. v. Rodriguez,* 431 U.S. 395, 403-04 (1977).

Moussouris's and Muenchow's pay and promotion claims are not typical because their experiences relate only to their particular male and female managers. And "the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." *Dukes*, 564 U.S. at 355-56; *see also Bushbeck v. Chicago Title Ins. Co.*, 2011 WL 13100725, at *8 (W.D. Wash. Aug. 15, 2011) (Robart, J.) (named plaintiffs subject to one region's policies not typical of class members subject to another region's policies). Dr. Farber's own statistics show Plaintiffs do not "possess the same interest and suffer the same injury" as the class. *Rodriguez,* 431 U.S. at 403 (citation omitted). In terms of pay, neither earned significantly less than Dr. Farber's model predicts she should have and Moussouris earned *more* (even more than her male manager). Saad. Rpt. ¶¶39-42, Appx. 1 at p.1 (Farber's model predicts that in ████ Moussouris should have been earning ████ but she was actually making ████ per year—and in ████ ████ instead of her actual ████). As for promotions, Dr. Farber's model did not predict that either Muenchow or Moussouris should have been promoted during the class period,

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 37 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

yet Muenchow did receive a promotion during that time.[31]  *Id.* ¶¶48-49; Appx. 1 at p.2.  Because Plaintiffs are among the women *not harmed* according to their own statistics, they lack the same interest as those class members they contend were harmed by pay and promotion decisions.

Moreover, a named plaintiff cannot satisfy typicality if her "unique background and factual situation require h[er] to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class." *Hanon*, 976 F.2d at 508; *accord Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 633 (W.D. Wash. 2011) (Robart, J.).  For example, in *Hartman v. United Bank Card Inc*., 2012 WL 4758052, at *13 (W.D. Wash. Oct. 4, 2012) (Robart, J.), plaintiffs were not typical because finding liability "require[d] individualized evidence and analysis."  Some class members answered robocalls; others had the calls go to voicemail; some answered in Washington; others answered out of state.  *Id.*  Similar individualized defenses with individualized evidence and analyses are necessary here.

***Moussouris*.**  Microsoft has specific "legitimate, nondiscriminatory reason[s]" for Moussouris's pay and promotion decisions.  *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003).  Plaintiffs admit Microsoft can defeat liability for any class member by showing that her manager's pay or promotion decision was made "for lawful reasons."  Mot. 30 (disparate impact); Mot. 31 (disparate treatment).  Moussouris's reviews show her difficulty collaborating with others.  Her manager recommended she "seek training that will better enable [her] to manage differences in opinion" explaining that "[w]inning is not always about getting your idea across the finish line 100% intact."  MSFT29682; MSFT29680 (a "struggle[] that has continued in this period is around creating the conditions for successful collaboration with internal partner teams"); *id.* ("[Y]ou actually become hostile towards them if their opinion is different than your own."); *see also* MSFT29691 ("those around [Moussouris] were, at times, negatively impacted by" her "personal issues").  Moussouris's EEOC file corroborates Microsoft's assessment,

---

[31] Six of Plaintiffs nine declarants were paid more than predicted by Plaintiffs' model.  Saad Rpt. ¶43, Appx. 1 at p.1  As one example, Dove was paid approximately ▉▉▉ in 2013 when Dr. Farber expects her to make closer to ▉▉▉.  *Id.*  For promotions, only one declarant was not promoted under Dr. Farber's model expects her to have been; instead, she was promoted the following year.  *Id.* at ¶48, Appx. 1 at p.2

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 38 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

revealing the agency intended to dismiss her charge for lack of evidence—at least until her lawyer intervened and persuaded the agency to instead issue a right to sue letter.  P007578.

*Muenchow.*  Microsoft had performance reasons for Muenchow's pay and promotion decisions, too.  Reviews from managers (men and women) reported Muenchow would go "dark" leaving her "status on work unknown."  MSFT318.  She was told that "[i]n a central role that's all about informing and coordinating it's important to be consistent in your communication so others can depend on getting information from you in a timely manner."  P809; *see also id.* ("[Y]our communication to Test Managers was less regular than it needed to be this year."); P865 ("[C]ommunicating this information in an organized and reliable way has been an issue I have witnessed."); P872 (improving "outward communications" would provide "a clearer path to the next level.").  Muenchow recognized that she struggled with her "ability to focus."  P809.  A finder of fact could easily find in Microsoft's favor on Moussouris's and Muenchow's individual claims for reasons that would not apply generally to the class.  That defeats typicality.

## B.    Plaintiffs Cannot Demonstrate Adequacy

Rule 23(a)(4) requires that "named parties 'will fairly and adequately protect the interests of the class.'"  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Courts must determine whether there exist "any conflicts of interest with other class members" and whether "named plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class." *Ellis*, 657 F.3d at 985.  The adequacy requirement demands *shared interests* among the representatives and the class, not just a promise to advocate for the class.  *Id.*

Moussouris has an obvious conflict: she, like thousands of putative class members, actively participated as a manager in the Calibration Process, evaluating the very employees she now seeks to represent as alleged victims of that process.  But courts do not allow classes infected by such obvious internal division—as another judge of this Court held when Plaintiffs' counsel tried to bring a similar Title VII action against Microsoft in 2001.  In *Donaldson*, "[t]wo of the three named plaintiffs … [were] former Microsoft supervisors."  205 F.R.D. at 568.  "As such, they were obligated to implement the very supervisory system which th[e] litigation

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 39 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

challenge[d]." *Id.* Accordingly, the Court found two conflicts: "the named plaintiffs' interests [are] in potential conflict with those of the putative class *and* the "class members are … potentially in conflict with one another." *Id.* Other cases reach the same conclusion, refusing to certify classes consisting of supervisors and non-supervisors. *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) (representatives inadequate because "plaintiffs have authority within the company with regard to the compensation of some, and maybe many, of the unnamed class members"); *Wagner v. Taylor*, 836 F.2d 578, 595 (D.C. Cir. 1987) ("Although each group [i.e., supervisors and non-supervisors] shares the interest in freedom from discrimination, potential conflicts may and do arise within a class including both.").[32] Conversely, Muenchow, as a non-supervisor, cannot adequately represent the interests of supervisory-class members.

Plaintiffs admit the problem, conceding that an employee's "participat[ion] in decision making within the challenged process" would "preclude [her] inclusion in the Class." Mot. 9. They claim to have avoided the issue by excluding "women at Levels 68 ('partner') and above." *Id.* In fact, managers at levels below 68 participate extensively in calibration, and it is the direct managers who have the *most* influence, not those far removed from the employee. Calla Dec. ¶¶7-10 (promoted men and women; evaluates employee performance; participates in calibration); Watterson Dec. ¶¶3, 12-16 (similar); Helf Dec. ¶7 (all managers invited and typically attended calibration meetings); Shepherd Dec. ¶¶12-13; Ku Dec. ¶¶9, 13; DeCaprio Dec. ¶16. Thus, the proposed class includes thousands of female managers who participated actively in the challenged Calibration Process—and through that participation contributed to the decisions at issue.[33] Saad Rpt. ¶17 (2,126 class member managers; 1,331 leads).

---

[32] *See also, e.g.*, *King v. Enter. Rent-A-Car Co.*, 231 F.R.D. 255, 265 (E.D. Mich. 2004); *Bacon v. Honda of Am. Mfg., Inc.*, 205 F.R.D. 466, 481 (S.D. Ohio 2001), *aff'd*, 370 F.3d 565 (6th Cir. 2004); *Appleton v Deloitte & Touche L.L.P.*, 168 F.R.D. 221, 233 (M.D. Tenn. 1996); *Gonzalez v. Brady*, 136 F.R.D. 329, 333 n.12 (D.D.C. 1991); *Grant v. Morgan Guar. Tr. Co. of N.Y.*, 548 F. Supp. 1189, 1193 (S.D.N.Y. 1982); *Graves v. State of Colo.*, 31 Fed. R. Serv. 2d 1480 (D. Colo. 1980); *Arnett v. Am. Nat'l Red Cross*, 78 F.R.D. 73, 76 (D.D.C. 1978).

[33] While the mere *potential* for conflict is sufficient to deny certification, *see, e.g.*, *Graves*, 31 Fed. R. Serv. 2d at 1480, the tension here is identifiable because class members, including Moussouris and several declarants, played an active role in calibration sessions for women. Saad Rpt. ¶18. (Moussouris supervised putative class members); Alberts Tr. 53:7-17, 55:5-10 (participated in six calibration meetings involving class member-direct reports); Dove Tr. 36:8-37:22, 129:16-131:9 (provided performance evaluation reviews on an annual basis to between five and ten

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 40 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

1    In practical terms, this means thousands of managers within the class have a vested

2    interest in defending the integrity of their input (as they have testified),[34] as well as their

3    compliance with Microsoft policies requiring them to represent employees in calibration "in a

4    knowledgeable and unbiased way."[35]  MSFT2283.  But other class members allege

5    discrimination at the hands of the manager class members.  This tension necessarily means

6    proposed class counsel cannot "prosecute the action vigorously on behalf of the [entire] class,"

7    as they cannot zealously represent both the alleged perpetrators and their victims.  *Ellis*, 657 F.3d

8    at 985 (citation omitted); *see also* Fed. R. Civ. P. 23(g); *Kayes v. Pac. Lumber Co.*, 51 F.3d

9    1449, 1465 (9th Cir. 1995) ("The responsibility of class counsel to absent class members whose

10   control over their attorneys is limited does not permit even the appearance of divided loyalties of

11   counsel.") (citation omitted); *accord Fiandaca v. Cunningham*, 827 F.2d 825, 829 (1st Cir.

12   1987); *Vuyanich v. Republic Nat'l Bank of Dallas*, 82 F.R.D. 420, 434 (N.D. Tex. 1979).

13           These conflicts go to the heart of Plaintiffs' case.  They cannot prevail without showing

14   bias across the company, which will require impugning the input of thousands of class members

15   who participated in calibration.  Plaintiffs cannot solve the problem by seeking a decision on

16   liability first, followed by individual claims at mini-trials because the inherent conflict "impacts

17   upon the trier of fact's finding of liability."  *King*, 231 F.R.D. at 265.  Plaintiffs' allegations

18   "arise directly from the evaluation system at Microsoft," in which women actively participated as

19   evaluating managers; the Court should not certify a class that "include[s] both those who

20   implemented the ratings system and those who allegedly suffered under it."[36]  *Donaldson*, 205

21

22   direct reports, including women); Sowinska Tr. 55:3-59:12, 73:18-22 (attended calibration meetings; gave feedback on dozens of direct reports and peers of both genders); *see also* Saad Rpt. ¶18 (Muenchow supervised by class member-managers); Dove Tr. 50:15-25 (attesting to her belief that each manager "discriminated against [her]

23   because of gender" in pay or promotion).

24   [34] *See, e.g.*, Alberts Tr. 70:11-24 (as a calibration participant, she always provided truthful feedback and did not give "men more positive feedback than ... women"); Dove Tr. 45:8-17 (same); Sowinska Tr. 59:5-19 (same).

25   [35] Even non-managerial class members who did not participate directly in calibration meetings had input (as colleagues) into reviews affecting promotion and compensation decisions.  MSFT1595; Vaughn Tr. 76:25-78:18

26   (provided feedback during Connect process); Warren Tr. 110:2-111:19 (provided performance reviews for between 16 and 25 women); Boeh Tr. 53:11-54:7 (completed several performance evaluation reviews).

27   [36] In addition, as a *former* Microsoft employee, Moussouris is inadequate to pursue equitable relief.  *Ellis*, 657 F.3d at 986 ("Plaintiffs not employed by Costco throughout this case do not have standing to seek injunctive relief").

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    - 41 -
CASE NO. 2:15-cv-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

1 F.R.D. at 568.

2 **III.    Plaintiffs Do Not Meet The Requirements Of Rule 23(b)(3)**

3       Even if Plaintiffs could prove common issues, individual issues will predominate and

4 class resolution is not superior.  Fed. R. Civ. P. 23(b)(3).

5       **A.    Plaintiffs Have Not Shown Predominance**

6       Predominance is a "far more demanding" requirement than commonality.  *Amchem*, 521

7 U.S. at 624.  A plaintiff can establish predominance only if the "common, aggregation-enabling,

8 issues in the case are more prevalent or important than the non-common, aggregation-defeating,

9 individual issues."  *Tyson Foods,* 136 S. Ct. at 1045 (citation omitted).  "Predominance requires

10 that the common issues be both numerically and qualitatively substantial in relation to the issues

11 peculiar to individual class members."  *In re Dynamic Random Access Memory (DRAM)*

12 *Antitrust Litig.*, 2006 WL 1530166, at *6 (N.D. Cal. June 5, 2006) (internal quotation omitted).

13       **Liability.**  Plaintiffs say three common liability questions will predominate at trial:

14 whether the Calibration Process causes a disparate impact on women, whether there is a business

15 need for it, and if there's an alternative.  Beyond those, they argue, only "individual damages

16 issues" will remain.  Mot. 38.  That misstates the law.[37]  Plaintiffs simply label "eligibility for

17 relief" as part of "damages," even though that is just liability by another name.  Whether

18 someone has a discrimination claim requires an individualized determination as to *why* she did

19 not receive a particular raise or promotion.  *See Amchem*, 521 U.S. at 623-24.  Before Plaintiffs

20 can establish liability as to any particular class member, the parties must litigate issues requiring

21 highly individualized proof, including whether: (1) the employee was adversely affected in pay

22 or promotion relative to male peers, which statistics cannot determine; (2) deficient performance

23 or discrimination caused any adverse effect; (3) the employee declined advancement

24 opportunities; (4) the employee's business unit performed poorly; (5) business need for

25
───────────────
[37] Plaintiffs' argument is also improperly premised on the notion that predominance can still be satisfied despite
26 needing separate "*Teamsters* hearings" to determine liability.  But *Teamsters* was initiated by EEOC, 431 U.S. at
328, and Rule 23 did not apply in that context. *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 323 n.5, 324
27 (1980). *Teamsters* says nothing about the propriety of individual hearings where Rule 23's restrictions, including
predominance, do apply.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    - 42 -
CASE NO. 2:15-cv-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

promotion existed; (6) a promotion was available; and (7) the employee failed to exhaust administrative remedies (depending on applicable law). *See, e.g., Grosz v. Boeing Co.,* 2003 WL 22971025, at *6-7 (C.D. Cal. Nov. 7, 2003) (liability analysis requires individualized inquiry as to employee performance), *aff'd,* 136 F. App'x 960 (9th Cir. 2005); *see also Hartman*, 2012 WL 4758052, at *12 (certification denied where liability would turn on individualized defenses); *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 461 (N.D. Ill. 2009), *aff'd,* 675 F.3d 709 (7th Cir. 2012); *Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619, 676 (N.D. Ga. 2003).

Plaintiffs admit the need for individual hearings for each of the 8,600+ class members to show whether they "suffered an adverse employment action and therefore was a potential victim of the proved discrimination." Mot. 30; Mot. 31 (disparate treatment), Mot. 43 (need individual hearings to determine eligibility for relief and damages). Although Plaintiffs couch this concession as merely part of a trial plan, it shows the very defect that precluded certification in *Dukes*. This Court dealt with a similar issue in *Hartman*, where plaintiffs tried to certify a class of customers who received robocalls allegedly in violation of a Washington statute. 2012 WL 4758052, at *4. For any particular call, the defendant would not have been liable if a live person did not pick up or if the phone was not in Washington. *Id.* *12. Rule 23 was not met because the court might have to "hold individualized hearings" as "to each of the calls." *Id.* *14-15.

The same is true here. Determining the reasons for pay and promotion decisions—i.e., *why was I disfavored*—requires an intensive, fact-specific inquiry into each class member's individual circumstances. Take Olga Hutson, for example, one of Plaintiffs' nine declarants. She worked on a small team in Cambridge, Massachusetts. Hutson Dec. ¶3; Hutson Tr. 48:15-25. She was never promoted from an L64 role, even while she "observed men receiving promotions to Level 65" roles, which she attributes to discrimination. Hutson Dec. ¶5. But another woman on her team who started at L64 at about the same time did get promoted to L65. Silvestri Dec. ¶5. Hutson also contends she "complained to HR," and "despite telling [her] that my manager acted inappropriately, ERIT found no violation." Hutson Dec. ¶6. But Hutson's complaint related to a hearing disability, not gender discrimination. Hutson Tr. 116:22-117:7.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

\- 43 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

1  She was not promoted, her reviews explain, because she was "not meeting expectations as a

2  Senior PM: relative to [her] peers, technical depth and decision-making." MSFT884743. For

3  example, in the area of "specs" (designs for new software features), she "need[ed] to be faster,"

4  needed more "[c]areful review of [her] work," and needed a "strong[er] understanding of the

5  definitions, concepts and ideas" in the spec. MSFT884744.

6         Thus, answering the question why Hutson was disfavored, i.e., resolving liability issues

7  as to her, will require much more than a determination as to the Calibration Process; it will also

8  require an examination of her individual circumstances. Each of Plaintiffs' declarants has her

9  own unique story, as does every other putative class member. Appel Dec. ¶6 (happy as

10  individual contributor; managers respect decision to remain at that level); Shariff Dec. ¶¶8, 9

11  (believes pay and promotions were proper); Freshour Dec. ¶5 (rejoined Microsoft for work-life

12  balance).

13         **Causation.** Under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), Plaintiffs must have a

14  classwide method to show damages were caused by the same actions that give rise to liability.

15  Absent such showing, "plaintiffs cannot establish predominance." *Vaquero v. Ashley Furniture

16  Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016) (wage and hour class action) (citing *Pulaski &

17  Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987-88 (9th Cir. 2015)).[38]

18         Plaintiffs have not even tried to explain how they could present classwide proof to show

19  that calibration meetings adversely affected each class member. Their experts, in fact, disavow

20  finding any unifying cause. *Supra* at 20-21, 26. And so causation (or lack thereof) will

21  necessarily vary depending on the unique circumstances of each individual and her manager.

22  Some class members allege causes other than calibration meetings, such as discrimination *during

23  the hiring process*, *see* Smith Tr. 96:3-97:16; Vaughn Tr. 120:16-123:15; Warren Tr. 82:24-

24  88:17, or discrimination by peers or direct managers *before*—not during—calibration meetings.

25  Smith Dec. ¶7. Some claim adverse employment decisions not based on gender but alleged

26  disability or retaliation. Hutson Tr. 117:2-7; Underwood Tr. 236:10-15, 238:17-239:24. Most

27

---

[38] Plaintiffs rely on *Ellis II* for this issue but that district court decision preceded *Vaquero*. Mot. 38-39.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                    - 44 -
CASE NO. 2:15-cv-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

importantly, Plaintiffs' own statistics show that the overwhelming majority of the class was *not* injured by the Calibration Process. *Supra* at 24-28. In short, whether any injury was caused by an unlawful employment practice—i.e., the supposedly discriminatory discretion wielded during calibration—will require a highly individualized inquiry.

Where "[t]he functional equivalent of a full-blown trial on ... causation for each putative class member would be required to determine to which individuals [the company] is liable," Rule 23(b)(3) is not satisfied. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 149 (4th Cir. 2001).

**Damages**. Plaintiffs admit the need for individualized damages determinations but claim "individualized damages issues do not defeat predominance." Mot. 40. However categorical that rule may have been, the Ninth Circuit has retreated since *Comcast*: "Uncertainty regarding class members' damages does not prevent certification of a class *as long as a valid method has been proposed for calculating those damages*." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) (emphasis added). Plaintiffs offer no "valid method" for calculating damages for the simple reason that such determinations would be highly individual. Even if a class member could prevail on liability, she will have to show when she suffered discrimination; whether that discrimination was within the limitations period and affected her pay, promotion, or both; what her salary was; what it should have been; and how her pay was affected going forward.[39] By contrast, Plaintiffs cite cases susceptible to formulaic resolution. *Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, 2013 WL 4647190, at *7 (S.D.N.Y. Aug. 29, 2013) (using salary "tables listed in collective bargaining agreement" to calculate backpay); *Easterling v. Conn. Dep't of Corr.*, 278 F.R.D. 41, 48 (D. Conn. 2011) (disparate impact claims "typically dominated by individualized proof," but relying on exception in hiring cases that allows for class-wide calculation of backpay). And *Rollins v. Traylor Bros., Inc.* proves Microsoft's point: after reviewing the parties' trial plans, Judge Coughenour decertified the class because "trial

---

[39] Plaintiffs' own evidence illustrates why they have not proposed a formulaic approach: Plaintiffs and the declarants' actual pay varies wildly from (and at times statistically significantly exceeds) what Dr. Farber's model predicts. Saad Rpt. ¶¶42-43, Appx. 1 at p.1. Clearly then, his model cannot accurately predict any alleged underpayment to any particular individual.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 45 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

administration would be overwhelming" "given all of the individual issues that must be litigated." 2016 WL 5942943, at *1 (W.D. Wash. May 3, 2016).

### B. Plaintiffs Have Not Shown Superiority

The superiority inquiry focuses on "efficiency" and "economy" elements so "cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001); *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 654 (C.D. Cal. 1996) ("unwise" and "unmanageable" to certify where liability and damage inquiries are highly individualized).

Class certification would not produce the required efficiencies here. Though little can be gleaned from Plaintiffs' skeletal trial plan, one point is clear: they recognize thousands of trials would be needed to address liability and damages for each class member. Those would require extensive, individualized discovery of documents and witnesses as to evaluations, feedback, and annual budgets across teams to assess individual pay and promotion decisions. And, even as to the same individual, the documents and witnesses will vary from year to year. Burying the point in Plaintiffs' "Stage Two: Damages" discussion does not make the process any less burdensome or inefficient. Mot. 43 (acknowledging Court will have to resolve "issues around individual class members' eligibility for relief" and "amount of relief").

On the other hand, members of this putative class who feel aggrieved can pursue their claims individually.[40] Declarant Debra Dove, for example, was making more than ████ per year before her departure from Microsoft. Saad Rpt. ¶43, Appx. 1 p.1. Unlike *Beck v. Boeing Co.*, 203 F.R.D. 459, 466-67 (W.D. Wash. 2001) (cited by Plaintiffs), class members here are not "of limited means," and the magnitude of their claims depends on their substantial pay. Where a class consists of individuals whose income is near or above the top 10% in the country, a court has no reason to deprive them of control over their own claims—particularly when attorney's

---

[40] Plaintiffs also claim there is a benefit to allowing class members to proceed anonymously; however, as they acknowledge, each individual must eventually come forward for individual hearings. Mot. 43.

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                           - 46 -
CASE NO. 2:15-cv-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

fees are recoverable. *Cf. Amchem*, 521 U.S. at 617 (Rule 23(b)(3) was designed to vindicate rights of those who on their own lack "effective strength to bring their opponents into court").

## IV. Plaintiffs Do Not Meet The Requirements Of Rule 23(b)(2)

Plaintiffs seek a declaration that "Microsoft's existing Calibration process is unlawful" and "an order enjoining Microsoft from using it to make pay and promotion decisions in the future." Mot. 37. But they fail to satisfy Rule 23(b)(2)'s requirements: their proposed class is not cohesive, and their requested injunction is too vague, addresses a defunct practice, and would not be appropriate as to the entire class.

### A. Plaintiffs' Proposed Rule 23(b)(2) Class Is Not Cohesive

Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360. Accordingly, "class claims under Rule 23(b)(2) must be 'cohesive,'" *Fosmire*, 277 F.R.D. at 635 (Robart, J.); *Barraza v. C. R. Bard Inc.*, 2017 WL 3976720, at *15 (D. Ariz. Sept. 11, 2017) (cohesiveness "widely applied by other circuits and by district courts within the Ninth Circuit."), and they may not "be overrun with individual issues." *Fosmire*, 277 F.R.D. at 635 (quoting *Sweet v. Pfizer*, 232 F.R.D. 360, 374 (C.D. Cal. 2005)).

*Fosmire* illustrates a class lacking the requisite cohesiveness. Plaintiff alleged that Progressive's standard-form automobile policies improperly failed to cover a car's diminished value after repairs. 277 F.R.D. at 627. But there were "at least 17 forms" of the relevant policies across potentially 24 states. *Id.* 634. Evaluating each claim would have required an analysis of "the specific contract language issued by Progressive in each of these states." *Id.* 634-35. This Court concluded that because the "individual issues … overrun the common issues, the cohesiveness requirement" was "not met." *Id.* 636; *see also Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 481 (N.D. Cal. 2014) (nature of injunction "would differ depending on the specific facts giving rise to individual customer's claim" because Apple did not invariably enforce its refund policy); *Barraza*, 2017 WL 3976720, at *16 (Rule 23(b)(2) class lacked cohesiveness where defendants "ha[d] not engaged in uniform action toward all class members").

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 47 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

Here, there is not one "Calibration Process"—just as there was not one insurance policy form in *Fosmire* or one refund policy in *Herskowitz*. Rather, Plaintiffs' claims rest on the premise that there are (at least) hundreds of calibration processes, with variations depending on how each team handled decisions. Plaintiffs' expert admits as much: "[I]f Employee A were in Calibration Group/People Discussion Group 1 and Employee B who holds the same role happens to be in Group 2, the types of information on each employee considered in the meeting, where compensation level and promotion decisions are discussed, might differ." Ryan Rpt. ¶36.

Thus, "each individual class member would be entitled to a different injunction," based on how her specific calibration meeting(s) operated. *Dukes*, 564 U.S. at 360. The class is overrun with individual issues and not sufficiently cohesive for Rule 23(b)(2) certification.

## B. Plaintiffs' Proposed Injunction Is Too General To Satisfy Rule 65(d) And Would Address A Now Defunct Process

Under Rule 65(d), an injunction must "state its terms specifically" and "describe in reasonable detail…the act or acts restrained or required." This is to "prevent uncertainty and confusion on the part of those faced with injunctive orders" and avoid a possible "contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). At the class certification phase, Plaintiffs must describe the relief sought in "reasonably particular detail" so the Court can envision an injunction that would satisfy Rule 65(d)'s requirements. *Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso*, 543 F.3d 597, 605 & n.4 (10th Cir. 2008); *see also Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) (declining to certify class where proposed injunction was "far too general to satisfy Rule 65(d)"); *Martinez v. Brown*, 2011 WL 1130458, at *13-15 (S.D. Cal. Mar. 25, 2011) (similar).

Here, Plaintiffs seek an order "enjoining Microsoft from using [calibration] to make pay and promotion decisions in the future." Mot. 37. Given Plaintiffs' description of "calibration" as meetings where "managers compare employees within a peer group," Mot. 5, that injunction is at a "stratospheric level of abstraction." *Shook*, 543 F.3d at 604. If Microsoft gives one employee a larger bonus than another due to better performance, would that be enjoined? Can

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 48 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300

1    Microsoft never use any system where two employees' performances are "compared" in a

2    "meeting"?  It would be meaningless to certify a class to purse such abstract relief.  Further, the

3    variability in the Calibration Process—the core of Plaintiffs' claims—means a single injunction

4    to forbid "calibration" would be pointless because the Calibration Process varies among teams.

5           Even if an injunction prohibiting calibration meetings (as distinct from people

6    discussions) were feasible, Microsoft ended them in 2013—and courts will not certify Rule

7    23(b)(2) classes seeking an injunction against ceased conduct.  *See Arabian v. Sony Elecs., Inc.*,

8    2007 WL 627977, at *8 (S.D. Cal. Feb. 22, 2007); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991

9    F.2d 511, 520 (9th Cir. 1993) (requiring "threat of continuing violations").  Plaintiffs' expert and

10   declarants concede people discussions have no formal structure for peer comparisons (the key

11   component of Plaintiffs' definition of a calibration meeting) and the two processes feel "very

12   different." *Supra* at 20; Underwood Tr. 85:25-87:11.  A Rule 23(b)(2) class is improper.

13         **C.      Injunctive Relief Is Inappropriate For The Class As A Whole**

14          Rule 23(b)(2) also requires injunctive relief to be appropriate for the class as a whole.

15   Certification is therefore inappropriate when a large percentage of the class lacks standing to

16   pursue an injunction.  *Dukes*, 564 U.S. at 364 (criticizing Rule 23(b)(2) certification where many

17   members had no claim for injunctive relief); *see also Schulken v. Wash. Mut. Bank*, 2012 WL

18   28099, at *7 (N.D. Cal. Jan. 5, 2012) (denying (b)(2) certification because some class members

19   no longer had challenged credit lines); *Gonzales v. Comcast Corp.*, 2012 WL 10621, at *16

20   (E.D. Cal. Jan. 3, 2012) (same where class was mostly former customers).  Here, 33% of the

21   class consists of former employees who would be unaffected by an injunction and have no

22   standing to seek one.[41]  Saad Rpt. ¶¶16-17; *Walsh v. Nevada Dep't of Human Res.*, 471 F.3d

23   1033, 1037 (9th Cir. 2006).  Injunctive relief is therefore inappropriate for the *whole* class.[42]

24   _____

25   [41] Muenchow is the only named Plaintiff that still works at Microsoft.  If she is deemed atypical, an inadequate
     representative, or denied relief on summary judgment, then no class representative has standing to seek injunctive

26   relief under Rule 23(b)(2).  *Ellis*, 657 F.3d at 978 ("Plaintiffs must show standing with respect to each form of relief
     sought"); *Amaro v. Gerawan Farming, Inc.*, 2016 WL 3924400, at *2 n.3 (E.D. Cal. May 20, 2016).

27   [42] An injunction would also be inappropriate for all current Microsoft employees given that some benefit from
     calibration meetings/people discussions.  *See Schulken*, 2012 WL 28099, at *6 (denial of Rule 23(b)(2) certification
     proper absent uniform interest in injunction); Saad Rpt. ¶80-87.

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

1    Further, even as to current employees, it would be unworkable to enjoin an evaluation

2    method as to women in particular professions and within nine specific stock levels—a small

3    segment of Microsoft's employees—while allowing that same process to continue as to the

4    overwhelming number of employees outside the class.  And enjoining Microsoft's employment

5    practices company-wide based on a class representing a small segment of employees would be

6    massively overbroad, especially because this class has no standing to seek an injunction on

7    behalf of the other 95% of Microsoft's U.S. workforce.  *See, e.g.*, *Mamo v. BP P.L.C.*, 2006 WL

8    269056, at *3 (E.D. Va. Jan. 30, 2006) (company-wide training "is clearly overbroad" where

9    allegation did not relate to "all of the employees").[43]

10   ## V.    Plaintiffs Have Not Satisfied The Requirements Of Rule 23(c)(4)

11        Plaintiffs offer only a passing reference to their request for a Rule 23(c)(4) issue class and

12   no supporting legal argument.  Even under the most lenient preservation standards, the issue has

13   not been sufficiently raised and the Court should decline to address it.[44]  *Intellicheck Mobilisa,*

14   *Inc. v. Wizz Sys., LLC*, 173 F. Supp. 3d 1085, 1108 (W.D. Wash. 2016) (Robart, J.) (two sentence

15   argument "inadequately briefed" and "not properly before the court"); *United States v. Microsoft*

16   *Corp.*, 154 F. Supp. 3d 1134, 1140 n.4 (W.D. Wash. 2015) (same as to single sentence).

17                                   **CONCLUSION**

18        This Court should deny Plaintiffs' Motion for Class Certification.

19

20

---

21   [43] A 23(b)(2) class is also inappropriate because the "primary relief sought by Plaintiffs is monetary, not injunctive"
     which is "clear from the pleadings, as well as from the effort and expert fees expended" which demonstrate "that the
22   central focus of this suit is monetary relief."  *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 972 (S.D. Cal. 2016).

     [44] Moreover, it would be improper to use Rule 23(c)(4) as an end-run of Rule 23(b)(3).  *See, e.g.*, *Castano v. Am.*
23   *Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996) ("district court cannot manufacture predominance through the
     nimble use of subdivision (c)(4).  The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4)
24   is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a
     housekeeping rule that allows courts to sever the common issues for a class trial.") (citing *In re N.D.Cal. Dalkon*
25   *Shield IUD Prods. Liability Litig.*, 693 F.2d 847, 856 (9th Cir. 1982)).  Further, an issues class is inappropriate
     because there are no common issues.  *Supra* at 15-37.  Even if a liability class were permitted, numerous issues of
26   individualized liability, causation, and damages remain.  In these circumstances, "[t]he few issues that might be tried
     on a class basis …, balanced against issues that must be tried individually, indicate that the time saved by a class
27   action may be relatively insignificant."  *Dalkon Shield*, 693 F.2d at 856, *abrogated on other grounds by Valentino v.*
     *Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996).

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION                          - 50 -
CASE NO. 2:15-cv-01483-JLR

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7097
+1-206-839-4300

Dated: January 5, 2018

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: *s/ Mark S. Parris*
    *s/ Lynne Hermle*
    *s/ Jessica R. Perry*
Mark S. Parris (WSBA No. 13870)
mparris@orrick.com

701 Fifth Avenue
Suite 5600
Seattle, Washington 98104
Telephone: +1-206-839-4300
Facsimile: +1-206-839-4301
Attorneys for Defendant

Lynne Hermle
lchermle@orrick.com (admitted *pro hac vice*)

Jessica R. Perry (admitted *pro hac vice*)
jperry@orrick.com

1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

Dated: January 5, 2018

MICROSOFT CORPORATION

By: *s/ David Howard*
David Howard (WSBA No. 45211)
Corporate Vice President and Deputy General
Counsel, Litigation
dhoward@microsoft.com

1 Microsoft Way
Redmond, Washington 98052
Telephone: +1-425-704-768

MICROSOFT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. 2:15-cv-01483-JLR

- 51 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104-7097
+1-206-839-4300