UNITED STATES DISTRICT COURT
WESTERN DIVISION OF WASHINGTON
AT SEATTLE

—————————————————————— )
KATHERINE MOUSSOURIS, et al.            )
                                        )
                    Plaintiffs,         )
                                        )
        v.                              )
                                        )
                                        )      Case No. C15-1483JLR
                                        )
MICROSOFT CORPORATION,                  )
                                        )
                                        )
Defendant.                              )
—————————————————————— )

**EXPERT REPORT OF RHOMA YOUNG**

## I.   Scope

1.      I was asked to review relevant deposition transcripts and exhibits and a variety of information that has been exchanged by both sides in this litigation, with special focus on the Human Resources (HR) complaint investigation process at Microsoft.  The "investigation" itself is only part of the overall HR policies and processes focused on preventing and addressing employee concerns related to discrimination, harassment and retaliation.

2.      Microsoft has adopted a procedure for addressing concerns of and resolving complaints identified by Microsoft employees.  A foundational feature of this process is a quality and reasonable investigation. My work in this case has included a review and assessment of:
- the process used at Microsoft;
- the staff who conducts the investigations and their practices;
- how the staff reaches conclusions; and
- how the staff engages in the handoff to HR for any follow-up or further action, if needed.

3.      I then evaluated how Microsoft's investigation processes compare with usual and customary HR "suggested management practices" (SMP) to identify any differences, and if any existed, determined:
- what the differences are;
- how they might impact the quality of the investigation process;
- how they might affect the impact, fairness and equity of employee treatment;
- what the relevant Microsoft policies addressing investigations are; and
- whether the actual investigation process and practices used in the implementation of those policies are consistent with SMP and their own internal policies.

4.      As the basis of my analysis, I reviewed deposition testimony of some of the Employment Relations Investigative Team (ERIT) investigators, including Melinda De Lanoy and Judy Mims,[1] conducted interviews with some of the investigators, including Ms. De Lanoy and Kimberly Meyers (Manager of ERIT), to address information not contained in relevant deposition testimony (*see* **Exhibit 4** for interview notes), reviewed actual investigation case files, and analyzed relevant HR policies as well as the professional experience, education and background of ERIT investigators.

5.      I reviewed samples of communications drafted by ERIT in the case files, so I could assess their communication style and investigation process.

6.      For a full list of the information reviewed, please see **Exhibit 3**.

---

[1] This testimony was provided on January 24, 2013 in another case, *Oliver v. Microsoft*, No. CV 12-0943 RS (N.D. Cal.), in which the court granted Microsoft's motion for summary judgment of the plaintiff's discrimination claims.

## II.    Qualifications

7.      I am a Human Resources consultant with 35+ years of professional HR management experience.  I have over 30 years of direct experience in dealing with employee and employer issues and questions in HR practices and decision making.  Since 1983, I have been principal and managing partner in my own human resources consulting firm. Previously, I held management positions with the County of Los Angeles, General Motors and Boise Cascade.  When I had corporate-wide responsibility for managing Equal Employment with Boise Cascade, the company was a federal contractor and had over 300 Affirmative Action Plans to cover their varied locations. We also handled employee complaints.

8.      A significant portion of my Human Resources consulting work includes designing and implementing policies and procedures to help employers prevent possible discrimination, harassment and retaliation, and to help them retain, attract, reward, and advance diverse applicants and employees.  I have worked with and advised numerous client organizations on dealing with and resolving employee issues on managing employee performance, accountability, disability case management, accommodation, the interactive process, family/medical leave, and time away from work options.  I have also coordinated, managed and advised organizations on the numerous steps in planning for and implementing HR policies and establishing a viable complaint process.

9.      I have personally conducted over 300 HR audits and reviewed an even greater number of audits conducted by fellow HR colleagues.  These audits have been conducted in a wide array of sizes and types of public and private organizations and industries.  Each audit is carefully focused on the unique characteristics of each individual situation.  These audits have covered defining workplace issues, investigation of perceived employee problems and employee complaints, employee/employer interactions related to hiring, pay, promotion, hours and working conditions, and performance management/accountability, relevant record keeping, and documentation. Key equal employment opportunity areas include discrimination, harassment, retaliation, disability/leave of absence activity, and the intersection of these areas with workers' compensation.

10.     During the audits, we conduct employee and management personnel interviews, review documentation/information on HR practices and experience, management training, problem solving in the implementation of the performance management system, discipline and accountability.  We also evaluate potential accommodation processes and practices.

11.     While I honor client confidentiality and keep what I have done for each client private, my clients include well-known companies in construction, manufacturing, and entertainment, with a special focus on the complex environments in tech, defense, transportation, finance and health care.  Sample clients are IBM, Apple, Facebook, LinkedIn, Seagate, KLA, Kaiser Permanente, Stanford Healthcare, GE, Proctor &

3

Gamble, Ford Motor, Lockheed Martin, Northrup Grumman, Barclay's Bank, and Bank of America.  I have also worked closely with several cities, counties, and the State of California.

12.     My education includes a master's degree in management from Pepperdine University, an undergraduate degree from UCLA, and a certificate in psychology from USC.  My graduate work focused on management and employee/labor relations, executive development, and human resource management.  In addition, I have taken classes in employee and labor relations and human resource management at UCLA, Cal Tech, Wharton School of Business, and the University of Michigan, and was a Weinberg Fellow at Cornell University's School of Industrial Relations.

13.     I have been active in the Association of Workplace Investigators (AWI) from its inception, participating in its intense and comprehensive week-long Investigator Training Institute, coordinating its Bay Area member "circle", and incorporating its principles as guidelines in my investigation work (attached as **Exhibit 9**).

14.     For about 15 years, I taught other HR and operations management professionals at San Francisco State University, UC Berkeley, and Mills College on how to gather and analyze information, conduct investigations, and resolve employee complaints.  I have also taught at professional HR association seminars and presented in smaller, in-house training sessions.  My complete résumé is attached as **Exhibit 1**.

15.     I have testified as an expert witness in many cases involving employment practices and discrimination for both plaintiffs and defendants, and often serve as a neutral third party in assessing, investigating, and facilitating/resolving a broad array of workplace disputes.  I have performed work as an expert witness for over 20 years, been deposed numerous times, and testified as an HR expert in court over 100 times. *See* **Exhibit 2**.

16.     Expert witness work comprises about 15-25% of my work.  In expert witness work, at case intake, I am careful to keep the balance to half plaintiff and half defense. This helps ensure an objective and balanced perspective.  The remaining 75-85% of my professional consulting work is with companies and organizations to conduct investigations and provide advice, training, coaching, and mediation of human resource issues needing resolution.

17.     In the expert witness work, I am very careful not to draw legal conclusions.  I charge $495 per hour for case research and analysis, and $595 per hour for deposition and trial testimony.  Money earned from trial testimony is donated to the American Cancer Society.

18.     While recognizing that each workplace situation has individual and unique "issues" and personalities, I base my testimony on professional HR principles.  Those are basic HR practices widely recognized and accepted as suggested management

practices (basic standards of care) that outline parameters in certain areas of HR activity, such as the attached AWI guiding principles for investigations.

19.     I do not expect perfection or use "best practices" as a benchmark.  Using a very pragmatic approach, I recognize that there may be many effective, different, and acceptable ways in which the basics of suggested management practices may be implemented.  I use my broad-ranging experience and knowledge to be familiar with those ever-expanding and changing options.

## III.    Summary of Opinion

20.     Plaintiffs allege that "Microsoft does not appropriately investigate or redress employee complaints of discrimination and harassment."  This is not consistent with my review and assessment of Microsoft's complaint and investigation process.

21.     Based on my experience and knowledge, the quality of a complaint and investigation process depends on the skill, objectivity, and experience of the persons doing the investigation, clear policies, and neutral, logical, and skillful implementation of those policies.  From the information I reviewed, it is my opinion that the investigation steps and sequence at Microsoft are consistent with suggested management practices.

22.     ***ERIT investigators are skilled, objective, and highly experienced.***  Microsoft takes the handling and resolution of employee concerns, issues, and complaints seriously.  To do that, it has hired a core group of trained and able investigation professionals.  Their diverse and comprehensive education, experience, backgrounds, and abilities exceed and differ from what I have seen for HR representatives and attorneys in similar investigatory roles in other organizations.  Objectivity is enhanced because they function as a separate group of investigators outside of the day-to-day work of employees and management.  Microsoft's commitment in establishing ERIT exceeds suggested management practices and demonstrates a commitment to defining and resolving workplace problems, rather than just responding to external agency complaints or protecting the Company's interests (which is outside the scope of ERIT's role).  In my experience, offering a centralized, coordinated resource like ERIT is not a usual practice among larger companies.

23.     ***Microsoft has clear anti-discrimination and anti-harassment policies and communicates them effectively.***  Microsoft has clear anti-discrimination, anti-retaliation, and anti-harassment policies that it communicates to employees through internal communications, trainings, and websites.  These communications inform employees about the variety of resources available to them.  As a further way of communicating and implementing their relevant policies, ERIT provides training to HR and operational staff that is down-to-earth, practical, and tailored to the audience skill level.  This training enables HR to be a realistic filter of information to ERIT and to employees.  As a result, employees know of and use the many resources that Microsoft makes available.

24.    ***Microsoft implements its policies in a neutral, logical, and skillful manner.***
My review revealed that steps used by Microsoft in its investigations are based on being thorough, timely, accurate, objective, well-documented, and focused on thoughtful and reasoned conclusions.  ERIT investigators also recognize the uniqueness of each situation, each person, each concern or complaint raised, and each aspect of a case.  Each step of the investigation process is, therefore, distinct and case-specific.  ERIT communicates the investigation finding—founded/substantiated policy violation or not—and, regardless of the finding, further determines and communicates to HR other areas that may warrant HR and/or management follow up.  If appropriate, HR may work with management to take further subsequent steps, such as coaching, restated performance expectations, or other corrective actions.  Given the unique nature of each investigation, it is not possible, in my opinion, to make accurate or valid generalizations (through statistics or otherwise) about the number of concerns or complaints raised or the results of the investigations, as Plaintiffs have alleged.  The number of complaints that Plaintiffs' attorney mentions in the deposition of Ms. De Lanoy is not unusual in a company of Microsoft's size.  I have seen organizations that work hard to ensure their processes are consistent with suggested management practices have a large number of complaints.  I have also seen organizations that do little to implement suggested management practices with few complaints.  The number of complaints may be the result of heightened employee awareness from increased training, communication about EEO policies, and/or increasing employee comfort and trust in using the complaint procedure to address their questions and concerns.  Reports of concerns by employees of issues and complaints can be beneficial.  It can enhance a company's ability to address and prevent discrimination, harassment, and retaliation.

## IV.    ERIT investigators are skilled, objective, and highly experienced

25.    An effective investigation process is one in which employees can rely upon the knowledge, experience, and neutrality of management and investigative staff.  Such objectivity is crucial in ensuring that employees (and witnesses) feel comfortable in identifying inappropriate behavior or perceived problems in HR decision making.

26.    Microsoft has made a significant commitment to hiring skilled investigators whose backgrounds are broad and diverse in terms of education, community work/affiliation and activism, experience, and training in HR and mediation, as summarized in **Exhibit 6**.  Their backgrounds are much more expansive than what I usually see in other organizations, both for internal HR representatives and investigator/attorneys.  ERIT's rich and diverse set of skills, experience, and training can be a huge benefit to a company that is focused on defining and resolving workplace problems, rather than just responding to external agency complaints or protecting the company's interests (which is outside the scope of ERIT's role).  In my experience, this type of benefit facilitates and enhances the handoff to HR for any needed follow-up after ERIT concludes an investigation.  Offering a resource like ERIT is not a usual practice among larger companies.

6

27.     Microsoft employees have consistently had access to multiple mechanisms in which to ask questions and address and raise concerns and complaints, including through the group of trained and experienced specialists in ERIT.  It is my opinion that the organizational decision to have a core group of trained and able investigation professionals, as a single team dedicated to conducting investigations, goes a long way to preserve objectivity and the equally important perception of objectivity.  Communications about these resources are easily available to employees as part of internal communications, trainings, and websites.

28.     Through my experience teaching, conducting hundreds of external, third party investigations, and conducing hundreds of HR policy and practice audits, I have become aware that some companies prefer certain types of outcomes in investigations.  I have chosen not to work with some organizations as a result of that predetermined outcome approach.  While this trend seems to have slightly decreased over the last few years and more qualified investigators are available, some major organizations still purposefully do not hire the most able investigators.  Many companies rely on in-house HR representatives to do investigations.  Oftentimes, these individuals do an investigation only occasionally, and their needed skills are not finely honed.  They may have multiple, competing, and unrelated priorities on their plate which can significantly interfere with or delay an investigation.  Based on the interviews I conducted and documents I reviewed, it is my opinion that this is not the case with Microsoft.  Several years ago, Microsoft made a conscious decision to set up the ERIT function, staff it with very able, diverse professionals, and give them the room and support to do their job.  The ERIT investigators are told to "call it as they see it," without the political internal pressure to come up with predetermined conclusions.  This is enormously valuable to a company that really desires to solve problems and ensure equity in the workplace, not just continue "business as usual."

## V.  Microsoft Has Clear Anti-Discrimination and Anti-Harassment Policies and Communicates Them Effectively

### a.  Policy Content

29.     A policy is an organization's formal communication to employees that defines issues in a clear and easily understandable way.  Policies act as guidelines to establish a framework to follow and outline at a high level what an employee should (and should not) expect to occur.  Policies are a general outline of basic parameters, but seldom have very specific, step-by-step directions to cover every detailed aspect of decision making.  There are several key areas to examine when evaluating the effectiveness and implementation of HR policies and practices.  In general, I look at whether they *are appropriate and reasonable* given the point in time and the focus and size of the industry and organization.

30.     Consistent with suggested management practices, Microsoft's anti-discrimination, anti-retaliation, and anti-harassment policies (*see* **Exhibit 7**) are clear in their content and define Microsoft's expectations.  The policies act as general guidelines

to define what behavior is precluded, and then present examples to help employees decide if certain behavior is problematic. The policies also provide a variety of resources to employees.  Employees can complain publicly or privately, even anonymously, if they are uncomfortable going to their management or directly to the person whom they see as behaving inappropriately.  If someone behaves in a way that is unwelcome and makes the employee uncomfortable, the policy outlines definitions and suggestions for the employee to follow.  The policies continue to evolve to clarify any possible ambiguities.

### b.  Communication of Policies

31.     Implementation of policies involves making sure managers (and whoever is representing, communicating, and implementing the policies) know the organization's policies and are clearly able to confirm that employees understand how the policies affect them.  Implementation necessitates adequate communication and credible "enforcement" of the policies.  Communication usually involves training and making sure all relevant employees and decision makers are adequately notified and informed. Credible enforcement means that the staff and managers charged with implementing the policies are responsive, knowledgeable, thorough, and objective.

32.     Consistent with these standards, Microsoft communicates its policies to employees in a variety of ways, including through internal communications, trainings, and websites.  In addition, ERIT provides training to HR and operational staff (**Exhibit 8**) that is down-to-earth, practical, and tailored to the audience skill level.  This training enables HR to be a realistic and effective filter of information to and from employees. As a result, employees know of and use the many resources that Microsoft makes available.  The training also serves as a roadmap to help HR and operational staff understand and digest information that they are receiving from employees, and determine whether and how to proceed with an investigation.

33.     The training includes, for example, an explanation of ERIT's scope, including that ERIT handles claims of harassment, discrimination, retaliation, and issues related to conflicts of interest/romantic relationships.

34.     The training informs HR and operational staff that they must:

- *Listen to employee complaints – what's "unfair" now could be "discrimination" or "retaliation" later*
- *Stand up for a world-class working environment*
- *Don't agree to keep "confidentiality" (if not possible)*
- *Notice which side of the desk you are speaking from*
- *Use investigation outcomes to drive people manager/business accountability*

35.     The training also provides guidance for each stage of the investigation:

*Before the Investigation*

- *Can I remain anonymous?  While we can't promise anonymity, we do treat these investigations confidentially.  Example: "XYZ told me" vs "the evidence shows."*
- *Will I see a written report?  The findings will be disclosed to* <u>parties</u> *in a high level memo.*

*During the Investigation*

- *My colleague told me that she was contacted by ERIT and wants to know what this is about.  What should I say?  To discourage the rumor mill; direct questions to ERIT investigator.*
- *My manager has been ignoring me since this investigation started.  Use triage skills to assess retaliation concerns.*
- *What is taking so long?  Important to gather all relevant information, that takes time – HR Managers can help by reinforcing importance of opening up calendars for scheduling.*

*After the Investigation*

- *My manager gave me a low rating after I initiated an ERIT complaint.  Be ready for "trigger" language to assess retaliation concerns.  Has manager referenced ERIT matter?*
- *Will a record of this investigation be noted in my personnel file?  If unsupported, no notation in personnel file; if supported, can discuss notation in personnel file.*

36.     The training also provides guidance for gathering facts:

- *Say more about that.*
- *Tell me what happened next.*
- *What did you see/hear/believe?*
- *What did that mean to you?*
- *Why?*
- *Are you drawing a connection there?*
- *Can we pin that down?*
- *Is there anything else I should know about?*
- *Tell me how that happened.*
- *Share what you've experienced.*
- *What's the best possible outcome here?*

## VI.   Microsoft implements its policies in a neutral, logical, and skillful manner

37.     In my opinion, my review of the overall investigation process indicates ERIT conducts investigations that are thorough, timely, accurate, objective, and well-

documented, and target thoughtful and reasoned conclusions.  ERIT recognizes the uniqueness of each situation, each person, each concern or complaint raised, and each aspect of a case.  This is consistent with suggested management practices.

### Thoroughness

38.     **Suggested Management Practices (SMP):**  Thoroughness relates to scope. Was everyone who could provide information on the allegations included?  Were employees in the immediate area interviewed about what they observed in the interaction between the employee and the subject of the complaint?  Were the allegations clear and were they all investigated in sufficient detail?  If the initial allegation is not detailed or specific, there is a need to get clarity and specificity, possibly through an additional interview(s) with the complainant.  It is important to know all of the allegations to conduct a fair, reasonable investigation.  An investigation has to be balanced in questions and conclusions.

39.     **Microsoft:**  Based on the information I reviewed, including interview outlines, ERIT staff asks the necessary questions during investigations and conducts appropriate interviews with witnesses and employees who have relevant knowledge.  For instance, the investigators routinely ask the complainant (and the subject of the complaint) "who else do you suggest be interviewed who might have information on your allegations? What should I expect them to tell me?"  The information I reviewed and interviews I conducted indicates ERIT investigators generally make it a priority to interview those persons, or they otherwise document legitimate bases for not doing so.  In my interviews with ERIT staff, they also pointed out that the complainant interview can take place in numerous follow-up conversations (as was the case with former named Plaintiff Dana Piermarini).  We also discussed how important the initial interview(s) can be in shaping the ultimate scope of the investigation.  Other relevant information also is a usual part of the investigation process, such as "Connects", emails, and other HR documents.

### Timeliness

40.     **SMP:**  Timeliness has two components: (1) whether the investigation was started in a timely fashion; and (2) whether the length of the investigation was reasonable given the number of people interviewed and the types of allegations.

41.     **Microsoft:**  During my review, I learned that ERIT starts investigations within 24-48 hours of notification (or earlier, if employee safety is an issue).  ERIT staff also informed me that they aim to complete investigations in 50 business days, though sometimes investigations are completed much earlier.  Sometimes they take longer in very complex situations.  This is all consistent with suggested management practices.

### Accuracy

42.     **SMP:**  Accuracy in the investigation is based on the scope and integrity of the process.  If the investigator does not have complete information, consciously excludes important interviews or information or adds irrelevant information that dilutes the allegations, the conclusion may be flawed.  Investigators should ask: "Is available information (such as the complaining employee's background) consistent with the information revealed during the investigation?  Do the "facts" make sense?  If not, why?

43.     **Microsoft:**  In my interview with the Manager of ERIT, Kim Meyers, she made a point of talking about her review of the case summary before the final conclusion of an investigation to check for these things and ask these questions.  This indicates Microsoft has a built in check-and-balance to assure quality control which is consistent with suggested management practices.

### Objectivity

44.     **SMP:**  To review an investigation process, it is important to ask, "was the investigator really neutral?"  It is also important that the investigator be *perceived* as objective by the complainant and the witnesses interviewed.  If an employee or witness has doubts about the neutrality of the process or the investigator, they will often be more circumspect and guarded during the investigation, especially if they are still or hoping to be employed in the organization.  The investigator should look for whether any political issues or relationships should be explored and make an extra effort to ensure the integrity, quality and accuracy of the investigation when the alleged wrongdoer is a high-level, longer-term employee who is otherwise valued in the organization.  This makes "distance" from the day-to-day situation especially valuable.

45.     **Microsoft:**  ERIT has that separation and has been given the mandate to make independent assessments that are objective and neutral.  ERIT investigators are not in the direct line of decision making, job granting, hiring, or influencing employability.

### Documentation

46.     **SMP:**  Documentation, at minimum should include relevant collateral or possibly confirming/conflicting information, such as time records, work schedules, evaluations, ratings, salary history, performance reviews, and electronic communications, as well as legible and complete interview and case notes with a record of contacts made or attempted.  Documentation tracks communication and is a two-way street between the employee and the organization.  What is the investigation plan?  Is there a defined sequence in which interviews are going to be conducted?

47.     **Microsoft:**  Case file reviews in this case showed legible, clear notes taken by the ERIT staff, though each investigator has their own unique method.  ERIT investigators said they are "in charge" and the central point for questions, coordination, logistics, and sending/retaining information and documentation.  Case files indicated thorough and comprehensive record review.  However, I did not make any quantitative evaluation of any particular case for accuracy.

***Balanced conclusion based on the unique facts in each case***

48.    ***SMP:***  If the standard used to make a final assessment is too narrow, it can act to protect the organization at the expense of not recognizing problems and taking corrective or remedial action.  Superficial conclusions, based on a singular aspect of the investigation, only distort any overall view or analysis of the investigation.  That is why skilled, experienced and open-minded investigators, who are completely focused on this singular activity, are so important to an organization's ability to respond quickly, objectively, supportively, and knowledgably to employee concerns and complaints.

49.    Each step in the investigation process is a separate and distinct decision making process, that—like HR decisions on pay, promotions, and career advancement—are an amalgam of job-related assessments of each individual's unique efforts and performance in different positions and departments, for different supervisors/managers. Each portion of the investigation has to be viewed as a unique part of a whole.  It is case specific, making it difficult, if not impossible, to make broad generalizations or accurate assumptions by looking at or analyzing only one aspect of the specific situation.  Each individual set of circumstances in each situation is different.  Each person views their workplace within their own unique perspectives.  Each employee has differing expectations or hopes about a possible outcome of the investigation.  Each person has their own reservations or comfort level in what to disclose.  The individual employee's level of trust in the complaint procedure varies.

50.    As in many HR decisions, a layered decision making process, involving multiple parties, is more effective than unilateral decisions.  It helps provide multiple perspectives that protect the integrity and objectivity of the decision making process and acts as a safeguard against possible bias.

51.    The conclusion of the investigation should, therefore, include a consideration of all appropriate factors.  Is the information clear and convincing?  Was behavior inconsistent with policies and organizational values?  If so, how?  What is the possible impact?  How serious is it?  What are the organizational options to prevent/remedy/address the situation?  Did the investigator access readily available data and electronic information to provide a practical and realistic context for making his/her final assessments?

52.    ***Microsoft:***  The information I reviewed reflects that ERIT investigators access a variety of available information to answer these questions.  In our interviews, investigators indicated they read the original list of allegations (and any allegations subsequently raised) as a checklist in reaching their conclusions and making sure the investigation covered all necessary points. The investigation process is layered.  The process begins with an overview and assignment to ensure objectivity, then the investigation is conducted by an investigator and subsequently reviewed by the ERIT manager for logic and thoroughness (*see* **Exhibit 4**).  ERIT may also seek legal advice

if they feel it is needed.  HR is involved (usually as the initial referral source) and engaged, including if any follow-up is appropriate at the close of the investigation. Management is informed and engaged.

53.     As part of reaching a conclusion, the usual standard or threshold is a "totality" of the evidence.  As became clear in my conversations with ERIT staff, they view each part of the investigation process to be case-specific, unique and distinct, starting with the original intake and conversation(s) with the complainant, through witness interviews and document review, and then talking to the subject of the complaint.  They indicated there is no way to make any valid generalizations or assumptions based upon the broad classification of an investigation as one related only to allegations of harassment, discrimination, and/or retaliation.

54.     Ms. De Lanoy's frequent use of the term "it depends" in her responses to deposition questions illustrates the individuality of each situation.  Each word spoken by a complainant, witness, or the subject of the complaint can be said in a different tone of voice.  That subtle difference may have a major impact on credibility determinations. Credibility determinations are an important part of this process, and they often depend on the weight of the information in the final evaluation.  A conclusion is often not black or white.  Sometimes, the evaluation may not be totally clear.  That is why the experience, education, and training of the ERIT investigators is so important.  They know how to deal with complex situations in a way that ensures consistency in approach and appropriate confidentiality, consistent with suggested management practices.

55.     Even when the investigator concludes that there is no policy violation, the situation does not end with that investigation closure designation.  If the behavior substantiated during the course of the investigation is questionable, problematic, or is inconsistent with a policy, the matter is referred to HR for follow-up.  All corrective action or follow-up that is required following an investigation—regardless of whether a policy violation is found—is outside of ERIT's scope and is handled by HR and management. This helps protect the objectivity and neutrality of ERIT in its role as fact-finder making policy determinations.

* * *

56.     Plaintiffs have alleged that the number of complaints reflect a common culture of gender stereotyping and bias against women at Microsoft.  That is not consistent with my experience.  The number of complaints at Microsoft is not unusual in a company of Microsoft's size.  Moreover, the number of employee complaints or investigations can often be the result of heightened employee awareness from increased training, expanded communication about EEO policies and/or increasing employee comfort and trust in using the complaint procedure to address his or her questions and concerns. The number of complaints could as easily reflect the positive reputation of the investigation process/staff as an effective problem solving mechanism.

57.     Plaintiffs also note that there were very few "founded" (confirmed policy violations), compared to the total number of investigations. However, after further discussing this with some of the ERIT staff, the "conclusion" of a complaint should be looked at in a broader context of that particular investigation to more accurately reflect the reality of the investigation process and conclusion. While a conclusion may not result in a designated policy violation, if there is confirmed behavior that is questionable, problematic, or inconsistent with policies, that information is communicated to HR for follow-up. If appropriate, further subsequent steps, such as coaching, restated performance expectations, or other corrective measures can be taken by HR and management. To take one aspect of an investigation, and then surmise from it the quality of an entity's entire investigatory process, in my opinion, cannot result in an accurate portrayal.

## Conclusion

58.     The information I have reviewed in this case indicates that Microsoft takes the handling and resolution of employee concerns, issues, and complaints seriously. Microsoft has proactively set up the ERIT function, staffed it with very able, diverse professionals, and has given them the room and support to do their job. ERIT has helped implement Microsoft's clear Anti-Discrimination and Anti-Harassment policies through their trainings. Those training sessions are tailored to the needs and abilities of the audience. Objectivity is enhanced by having a separate group of investigators who are outside the day-to-day operating cycle with employees and management. Investigators rely on their expertise and understanding of Microsoft's HR policies and practices to plan and conduct each investigation, and when the investigation is complete, to refer issues to HR even when it does not result in a finding of a violation of Microsoft's Anti-Harassment and Anti-Discrimination Policies. In my opinion, these actions reflect a desire to solve problems and ensure a professional and respectful workplace, not just continue "business as usual."

59.     This can perhaps best be summed up in quoting the final statement made by Ms. De Lanoy at the close of our interview, when she said she "loves her work because it is about fairness and integrity. Microsoft is willing to have ERIT as part of its corporation self-reflection, not a rubber stamp. They can really 'call it as they see it,' not simply defer to what management wants to have as an outcome. They are not trying to minimize or ignore problems or minimize potential liability. They want to find them (possible problems) out early so they can address and identify and resolve them."

*Rhoma D. Young*          *Rhoma D. Young*     1-4-18

Exhibit 1 Rhoma Young CV
Exhibit 2 Rule 26 Case List
Exhibit 3 Information Reviewed
Exhibit 4 Interview Notes
Exhibit 5 Select Deposition Excerpts

14

Exhibit 6 Select ERIT Staff Backgrounds
Exhibit 7 Select Policy Excerpts
Exhibit 8 Sample Training Content
Exhibit 9 AWI Guiding Principles

**Exhibit 1**

### *RHOMA YOUNG, HR Consultant*
Oakland, CA
(510) 530-6746
RYAA@earthlink.net
RYAA.com

*Professional Experience*

**RHOMA YOUNG & ASSOCIATES**, 1983-present

Managing Principal of successful HR/business consulting firm focusing on practical, common-sense and cost-effective approaches to business and human resource management issues and problems. Clients range from large, Fortune 50 organizations, to ground breaking high tech organizations, to smaller electronics, bio-tech, distribution, health care, financial and professional services, software development, food processing, construction and manufacturing firms.  Clients are public and private companies, not-for-profit organizations, individuals, and local, state and federal governmental organizations.

- A recognized expert in HR and equal employment, which mandates active involvement and familiarity with the many facets of human resource management -- employee/labor relations, compensation and benefits, training and management development, organizational transition management, strategic planning and recruiting. Special projects include designing equity and fairness into a broad array of complex issues, such as:
  - facilitating definition and resolution of  "dicey" performance management situations
  - disability and accommodation/return to work case management options and procedures and the interactive process in a wide array of industries
  - design of special recruiting and employee selection programs to foster inclusion
  - comprehensive audits of the design and implementation of HR policies and practices
  - executive coaching
  - workforce restructuring

- Frequently use the hybrid background of being on both sides of the labor bargaining table and decades of professional HR experience with public, private and not-for-profit employers to testify as an expert witness for both plaintiffs and defendants in depositions, arbitrations, and litigation involving discrimination, harassment, retaliation, disability, and mitigation of damages.  This includes related HR areas, such as employment hiring and selection, employee

development, workforce planning, investigations, efforts "to prevent", and the more generalized aspects of performance management.

- Frequently asked by an organization's top management and/or Board of Directors to act as a "neutral third party"--investigating, analyzing and mediating/negotiating and gaining acceptance of, sometimes, creative or non-traditional solutions.  This is often in very complex, dramatic and high profile situations of perceived unfair treatment, overt and covert bias, discrimination, harassment, retaliation and performance management situations.

- Conduct one-on-one, intensive "charm school" sessions to help executives and managers communicate and manage more effectively and advise their management on how to best support needed changes.

- Use a broad knowledge and extensive experience with varied industries, career areas and labor market analyses to conduct targeted executive search activities, assess the viability of individual job search efforts, provide individual and group career planning/coaching and customized outplacement.  Consult and provide expert witness testimony in mitigation of damages, evaluate individual job search efforts and research and explore viable options for labor market/marketplace/occupational assessments.

- Building on extensive experience in workforce and workplace reorganizations and reductions, design highly tailored programs to maximize continuing employee commitment and productivity. This covers planning for, communication and implementing decisions about who stays and who goes, accompanying legal concerns, benefits, outplacement, separation packages, and transition counseling/communications.  My work deals with the fears and expectations of those "left behind", while also focusing on skills needed for future organizational needs.

- Recognizing the critical importance of performance management processes, designed pragmatic and logical approaches to effectively manage, measure and motivate employee performance. This process analyzes, plans for and evaluates individual employee performance to sharply define, motivate and modify (if needed) changes in employee performance.  This clarifies and enhances accountability and, if necessary, lays the foundation for corrective action.

- Frequent presenter and program organizer in numerous successful HR and business seminars and conferences on a broad array of HR topics

- Research, analyze, evaluate and develop HR policies and practices via comprehensive audits focused on risk reduction, cost effective setting of priorities and problem avoidance and resolution.

- ▪ Taught at University of California, Berkeley, Mills College, and San Francisco State University, teaching classes in Affirmative Action/EEO, managing employee performance/performance appraisal design, workplace investigations, resolving employee concerns and defining employee accountability.

**BOISE CASCADE CORPORATION** (31,000 employees), 1980-1983
*Multibillion dollar paper and forest products company with 250+ locations, headquartered in Boise, Idaho.*

Directed corporate-wide division and employee relations staff on Equal Employment and Affirmative Action Plan and compliance.  This included conducting and providing corporate oversite and direction of over 250 Affirmative Action Plans and Company-wide complaint investigation, negotiation, and resolution.  Designed and implemented corporate EEO/AA policies and program initiatives to support business strategies aimed at, often creatively, increasing ethnic, cultural and gender representation and diversity, including the disabled, and expand career options for women in traditionally male dominated jobs and industries.

**GENERAL MOTORS CORPORATION**, Fisher Body Division, 1978-1980
*28 metal fabrication, trim, hardware, engineering/design and automotive assembly plants, 90,000+ employees, Detroit, Michigan.*

On Division Labor staff, then managed labor relations at the downtown Detroit Fleetwood (Cadillac) assembly plant, (5,000 plus hourly employees) to negotiate and get support for, then implement and administer, a complex local agreement.  The focus was on reducing a high grievance volume and convincing a militant and divisive union local to recognize, and ultimately participate in and support, ambitious mutual union/management goals for improved quality and profit.  This occurred during a period of major layoffs and stepped-up productivity requirements in an increasingly competitive marketplace.

**COUNTY OF LOS ANGELES** (83,000 employees), 1964-1978
*Fourteen years of progressively responsible experience in personnel, the Chief Administrative Office and the Probation Department.*

As a Probation Officer, investigated and supervised adults and juveniles in custody and residing in the community. Implemented a more systematic method to objectively assess and identify feasible options for Superior Court judges in sentencing convicted felons, including the challenge of white collar crimes with hoped-for restitution.

Directed a highly effective job placement program to successfully get jobs and employ ex-offenders in a wide array of industries.  Worked closely with business organizations and labor unions to increase employment retention on inmates released from custody.  Advised Correctional organizations on viable internal and external occupational training options matched to the actual job market.

Directed a program for community volunteers to work with the Probation Department staff and clients. Recruited, trained, supervised, "matched", motivated, and evaluated volunteers from all segments of the community.

In HR, audited County HR practices and then implemented major changes in training, personnel/HR practices, compensation structure, budget priorities, and information systems.  Researched and implemented job share, half and flex-time positions, a managerial potential assessment center and career development program.  Active in CBA negotiations on both sides of the bargaining table with SEIU and AFSCME.

### *Education*

M.A., Administration and Management, Pepperdine University, Los Angeles

Graduate work and executive development programs in business management, supervision, employment, labor-management negotiations and employment/labor law, and HR policies and practices:
    Wharton School, University of Pennsylvania
    University of Chicago
    UCLA Graduate School of Business Management
    Cornell University, Weinberg Fellow, School of Industrial Relations
    California Institute of Technology, Industrial Relations Center

Certificate in Counseling and Psychology, University of Southern California
Certificate in Conducting Workplace Investigations, AWI Institute

B.A., History, University of California, Los Angeles

### *Additional*

On the business advisory committee to the Board of Directors for privately held, but rapidly growing Specialty's Bakery/Café headquartered in San Francisco.  Actively participated in the preparation for eventual "liquidity".

Continuously active on the Boards of several community and non-profit organizations, doing strategic planning, Human Resources and fund-raising

Coro Foundation CityFocus participant

Co-authored 2 extensive, peer reviewed White Papers published by SHRM.
        "Unlawful Workplace Harassment: An Ongoing Employer Challenge"
        "Is there a Standard of Care to Define a Reasonable Harassment Investigation?"

On the editorial Board of the Employment Resource Advisory Institute (ERI)

Certified as Workplace Investigator after completing the intensive Association of Workplace Investigators Training Institute.

Member of the Equal Pay Task Force as part of the California Commission on the Status of Women

***Professional Affiliations include:***

The national panel of experts for the Society of Human Resource Management (SHRM) in Diversity and Equal Employment. Longtime member of the national SHRM Legislative and EEO Committees

Active in the Northern California Human Resources Association (NCHRA) and was long time chair of the Legislative Committee

Association of Workplace Investigators (AWI) coordinated the Bay Area Local Circle

Active member of DMEC

Recipient of the 1999 NCHRA Special Service Award

Licensed Private Investigator (California)

**Exhibit 2**

## *Rule 26 Case List for Rhoma Young*

While I have been involved as an expert witness in a broad series of cases for both plaintiffs and defendants, the following situations are those in which I have been deposed and/or testified as an HR expert in trial/arbitration in the last four years.  Cases involving the complaint procedure, employer response to complaints, and the quality of the investigation are <mark>highlighted.</mark>

English v. Estes Freight.  Defense represented by Poyner and Spruill.  Issues are performance management, wrongful termination, discrimination on the basis of age and race.  Rebuttal HR expert.  Deposed August 2017.

Edwards v. AC Transit.  Defense represented by Tammy Brown at Foster Law.  Issues were race, lack of promotion, retaliation, discrimination.  Rebuttal HR expert.  Deposed June 2017.

Castillo v. Safelite.  Plaintiff represented by Jinny Kim of Legal Aid at Work.  Issues are retaliation, harassment, <mark>quality of investigation</mark>, associated disability, performance management, failure to prevent, HR policies and wrongful termination.  Deposed May 2017. Case settled.

Rotz v. Symetra.  Plaintiff represented by Steve Murphy and Ron Spector.  Issues are retaliation, age and gender discrimination, <mark>quality of investigation</mark>, policies and performance management.  Deposed October 2016.  Case settled.

Sargent v. Cal State Sonoma.  Defense represented by Durie Tangri.  Issues are retaliation, whistleblower retaliation, constructive discharge, performance management and <mark>quality of investigation</mark>.  Deposed October 2016.  Testified in trial February 2017.

Teasley v. SpaceX.  Defense represented by Orrick Herrington & Sutcliffe and Fox Rothschild.  Issues are gender and disability discrimination, retaliation, the interactive process, consideration for accommodation, pay administration, the <mark>quality and need for an investigation,</mark> performance management and accountability.  Deposed October 2016. Testified in trial October 2016.  Defense verdict.

Lannear v. Diamond Pet Foods.  Plaintiff represented by Bryan McCormack.  Issues were racial harassment, performance management, <mark>prevention efforts and considerations</mark>, HR policies and procedures. Deposed June 2016.

Magdaleno v. Ronpak.  Defense represented by Keller Sloan.  Issues are wrongful termination, ethnic origin, race discrimination, harassment, hostile work environment, performance management and employee and managerial accountability and <mark>the need for and quality of investigation</mark>.  Deposed April 2016.  Defense verdict.

Smith v. Northrop Grumman.  Defense represented by Michael Hoffman.  Issues are disability consideration, the interactive process, LOA, failure to prevent discrimination and retaliation, alternative job search efforts and response to other expert witness. Deposed March 2016.  Case settled.

Evans v. Poms Insurance.  Plaintiff represented by Pillsbury Coleman.  Issues are HR policies and practices in benefit coverage when an employee died while on LOA and insurance coverages transitioned from one company to another.  Deposed March 2016. Case settled.

Avalos v. Redwood Hill Farm.  Plaintiff represented by Judy McCann.  Issues are communication in the interactive process, exploration of accommodation, wrongful termination, failure to prevent discrimination and mitigation of damages.  Deposed November 2015 and April 2016. Case settled.

Mauldin v. ISS/VSS.  Defense represented by Barbara Cotter.  Issues are RIF selection process, recall and  RTW, race, age, disability, LOA and RTW, need for and quality of investigation and efforts to prevent discrimination, harassment and retaliation.  Deposed September 2015. Testified in arbitration November 2015.

Metzner v. Kaiser.  Defense represented by Curley Hessinger.  Issues are disability, LOA, RTW, retaliation, performance management and accountability, wrongful termination and quality of job search, efforts to mitigate and recent and projected job market information. Deposed September 2015. Testified in trial November 2015. Plaintiff verdict.

Thompson v. Kirby.  Defense represented by David Frye et al, of Lathrop and Gage. Issues are sexual harassment, sexual assault, efforts to prevent, retaliation, complaint procedure, independent contractor v. employee status and usual HR practices, performance management, accountability and rebuttal to plaintiff HR expert. Deposed August 2015.  Case settled January 2016.

Bustos v. Global plastics.  Plaintiff represented by Joe Beccera.  Allegations include disability, use of LOA, FMLA/CFRA coverages, HR policies and practices, return to work, interactive process and accommodation, retaliation, RIF processes, performance management and wrongful termination.  Deposed April 2015.  Case settled.

Baker v. VSS.  Retained by Laura Mc Hugh of Rediger McHugh.  Allegations of race, age, and gender discrimination and harassment, wrongful termination, investigation, performance management and prevention of discrimination.  Also opined on mitigation of damages.  Deposed April 2015. Testified in arbitration, which was concluded in a defense finding.

Hurley v. California Dep't of Parks and Recreation.  Retained by Sedgwick (representing single defendant).  Issues are quality of investigation, reliability of investigation, gender

orientation, retaliation, discrimination, failure to prevent, hostile environment, harassment and performance management.  Deposed February 2015.

Pao v. Kleiner Perkins.  Defense represented by Lynne Hermle, et al.  Issues are discrimination, gender, wrongful term, company response to complaint, quality of investigation, retaliation, failure to prevent, performance management and broad based HR policies, practices and procedures.  Deposed February 2015. Testified in trial March 2015.  Defense verdict.

Johnson v. Sutter Health.  Defense represented by Hanson Bridgett.  Issues were mitigation of damages, quality, scope, depth and reasonableness of job search efforts, availability of comparable jobs, anticipated period of time in which to find a job and estimated potential income.  Deposed May 2014. Case settled.

Maloco v. Prometrics.  Defense represented by Allen Matkins and plaintiff by Chris Dolan.  Issues included disability accommodation, interactive process, LOA, performance management, wrongful termination and retaliation.  Deposed early 2014. Case settled.

Tina Brown Pruitt v. Oakland Arena Joint Venture-SMG.  Plaintiff represented by Jocelyn Burton.  Issues are policies and practices impacting wrongful termination, performance management, considerations of accommodation, the interactive accommodation discussion/process, LOAs, the organization's response to employee complaints of discrimination, retaliation and harassment, failure to prevent discrimination, management training and quality of the investigation. Deposed January 2014.  Case settled

Sar v. County of Fresno.  Defense represented by McCormick and Barstow Marty Oller. Issues are sexual harassment, hostile environment, organizational response to complaint, retaliation and prevention efforts.  Deposed November 2013.  Defense verdict, November 2013

Andrews, et al v. LLNL.  Issues are discrimination and adverse impact in age and quality and process used in implementing a workforce reduction.  Over 100 individual cases.  Defense represented by Andrew Livingston, et al.  Deposition October 2013. Testified in trial.  Defense verdict, December 2013

Michael Jackson family trust v. AEG Live.  Retained by the defense counsel O'Melveny and Myers (LA).  Issues were wrongful death, negligent hiring, supervision/ retention, background checks, industry standards/practices, and independent contractor/employee status, sourcing and practices.  Deposed (in 2 sessions) April 2013.  Trial testimony in August 2013.  Defense verdict.

Rhodes v. Dyson.  Defense represented by Sara Dionne and Rob Shwarts.  Issues were LOA, FMLA, disability, interactive process, accommodation and wrongful

termination. Deposed in fall 2013.  Trial testimony in September, 2013.  Defense verdict.

Curran v. Sacred Heart Schools.  Retained by defense attorneys Denise Trani Morris and Jim Brown (Sedgwick).  Issues were age, gender, performance management, efforts to prevent discrimination, quality of employer response and wrongful termination. Deposed in March 2013.  Testified in trial in November 2013.  Defense verdict.

Dally v. JFK Hospital.  Plaintiff attorney Nancy Doumanian.  Issues are sexual harassment, sexual assault, potential disability, quality of investigation, organizational response to complaint of harassment.  Deposed February 2013.  Case settled.

**Exhibit 3**

**Data and Documents Considered**

Case Documents

Declaration of Larissa Johnson, May 2, 2016
Deposition of Joseph Whittinghill and Exhibits, May 10, 2016
Deposition of Melinda DeLanoy and Exhibits, September 18, 2017
Deposition of Melinda DeLanoy and Exhibits, September 20, 2017
Deposition of Katherine Moussouris and Exhibits, June 10, 2016
Deposition of Dana Piermarini and Exhibits, June 9, 2016
Deposition of Holly Muenchow and Exhibits, June 22, 2016
Deposition of J. Ritchie and Exhibits, Volume I, June 29, 2016
Deposition of J. Ritchie and Exhibits, Volume II, June 30, 2016
Deposition of Joseph Whittinghill and Exhibits, May 10, 2016
Plaintiffs' Motion for Class Certification and Proposed Order, October 27, 2017
      Declaration of Anne Shaver and Exhibits
      Declaration of Holly Muenchow
      Declaration of Amy Alberts
      Declaration of Debra Dove
      Declaration of Heidi Boeh
      Declaration of Jenifer Underwood
      Declaration of Kristen Warren
      Declaration of Lanen Vaughn
      Declaration of Laura Miller
      Declaration of Mary Smith
      Declaration of Olga Hutson
      Declaration of Suzanne Sowinska
      Expert Report of Anne Marie Ryan and documents referenced in Appendix B
      therein
      Expert Report of Henry S. Farber and documents referenced in Appendix B
      therein
Stipulated Protective Order, Jan 29, 2016
Plaintiffs' Second Amended Class Action Complaint, April 6, 2016
AWI Guiding Principles

Documents

MSFT_MOUSSOURIS_00000107
MSFT_MOUSSOURIS_00000244
MSFT_MOUSSOURIS_00000397
MSFT_MOUSSOURIS_00000481
MSFT_MOUSSOURIS_00000586
MSFT_MOUSSOURIS_00000617
MSFT_MOUSSOURIS_00000877

MSFT_MOUSSOURIS_00001563
MSFT_MOUSSOURIS_00001597
MSFT_MOUSSOURIS_00001618
MSFT_MOUSSOURIS_00001638
MSFT_MOUSSOURIS_00001651
MSFT_MOUSSOURIS_00001904
MSFT_MOUSSOURIS_000001997
MSFT_MOUSSOURIS_00002066
MSFT_MOUSSOURIS_00002161
MSFT_MOUSSOURIS_00002171
MSFT_MOUSSOURIS_00002213
MSFT_MOUSSOURIS_00002253
MSFT_MOUSSOURIS_00002257
MSFT_MOUSSOURIS_00002267
MSFT_MOUSSOURIS_00002305
MSFT_MOUSSOURIS_00006337
MSFT_MOUSSOURIS_00006411
MSFT_MOUSSOURIS_00058096
MSFT_MOUSSOURIS_00058118
MSFT_MOUSSOURIS_00058138
MSFT_MOUSSOURIS_00058149
MSFT_MOUSSOURIS_00058153
MSFT_MOUSSOURIS_00187720
MSFT_MOUSSOURIS_00359629
MSFT_MOUSSOURIS_00467139
MSFT_MOUSSOURIS_00591188
MSFT_MOUSSOURIS_00645459
MSFT_MOUSSOURIS_00688790
MSFT_MOUSSOURIS_00737357
MSFT_MOUSSOURIS_00739781
MSFT_MOUSSOURIS_00739834
MSFT_MOUSSOURIS_00739956
MSFT_MOUSSOURIS_00813057
MSFT_MOUSSOURIS_00813058
MSFT_MOUSSOURIS_00813059
MSFT_MOUSSOURIS_00813063
MSFT_MOUSSOURIS_00813064
MSFT_MOUSSOURIS_00813065
MSFT_MOUSSOURIS_00813066
MSFT_MOUSSOURIS_00813068
MSFT_MOUSSOURIS_008211388
MSFT_MOUSSOURIS_008211389
MSFT_MOUSSOURIS_00821401
MSFT_MOUSSOURIS_00821421
MSFT_MOUSSOURIS_00839697
MSFT_MOUSSOURIS_00863197

MSFT_MOUSSOURIS_00883744
MSFT_MOUSSOURIS_00883747
MSFT_MOUSSOURIS_00883750
MSFT_MOUSSOURIS_00883756
MSFT_MOUSSOURIS_00883760
MSFT_MOUSSOURIS_00883764
MSFT_MOUSSOURIS_00883772
MSFT_MOUSSOURIS_00883775
MSFT_MOUSSOURIS_00883780
MSFT_MOUSSOURIS_00883913
MSFT_MOUSSOURIS_00883919
MSFT_MOUSSOURIS_00883929
MSFT_MOUSSOURIS_00883936
MSFT_MOUSSOURIS_00883943
MSFT_MOUSSOURIS_00883948
MSFT_MOUSSOURIS_00883953
MSFT_MOUSSOURIS_00883993
MSFT_MOUSSOURIS_00884001
MSFT_MOUSSOURIS_00884004
MSFT_MOUSSOURIS_00884007
MSFT_MOUSSOURIS_00884010
MSFT_MOUSSOURIS_00884016
MSFT_MOUSSOURIS_00884020
MSFT_MOUSSOURIS_00884099
MSFT_MOUSSOURIS_00884106
MSFT_MOUSSOURIS_00884112
MSFT_MOUSSOURIS_00884118
MSFT_MOUSSOURIS_00884148
MSFT_MOUSSOURIS_00884154
MSFT_MOUSSOURIS_00884158
MSFT_MOUSSOURIS_00884161
MSFT_MOUSSOURIS_00884167
MSFT_MOUSSOURIS_00884171
MSFT_MOUSSOURIS_00884174
MSFT_MOUSSOURIS_00884199
MSFT_MOUSSOURIS_00884204
MSFT_MOUSSOURIS_00884209
MSFT_MOUSSOURIS_00884274
MSFT_MOUSSOURIS_00884283
MSFT_MOUSSOURIS_00884287
MSFT_MOUSSOURIS_00884291
MSFT_MOUSSOURIS_00884299
MSFT_MOUSSOURIS_00884303
MSFT_MOUSSOURIS_00884307
MSFT_MOUSSOURIS_00884394
MSFT_MOUSSOURIS_00884406

MSFT_MOUSSOURIS_00884413
MSFT_MOUSSOURIS_00884419
MSFT_MOUSSOURIS_00884428
MSFT_MOUSSOURIS_00884435
MSFT_MOUSSOURIS_00884442
MSFT_MOUSSOURIS_00884450
MSFT_MOUSSOURIS_00884455
MSFT_MOUSSOURIS_00884459
MSFT_MOUSSOURIS_00884468
MSFT_MOUSSOURIS_00884477
MSFT_MOUSSOURIS_00884488
MSFT_MOUSSOURIS_00884493
MSFT_MOUSSOURIS_00884500
MSFT_MOUSSOURIS_00884506
MSFT_MOUSSOURIS_00884514
MSFT_MOUSSOURIS_00884518
MSFT_MOUSSOURIS_00884656
MSFT_MOUSSOURIS_00884661
MSFT_MOUSSOURIS_00884664
MSFT_MOUSSOURIS_00884667
MSFT_MOUSSOURIS_00884669
MSFT_MOUSSOURIS_00884673
MSFT_MOUSSOURIS_00884677
MSFT_MOUSSOURIS_00884681
MSFT_MOUSSOURIS_00884713
MSFT_MOUSSOURIS_00884721
MSFT_MOUSSOURIS_00884726
MSFT_MOUSSOURIS_00884730
MSFT_MOUSSOURIS_00884736
MSFT_MOUSSOURIS_00884742
MSFT_MOUSSOURIS_00884745
MSFT_MOUSSOURIS_00884748
MSFT_MOUSSOURIS_00884750
MSFT_MOUSSOURIS_00884760

ERIT Files

MSFT_MOUSSOURIS_00818186- MSFT_MOUSSOURIS_00818407
MSFT_MOUSSOURIS_00819759- MSFT_MOUSSOURIS_00820346
MSFT_MOUSSOURIS_00812513- MSFT_MOUSSOURIS_00812618
MSFT_MOUSSOURIS_00815350- MSFT_MOUSSOURIS_0081535
MSFT_MOUSSOURIS_721317- MSFT_MOUSSOURIS_721321
MSFT_MOUSSOURIS_815320- MSFT_MOUSSOURIS_00816417
MSFT_MOUSSOURIS_00821060- MSFT_MOUSSOURIS_00821093
MSFT_MOUSSOURIS_00817904- MSFT_MOUSSOURIS_00817970
MSFT_MOUSSOURIS_00818424- MSFT_MOUSSOURIS_00818428

<u>Resumes</u>

Holly Klein
Judy Mims
Kate McMahan
Kim Tran
Melinda DeLanoy
Miles Williams
Rachel Winship
Steve Zwerin
Tamara Fountain
Yong Lee


<u>Documents Related to Other Cases</u>

*Oliver v. Microsoft Corp.*, No C 12-0943 RS (N.D. Cal.)
       Dkt. No. 92 Order Granting Motion for Summary Judgment
       Deposition of Judy Mims, January 24, 2013

**Exhibit 4**

## *Interview notes from Microsoft ERIT staff interviews*

### Interview Kim Meyers, Manager of ERIT, November 17, 2017 and December 8, 2017

ERIT is the group in charge of doing investigations for employee complaints of possible policy violation at Microsoft.

Kim indicated that she has been with Microsoft for several years, and that the investigation process was built into the problem solving culture. She said that the process is a sophisticated one, but also down to earth. She said that she would be sending me background information on her team.

She manages both the affirmative action component and ERIT as her scope of responsibility. All the members of her team are attorneys, and their backgrounds are broad and experienced in employment law.

She indicated that in her opinion, having a separate group to focus only on investigations added strength and acceptability to the investigation process. The investigators were not part of the day-to-day operations of the employee and managers.

I had a topical outline of points to cover in this conversation, but it was a fairly free-flowing and informal conversation, rather than a rigid outline in asking her questions and getting her responses. She did say that each case is so different, and they deal with so many issues in their investigations, that there can be subtle differences that end up making major differences (# of witnesses, needed time frame, types of documents reviewed) in how each individual investigation may be conducted.

She said that they do not have a lot of "rules" as it was really impossible to do that outside of a basic set of parameters. She outlined the normal process as a checklist, which would begin with meeting the complainant and getting as full and complete information as possible.

She said that the usual next stage would involve the interview of witnesses, followed by a review of relative and pertinent documents. She said that there was not a rigid sequence, as often, at one stage, something would become known that may be important for her to go back and check a prior document or witness.

The fourth item that she mentioned was that the person being complained about would be interviewed. Any witnesses that either party wanted to have included that would, in their view, be possible sources of information on the issues being alleged, would also be interviewed. She saw the investigation as a balanced process between both the person complaining and the person being complained about.

She indicated that after the investigation is conducted, HR would become involved in implementing a conclusion that was reached by the investigator. HR's role would be to pick up the ball at that point, and do follow-up. That was not within the ERIT span of responsibilities.

She defined ERIT as fact-finding, problem-solving, and making findings (or conclusions).

The investigator, by conducting the investigation, really provides a framework for HR decision-making and follow-up. This is especially true if there is a finding of policy violation, and certainly if there is a finding that, while behavior may not be a direct policy violation, it may be problematic in some way that needs to be addressed by follow-up work, and that is HR's responsibility. They deal with complex situations and act as a referral point to HR once the investigation is concluded.

HR does the day-to-day employee relations issues, such as if an employee is unhappy with their manager, their pay, their "Connect", or other work-related situations. ERIT is specifically designed to respond to issues where there is a complaint involving possible policy violation of the harassment and discrimination policies, as well as retaliation. They also do some work in the ethics area.

They had a new SH policy in 2016 as an update, which was a little bit more formal than their prior policy in requiring managers to directly report to HR or ERIT if they feel that there is any specific potential policy violation in behavior. It addressed EEO, retaliation and harassment, and made sure that there was some mention about avoiding potential retaliation.

The investigation has to be thorough, and timely, balancing the need to find appropriate facts, through witness interviews and documentation review. That balance is critical to maintain objectivity. There are many different sources by which complaints can come to the ERIT group for investigation, but the significant majority (approximately 80-90 percent) come from an HR referral.

Initially, the ERIT group contacts the complainant, and then lays out a plan in how they will approach the investigation.

From a timing point of view, their general aim is to complete an investigation within a 50-business-day review. They want to work as quickly as possible, and generally contact the potential complainant within 24-48 hours after being notified of a potential investigation need.

If there is a situation to address to protect employees' safety, they will move immediately.

The case is referred to the ERIT group and it is assigned to an investigator. Kim does an overview to ensure that there is no potential conflict of interest with whom she

assigns to a particular investigation. They check out relevant documentation, and have access to performance management, "Connect", pay or any other related information.

Each case is fact-specific. They are all different. For example, in looking at pay histories, it is very different even though another person may have a related job.

They ask "who" should be interviewed, and that is a question that is asked both of the complainant and the person being complained about.

All of the case summaries, once the investigation is completed, are reviewed by Kim for any additional items that remain unresolved or additional questions that need to be asked or interviews conducted.

She looks for a sequence that "makes sense", and makes sure that they have all the relevant data, that it is logical, and that the analysis is clear. To maintain objectivity, they may also use a third party if necessary. That may even be an external investigator. That would occur when the workload became so heavy that the investigator was not available in a timely manner. There was also the possibility that if one of the parties in the potential investigation is a highly-placed person, that might be a situation in which a third party might be used.

In terms of basic documentation, each investigator takes their own notes, but the way in which they do that may vary. Sometimes they use OneNotes; sometimes they do it by hand. It really depends on the circumstances and needs of the case, and the investigator. Microsoft encourages using whatever methodology seems to be the best for an individual investigator to fit their conversations with the particular people being interviewed. They do not generally (tape) record data, but the notes are comprehensive. They can also check email communications and other types of communications if that would be helpful to the investigation.

In terms of records retention, they do have a database. Their current one was introduced in 2014, and prior to that had a CRM (client relationship management) system that was used to track who was reporting, on what, and about whom.

The ways that an employee complained were usually directly through HR, through their management, and even anonymously. Many forums which they can use are outlined in various policies that are posted and on the internet?? Intranet? Oftentimes, while they try to do an in-person interview if the person is within the geographic range, because of the broad geographic and multiple location diversity in the company, they do phone interviews, often using Skype.

The database has the case, the subject of the complaint, the HR person, the investigator, the dates, the finding of any investigation, and can also connect with the employee information, "Connect", and pay.

To make sure that the person being interviewed is as comfortable as possible and that the information can be conducted in a confidential way, they try to arrange their schedules in a way to enhance comfort and confidentiality. They use Outlook as trying to arrange schedules.  The selected location of an in-person interview, tries to focus on privacy and confidentiality. Each employee at Microsoft has a private email address, and so that would be used rather than another email mechanism which might be available to multiple parties in order to keep the process confidential. The group having an open calendar is the sales department. That is a necessity of their business.

During the interview, the investigator also cautions the person being spoken to about confidentiality and addresses other communication issues. In some of the material reviewed, there would be handwritten notes in the upper right hand corner indicating the focus and to remind the investigator to cover those items during the course of the interview, and make sure that they are not forgotten.

In terms of reaching a conclusion, this may or may not involve a policy violation. The situation does not end with that designation of closure. In either case, there is often follow-up, and that is where the referral to HR is so important. If there is any corrective action, that is taken by HR. That is not part of the ERIT scope.

Sometimes it is a very fine call between whether there is or is not a policy violation, but even if the behavior that is substantiated during the course of the investigation is questionable, problematic, or is inconsistent with a policy, that would lead to a follow-up referral to HR.

It would also be through that mechanism of referring to HR, that any follow-up with the complainant or the person being complained about would be conducted, to help prevent any perception or reality of retaliation.

As part of reaching a conclusion, the usual standard or threshold was a "totality" of the evidence. It is not a legal finding. It simply begins with "I concluded" or language to that effect.

Credibility is a necessary finding, and that often depends upon a weight of the information in the final evaluation.  A conclusion may not just be black or white, and sometimes the evaluation may not be totally clear. That is why the experience and education and training of the investigators is so important. This is the only job they do. They are very good at it. They know how to deal with complex situations in a way that ensures consistency, confidentiality and trying to remedy a situation or try to find out if a situation needs to be remedied.

To prevent retaliation, the investigator and any follow-up HR contacts make sure that they tell the employees to get back to them if there is any question or possible problem that they perceive as being retaliatory or negative as a result of them having complained or participated in an investigation. They try to build that bridge, and feel that they have been quite effective in doing that.

33

In terms of the final report, there is usually a report, but there may be certain cases in which one is not done. Again, this underlines why each case is so unique, individual and different from each other. There is not a one-size-fits-all approach to an investigation.

In the prevention of retaliation, it is very important that the message given to the employees participating in the investigation is "real". Being real, being genuine, being authentic, works.

One of the most important roles for ERIT staff is to do periodic training. Most of the training is directed towards HR staff or employee relations staff who deal with either the follow-up of the investigation or the preliminary part of referring a matter for investigation. Such training covers the need to know what types of questions to ask, how to ask them, and how to discern whether or not an investigation may or may not be called for. It is not a dual investigation, but almost a preliminary step to the referral for an investigation. Training that is done may vary from situation to situation, as again, it is tailored to the needs, experience level and knowledge of the particular people whom are participating as training class members. The whole goal is to get complete and comprehensive information during the investigation and to ensure that ERIT is referred to by HR.

One of the questions that managers always have to ask, is "When is a complaint a complaint?" As part of the training, all managers and employee relations staff are encouraged to say, "Thank you", to the employee for coming forward, and then be told that they are handing it off or involving HR to get the best and most relevant treatment for their issues. "We want to clarify the definitions of where it is used and make sure that we are as accurate as possible in having ERIT perform investigations on issues which need it, and then reach a conclusion which is balanced and fair to the parties".

**Interview with Melinda De Lanoy, November 29, 2017**

Ms. De Lanoy is one of the members of the ERIT team and is a person who does investigations full time for Microsoft.

Her deposition had been previously reviewed, and so some of the questions that were addressed in that or in the prior interview with her manager, were not specifically part of this subsequent interview.

Initially, Ms. De Lanoy indicated that there were some types of things that she was not asked that surprised her. She said that they didn't really ask much about her qualifications, and seemed much more interested in the legal orientation. They did not ask much about performance appraisal, pay or promotion, and the more subtle aspects of where women might be treated differently or sometimes complain about. She was also not sure that the person who deposed her really understood her (or other ERIT investigators) relationship to employee data, what she had access to and what she would frequently use.

She said she tried to incorporate into her answers during her deposition the fact that they give equity to both the complainant and the person being complained about to reach an accurate assessment. She said that all of that information was relevant.

Ms. De Lanoy said that she joined Microsoft in 2009. Prior to that, she had been in a labor law firm and also was a law clerk in a federal court. She said that most attorneys are trained about advocacy, and her current role is very different, in that she is neutral. She sits in the middle, and tries to bring balance and perspective. To do this, she is patient, listens, and invites disclosures. She went to a class at Pepperdine in their Straus School for mediation training and it was very helpful to her in dealing with her cases.

She cited a specific example in talking about her work as investigating Dana Piermarini, one of the plaintiffs in this case. She said that they had many conversations to allow Ms. Piermarini to become comfortable, and to be more complete in her disclosure. Ms. De Lanoy indicated that initially, Ms. Piermarini did not seem to feel that there was much likelihood of her issues being treated seriously and she seemed almost reluctant to disclose details.

It is important for the complainant to be comfortable. Ms. De Lanoy said that she tried to do that in many different ways for Ms. Piermarini to make sure that she could fully engage in the conversation, disclose all of the issues that were of concern to her, and to make sure that they were addressed in the investigation.

Ms. De Lanoy indicated that they cannot investigate what they do not have information about, which is why it is so important that the initial information disclosed by the complainant be as comprehensive as possible. That preservation of confidentiality is very important, but also needs to be viewed realistically.

The role of an ERIT investigator is "important" and it really determines what is and is not within the ERIT mission.

Training that is done by the ERIT staff is really an important part of what they do. It defines and helps define what is and is not within the ERIT scope and issue, and acts as a filter. It is a checkpoint on closure and that is how she uses it the original complaint, as a checklist to go back before she concludes an investigation to make sure that all of the issues that need to be addressed have been.

She sees her work as proactive, and loves her job and keeps her focus on professional standards and ethical behavior.

Any procedure used in the investigation can define a more specific sequence, and help determine the range of scope of the ERIT investigation. It can be defined or reflect how you do it, and how well you conduct the interview. It just cannot be a rigid, standardized protocol.  That does not work.

Ms. De Lanoy indicated that she was more into "practice" than procedure. She understands the policy and uses it in her initial conversations with the complainant to make sure that there is clarity on expectations about what the ERIT investigation will and will not cover and what it can and cannot do. You want to focus on the person's concerns, and go through the fact-checking and information received at the very outset of an investigation, and then use that also as a checklist way to make sure that the conclusion has reached all of the corners.

Other documents, such as the "Connects", help the analysis, but document selection, review and determination of relevancy really focuses you to challenge your own bias, (such as the confirmation bias) to make sure that the investigator is and remains objective throughout the entire process, especially important in reaching a conclusion.

The most thoughtful part of the investigation is to make sure that neutrality is retained and objectivity is paramount. The communications, the finding and determining what is next can be critical in the initial point of bringing out the most critical and perhaps subtle allegations/concerns and defining expectations about the conclusion of the investigation.

Also, that needs to continue into the next stage after a conclusion has been reached. What is next? What she does triggers others from HR to follow up and improve a situation (hopefully).

In terms of complaints, she gets a lot of them that are beyond sexual harassment. They are truly across the board.  The issues are part of broader cultural issues, and may well mirror cultural questions and values that are currently in the public purview. The question of what is "politically correct," is not right, if it leads to a diminution and demeaning impact because of a certain feature, (i.e., gender, race, age). It is actual

behavior that determines what works, and how a message is both sent and received or perceived.

Ms. De Lanoy was asked about the culture at Microsoft, and whether it could be described as "intense". She said that individual employees' environment is really so contingent upon an individual microclimate of who is your manager is and who your Skip level manager, that determines the world in which you work, that it was difficult to find one or two words to describe the culture at Microsoft. She did say that most employees are very bright.  They are focused and have a sense of what their career trajectory expectations are, whether they are on target and on time. It seems to almost become an expectation…

The issues that are raised by employees are an across-the-board series of topics that are part of broader cultural issues. Employee knowledge and anticipation of what they describe as the pace and sequence for their own career trajectory seem to almost become an expectation and may become a point of asking or challenging decision-makers. Employees poke, prod and explore reasons why there may be a delay, if the reasons are not clearly and acceptably explained. It can cause issues and problems in their morale and dedication.

The ERIT team is absolutely committed objectivity. They said that sometimes HR, which works side-by-side with management, can "get too close" to have the arm's length relationship that is necessary for the objectivity to conduct independent, neutral investigations. That makes the distance of ERIT so positive for the employees and the company.

Again, for timing of an investigation, Ms. De Lanoy says that they aim for the 50-business day target, but that some complex cases, the travel schedule of the parties involved, or any new and emerging allegations added to the original complaint, kind of cause an investigation to almost "start over" or go back and re-discuss things with other witnesses or check different data. That could throw planned timing off.

However, she also indicated that she, personally, prefers to get things completed earlier.  However, she and believes that quickly done investigations are not the answer, if they are not thorough. However, she tries to get the matter expedited so that it clarifies things for people early on, rather than waiting for an extended period of time in a vacuum.

Most of the interviews are done on the phone if people are in field offices. It depends on the business or the organization. She likes to do investigation interviews in person, but also uses phone for interviews and occasionally, Skype.

Just as there is a policy language, which Ms. De Lanoy tries to use and incorporate as part of her message to both the complainant and the person being complained about, there is also a sequence outlining what the company's commitments are to a neutral investigation. Then, when the investigation is completed, there is the hand-off to HR.

In every case, they talk about confidentiality.

It is surprising how conclusions, when reached, can be mischaracterized.  Ms. De Lanoy indicated that there are the two words, "founded" and "unfounded", that are used to talk about the conclusion of an investigation, but there really should be a third. They should add "unfounded (which means not a defined policy violation) but with follow-up".

Follow-up is HR, and occasionally ERIT. They meet with the complainant after the investigation. They try to answer questions, make sure that the complainant is clear about what is happening or why something can wait or can't wait.

It is sometimes difficult, and you can wrestle with making that "finding". She indicated it is not a huge challenge, because they know that HR follow-up will address the subtleties and the learning opportunities.

If a person being complained about begins with a rigid denial, (which Ms. De Lanoy says is rather unusual), it can shut down any movement forward. Usually, (at an increasing rate over the last 4-5 years) the person who is being complained about approaches it more from a "what can I do differently?"

Ms. De Lanoy indicated that there had been a slow culture change occurring over the last several years, but that their current CEO seems really committed to building a collaborative environment.

The response of operations management to the investigation process has changed. It used to be that they may have resented taking time away from work to participate in an investigation, and with an attitude of "why are you bothering me", but that has changed. She said that it is becoming much more utilized by management in engaging in the process. They view it as a "what can I learn or do differently?"

The culture is to have possible solutions, not resistance or reluctance. They view the process of the investigation as an opportunity to grow and build. It is not just shoot someone down.

It used to be (5-6+ years ago), more problem-based, and competitive. They have ambitious employees. But that has shifted. It has shifted from finger-pointed and criticizing into building a collaborative work environment.

She recognized that there are still some problems in some parts of the organization, and she is realistic in her expectations. She loves her work because it is about fairness and integrity. Microsoft is willing to have ERIT as part of its corporation self-reflection, not a rubber stamp. They can really call it as they see it, not simply defer to what management wants to have as an outcome. They are not trying to minimize or ignore problems or minimize potential liability. They want to find them (possible problems) out early so they can address and identify and resolve them.

**Exhibit  5**

### *Select De Lanoy Deposition Excerpts*

Q. …the primary purpose of my job was to conduct investigations related to employee complaints raised regarding Microsoft's anti-discrimination, anti-harassment policy, and to provide training to HR regarding their part in accurately identifying and raising issues appropriate for the ERIT team to investigate. Depo De Lanoy 09/18/17 p 24. 10-16

THE WITNESS: When I conduct an investigation, I work to understand what documents would be relevant, and I review a variety of documents depending on what the allegations are and what the person who is raising the complaint, or the complainant, has indicated what thee believe the issue is. Depo De Lanoy 09/18/17 p 33. 19-24

A. From time to time we will have what I would call a postmortem of a particular investigation. But we don't have a general practice of talking about investigations as they're ongoing in a broad way. Depo De Lanoy 09/18/17 p 41. 7-10

A. … It's a part of a process that's encouraged within the company to share learnings and demonstrate a growth mindset by looking for learning opportunities and sharing those with your colleagues so that folks can benefit from them in common. Depo De Lanoy 09/18/17 p 41. 16-20

Q. Who determines the scope of an employee complaint? … THE WITNESS: … the employee raising the complaint decides what they are going to complain about. Depo De Lanoy 09/18/17 p 55. 24-25; p 56. 2-3

A. … partnership with HR and ERIT means that HR surfaces and escalates issues that are appropriate for ERIT engagement to ERIT. ERIT generally, the broad majority of the time, would conduct the investigation for issues that are within its scope. While the investigation is pending, there may be some communication between the ERIT investigator and HR with respect to the investigation. The HR manager is closer to the work and the people in the work group who may be impacted by receiving notices of the investigation. … Depo De Lanoy 09/18/17 p 56. 7-18

A. ERIT can obtain a complaint from HR. ERIT can obtain a complaint that is relayed by a manager within the business. ERIT can obtain a complaint from an employee who isn't the person with the issue, but has become aware of it. And ERIT can obtain a complaint on referral from the intake line and intake website that is operated by Microsoft's Office of Legal Compliance, and is described in the company's public facing integrity website. ERIT has received anonymous complaints by mail. Depo De Lanoy 09/18/17 p 57. 25; p 58. 1-8

Q. And how does Microsoft inform its employees of those anonymous methods to submit a complaint? A. That information, as I recall it, is covered in the standards of business conduct training, most years that I can think of. There is also information

available on the company's internal website, Microsoft Policy. And then, broadly speaking, it's my observation that the company reminds employees from time to time of its various listening mechanisms for eliciting and responding to employee complaints. Depo De Lanoy 09/18/17 p 59. 5-14

THE WITNESS: When we conduct trainings, we generally have a PowerPoint, and we have a speaker, and we talk about the scope of ERIT policies that we have investigative responsibility to. And we present the information in a variety of formats. We put the policy language in front of them. We put hypotheticals in front of them. We try to use a variety of teaching mechanisms to address a variety of learning styles, and the variety of ways that issues might be presented. Depo De Lanoy 09/18/17 p 66. 10-18

A. … the line HR person working directly with employees in an HR organization with a specialist team would sometimes, but not in all cases, be the initial point of contact when an employee started a conversation about a concern that they had. And then, at some point, when the subject of the complaint appeared to be relating to areas for the specialist teams' scope of work, the line HR person would make that correction or introduction, and the conversation might continue for a while with the member of that specialist team. Then, depending on how the complaint was articulated and elucidated and understood over time, then the HR specialist team would typically be the team that would escalate it to ERIT. Depo De Lanoy 09/18/17 p 71. 5-18

Q. Does the training vary based on organization? A. It does. Q. Does it vary based on anything else? A. On the skill level and frequency with which that organization addresses employee triage with the preferences of that HR organizational leader, with their availability, given their business rhythms and the programmatic demands on their time. There are numerous factors that could cause it to vary, yes. … THE WITNESS. We talk about Microsoft's efforts to maintain employee complaints in a manner as confidential as possible. We train HR managers that it is not appropriate to promise confidentiality. Sometimes, when that term is used, what an employee says is, I don't want you to do anything about this complaint. That's something that we try to train HR Managers to address, because we don't think it'
s proper for them to take a complaint in and not take action on it. Depo De Lanoy 09/18/17 p 77. 20-25; p 78. 1-15

THE WITNESS: … Microsoft does not tolerate retaliation against employees who raise good faith complaints about their working environment, or who assist the company in its review of such complaints. Depo De Lanoy 09/18/17 p 79. 6-9

THE WITNESS: The database, as I have described it to you previously, the current CRM data base, tracks who raises a complaint, what their complaint is understood to be in a number of categories. It tracks the investigator assigned to the case. It tracks the data the case is opened and closed. It tracks the date that the summary report or report on investigation is finalized. And it identifies structurally what Microsoft organization the complainant sits in, and if the complainant has identified a subject of his or her complaint, it would also identify that person. … A. The current ERIT database dates

back to 2014. We have record of prior complaints, but they exist in that historical database that I described to you previously.  Depo De Lanoy 09/18/17 p 82. 19-25; p 83. 1-4; p 84. 3-5

THE WITNESS: The database contains data across Microsoft, and it can be viewed in a number of ways. You could view it in a comparative way. Depo De Lanoy 09/18/17 p 87. 7-9

THE WITNESS: Microsoft investigates employee complaints. If a complaint is brought to me in my work as an ERIT investigator, and I understand that the subject has been the subject before, I have a professional obligation to conduct a fair and neutral investigation as to that individual, and to follow the evidence as it relates the complaint – to the complaint that's before me at that time. Depo De Lanoy 09/18/17 p 89. 7-14

THE WITNESS: My responsibility as an investigator is to be neutral and fair, and to conduct a reasonable and prompt investigation. Depo De Lanoy 09/18/17 p 92. 18-20

THE WITNESS: … circumstances in complaints can vary really widely, and because we have an obligation for procedural fairness towards complainants and subjects, and because each investigation needs to be taken on its own merits … Depo De Lanoy 09/18/17 p 93. 19-23

Q. Under what circumstances would a prior complaint be relevant, in your opinion? A. If it were brought forward by the same complainant; if it was related to the same subject matter or the same kind of behavior; if it occurred in the same time, place, manner; those are some of the ways I can imagine a prior complaint becoming relevant. Depo De Lanoy 09/18/17 p 94. 1016

THE WITNESS: In any particular complaint, the data that I look at would be guided by the nature of that person's complaint, and the issues that he or she was raising. There is no specific set of documents or view that I would pull in response – in a rote manner. Depo De Lanoy 09/18/17 p 99. 11-15

THE WITNESS: When I conduct an investigation into an individual person's allegations, I look at data that is relevant on the basis of the issues he or she is raising. Depo De Lanoy 09/18/17 p 100. 13-16

A. … I like to emphasize to HR that this really is a situation that requires the exercise of judgment and good listening, and sometimes if you provide a formula, people's listening gets a little narrow. Depo De Lanoy 09/18/17 p 104. 16-20

THE WITNESS: When I'm focusing on the scope for ERIT investigations that aligns to the anti-discrimination, anti-harassment policy, I have used the policy language … I have spoken broadly about an employee making a connection between any policy protected class basis and a concern that touches on the workplace. I have used hypotheticals, role plays. I have used a variety of mechanisms to try to impart to my HR

audience an effective means of recalling ERIT's scope under the anti-discrimination, anti-harassment policy. Depo De Lanoy 09/18/17 p 106. 15-18; p 107. 1

THE WITNESS: … it would be common for me to look at peers of a complainant, if that data was relevant to their particular complaint, but, again, I have to stress that because each complaint is unique, my actions with respect to each complaint are likewise unique, and there is not a one-size-fits-all for any given type of complaint. Depo De Lanoy 09/18/17 p 108. 5-10

A. … intended to elicit a conversation across the room where we could draw out form HR managers how they've interacted with situations where an employee has raised a complaint to them before, and questions they can use that would help them get additional facts out on the table that would allow them to understand the concerns that the employee was expressing. This slide doesn't reflect that there is some magical series of questions that must be asked in any particular order, in any particular case. … THE WITNESS:; There are no formalized, recorded scripts that I am aware of ERIT providing to HR. Depo De Lanoy 09/18/17 p 110. 18-25; p 111. 1-3; 10-11

Q. So why does the level of the party impact who conducts the investigation? A. It may be just a more sensitive situation overall, and if you had resources that varied in their knowledge of Microsoft or their experience with Microsoft investigations, you would want to allocate the most experienced resources that you had to those most sensitive or most complex investigations. Depo De Lanoy 09/18/17 p115. 2-9

A. Each ERIT investigation proceeds in a vary individualized way. There is not a programmatic differentiation based on stock level. Depo De Lanoy 09/18/17 p 116. 2-4

A. The intake form has a limited amount of information, and it's going to be presented on the basis of how the HR person who filled it out understood the concern that was being raised; and so, yes, each ERIT investigator, I think, anticipates confirming what particular issues the employee may be raising that are appropriately understood as in scope for ERIT. Depo De Lanoy 09/18/17 p 116. 22-25; p 117. 1-3

A. … I personally am aware of employee complaints that I have investigated that the employee has articulated or rearticulated over the course of an investigation, and a matter that may have appeared initially not to be within scope may subsequently be rearticulated or explained in a way that changes how I look at it. And so it's really not as hard-and-fast as that word "confirm" suggests. Depo De Lanoy 09/18/17 p117. 11-18

THE WITNESS: The ERIT investigator determines what issues are in scope for investigation … Depo De Lanoy 09/18/17 p 117. 23-24

A. ERIT investigators are not functionally advocates or advice gives. We're neutral investigators. Depo De Lanoy 09/18/17 p 118. 23-24

A. The standards of business conduct training content changes each year, but to the best of my recollection, as I reflect on that training and what I've seen in it over the years, a portion of it is always devoted to how people can raise their concerns to Microsoft. … A. … there are multiple locations on the intranet where the employees could find information about ERIT. One of those is on HR Web. The other is through Microsoft Policy. … Microsoft has an integrity website. I think we talked about that in connection with the standards of business conduct training. That site is public and employee facing, and it describes how Microsoft can be contacted to receive complaints. Depo De Lanoy 09/18/17 p 131. 7-12; p 132. 11-20

Q. Do you customize all your trainings based on the org. you're presenting to and the people you're presenting to? A. Yes. … A. There's probably similarities between what investigators do, because we support each other by sharing examples, but there is not a fixed, prescribed set of slides. Depo De Lanoy 09/18/17 p 141. 11-19

THE WITNESS: … the current version of this policy more closely and explicitly aligns with Microsoft's open-door policy, … A. Microsoft has an internal open-door policy. I can't quote it to you chapter and verse, but in effect it invites employees to escalate their issues when they have them, and if they don't feel that their issue has been resolved by the first place they've taken it to, that they have an invitation to seek other conversations. Depo De Lanoy 09/18/17 p 147. 10-11; 17-22

THE WITNESS: … the current text of Microsoft's anti-harassment and anti-discrimination policy reminds employees of the company's open-door policy; let's them know that they can raise concerns related to that policy to their manager, their skip manager, to HR, or to ERIT. That's what I believe the current version of the company's policy reflects. Depo De Lanoy 09/18/17 p149. 11-17

THE WITNESS: The actions that Microsoft takes in response to any particular employee complaint depends upon the specific nature and allegations of what that complaint entails. Depo De Lanoy 09/18/17 p 153. 2-5

THE WITNESS:; Each investigation is undertaken individually on the basis of the allegations presented. Depo De Lanoy 09/18/17 p153. 11-12

THE WITNESS: … there is not a formal written policy that directs ERIT's actions. ERIT's actions are determined individually in light of each particular case. Depo De Lanoy 09/18/17 p 157. 11-13

Q. How does ERIT ensure the safety of employees who allege sexual harassment? … THE WITNESS: It depends on what allegations ERIT is presented with. Depo De Lanoy 09/18/17 p 157. 15-19

THE WITNESS: … IN some cases where employees bring complaints forward, I have sought consultation or I have referred them to our global security team for an assessment of their physical safety. In some cases that I've had, I have worked to have

HR articulate for the employee a work-from-home arrangement. It really varies depending on the particular allegations that the complaining employee puts forward. Depo De Lanoy 09/18/17 p 158. 1-8

THE WITNESS: … There is no standard set of steps that is taken on a rote basis in response to any particular type of complaint. Depo De Lanoy 09/18/17 p 159. 22-24

A. I can't think of a time when I haven't received an intake form. … I would also say that the intake form is just a snapshot… Depo De Lanoy 09/18/17 p 161. 11-14

A. Witnesses are not entitled to updates on the outcome or progress of an investigation. That's one of the measures that we would take to try to preserve as much confidentiality around the matter as we could. Depo De Lanoy 09/18/17 p 162. 6-9

THE WITNESS: … with the finding of a violation of the company's anti-discrimination, anti-harassment policy, that finding would be communicated to ELG, to HR, to the – typically the manager of the subject, and eventually to the subject of the complaint and the complainant. Depo De Lanoy 09/18/17 p 162. 14-18

THE WITNESS: … we maintain our investigations as confidentially as possible, and I've distinguished that for your between occasions where an employee comes forward and asks HR or asks ERIT to listen to a complaint, but take no action., Depo De Lanoy 09/18/17 p 163. 10-14

A. … I believe that the disciplinary outcome should be recorded in the ERIT database. Depo De Lanoy 09/18/17 p 167. 24-25

Q. Does Microsoft have any written policy documents or guidelines that specify the remedies or corrective action available for a violation of Microsoft policy? … THE WITNESS: I'm not aware of any formal written document that specifies remedies or corrective actions as you've described it. Depo De Lanoy 09/18/17 p 170. 17-24

Q. Does Microsoft provide complainants with information that outlines the available remedies or corrective actions if a violation of Microsoft policy is established? … A. It depends on if they ask. It depends on what the circumstances are, information from investigations that impact someone other than the person that you're sharing it with, is shared really only on a very specific and need-to-know basis. Depo De Lanoy 09/18/17 p 171. 2-15

Q. … if an ERIT investigation results in a finding of a policy violation, and some follow-up action is taken, who is notified about the follow-up action? … THE WITNESS: In investigations where I have made a finding of a policy violation, I'm aware of the decision to take follow-up action, and what that action should be, resting with HR and management. And the notification or who would get to hear about it depends on who has a specific need to know in the circumstances of that particular case. Depo De Lanoy 09/18/17 p 171. 22-25; p 172. 2-8

Q. HR and management make the decision on follow-up actions? A. Yes. Depo De Lanoy 09/18/17 p 172. 15-17

Q. … "ERIT presents findings to the Subject's manager. Based on findings, HRBP assists manager to determine and implement any resulting action(s) with legal advice from ELG. HRB [sic] notifies ERIT when resulting actions are determined." … THE WITNESS: This document is a guideline and a framework. Depo De Lanoy 09/18/17 p 173. 9-14; p 23-24

A. This is a guideline, and that the individual circumstances and individual ERIT investigations varies. Q. Who has the final decision on what corrective action will be taken? A. HR and management. Depo De Lanoy 09/18/17 p 174. 5-9

Q. What involvement in corrective action does a subject's manager have? A. They're a part of the decision-making process for what the final corrective action or responsive action should be. … A. … they are the businessperson who has evaluative responsibility for that employee. Depo De Lanoy 09/18/17 p 174. 10-18

THE WITNESS: … I've taken a variety of trainings that have touched on structuring an investigation that is responsive to the allegations raised, and that identifies appropriate evidence, and that would include helping to identify what kinds of witnesses one would want to interview in a given investigation. Depo De Lanoy 09/18/17 p 175. 19-25

THE WITNESS: Investigators have broad discretion over formulating structuring and carrying out their investigations. … but not unfettered discretion. Depo De Lanoy 09/18/17 p 176. 5-11

THE WITNESS: … at different times in the course of my work as an investigator on the ERIT, I can recall talking with my fellow investigators or with the manager at the time to talk about kinds of data that were accessible to us at the company, and different ways that different investigators had utilized or accessed that data in the course of completing their work. … A. There are multiple kinds of data that are available to us. Depo De Lanoy 09/18/17 p 177. 13-24

A. … promotion justification data is a form of data that is recorded during a consideration period where managers articulate their reasoning for their promotion decisions. Depo De Lanoy 09/18/17 p 178. 4-7

THE WITNESS:; We've talked previously today about how ERIT investigations are conducted on an individualized basis, and there is no rote formula for what evidence should, could, or must be pulled in any particular case. Depo De Lanoy 09/18/17 p

THE WITNESS: There is no formal written policy that directs an ERIT investigator to pull a rote set of documents or data in response to any particular type of complaint. Depo De Lanoy 09/18/17 p 180. 4-7

Q. What steps does Microsoft take to ensure that the appropriate data is reviewed in an internal complaint?  … THE WITNESS: Microsoft hires experienced, thoughtful investigators as ERIT investigators to review internal complaints related to its anti-discrimination, anti-harassment policy. Microsoft has a manger of that investigations team who supervises and reviews the work of that team. Depo De Lanoy 09/18/17 p 180. 19-25; p 181. 1-3

THE WITNESS: ;… HR doesn't take corrective action, because they advise the business. As I understand it, it really is the business that has to take that action, because they manager the employee. Depo De Lanoy 09/18/17 p 191. 10-14

Q. … Is appropriate or responsive action ever taken when a violation of policy is not found? A. Yes. Q. And in what circumstances would that occur? A. When there is conduct short of a policy violation that is not consistent with Microsoft's expectations for its best workplace. Depo De Lanoy 09/18/17 p 195. 21-25; p 196. 1-2

A. As to a policy violation, we record lpolicy violation discipline in our ERIT database in connection with the closure of an investigation. … requests for additional action was made that wasn't bounded by a specific policy violation finding. Depo De Lanoy 09/18/17 p 197. 24-25; p 198. 1-6

A. … there is no standard format for process and procedure under an ERIT investigation. Depo De Lanoy 09/18/17 p 201. 5-7

THE WITNESS: … complainants don't enter the investigation process with – generally speaking with that kind of request. And Microsoft doesn't put forward, like, a memo of options for complainants to choose from or advocate toward in the course of an internal investigation. Depo De Lanoy 09/18/17 p 204. 2-8

THE WITNESS: … there is not a specific template of data or evidence that I would follow in response to any particular allegation. Depo De Lanoy 09/18/17 p 206. 15-17

A. … there are exit interviews conducted. Depo De Lanoy 09/18/17 p 210. 6-7

Q. Are slurs, nicknames, and jokes necessary for a violation of Microsoft policy? A. No. Depo De Lanoy 09/18/17 p 211. 15-17

THE WITNESS: So this may seem confounding, but Microsoft believes that the complaints that it receives are evidence of its listening mechanisms working, and so I'm not aware and have never understood the company to have a goal to minimize (the number) employee communications. Depo De Lanoy 09/18/17 p 219. 13-16

**Exhibit 6**

### *ERIT Team Backgrounds*

A key components of a viable investigation and complaint resolution process is a team of investigators who are qualified, experienced, appropriately educated and have broad experience in multiple environments so that they can realistically assess the quality and accuracy of the information that they are hearing, seeking out, reviewing, and analyzing. This allows them to come to a balanced and reasonable resolution and finding.

The ERIT staff has a wide array of education and experience with various types of previous employers. Many of the staff have extensive employee relations/HR backgrounds, and several of them have mediation training, which provides a foundation for a problem-solving rather than an advocacy approach.  They have resolved problems in profit, non-profit, community, civic, public advocacy groups and commercial organizations, as well as law firms.  As a group, they are high-achievers, with special awards and recognition as part of their *curriculum vitae* information.

For example, **Judy Mims** describes her background as having the "value and challenges of conducting a thorough, fair investigation and the complexity of implementing the results in a way that treats the accused and the complainant with dignity." Her focus has been primarily on discrimination and civil rights issues since she worked in a Congressional office while attending law school at Howard University in Washington, D.C. She received her J.D. from Howard in 1993, after earning a Bachelor's of Arts at the University of Idaho.

Subsequently, she worked as the Associate Director of Personnel Policy at the University of Washington's School of Medicine in the Dean's Office. She was also Assistant Attorney General for the University of Washington at the Office of the Attorney General for the State of Washington. She was on staff with the Honorable Richard Stallings in the House of Representatives. She has gone through mediation training at University of Washington Law School Professional Mediation Skills Training Program in 2000.

**Melinda De Lanoy** was designated as the Rule 30(b)(6) deponent for the topic of internal complaint and investigation policies and procedures. She has worked at Microsoft since September 2008 as an ERIT attorney.  Prior to that, she was a partner in a law firm for approximately nine years. She attended the Straus Institute for Dispute Resolution at Pepperdine University in 2012.

She earned her law degree at Seattle University School of Law. She was also a law clerk to the Honorable Franklin D. Burgess in the U.S. District Court, Western District of Washington. She has in-depth and experience in delivering training to HR and management, and conducting complex investigations. She has maintained an investigation caseload while completing project work, such as designing an investigation protocol for the retail store organization.

**Kim Tran** joined ERIT in 2012. Prior to that, she worked as an Employee Relations Manager (but as an attorney). Her resume indicates that she has resolved dozens of workplace investigations, addressing complex and substantive matters across a variety of business groups, from Engineering to Sales to Marketing, involving employees at varying levels, from Director to Partner level employees.

She has also collaborated with HR professionals to ensure compliance, educate, and build employee relationships. She served as a judge *pro tem* in Renton and Seattle for the King County District Court. After that, she was with a law firm, after obtaining her law degree from the Northwestern School of Law of Lewis and Clark College in Portland in 1999, and a BA from Tufts University. She also attended the University of Washington – Seattle and received a Certificate in Human Resources to broaden her skills. She has been active in both the Minority Bar Association and the Asian Bar Association, as well as involved on other civic and professional organizations.

**Steve Zwerin** was an attorney on the ERIT team of Microsoft from 2012 to 2014. While at Microsoft, he helped ensure compliance with Microsoft policy in law, by ensuring that discrimination, harassment and retaliation concerns were addressed objectively, thoroughly and timely. He created a case management process that simplified the investigation process and streamlined the transfer of cases between investigators. He has done extensive training of employee relations and HR staff. He has also been the Labor and Employee Relations Manager at the University of Washington Medicine Center, and was a Senior Civil Rights Analyst for the Seattle Office for Civil Rights. He was an attorney with the Northwest Law Center, and a King County Prosecuting Attorney as a Deputy Prosecutor. He earned his J.D. from Seattle University, and a Bachelor's in English and Sociology from Lewis and Clark. He was also certified by the Society of Human Resources Management by earning the SPHR designation, after completing the course of study and test. He notes his professional affiliations include the Association of Workplace Investigators, as both a board member and committee president.

Another example of the diversity of the current and former ERIT team members is **Miles W. Williams**. He drove EEO investigations and programs to address employee relations issues inside and outside the US. He conducted internal training designed to increase global HR's staff proficiency to assess and investigate workplace complaints. He was a Senior Employee Relations Administrator for REI in the early 2000's. He managed proactive employee relations programs, which also included investigating confidential workplace concerns. He received a Bachelor of Arts from Auburn in 1986, and earned his J.D. at the University of Florida College of Law. He previously a manager in regulatory affairs and consumer appeals. Prior to that, he was a practicing attorney in a private law firm.

**Exhibit 7**

*__Microsoft Policy Highlights__*

***Below are excerpts of what I view as key provisions of Microsoft's policies as they relate to my review and assessment of the complaint and investigation process, with emphasis on the highlighted portions.***

**Anti-Harassment and Anti-Discrimination Policy (Revision Date 08/01/16)**

**Purpose**

This policy provides that harassment and discrimination will not be tolerated at Microsoft.

**Summary**

Microsoft strives to maintain a workplace free of harassment and discrimination so that everyone can work in a productive, respectful, and professional environment.

**Requirements**

**Harassment and Discrimination**

Microsoft prohibits harassment and discrimination in employment on the basis of age, ancestry, color, family or medical care leave, gender identity or expression, genetic information, marital status, medical condition, national origin, physical or mental disability, political affiliation, protected veteran status, race, religion, sex (including pregnancy), sexual orientation, or any other characteristic protected by applicable local laws, regulations, and ordinances.

Microsoft will not tolerate harassment or discrimination based on any protected characteristic by anyone in the workplace – managers, co-workers, or non-employees (including customers, external staff, independent contractors, and any other persons who conduct business with Microsoft). Harassment is unwelcome verbal or physical behavior based on the protected characteristics identified above. Microsoft will take appropriate disciplinary and/or other appropriate action when it determines this policy has been violated.

**Examples of Sexual Harassment**

Sexual harassment is unwelcome verbal or physical behavior based on sex and includes gender-based harassment of a person of the same gender.

Examples of sexual harassment include, but are not limited to:

- Unwelcome sexual advances
- Sexual comments or inappropriate gender-based jokes
- Excessive, unwelcome romantic attention
- Offering or conditioning an employment benefit, like a promotion or job assignment, in exchange for sexual favors
- Unwelcome physical contact
- Sharing or displaying sexually explicit content
- Using sexually degrading words

**Complaint and Investigation Process**

Complaints of harassment or discrimination should be promptly reported in accordance with the Open Door Policy. Appropriate contacts include:

- Your manager or skip-level manager, or
- Human Resources, or
- Employee Relations Investigation Team (erit@microsoft.com)

Managers must report complaints they receive or conduct they observe that may violate the terms of this policy to their HR representative.

Microsoft investigates complaints of harassment and discrimination in a fair, timely, and thorough manner. Microsoft reviews relevant information and reaches conclusions based on the evidence. Investigations are conducted as confidentially as possible.

**Retaliation Will Not Be Tolerated**

**Procedure**

None.

**Exceptions**

There are no exceptions to this policy.

**Enforcement**

Violation of this policy will result in prompt and appropriate remedial action. This may include disciplinary action up to and including termination of employment or other appropriate actions to address and/or prevent further harassment, discrimination, or retaliation.

\* \* \*

## Anti-Harassment and Anti-Discrimination Policy

**Policy**

Microsoft is committed to providing equal employment opportunity to all qualified employees and applicants (Equal Employment Opportunity Policy). Harassment, discrimination, intimidation, or retaliatory conduct on the basis of race, color, sex, sexual orientation, gender identity or expression, religions, national origin, marital status, age, disability, or veteran status toward another employee or any other person (including an agency temporary worker, independent contractor, vendor, or supplier) is prohibited and will not be tolerated.

**Examples of Sexual Harassment**

Sexual harassment is unwelcome verbal or physical conduct that is sexual in nature or that is directed at a person because of his or her gender.

Types of sexual harassment include the following…

**Other Forms of Harassment, Discrimination, and Retaliatory Conduct**

This policy applies not only to complaints and investigations of sexual harassment and intimidation but to all other forms of harassing, discriminatory, retaliatory, and intimidating conduct based on age, race, color, sex, sexual orientation, gender identity or expression, national origin, religion, marital status, disability, and/or veteran status.

## Internal Complaint Procedure

If you believe you are experiencing harassing, discriminatory, or retaliatory conduct or are aware of any such behavior toward others, immediately do the following:

- Notify your manager of the behavior or, if you feel that you cannot talk directly to your manager, notify your manager's manager or your Human Resources (HR) representative. Your notification may be in either verbal or written form.
- You are encouraged, but not required, to identify the offensive behavior to the person engaging in the behavior and request that it stop.

Even if you have addressed the issue with the person engaging in the behavior, let your manager, your manager's manager, or your HR representative know about the situation so that he or she can follow up with any measures he or she considers appropriate. If for any reason you feel you cannot address the issue with one of these individuals, you can send an e-mail message to the Employee

==Relations Investigations Team.== Microsoft prohibits reprisal or retaliation against employees who raise good-faith concerns of discriminatory, harassing, or retaliatory behavior or provide information as part of an investigation into alleged violations of the Equal Employment Opportunity (EEO) policy.

**Company Action**

In applying this policy, ==Microsoft has zero tolerance for prohibited discrimination, harassment, intimidation, or retaliatory conduct.== What does this mean? Microsoft has the following in place:

- An ==internal complaint procedure== set forth in the preceding section to enable an employee to raise a concern or complaint about any conduct believed to be in violation of the EEO policy.
- ==HR professionals trained to promptly conduct unbiased investigations when complaints are raised.== To the extent possible, employee confidentiality is maintained.
- A policy that is enforced to protect employees who complain about discriminatory, harassing, or retaliatory conduct.

Implementation of policy is making sure managers (and whoever is representing, communicating and implementing the policies) know the organization's policies and are clearly able to confirm that employees understand how the policies affect them.   Implementation necessitates adequate communication and credible "enforcement" of the policy. Communication usually means training and making sure all relevant and decision-making employees are adequately notified and trained. Credible enforcement means that the staff and managers charged with implementing the policy are responsive, knowledgeable, thorough and objective.


**Whistleblowing Reporting Procedure and Guidelines**

==Microsoft is committed to providing a positive work environment for its employees and to maintaining its reputation for integrity with customers, other business partners, and the community==…

==Examples== of the types of information that you should report under this policy include: …

Microsoft also prohibits discrimination against and harassment of any person on the basis of age, race, color, gender, sexual orientation, national origin, religion, marital status, disability, and/or veteran status.

To report suspected discrimination or harassment, please refer to:

Microsoft Anti-Harassment and Anti-Discrimination Policy or Equal Opportunity Policy.

All reports made under this procedure will be documented and assigned to the appropriate individual for review and, if needed, investigation, information about the complaint will be shared on a strict "need to know" basis as required to conduct and complete the review and/or investigation. …

Microsoft will not tolerate retaliation against any employee for making a good-faith report, cooperating with an investigation under this procedure or applicable law, or refusing to participate in activities that violate applicable laws, company guidelines, or standards of ethical conduct. Any employee who engages in retaliation shall be subject to disciplinary action up to and including termination.

\* \* \*

## Open Door Policy

Microsoft strongly supports an open door policy for resolving problems quickly and fairly. You are encouraged to air creative ideas, issues, or concerns, Feel free to ask for what you need. It is your responsibility to ask about things you do not know or understand, as well as to make suggestions that could improve any part of the company or its operations.

The best way to do this is through open discussions with your manager or any member of management. While you may not always get the answer you want, every effort will be made to provide a response quickly.

In any organization, problems or differences of opinion over work matters may occasionally arise between you and your manager, fellow employees, or the company in general. We encourage you to bring any problems you might have to your immediate manager first. If he or she is unable to resolve the problem to your satisfaction, please discuss it with the next level of management. …

Occasionally, you may have a problem or question that you feel uncomfortable discussing with your immediate manager, in that case, you may take your problem or question directly to the next level of management. Or, you may contact your Human Resources representative at any time.

\* \* \*

## Equal Employment Opportunity Policy

Microsoft promotes a cooperative and productive work environment by supporting the cultural and ethnic diversity of its workforce. Our collective

challenge is to enhance the company's performance through valuing and understanding differences.

Microsoft is committed to a policy of providing equal employment opportunity to all qualified employees and applicants. This commitment is reflected in all aspects of our daily operations. We do not discriminate …

At Microsoft, we believe that diversity enriches the company, the communities in which we live and work, and the lives of our employees. All employment decisions, Microsoft programs, and personnel actions are administered in conjunction with our Equal Employment Opportunity (EEO) policy and Diversity goals.

The general manager of Diversity has been designated as the Microsoft equal employment officer. The equal employment officer will work closely with the compliance manager, who is responsible for developing affirmative action plans and ensuring compliance with all applicable federal, state, and local regulations. But, just as we all share the responsibility of meeting the challenges of our business objectives, each of us must assume a leading role in ensuring that our EEO policy is fully supported throughout all levels of the organization.

Employees and applicants may review summaries of our affirmative action plans during normal business hours.

**Exhibit 9**

***ERIT Training for HR Managers***

***Below are excerpts of what I view as key content in ERIT's training as it relates to my review and assessment of the complaint and investigation process, with emphasis on the highlighted portions.***

ERIT has developed a 30-minute online training for HR managers to help respond to employee complaints.

Course topics include the following:

- How to triage employee complaints
- How to determine if an issue is in ERIT's policy scope
- How to collect and share key information with ERIT
- What to expect through the course of an ERIT investigation

**Initiate an Investigation**

When you contact ERIT to initiate an investigation into a possible violation of a policy within its scope, use the ERIT Intake form.

**Find Your ERIT Contact**

Find ERIT contact aliases by business group or focus area to use when you contact ERIT about a matter in scope for an employee relations investigation.

**Related Resources**

Review the ERIT Investigations Framework to learn how employee relations investigations are managed.

For Microsoft policy issues out-of-scope for ERIT that are overseen by LCA's Office of Legal Compliance (OLC), contact the OLC Investigations Teams.

\* \* \*

**Avoiding Trouble**

- Consider motivations of everyone involved in decisions
- Seek out independent corroboration of manager's opinions (e.g., feedback)
- Independent investigation of alleged misconduct is important
- Watch for adverse action against friend/relatives of employees engaged in protected activity

55

**ERIT Scope**

- Harassment
- Discrimination
- Retaliation*
- Conflicts of Interest/Romantic Relationships

* * *

Microsoft promotes a cooperative and productive work environment by supporting the cultural and ethnic diversity of its workforce and is committed to providing equal employment opportunity to all qualified employees and applicants. We do not unlawfully discriminate on the basis of race, color, sex, sexual orientation, gender identity or expression, religion, national origin, marital status, age, disability, or veteran status in any personnel practice, including recruitment, hiring, training, promotion, and discipline. We take allegations of harassment and unlawful discrimination seriously and address such concerns that are raised regarding this policy.

**What you must do**

- Listen to employee complaints – what's "unfair" now could be "discrimination" or "retaliation" later
- Stand up for a world-class working environment
- Don't agree to keep "confidentiality"
- Notice which side of the desk you are speaking from
- Use investigation's outcomes to drive people manager/business accountability

**Before the Investigation**

- Can I remain anonymous? While we can't promise anonymity, we do treat these investigations confidentially. Example: "XYZ told me" vs "the evidence shows"
- Will I see a written report? The findings will be disclosed to parties in high level memo

**During the Investigation**

- My colleague told me that she was contacted by ERIT and wants to know what this is about. What should I say? To discourage the rumor mill; direct questions to ERIT investigator
- My manager has been ignoring me since this investigation started. Use triage skills to assess retaliation concerns

56

- What is taking so long? Important to gather all relevant information, that takes time – HR Managers can help by reinforcing importance of opening up calendars for scheduling

**After the Investigation**

- My manager gave me a low rating after I initiated an ERIT complaint. Be ready for "trigger" language to assess retaliation concerns. Has manager referenced ERIT matter?
- Will a record of this investigation be noted in my personnel file? If unsupported, no notation in personnel file; If supported, can discuss notation in personnel file.

**Ask for the facts**

- Say more about that
- Tell me what happened next
- What did you see/hear/believe
- What did that mean to you
- Why
- Are you drawing a connection there
- Can we pin that down
- Is there anything else I should know about
- Tell me how that happened
- Share what you've experienced
- What's the best possible outcome here

**Exhibit 10**

**AWI GUIDING PRINCIPLES FOR CONDUCTING WORKPLACE INVESTIGATIONS**[2]

INTRODUCTION
With great pride, the Association of Workplace Investigators ("AWI") originally published its then-entitled "Guiding Principles for Investigators Conducting Impartial Workplace Investigations" ("the Guiding Principles") on the third anniversary of the founding meeting[3] of its Board of Directors ("Board").

AWI's Guiding Principles Committee ("the Committee"), which was established at AWI's founding Board meeting, developed the Guiding Principles in collaboration with AWI membership. Specifically, in March, 2010, the Committee conducted three full-day roundtables to gather the information which provided the foundation for the Guiding Principles. Of AWI's 100 Charter Members, 85 participated.

Over the next two and one-half years, the Committee synthesized the information gathered and prepared drafts of the Guiding Principles. The Guiding Principles were reviewed by the Committee, the Board, and ultimately the entire AWI membership, which currently numbers approximately 400.

The first revision of the Guiding Principles is based on numerous suggestions submitted by AWI members. Again the Committee prepared drafts, and the final version was approved by the Board. Although the title of the Guiding Principles was simplified in the first revision, the Guiding Principles remain focused on impartial workplace investigations.

An impartial investigation is generally conducted so that an employer can determine what occurred when there are contested allegations affecting the workplace that involve a potential violation of the employer's policies, standards, ethics, or the law. The point of an impartial investigation is to provide a fair and impartial process for the complainant and respondent and to reach reasoned conclusions based on the information gathered.

---

[2] © 2012-2013 Association of Workplace Investigators, Inc. All rights reserved. Originally published September 25, 2012. First revision July 29, 2013. The principles and key factors contained herein are of a generalized nature and are intended for both in-house and third party investigators conducting impartial workplace investigations. Because every investigation presents different circumstances, it may be necessary or desirable in any given investigation for an investigator to deviate from the identified principles or key factors. Accordingly, any such deviation or decision not to adhere to the identified principles or key factors does not necessarily render an investigation inadequate.

[3] The founding meeting of the Board of Directors of the California Association of Workplace Investigators, Inc. (CAOWI) was on September 25, 2009. On October 31, 2011 CAOWI changed its name to Association of Workplace Investigators, Inc. (AWI) and expanded its purpose beyond California.

AWI believes that the publication and revision of these Guiding Principles will enhance the quality of workplace investigations.

1. DECISION TO CONDUCT AN INVESTIGATION

Guiding Principle: A workplace investigation should occur when indicated by law or policy as determined by the employer.

Key factors to consider:
a. If key facts are in conflict, an investigation often is appropriate.
b. Even if key facts are not in conflict (e.g., the respondent has admitted the alleged conduct), the employer may need to determine the number of persons affected or the extent of harm.
c. Whether or not a violation is one of policy or of law may influence the decision.
d. Whether the complaint is based on the complainant being in a protected category is a consideration. If not, an employer may consider whether the conduct alleged nevertheless violates the employer's rules, policies, practices, or expectations.
e. Allegations may call for an "organizational assessment" instead of an "investigation" (e.g., friction within a work group).

2. CHOICE OF INVESTIGATOR

Guiding Principle: The investigator should be impartial, objective, and possess the necessary skills and time to conduct the investigation.

Key factors to consider:
a. Whenever possible, the investigator should be someone who is in fact, and who is perceived by the participants to be, impartial, though this may not be possible in every case.
b. Employers may choose to use an in-house (internal) investigator. In such a case, the internal hierarchy of the organization should be considered in order to avoid the fact or perception of bias or compromised objectivity.
c. Employers who choose to retain outside investigators should consider any licensure requirements which may apply to outside investigators.
d. An outside attorney investigator conducting an impartial investigation should appreciate the distinction between the role of impartial investigator and that of advocate.
e. Employers should guard against exerting undue influence on investigations. This does not preclude them, for example, without limitation, from preserving evidence, providing necessary notifications to employees, and providing input to investigators concerning the investigations' scope.
f. The investigator should consider whether specialized expertise is required, and, if so, consider whether the investigator possesses the requisite expertise, whether the investigator should partner with another with the requisite expertise, or whether the investigator should decline the investigation.

3. SCOPE OF INVESTIGATION

Guiding Principle: The employer and the investigator should develop a mutual understanding concerning the scope of the investigation. In this context, the "scope" of the investigation refers to the issues to be investigated.

Key factors to consider:
a. Determining the scope of the investigation differs from determining the process to be followed in conducting the investigation.
b. During the course of the investigation, the investigator may become aware of issues that are beyond the initial scope of the investigation. If this occurs, the investigator generally should provide appropriate notice to the employer, which may include documentation, so that the employer can determine the appropriate course of action.
c. If requested to do so by the employer and if the investigator agrees, the investigator may include the additional issues with the original investigation or may conduct a separate investigation.
d. During the investigation, if the employer decides to change the scope of the investigation for reasons other than the discovery of additional issues, to limit interviews, or otherwise to restrict the investigation, the investigator may wish to document these changes or restrictions.

4. INVESTIGATION PLANNING

Guiding Principle: The investigator should engage in planning for an effective investigation.

Key factors to consider:
a. The investigator should consider what documents, if any, are needed and how to obtain them. Documents may include emails and e-files, text messages, personnel and sensitive files, timelines, policies, procedures, handbooks, and relevant prior investigation materials.
b. The form that the report should take (i.e., oral v. written; recommendations; legal conclusions) generally is decided upon by the employer.
c. The advisements to be communicated to witnesses and the manner in which they will be given should be determined in advance.
d. Initial determinations to be made often include who will be interviewed, in what order, and for what purpose, subject to changes due to witness availability and additional information obtained.
e. Planning may include deciding who should schedule interviews, work out logistics, set up interviews, identify the resources needed, and provide the needed resources.
f. Adjustments to the investigative plan may need to be made as a result of new developments or newly-discovered witnesses or evidence.
g. General lines of inquiry are typically developed to be used in interviewing witnesses.

5. COMMUNICATINGWITH EMPLOYER REPRESENTATIVES AND WITNESSES

Guiding Principle: A determination should be made with whom the investigator will be communicating about what matters, taking into consideration issues of privilege.

Key factors to consider:
a. In addition to witnesses, communications with the employer (or on behalf of the employer) generally fall into three main categories: (1) communications concerning the scope of the investigation, the advisements to be given, and the type of report to be produced; (2) communications concerning the process for obtaining evidence, scheduling, and  logistics; and, (3) background information.
b. If feasible, investigators should avoid communicating outside the interview process with anyone who is or may be directly involved in the matters being investigated, or with anyone who is or may be interviewed on substantive matters.
c. If feasible, an employer representative should not be a witness or participant in the matter being investigated.
d. An employer representative generally is the most appropriate person to handle logistics and scheduling and to determine the content of initial advisements to be given to current employees.
These include, for example, the need to cooperate in the investigation, to maintain appropriate confidentiality, and to tell the truth during the interview.
e. An employer representative generally will decide whether third parties may be present during interviews if requested by a witness. This includes representatives if an employee is covered by a collective bargaining agreement. However, an investigator who is an attorney must be cognizant of rules of professional responsibility, including rules concerning contact with a represented party.
f. An investigator should avoid communicating conclusions before the investigation is complete.

6. CONFIDENTIALITY AND PRIVACY [3]

Guiding Principle: The investigator should take steps to safeguard the confidentiality of the investigation without guaranteeing anonymity or complete confidentiality.

Key factors to consider:
a. The investigator should maintain the investigation file in a manner that will protect the confidentiality of the information contained therein, consistent with the employer's instructions and legal requirements.
b. The investigator should consider the extent to which the investigator reveals information in order to conduct an effective interview.

7. EVIDENCE GATHERING AND RETENTION

Guiding Principle: The investigator should gather relevant evidence.

Key factors to consider:
a. In determining the evidence to gather, the investigator may consider, without limitation:
i. The nature of the allegations;
ii. Laws and policies, for example, the employer's electronic media policies;
iii. The probative value of the evidence, weighed against the costs of gathering the evidence, in terms of available financial resources, time, and potential disruption to the workplace; and,
iv. Whether outside expertise is needed.
b. If the investigator requests evidence from the employer that the employer declines to produce, the investigator may wish to document this.


[3] There have been significant legal developments regarding proper confidentiality instructions to witnesses. These developments should be considered.

## 8. WITNESS INTERVIEWS

Guiding Principle: There are many effective ways to handle witness interviews. The investigator should create an environment that maximizes the chances of obtaining reliable information and should document (either through note-taking, recording, or some other method) the witness' testimony in a reliable and consistent fashion.

Key factors to consider:
a. Whenever feasible, the parties and witnesses should be interviewed in person.
b. The interview presents a unique opportunity to assess witness credibility. The investigator should put himself or herself in a position to determine the credibility of witnesses relative to one another.
c. An environment that is safe, private, and reasonably comfortable is conducive to a productive interview.
d. Generally, the investigator's role, the purpose of the investigation, and advisements concerning confidentiality, retaliation, and the like, are provided at the outset of the interview.
e. Generally, open-ended questions, giving the witness an opportunity to expand on the requested information, are more likely to elicit information than closed-ended questions.
f. Questions that allow the witness to respond fully are the goal.
g. The complainant should generally be asked to provide the specifics of the incidents described and to identify any relevant witnesses and documentation.
h. The complainant and respondent should be provided with an opportunity to present their positions and to correct or challenge relevant statements contrary to their positions; specific admissions and denials should be sought.
i. Witnesses should be permitted to take breaks and leave the room.

## 9. DOCUMENTING THE INVESTIGATION

Guiding Principle: The investigator should document the steps taken during the investigation and the investigator's decision-making process, so that there will be a reliable record of the evidence the investigator relied upon in reaching findings.

Key factors to consider:
a. There are many different ways to effectively document. Whichever method the investigator uses, the investigator should take steps to ensure the reliability of the documentation.
b. The investigator should consider documenting: (1) occasions on which significant obstacles were encountered; and, (2) the process used to collect the information considered.

## 10. INVESTIGATION FINDINGS

Guiding Principle: An investigator's findings should be consistent with the scope of the investigation as defined by the employer.

Key factors to consider:
a. In many cases, the employer determines that the scope of the investigation be restricted to determinations of fact and/or policy violations. Legal conclusions and recommended personnel actions should be communicated only if they are requested, that is, if they are within the scope of the investigation.
b. The investigator should strive in good faith to make reasoned findings.
c. The investigator should clearly understand the applicable standard to be used in evaluating the evidence and should weigh the evidence in accordance with the applicable standard. In many workplace investigations, the appropriate standard of evidence will be "the preponderance of the evidence" standard; namely, whether after weighing all the evidence, it is more likely than not that the alleged incident occurred.

## 11. REPORTS

Guiding Principle: A written report should be prepared if requested by the employer. A written report may contain the following:

a. A statement of the scope and the issues;
b. An explanation of the investigation process;
c. A discussion of the evidence relied upon by the investigator;
d. An identification of the employer policies involved, if any;
e. An identification of any evidentiary standard used; and,
f. A statement of the investigator's findings and conclusions.