THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

KATHERINE MOUSSOURIS, HOLLY
MUENCHOW, and DANA PIERMARINI,
on behalf of themselves and a class of
those similarly situated,

          Plaintiffs,

    v.

MICROSOFT CORPORATION,

          Defendant.

Case No.  2:15-cv-01483-JLR

**PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION**

NOTE ON MOTION CALENDAR:
FEBRUARY 9, 2018

ORAL ARGUMENT REQUESTED

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

II.   FACTS ................................................................................................................................ 3

    A.    Microsoft's Corporate Organization and Common Employment Practices ........... 3

          1.    Microsoft's Job Classification System Organizes Employees Performing Similar Work By Profession, Discipline, and Job Title. ......... 3

          2.    Microsoft Has Used the Calibration Process Throughout the Class Period to Make Pay and Promotion Decisions. ........................................ 5

          3.    Microsoft Pays Women Less Than Men for Substantially Similar Work. ......................................................................................................... 7

          4.    Microsoft Promotes Men Over Similarly-Situated Women. ...................... 9

    B.    Microsoft Knew That the Calibration Process Disadvantaged Women in Pay and Promotions, But Did Nothing to Fix the Problem. ................................ 10

          1.    On an Annual Basis, Microsoft Audited Pay and Promotion Decisions for Adverse Impact. ................................................................ 10

          2.    The Federal Government Audited Microsoft's Data ███████████████. .................................................. 11

          3.    Employee Responses to Microsoft's Equal Pay Announcements Gave Microsoft Notice of Widespread Concerns of Pay and Promotion Bias. ............................................................................... 13

    C.    Microsoft Has Ignored Overwhelming Evidence of Intentional Gender Discrimination and Maintained a Company Culture Biased Against Women. ............................................................................................................... 19

          1.    Microsoft Maintains an Exclusionary "Boy's Club" Atmosphere. .......... 19

          2.    Microsoft's Culture is Rife With Sexual Harassment. ............................. 21

          3.    Microsoft Does Not Appropriately Investigate or Redress Employee Complaints of Discrimination and Harassment. ..................... 23

          4.    Microsoft Fails to Train Employees on Basic Principles of Anti-Harassment/Discrimination or Managers regarding Complaints. ............ 27

          5.    Microsoft Knows its D&I Programs are Little More than Window-Dressing that Fail to Produce Meaningful Results. ................................. 27

III.   ARGUMENT ................................................................................................................. 28

    A.    Legal Standards ................................................................................................... 28

          1.    Federal Rule of Civil Procedure 23 ......................................................... 28

          2.    Liability Under Title VII and WLAD ...................................................... 29

               a.    Disparate Impact Liability ............................................................ 30

              b.    Disparate Treatment ..................................................................... 30

    B.    Plaintiffs' Disparate Impact and Disparate Treatment Claims Satisfy Rule 23(a). ................................................................................................................. 31

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-i-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

|   |   | 1. | The Class Is Sufficiently Numerous. | 32 |
|---|---|---|---|---|
|   |   | 2. | There Are Common Questions of Law and Fact That Will Drive the Resolution of Plaintiffs' Claims. | 32 |
|   |   |   | a. Disparate Impact Commonality | 32 |
|   |   |   | b. Disparate Treatment Commonality | 33 |
|   |   | 3. | The Representative Plaintiffs' Claims Are Typical of the Class Claims. | 34 |
|   |   | 4. | The Representative Plaintiffs and Class Counsel Will Adequately Protect the Interests of the Class. | 35 |
|   | C. | | Certification Under Rule 23(b)(2) is Warranted for Liability and Injunctive Relief. | 36 |
|   | D. | | Certification Under Rule 23(b)(3) is Warranted for Liability and Monetary Damages. | 38 |
|   |   | 1. | Common Questions of Liability and Damages Predominate Over Individual Damages Issues. | 38 |
|   |   | 2. | Plaintiffs Satisfy Superiority. | 41 |
| IV. | | | CONCLUSION | 44 |

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR

-ii-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

**Page**

### CASES

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) .........................................................................................36

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
133 S. Ct. 1184 (2013) ....................................................................................29

*Beck v. Boeing Co.*,
60 F. App'x 38 (9th Cir. 2003)....................................................................31, 38

*Beck v. Boeing*,
203 F.R.D. 459 (W.D. Wash. 2001)............................................................34, 41

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir.1975)..........................................................................40

*Bouman v. Block*,
940 F.2d 1211 (9th Cir. 1991) ........................................................................8

Brown v. Nucor Corp.,
785 F.3d 895 (4th Cir. 2015) .....................................................................31, 34

*Chin v. Port Auth. of N.Y. & N.J.*,
685 F.3d 135 (2d Cir. 2012) ...........................................................................30

*Dunakin v. Quigley*,
99 F. Supp. 3d 1297 (W.D. Wash. 2015) .........................................................32

*Easterling v. Connecticut Dep't of Correction*,
278 F.R.D. 41 (D. Conn. 2011) ...........................................................37, 39, 41, 42

*Eldredge v. Carpenters 46 N. Cal. Counties J. Apprenticeship & Training Comm.*,
833 F.2d 1334 (9th Cir. 1987)...........................................................................8

*Ellis v. Costco Wholesale Corp.*,
285 F.R.D. 492 (2012)...............................................................................passim

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*,
907 F. Supp. 2d 492 (S.D.N.Y. 2012),
*aff'd sub nom. Gulino v. Bd. of Educ. of New York City Sch. Dist. of City of New York*,
555 F. App'x 37 (2d Cir. 2014) .......................................................................38

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*,
No. 96 CV 8414 KMW, 2013 WL 4647190 (S.D.N.Y. Aug. 29, 2013)...................41

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ........................................................................35

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992)..........................................................................35

*Hazelwood Sch. Dist. v. United States*,
433 U.S. 299 (1977) .......................................................................................31

*Houser v. Pritzker.*
28 F. Supp. 3d 222 (S.D.N.Y. 2014) ...............................................................37

*Ingram v. The Coca-Cola Co.*,
200 F.R.D. 685 (N.D.Ga. 2001) .....................................................................39

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-iii-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

*Int'l Bd. of Teamsters v. United States*,
431 U.S. 324 (1977) ..............................................................................19, 31, 37, 43

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ...................................................................................40

*Malave v. Potter*,
320 F.3d 321 (2d Cir. 2003) .......................................................................................8

*Mazza v. Am. Honda Motor Co., Inc.*,
666 F.3d 581 (9th Cir. 2012) ...................................................................................32

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
672 F.3d 482 (7th Cir. 2012) .............................................................................33, 37

*Moore v. Napolitano*,
926 F. Supp. 2d 8 (D.D.C. 2013) ............................................................................39

*Oliver v. Pac. Nw. Bell Tel. Co.*,
106 Wash. 2d 675 (1986) .........................................................................................29

*Paige v. California*,
233 F. App'x 646 (9th Cir. 2007)...............................................................................8

*Parra v Bashas', Inc.*,
291 F.R.D. 360 (D. Ariz. 2014) ..........................................................................33, 39

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ...................................................................29, 35, 36, 37

*Robinson v. Metro-North Commuter Railroad Co.*,
267 F.3d 147 (2d. Cir. 2001) ...................................................................................43

*Rollins v. Traylor Bros.*,
No. C14-1414 JCC, 2016 WL 258523 (W.D. Wash. Jan. 21, 2016) ...........31, 34, 40

*Scott v. Family Dollar Stores, Inc.*,
No. 3:08-cv-00540, 2016 U.S. Dist. LEXIS 105267
(W.D.N.C., June 24, 2016)................................................................................38, 39, 40

*Sellars v. CRST Expedited, Inc.*,
No. C15-117-LTS, 2017 WL 1193730 (N.D. Iowa Mar. 30, 2017) .........................40

*Smith v. Xerox Corp.*,
196 F.3d 358 (2d Cir. 1999) *overruled on other grounds by*
*Meacham v. Knolls Atomic Power Lab.*,
461 F.3d 134 (2d Cir. 2006) ......................................................................................8

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) .................................................................................................42

*Stockwell v. City & Cty. of San Francisco*,
749 F.3d 1107 (9th Cir. 2014) .................................................................................29

*Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) .................................................................................38

*U.S. v. City of New York*,
276 F.R.D. 22 (E.D.N.Y. 2011) ...............................................................................43

*Velez v. Novartis Pharma. Corp.*,
244 F.R.D. 243 (S.D.N.Y. 2007) .............................................................................43

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-iv-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ...................................................................................................passim

*Watson v. Fort Worth Bank & Trust*,
487 U.S. 977 (1988) ........................................................................................................30

*Williams v. Boeing Co.*,
225 F.R.D. 626 (W.D. Wash. 2005)......................................................................29, 30, 38

### STATUTES

Title VII of the Civil Rights Act of 1964,
42 U.S.C. §§ 2000e *et seq.* ...............................................................................................1

Washington Law Against Discrimination,
Rev. Code Wash. § 49.60.010. *et seq.* ...............................................................................1

### OTHER AUTHORITIES

Fed. R. Civ. P. 23(a) ...............................................................................................................32

Fed. R. Civ. P. 23(b)(3) .....................................................................................................38, 41

### RULES

Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1776 (3d ed.) ....................................................36

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-v-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

# I. INTRODUCTION AND SUMMARY OF ARGUMENT

Representative Plaintiffs Katie Moussouris and Holly Muenchow ("class representatives") seek certification of a proposed Class of women who worked for Defendant Microsoft Corporation ("Microsoft") in Stock Levels 59-67 in the Engineering and/or I/T Operations Professions in the United States from September 16, 2012 to the present.[1] All Class members have claims for systemic compensation discrimination, and Class members in levels 60-64 also have claims for systemic discrimination in promotions. Engineering and I/T Operations are the two technical Professions at Microsoft in which the class representatives worked.

As the evidence described herein shows, Microsoft has maintained a common, discriminatory pay and promotions process called, alternately, the Calibration or People Discussion Process (collectively "Calibration Process") throughout the Class period. This Calibration Process results in lower pay and fewer promotions for women compared to their male peers. Plaintiffs allege that the Calibration Process is a specific employment practice that causes gender-based pay and promotion outcomes that violate the disparate impact provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") and the Washington Law Against Discrimination, Rev. Code Wash. § 49.60.010. *et seq*. ("WLAD"). Plaintiffs also allege that Microsoft engages in a pattern or practice of intentional discrimination against women (disparate treatment) in violation of Title VII and WLAD.

Microsoft's Calibration Process, which determines employees' pay, promotion, and performance outcomes, is both unreliable—in that its structural features preclude consistent

---

[1] This Court held that the liability period for claims under the Washington Law Against Discrimination ("WLAD") begins on September 16, 2012. *See* Dkt. 134 at 18. Additionally, the Court denied Microsoft's motion to strike allegations of extraterritorial application of WLAD to Microsoft employees employed outside the state of Washington but subject to employment policies originating at Microsoft's Washington headquarters. Dkt. 52 at 17-18. Accordingly, absent further order from the Court, the Class liability period begins September 16, 2012 for all Class members.

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR

-1-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

decision-making between comparable people—and based on invalid criteria. Plaintiffs' expert Dr. Ann Marie Ryan, Professor of Organizational Psychology at Michigan State University, describes the common problems with this process.[2] Plaintiffs' expert Dr. Henry Farber, Hughes-Rogers Professor of Economics at Princeton University, describes statistically significant and meaningful gender-based pay differentials caused by the Calibration Process. When controlling conservatively for relevant characteristics (including controls for job type, job complexity, and performance metrics), women earn less than their male counterparts.[3] Dr. Farber also concludes that women have received over 500 fewer promotions than men with their same characteristics would have received.

The Calibration Process operates within the context of a corporate culture that systematically devalues women's contributions. This is evidenced by the declarations of Plaintiffs and other female employees describing their experiences of gender discrimination in pay and promotions and Microsoft's culture of bias; over 230 internal complaints to Human Resources ("HR") describing gender discrimination, sexual harassment, and retaliation; and company records showing that Microsoft was well aware of the Calibration Process's adverse impact on women and did not fix it. Instead, Microsoft has tried to sidestep this issue by publishing two misleading "pay equity studies" and pursing diversity and inclusion ("D&I") programs that its own HR professionals dismiss as mere window dressing.

Plaintiffs' claims raise common questions of law and fact, the answers to which will drive the resolution of this litigation. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). Plaintiffs seek certification of their claims for injunctive relief under Federal Rule of Civil Procedure 23(b)(2), certification of their claims for damages under 23(b)(3), and certification of

---

[2] *See* Expert Report of Dr. Ann Marie Ryan ("Ryan"), filed herewith.

[3] The analysis of data through June 2016 reflects that in less than four years women in Engineering and I/T Operations have been underpaid between $100-$238 million, depending on whether job title is included in the model. *See* Expert Report of Dr. Henry Farber ("Farber"), filed herewith, ¶ 80 & Table 8. That number is expected to increase as further years of data are analyzed.

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-2-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

liability under 23(b)(2), (b)(3), and/or (c)(4).  Below Plaintiffs include a proposed trial plan

showing how their claims may be fairly and efficiently adjudicated on a class basis.  Plaintiffs

respectfully submit that their motion should be granted.

## II.      FACTS

### A.      Microsoft's Corporate Organization and Common Employment Practices

#### 1.      Microsoft's Job Classification System Organizes Employees Performing Similar Work By Profession, Discipline, and Job Title.

Microsoft is a multinational technology company headquartered in Redmond,

Washington.  Microsoft has a uniform system for organizing its employees throughout the

United States. Whittinghill Tr. at 101:4-13.[4]  Microsoft classifies groups of employees doing

similar work into Professions.  *Id.*  "A profession is a grouping of functional areas—such as

Engineering, Sales, Marketing, and Human Resources—with common functional skillsets,

business results, and success differentiators."  MSFT_MOUSSOURIS_00688508 at 513.  Within

Professions, Microsoft classifies employees into subcategories called Disciplines, according to

"the actual work that the individual is currently doing," such as "software design engineer test

[SDET]."  Whittinghill Tr. at 102:16-103:4.  Within each Discipline, the next and most specific

level of organization is Standard Title, *id.* at 103:12-16, such as "Program Manager."  The

proposed Class includes employees in just two of Microsoft's Professions: Engineering and I/T

Operations.  Standard Titles in these Disciplines come in variations reflecting increasing levels

of seniority, e.g.:  I, II, Senior, and Principal.[5]  For instance: Program Manager (equivalent to

"Program Manager I"), Program Manager II, Senior Program Manager, and Principal Program

Manager.  Regardless of which business organization they work in (such as Windows & Devices,

---

[4] Evidence cited herein is attached to the Declaration of Anne B. Shaver in Support of Plaintiffs'
Motion for Class Certification ("Shaver Decl.").  All corporate documents are attached as
collective Exhibit A in numerical order by Bates Number.  Excerpts of Deposition Transcripts
are attached as Exs. E to H, in chronological order by deposition date.  Declarations and Reports
in support of this Motion are submitted separately and referred to herein by last name of author.
[5] Shaver Decl., Ex. B (Career Stage Profiles for Engineering and I/T Operations).

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR

-3-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

1  Office Products, etc.), employees are categorized by common Professions, Disciplines, and

2  Standard Titles.

3      Two other aspects of Microsoft's corporate organization are relevant to this Motion.

4  First, all employees are assigned to a pay band, called a Stock Level, ranging from 59 to 98.

5  Ritchie Tr. 521:2-14. ███████████████████████████████████████

6  ████████████████████. Ritchie Tr. 308:6-13; MSFT_MOUSSOURIS_00688508 at 9.

7  Employees at level 80 or higher are Corporate Vice Presidents or above, Whittinghill Tr. 14:8-

8  19, up to CEO Satya Nadella who holds level 98. Ritchie Tr. 521:13-14. Employees in levels

9  68-70 are partners. *Id*. 416:1-3.

10     Second, employees are classified by Career Stage for purposes of guiding their career

11  progress. Career Stages progress from 2 through 9, and are broken out separately for

12  Independent Contributors ("IC"), Leads, and Managers. The Career Stages overlap with

13  Standard Titles, such that, for example, a Program Manager I is Stage 2, a Program Manager II is

14  Stage 3, a Senior Program Manager is Stage 4, and a Principal Program Manager is Stage 5.[6]

15  Career Stages have associated "competencies" and "key results" that set forth the "how" and

16  "what" of each job.[7] Each Discipline shares a common set of competencies and key results.[8]

17

18

19

20

21

22

23

---

24  [6] Shaver Decl., Ex. B.
25  [7] MSFT_MOUSSOURIS_00187720 at 5. *See also* Whittinghill Tr. at 137:20-39:13 (explaining that key results areas are about skills and knowledge, whereas competencies are about behavior).
26  [8] Shaver Decl., Ex. B.

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR                     -4-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

Women are concentrated in the lowest levels of Engineering and I/T Operations, as shown in this diagram: [9]



## Women          Men

| | | |
|---|---|---|
| 0% | 81+ | 100% |
| 6.7% | 80 | 93.3% |
| 7.0% | 68-70 | 93.0% |
| 10.1% | 65-67 | 89.9% |
| 15.2% | 63-64 | 85.8% |
| 20.3% | 61-62 | 79.7% |
| 20.4% | 59-60 | 79.6% |

**2.  Microsoft Has Used the Calibration Process Throughout the Class Period to Make Pay and Promotion Decisions.**

The Calibration Process is a process in which managers compare employees within peer groups to determine performance, pay, and promotion outcomes.  From 2011 to May 2014, Microsoft used the term "calibration meetings" for this process; since May 2014, it is called "People discussions," but the function has been the same.[10]  At these meetings, managers compare employees within a peer group, which encompasses employees in multiple stock levels doing essentially the same work at different rates of pay.  ████████████████████

---

[9] Farber Table 1.  According to Microsoft's data, there are no employees in Levels 71-79. Accordingly, those levels are not represented in the diagram.
[10] Ritchie Tr. at 136:25-138:22; 157:6-8; 229:16-17; 234:5-235:25.

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR
-5-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

█████████████.[11]  Peer groups correspond to career stages and overlap with standard titles.  Farber ¶¶ 17-21.  The result of the process is recommendations as to every employee's performance review score, pay, and promotion.  Ritchie Tr. 136:25-137:4; 228:25-229:25.  The process was developed by, and is administered by, Microsoft's HR team in Redmond, headed by J. Ritchie.  Ritchie Tr. at 42:17-43:7.  The discussions, their inputs, and the process for arriving at their outcomes, were not consistently recorded.  Ritchie Tr. 129:8-130:18; 133:19-134:11; 149:6-13.

Plaintiffs' expert in Organizational Psychology, Dr. Ryan, explains that problems with the process itself, as well as with the inputs to the process, undermine its reliability.  Ryan, ¶ 25.  First, regarding the process itself, Dr. Ryan found a lack of standardization in the types of information serving as inputs into compensation and promotion decisions, as well as in the specific procedures for discussing and making compensation and promotion decisions.  *Id.*, ¶¶ 32-39.  For example, the meetings were inconsistent in terms of whether direct supervisors attended, how it was determined which employees were compared to each other, and what information was available when recommendations were made.  *Id.*, ¶¶ 35-36, 39, & n.30.

Next, regarding the inputs to the process, Dr. Ryan found that decision makers were able to apply variable standards in making compensation and promotion decisions, because Microsoft did not prescribe weights to the underlying criteria.  Ryan, ¶¶ 26-31.  Thus, evaluators were free to weight criteria for pay and promotions in ways not aligned with job requirements.  *Id.*  Indeed, Dr. Ryan found that promotion decisions are not adequately linked to what Microsoft has stated are the job requirements in the Career Stage Profiles, so that there is no evidence that managers made decisions based on job related information.  *Id.*, ¶¶ 17-24.  Job performance, as measured by Microsoft's performance review process, likewise does not explain pay and promotion decisions.  Farber ¶ 57.

---

[11] MSFT_MOUSSOURIS_00002269 at 2276.

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR

-6-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

1    Finally, Dr. Ryan notes that Microsoft does not adequately train managers or monitor to

2    ensure the reliability and validity of outcomes in the Calibration Process.  Ryan, ¶¶ 40-42.  The

3    training that is available to managers on these decisions does not provide instruction on how to

4    weigh criteria in relation to the job requirements.  *Id.*, ¶ 43. And Microsoft does not take steps to

5    test inter-rater reliability, or whether manger decisions are *appropriately* calibrated such that

6    managers apply the same standards consistently with each other.  *Id*.

7        Dr. Ryan concludes that, "[o]verall, there is no evidence that compensation and

8    promotion decisions are made reliably, and in fact, the processes contain numerous critical

9    defects."  Ryan, ¶ 37.

        **3.    Microsoft Pays Women Less Than Men for Substantially Similar
               Work.**

11       Compensation at Microsoft is determined as part of the Calibration Process.  The data

12   show that men and women perform equally well at Microsoft—that is, men's and women's

13   performance review scores are roughly equal.  Farber ¶ 57.  Yet women are consistently paid

14   substantially less than men in the same job title and with the same performance.  Farber ¶ 5 &

15   Table 3.

16       Dr. Farber's pay regression controls for certain employee characteristics in order to

17   compare employees who are similar to one another in relevant ways.  His model controls for

18   Profession, Discipline, Standard Title, age,[12] tenure,[13] year, and location.[14]  Farber ¶¶ 53-56 &

19   Table 3.  The regression analysis shows that women are paid less than men, to a statistically

20   significant level of 21.7 standard deviations.  *Id.*  This finding well exceeds the threshold of 1.96

21   standard deviations to establish statistical significance that courts routinely accept as probative

---

[12] Age is commonly used as a proxy for prior work experience where, as here, the employer's data does not contain information about employees' prior work experience.  Farber ¶ 45.
[13] Tenure is equivalent to years of experience at Microsoft.  Farber ¶ 45.
[14] Pay is based in part on geographic location to accommodate cost of living differences within the U.S., so Dr. Farber's model accounts for that as well.  Farber ¶ 45.

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR

-7-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

1   evidence of discrimination.[15] The result is also practically significant given that the class

2   shortfall value ranges from approximately $100 million to $238 million dollars, depending on

3   whether standard title is included.  *Id.*,¶ 80 & Table 8.

4        Microsoft may argue ████████████████████████████ *see* § II.B.2, *infra*) that

5   Dr. Farber's model is wrong because it does not control for Stock Level.  However, Dr. Farber

6   explains that it would be inappropriate to control for Stock Level for two reasons.  First, stock

7   level is a pay band, so regressing compensation based on Stock Level would simply be accepting

8   pay as an explanation for pay, which is inappropriate.  Farber ¶ 47.  In other words, it is

9   tautological that the observed gender pay gap would go to zero if stock level is included in the

10  model; such an analysis merely confirms that Microsoft adheres to its pay bands and does not

11  answer any question relevant to this case.  Second, Dr. Farber has found that women are

12  systematically assigned to lower Stock Levels than similar men; thus, controlling for Stock Level

13  would lead one to underestimate the true pay gap.  *Id.*, ¶¶ 48, 56 & Figure 3.  In fact, in response

14  to Microsoft's publication of two equal pay studies that controlled for Stock Level, over 30

15  employees wrote to HR that controlling for Stock Level was a mistake.  The employees noted

16  that Stock Level is nothing more than a pay band, and that women receive lower pay (lower

17  Stock Levels) than males in their peer group and are not promoted into higher Stock Levels at

18  the same rate as men.  *See* note 32 *infra*.  In fact, Dr. Farber's model is overly conservative in

---

19  [15] *Bouman v. Block*, 940 F.2d 1211, 1225 n.1 (9th Cir. 1991) (accepting significance at the 5%
20  probability level as probative of discrimination); *Eldredge v. Carpenters 46 N. Cal. Counties J.
    Apprenticeship & Training Comm.*, 833 F.2d 1334, 1340 n.8 (9th Cir. 1987) (holding that a
21  probability level of 4.5%—*i.e.,* below 5%—gave "rise to an inference that the [challenged
    practice] rather than chance [was] responsible for" discrimination against women); *Paige v.
22  California*, 233 F. App'x 646, 648 (9th Cir. 2007) (stating that "we have relied upon the 1.96
    standard deviation standard"—*i.e.*, a probability level of 5%—in discrimination cases); *Smith v.
23  Xerox Corp.*, 196 F.3d 358 (2d Cir. 1999) ("If an obtained result varies from the expected result
    by two standard deviations, there is only about a 5% probability that the variance is due to
24  chance. Courts generally consider this level of significance sufficient to warrant an inference of
    discrimination.") (internal citations omitted) *overruled on other grounds by Meacham v. Knolls
25  Atomic Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006); *Malave v. Potter*, 320 F.3d 321, 327 (2d
    Cir. 2003) (same).

26

that it controls for Standard Job title, which overlaps with and bakes in decisions about
employees' Career Stage and Stock Level.[16]

The observed gender-based pay differential in Engineering and I/T Operations has
existed across Microsoft locations throughout the United States to a statistically significant
degree throughout the entire class period. Farber Table 3. The proposed Class includes women
in Levels 59-67. While women at Levels 68 ("partner") and above may experience gender
discrimination in pay, employees at these levels participate in decision making within the
challenged process to an extent that likely would preclude their inclusion in the Class. Moreover,
there are relatively few women in these senior positions.

### 4.  Microsoft Promotes Men Over Similarly-Situated Women.

Like compensation, promotions at Microsoft are determined in the Calibration Process.
Women in Engineering and I/T Operations obtain fewer promotions than men in the same job
and with the same characteristics and performance measures.

Dr. Farber's promotion regression (which is a probit model)[17] controls for Profession,
Discipline, Stock Level,[18] age, experience at Microsoft, location, and performance. Dr. Farber
finds that, between 2011-2016 (the last year data was available) women in Engineering and I/T
Operations received approximately 518 fewer promotions than would be expected given their
characteristics other than gender, and that the difference is statistically significant. Farber ¶ 77 &

---

[16] Standard Title is defined by Profession, Discipline and Career Stage Level. Career Stage
Level and Stock Level are intertwined; a Career Stage Level is generally defined as either two or
three Stock Levels within a particular Discipline. Farber ¶ 21. Women are in lower Career
Stages, and in lower Stock Levels within Career Stage. Farber ¶¶ 59-64 & Figures 1-3.

[17] A probit model is a form of multivariate analysis that can be used when the object of the study
is an outcome that takes on one of two discrete values—*e.g.*, promoted or not promoted. Dr.
Farber's probit model allows estimation of the difference in probability of promotion between
men and women. Farber ¶¶ 42-43.

[18] Stock Level is not an appropriate control in the compensation regression for the reasons set
forth above in Section II.A.3. However, because Microsoft defines a promotion as a move from
one Stock Level to the next, in order to study advancement from one level to the next, one must
control for Stock Level in this probit regression. Farber ¶ 68.

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR
-9-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

Table 7.  This is a properly specified model that controls for the relevant employee characteristics present in the data.

The proposed Class members with promotion claims include women in Levels 60-64. While the evidence suggests that women are also under-represented at Levels 65-67 (and above),[19] the relatively small numbers of women at very senior levels means that even a small number of promotions can mask unfairness because the feeder pool of women available to be promoted to the next level is so small.

**B.** **Microsoft Knew That the Calibration Process Disadvantaged Women in Pay and Promotions, But Did Nothing to Fix the Problem.**

Microsoft knew from the internal and external sources described below that its Calibration Process had an adverse impact on women in Engineering and I/T Operations in terms of both compensation and promotion, but did nothing to remedy the problem.

**1.** **On an Annual Basis, Microsoft Audited Pay and Promotion Decisions for Adverse Impact.**

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

---

[19] *See, e.g.*, MSFT_MOUSSOURIS_00284174 at _191 (in Windows & Devices group,"L65+ Female representation is 20.6% pts below Overall female").

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR

-10-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

█████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████ and must be aware the

disparities in compensation and promotion identified here by Plaintiffs.  Nevertheless, it has

allowed these issues to persist uninterrupted.  Further, as described by Dr. Ryan, the non-

privileged "monitoring" that occurs—in other words, that which is shared with actual decisions-

makers—is simply HR sitting in on Calibration meetings, and is woefully inadequate.  Ryan,

¶¶ 40-43.

      **2.**      **The Federal Government Audited Microsoft's Data** ████████
████████████████████

███████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

███████ █████████████████████████████████ ███████████████████

█████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██████████

---

[20] MSFT_MOUSSOURIS_00065719.

[21] MSFT_MOUSSOURIS_00801714.

[22] MSFT_MOUSSOURIS_00801714 at 0008-9.

███████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████ and must be aware the

disparities in compensation and promotion identified here by Plaintiffs.  Nevertheless, it has

allowed these issues to persist uninterrupted.  Further, as described by Dr. Ryan, the non-

privileged "monitoring" that occurs—in other words, that which is shared with actual decisions-

makers—is simply HR sitting in on Calibration meetings, and is woefully inadequate.  Ryan,

¶¶ 40-43.

   **2.**   **The Federal Government Audited Microsoft's Data** ████████
████████████████████

███████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████ ████████████████████████████████ ██████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████

---

[20] MSFT_MOUSSOURIS_00065719.

[21] MSFT_MOUSSOURIS_00801714.

[22] MSFT_MOUSSOURIS_00801714 at 0008-9.



[23] MSFT_MOUSSOURIS_00801714 at 0008.

[24] MSFT_MOUSSOURIS_00308243 at 248-49.

[25] MSFT_MOUSSOURIS_00802741 at 0001.

[26] MSFT_MOUSSOURIS_00801714 at 009.

[27] MSFT_MOUSSOURIS_00801714 at 010 (emphasis in the original).

[28] *Id.*

[29] *Id.*

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-12-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

3. **Employee Responses to Microsoft's Equal Pay Announcements Gave Microsoft Notice of Widespread Concerns of Pay and Promotion Bias.**

Microsoft received substantial employee reaction to two equal pay announcements during the class period. First, after CEO Satya Nadella made headlines for statements he made at the 2014 Grace Hopper Institute (women in technology conference) about equal pay being a function of "karma",[30] he sent a clarifying email to employees claiming that "the overall differences in base pay among genders and races (when we consider level and job title) is consistently within 0.5% at Microsoft." MSFT_MOUSSOURIS_00017963. In response, employees swamped Microsoft's leadership team and HR with messages telling the company that analyzing pay by Stock Level is a logical fallacy, because Stock Level is nothing more than a pay band, and women are systematically paid less than male peers in the same jobs consistent with their lower pay bands (Stock Levels). For example, one manager wrote, "The logic seems to be that men and women in the same pay grade receive roughly the same pay. This is not evidence of equal pay, but rather that Microsoft enforces an even compa ratio[31] among men and women employees. As a manager with direct reports who might ask me whether or not I can provide any evidence that our pay system is fair, this doesn't pass the giggle test." MSFT_MOUSSOURIS_00563277. Another employee wrote: "I disagree with the stats on equal pay. When people are not promoted at the same rate as their peers, the fact that they are paid on par within their level hides the facts

---

[30] Satya Nadella responded to a question on what advice he would offer women who are not comfortable asking for pay raises: "It's not about asking for the raise, but knowing and having faith that the system will actually give you the right raises as you go along. . . . And that, I think might be one of the additional superpowers that quite frankly women who don't ask for a raise have. Because that's good karma." *See* https://news.microsoft.com/2014/10/09/satya-nadella-email-to-employees-re-grace-hopper-conference/.

[31] A compa ratio is "the result of dividing a person's base pay rate [] by the midpoint of their salary range," which is used to determine whether someone is paid at the low, middle, or high end of their Stock Level range. Ritchie Tr. at 393:24-394:11.

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-13-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

that they are not paid equally. If I'm doing the exact same job but am at a different level, that's not pay equality." MSFT_MOUSSOURIS_00150735 at 739. Other comments reflected similar feedback.[32]

The response was the same when Microsoft released the results of its April 2016 Equal Pay Study. The study was undertaken in response to pressure from shareholder Arjuna Capital, which threatened Microsoft (and other technology companies) with a shareholder resolution forcing it to disclose pay data. Microsoft decided to make a large public announcement about its pay data in April 2016 "to preempt[] the investment firm" and "get[] credit for the good deeds." MSFT_MOUSSOURIS_00592294. Unfortunately, again Microsoft simply asserted that women earn 99.9 cents to men's dollar when comparing employees in the same job title and Stock Level.[33] Once again, employees were quick to respond that the study ignored Microsoft's actual problems: gender bias in pay across job peer group (leveling) and promotion velocity.[34] As one

---

[32] *See, e.g.,* MSFT_MOUSSOURIS_00562093. ("It is vital that when discussing the pay gap, we don't simply say 'both genders at the same level are marking the same pay' and instead ask 'are the genders appropriately leveled?'"); MSFT_MOUSSOURIS_00231183 ("But there is no check on promotions. We should put something into the system that does another check by HR to ensure this is the case. We could create a separate metric on promotions of woman (and minorities) to be sure we are driving toward it."); MSFT_MOUSSOURIS_00150735 at 739("Have we looked at the data, though, to see if there is a 'promotion gap' between genders? That is, how long does a man stay in a role without being promoted versus how long a woman stays in the same role before being promoted? Or whether women and men with the same number of years' experience come in to Microsoft at different grade levels?").

[33] Kathleen Hogan, Ensuring equal pay for equal work, Official Microsoft Blog (Apr. 11, 2016), https://blogs.microsoft.com/blog/2016/04/11/ensuring-equal-pay-equal-work/.

[34] These responses are too numerous to catalog here; they are listed in a chart at Shaver Decl., Ex B for the Court's reference. Some representative examples include: MSFT_MOUSSOURIS_00744109 at 109-110 ("[T]his report made me feel that Microsoft is not actually committed to diversity, but rather the appearance of diversity. . . . I think the more interesting data are the promotion numbers. . . . [I]t is clear that women have much lower levels than men, and are not in leadership positions. . . . I'm very disappointed that the head of HR, a woman herself, would publish a report like this, without even including a caveat about promotions."); MSFT_MOUSSOURIS_00743994 ("I'm not at all surprised that the pay difference for different groups in the same level and title is so small. It's comparatively straightforward to make sure that a female L60 PM earns the same as a male L60 PM. What I've experienced firsthand and among female friends of mine is that promotion velocity for male

*Footnote continued on next page*

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-14-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

General Manager succinctly put it, "Comparison only of pay at the same level was a big miss. It's all about 1) are similar roles/responsibilities leveled [paid] the same between men and women and also 2) is the promo timeline [the] same for men and women."[35]  Dozens of employees stressed the sentiments that "[t]here is an important distinction between equal pay for equal level, and equal pay for equal work.  The latter presupposes women are appropriately leveled, and numbers suggest this is not the case at Microsoft,"[36] and "[t]he statistics . . . about equal pay for people at the same level and title aren't really convincing . . . .  Correct me if I am wrong, but the pay is mostly based on a function of someone's level. . . .  [I]t is really promotion velocity that indicates whether we are truly rewarding different groups equally for their equal work."[37]  One manager even pointed out to HR leaders that Microsoft was repeating the same mistake as it had in the prior equal pay announcement, and that Microsoft was still refusing to answer the relevant questions which it had the data to measure: promotion velocity and bias across peer group due to pay level. MSFT_MOUSSOURIS_00703435.  Another manager noted that "he has been deluged by women here at the company asking him to unpack today's news. He said 'already a bunch of women' have been pinging him to find out if we've done a pay data comparison between different levels, and is the news bad or did we just not bother to do it."[38] Finally, an email chain from a group of Microsoft Partner-level technical women ("A Life Without Lines"), stated that it was more of the same "vanity metrics" seen after the Grace

_Footnote continued from previous page_
versus female employees is different. My observation is that it's harder for a woman to get promoted at Microsoft than it is for a man."); MSFT_MOUSSOURIS_00744097 at 098 ("I think it's virtually meaningless that people in the same level with the same job title have nearly equal salaries. The real disparities, as we know, are in hiring, promotion, leadership positions, and representation in non-traditional roles . . . .  [W]omen and non-whites are clearly underrepresented in tech and leadership roles . . . seems disingenuous to slice the report in such a way that it looks like we are already at equality.").
[35] MSFT_MOUSSOURIS_00775226 at _227.
[36] MSFT_MOUSSOURIS_00705352 at 353.
[37] MSFT_MOUSSOURIS_00744107.
[38] MSFT_MOUSSOURIS_00806770.

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR

-15-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

1 Hopper fiasco, and "I'm surprised to see us proudly releasing these figures again.  Of course we

2 make sure not to underpay women and [minorities] at a given level.  The much more insidious

3 problem is promotion velocity."[39]

4   Microsoft's HR and Communications departments discussed how to respond to all of

5 these employee comments.  Specifically, as to the frequently raised question of whether

6 Microsoft had looked at and would release promotion data, Kathleen Hogan, head of HR,

7 acknowledged that, "This is the tough question."  MSFT_MOUSSOURIS_00744230 at 231

8 (emphasis added).  But rather than actually answer the question (or address the underlying issue),

9 Microsoft developed a canned response to evade the issue, refusing to acknowledge that it had

10 studied this issue or to report the results.  *Id*. at 230.[40]

11   Microsoft was well aware of the persistent gender-based pay and promotion disparities

12 from its own internal audits.  Instead of being candid with its employees, investors, and the

13 public, Microsoft cooked the analysis by adding stock level—*i.e.*, a pay band—to claim success.

14 Many of its own employees knew the truth:  the pay studies were a sham.

15   **4.**   **Knowledge of Gender Bias Went to the Very Top of Microsoft.**

16   Microsoft's leadership Senior Leadership Team (SLT), which consists of CEO Satya

17 Nadella and the Executive Vice Presidents ("EVPs") who report to him, routinely observed

18 gender bias and culture problems at Microsoft.  In Mr. Nadella's company email clarifying his

19 [39] MSFT_MOUSSOURIS_00797920 at 922-923 ("The question here is not whether two people

20 of different gender are at the same level are paid equally.  The question really is whether two
people of different genders with equal performance are recognized to be the same level this is

21 where length in level/promo velocity is the more relevant measurement.") ("This data would be

22 more meaningful to me if they not only looked at equivalent levels but also other measures like
equivalent experience and education to make sure women and men were being leveled the same.

23 Otherwise where people are in level (through hiring and promotion) could be indicative of a bias
. . . basically a circular reference on our own practices.").

24 [40] *See, e.g.*, MSFT_MOUSSOURIS_00784718; MSFT_MOUSSOURIS_00705901 at _902;
MSFT_MOUSSOURIS_00592294; MSFT_MOUSSOURIS_00714794;

25 MSFT_MOUSSOURIS_00744437. Microsoft has also refused to provide its promotion velocity
data to third parties performing research into how women fare at various technology companies.

26 MSFT_MOUSSOURIS_00418344.

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR
-16-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

statements at the 2014 Grace Hopper Institute, Mr. Nadella acknowledged three areas in which Microsoft needed to make progress: 1) "we must ensure not only that everyone receives equal pay for equal work, but that they have the opportunity to do equal work"; 2) "we need to recruit more diverse talent to Microsoft at all levels … These numbers are not good enough … and especially in engineering"; and 3) "we need to expand training for all employees on how to foster an inclusive culture." [41]  Mr. Nadella has stressed that "equal opportunity for equal work … is where [Microsoft] need[s] to do the hard work to bring in and promote into senior ranks more people representing all diverse groups." [42]

This has not generated appropriate interventions to address known problems.  For example, the

[41] MSFT_MOUSSOURIS_00017963.
[42] MSFT_MOUSSOURIS_00563277.
[43] MSFT_MOUSSOURIS_00678321 at 326.
[44] MSFT_MOUSSOURIS_00825924 at 928; *see also id*. at 925 (

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR
-17-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

MSFT_MOUSSOURIS_00278390 at p. 8.  Other records similarly reflect that knowledge of

Microsoft's institutional biases and the way the company masks them went to the very top of the

organization.  For example, outside consultant Sunergos held focus groups with technical women

at the company and reported back to HR EVP Kathleen Hogan on the common themes that

emerged, including:

- Being overlooked, not listened to. Hard to speak, so outnumbered in this environment;
- Women leaders are almost invisible here;
- I don't want to be treated differently. First it seems like I have to work harder to get here and then to have others think I am here because I am a woman, that is a double whammy;
- Insensitivity and lack of awareness of women's issues.  For example, asking 'how was your vacation?' when coming back from maternity leave;
- Advice to other women at Microsoft: Don't talk about your children.

MSFT_MOUSSOURIS_00677331 at pp. 16, 19, 24, 25, 34.  In another example, in June 2015,

the ███████████████████████████ had a Q&A with the ██████████████████████

An attendee asked, "Can you address the gender pay gap?"  ████████████████████████

████████████████████████, responded: "I think it is more about promo velocity than actual pay

gap, because every level has clear pay boundaries."[45]

In sum, Microsoft's senior leadership knew from multiple sources that it had a pay and

promotion problem, but failed to remedy the systemic bias against women as ████████████

██████████████████████████████████████████████ MSFT_MOUSSOURIS_00278390

at p. 8.

---

[45] MSFT_MOUSSOURIS_00022538 at 540.  *See also* MSFT_MOUSSOURIS_00201435 (email to HR manager: "overall themes determined based on the data we looked at" include "males are promoted faster than females," and "females are in level longer than males").

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR
-18-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

**C.** **Microsoft Has Ignored Overwhelming Evidence of Intentional Gender Discrimination and Maintained a Company Culture Biased Against Women.**

Microsoft's discriminatory processes do not operate in a vacuum, but instead are shaped by a common culture of gender stereotyping and bias against women at the company. The evidence of intentional discrimination is substantial, from many different sources, which separately and collectively show Microsoft's pattern and practice of gender bias and bring "the cold numbers convincingly to life." *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977). This evidence includes internal complaints by female employees submitted to Microsoft's Employee Relations Investigations Team ("ERIT"), comments made by employees in the Microsoft Poll Survey, civil lawsuits and gender discrimination charges filed against Microsoft with governmental agencies, and documentary evidence such as corporate emails and records reflecting persistent biases and systemic problems for women.

This constellation of evidence reflects the following themes: 1) an exclusionary "boys club" atmosphere; 2) a culture rife with sexual harassment; 3) a near-total failure of HR to properly investigate and redress employee complaints of discrimination and harassment; and 4) acknowledgment that Microsoft's diversity and inclusion (D&I) initiatives are mere window-dressing and have failed to address the underlying problems. This common, classwide evidence shows that Microsoft "operated under a general policy of discrimination." *Dukes*, 564 U.S. at 353.

**1.** **Microsoft Maintains an Exclusionary "Boy's Club" Atmosphere.**

Like every other large company in the United States, Microsoft has a written policy against gender discrimination and sexual harassment. Microsoft does not follow its policy.

Microsoft women have reported to senior leadership that Microsoft maintains an abusive, toxic, "boy's club" atmosphere, where women are ignored, abused, or degraded. *See, e.g.*, MSFT_MOUSSOURIS_00792417 at 419 (███████████████ "I will not be able to

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR
-19-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

recommend MS to other female engineers.  The main reason is that MS culture accepts and tolerates abuse and toxic behavior, especially towards females.");

MSFT_MOUSSOURIS_00708659 at 661 (Email to Kathleen Hogan, EVP: "In an Engineering role, I am surrounded by men and only men in most of my meetings. …The good ol boy culture and way of behaving at meetings is alive and well."); MSFT_MOUSSOURIS_00371657 at 658-59(Email to ▮▮▮▮▮▮▮▮▮▮▮ "Our organization is actually empowering a culture of exclusion.  We have ▮▮ women in ▮▮▮▮▮▮▮ within my group . . .There are undeniable differences in the level of support, professional growth opportunities and assigned project tasks for male peers with similar experience and qualifications.");

MSFT_MOUSSOURIS_00561670 at 562752 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮: "It is hard to believe behavior like this, especially by a ▮▮▮▮▮, would be tolerated at Microsoft. . . .  The behavior I am referring to ranges from a development project code named 'Wrecking Ball' after Miley Cyrus' provocative video, to a hostile t-shirt graphic depicting ▮▮▮▮▮ ▮▮ an email titled 'Working Backwards' that stereotypes and degrades women, employees being called pussy, cunt, and Steve Ballmer being referred to as our limp dick CEO.  This cultural backdrop has had a real effect on me.  I consider myself to be a strong person.  I have a strong track record of performance over a long tenure.  I should not feel powerless.  But I do. Completely.  Powerless."); MSFT_MOUSSOURIS_00677331 at p.16 ("The 'bro culture' is the natural comradery that the men have.  Not always easy or natural for women to fit in to this.").[46]

---

[46] *See also* Boeh Decl., ¶ 7 (culture is "unfriendly toward women"); Dove Decl., ¶ 7 ("Women and their perspectives are undervalued at Microsoft. On many occasions I have experienced or witnessed women being cut off in meetings, excluded from meetings, and our opinions dismissed or undervalued."); Muenchow Decl., ¶ 6 ("Women are held to a different standard than men: when they speak up in meetings, they receive negative criticism for being too aggressive, but men routinely talk over women without criticism."); Moussouris Decl., ¶ 6 ("Women were frequently interrupted or talked over at meetings. I saw on several occasions that women who shared their ideas were ignored, but that the same or similar ideas later presented by men would be acknowledged and congratulated."); Smith Decl., ¶ 7 ("The men I worked with created a 'good ol' boy's club' atmosphere, where the men often socialized and drank together. As a

*Footnote continued on next page*

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR
-20-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████

Even Microsoft's Unconscious Bias training is prey to the culture of bias and stereotyping that it purports to correct. One attendee wrote: "In spite of this being a course about unconscious bias, the facilitator tended to ignore or pass over the less outspoken women in the audience in favor of the louder voices. In particular, one woman was given a microphone and assured she could speak next. At least 15 minutes later, the facilitator still had not acknowledged the woman with the microphone and encouraged several men who just jumped in and spoke out of turn." MSFT_MOUSSOURIS_00166305 at 307-308. *See also* MSFT_MOUSSOURIS_00371657 ("The unconscious bias training has not made any notable difference."); Muenchow Decl., ¶ 7 (same).

### 2. Microsoft's Culture is Rife With Sexual Harassment.

Company records indicate that women at Microsoft are sexualized by their male managers and coworkers, leading to a substantial number of incidents of alleged sexual harassment, and even several incidents of sexual assault, that often go unpunished. In files

---

*Footnote continued from previous page*

woman, I felt objectified and excluded."); Sowinska Decl., ¶ 7 ("I frequently heard stories, and shared my own experiences, regarding women's contributions being undervalued and women being denied professional development opportunities. . . . I also spoke with women about the pressure we felt to hit the sweet spot between being perceived as 'too timid' or 'overly passionate' and 'too harsh' in Microsoft's male dominated culture."); Underwood Decl., ¶ 6 ("I was marginalized, excluded, denied resources, and treated differently than my male peers."); Vaughn Decl., ¶ 6 ("I am often excluded from meetings I should attend, and more senior male employees refuse to respond to my correspondence."); Warren Decl., ¶ 7("[M]en are praised for exhibiting strong opinions and being assertive, while women are admonished for the same behavior.").

[47] MSFT_MOUSSOURIS_00341320 at 321.

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR
-21-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

produced for the period 2010-2016, there have been at least 108 *reported* incidents of sexual

harassment and assault alleged by women in US-based technical jobs at Microsoft.[48]

Such incidents were often tied to Microsoft work trainings, *see e.g.*,

MSFT_MOUSSOURIS_00819252 at 257-258 (female employee sexually harassed by *three*

different male employees at a Microsoft training), or work social events, which should have been

important professional networking and development opportunities, but instead were threatening

environments for many Microsoft women. *See e.g.*, MSFT_MOUSSOURIS_00816432 (*four*

women raised separate complaints of sexual harassment against one male employee occurring at

a single work social event); MSFT_MOUSSOURIS_00809046 at 048 (intoxicated male

Microsoft employee pulled down the shirt of a female employee at a company function and as a

result the female employee left her role); MSFT_MOUSSOURIS_00818175 (male employee

repeatedly touched leg of female employee during a meal with all Microsoft employees

following the ████████████████); MSFT_MOUSSOURIS_00809106 at p. 8 (female

employee groped and sexually harassed by male employee at team happy hour);

MSFT_MOUSSOURIS_00809030 (female employee groped by a male employee at ████████

████████████████); MSFT_MOUSSOURIS_00631799 (four women groped and sexually

harassed by male employee at several work-related functions);

MSFT_MOUSSOURIS_00814864 at 866 (female employee groped by male employee multiple

times at company event). *See also* Boeh Decl., ¶ 7 ("I was sexually harassed by a co-worker. I

sought advice from [HR] regarding the situation, but HR failed to address the harassment while

increasing the pain and stress of my situation."); Miller Decl., ¶ 8 ("[My manager] would

regularly make inappropriate comments about what I was wearing, and would touch me and ask

why I was not married."); Moussouris Decl., ¶ 7 (male manager found to have sexually harassed

his female reports, yet he was simply transferred to another group and eventually promoted);

---

[48] The two Employee Relations Investigations Team complaint logs produced by Microsoft are
attached to the Shaver Declaration as Exhibit C.

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-22-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

Smith Decl., ¶ 7 ("[M]ale co-workers frequently commented on my looks and figure and made inappropriate comments about other women's looks. These comments occurred nearly constantly, even on conference calls before meetings began."); Sowinska Decl., ¶ 7 (describing frequent incidents of sexual harassment and strategizing with another manager "regarding his concerns about sending a female employee to meetings with senior IT employees who failed to pay attention to her and obviously stared at her breasts"); Warren Decl., ¶ 7 ("Microsoft's Xbox team hosted a party in spring of 2015 that included scantily clad women dancing on tables, which was widely praised by the men in my office.").

Even more disturbingly, in the same time period, at least three women reported sexual assault or rape by male Microsoft co-workers. *See e.g.,* MSFT_MOUSSOURIS_00064984 at 985 (female Microsoft intern raped by male Microsoft intern, reported rape to supervisor and HR, and yet forced to work alongside her accused rapist; when victim told HR she was considering obtaining a restraining order she was informed she would be moved off the team if she did so; accused rapist offered fulltime employment at Microsoft); MSFT_MOUSSOURIS_00646449 at p. 5 (female ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ told HR Manager that she and another female Microsoft employee were raped by a male ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮); MSFT_MOUSSOURIS_00632500 at 527-528 (female Microsoft employee reported to Microsoft Global Security that another female Microsoft employee was sexually assaulted by a male Microsoft employee on a business trip and there may have been three additional victims). The flagrant and repeated incidents of sexual misconduct toward women at Microsoft reflects the corporate culture in which women are undervalued and underpaid.

### 3. Microsoft Does Not Appropriately Investigate or Redress Employee Complaints of Discrimination and Harassment.

As described above, from 2010 to 2016, Microsoft received 108 complaints of sexual harassment from female US-based technical employees. During this time, women in US-based

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

technical jobs at Microsoft <u>also</u> lodged 119 complaints of gender discrimination, 8 complaints of retaliation, and 3 complaints of pregnancy discrimination.[49]  While 238 complaints lodged with HR by professional women making careers at a Fortune 50 company is shocking enough, what is even more disappointing is the lackluster response to the issues raised by the Microsoft team ("ERIT") tasked with investigating complaints of Microsoft's anti-discrimination and anti-harassment policy.  For example, of the 118 complaints of gender discrimination, ERIT only **once** concluded that a complaint of gender discrimination was "founded."[50]  Indeed, ERIT is notorious among Microsoft employees for "rubber-stamping" management, and employees have "little faith" in the investigations.  *See e.g.,* MSFT_MOUSSOURIS_00064978 at 79 ("if handled internally by Microsoft, [it] could only be expected to lead to another finding of 'unfounded', no matter how obvious the evidence … we already know of Microsoft's history of making a determination of 'unfounded' even when evidence of wrongdoing has been provided in the investigations.").[51]

---

[49] Shaver Decl., Ex. C.

[50] Shaver Decl., Ex. C.

[51] *See also* Alberts Decl., ¶ 8 ("I have no idea whether HR investigated my complaint, as HR never followed up. I believe that complaining to HR can be career-ending at Microsoft and I only did so because I saw no other option short of leaving the company, which I did when HR did nothing."); Boeh Decl., ¶ 5,8 (HR ignored multiple complaints of discrimination, including when manager explicitly stated he denied her a promotion because he did not want to waste it on someone who might become pregnant); Dove Decl., ¶ 9 (ERIT found no violation after complaint of gender discrimination and told her it was technically impossible to remove unfair comments from her performance review; "This is not plausible at a tech company."); Hutson Decl., ¶ 6 (for first complaint, "HR never followed up with me"; for second complaint, "despite telling me that my manager acted inappropriately, ERIT found no violation"); Miller Decl., ¶ 9 (complaining to HR "will not make any difference and will only subject the complainants to hostility and retaliation"); Muenchow Decl., ¶ 7 ("[M]aking complaints about discrimination to Microsoft's [HR] department does not make any difference."); Moussouris Decl., ¶ 7(HR took no action on multiple complaints of discrimination and retaliation); Smith Decl., ¶ 9 ( "HR sent a single email to my work email while I was out of the office and never attempted to reach me again, even after I followed up with them upon my return."); Underwood Decl., ¶ 9 ("ERIT collected information from me, but I did not see them take any action to address the discrimination. The multiple complaints I made did nothing to improve the hostility I and other women faced."); Vaughn Decl., ¶ 7 (After complaining that male co-workers with less

*Footnote continued on next page*

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

In fact, ERIT often concludes there is no policy violation even when all the evidence points to the contrary. For example, four female employees raised separate complaints of sexual harassment against a male employee at a Microsoft event, yet ERIT found no policy violation despite concluding that the accused harasser touched all four women in a manner that made them feel uncomfortable.[52] In another investigation, ERIT concluded that a male employee "engaged in harassing behavior as described in Microsoft's Anti-Harassment and Anti-Discrimination Policy (Sexual Harassment)," yet ERIT still perplexingly found that the behavior did not rise to the level of a policy violation.[53]

The ERIT team, which operates from the Redmond headquarters, also has no policies or procedures on how to conduct ERIT investigations. *Id*. 157:6-13. For example, ERIT has no policies or procedures in place to ensure the safety of Microsoft employees when they allege sexual harassment or assault. *Id*. *See, e.g.*, MSFT_MOUSSOURIS_00645459 at p. 2 (two women raised complaints of sexual harassment against a male employee, but one of them was subsequently left alone on site with the accused harasser). Also troublingly, ERIT does not monitor for "repeat-offenders." De Lanoy Sept. 18, 2017 Tr. 89:24-90:4; 86:25-87:2. While ERIT maintains a database of investigations, the database does not flag where an accused appears more than once. *Id*. 90:23-25. A repeat offender would only be identified if an investigator happened to recall the name from an earlier complaint and then searched the records for prior ERIT activity. *Id*. 9517-20 (investigator "*might* look in the database to see if that person's name was recorded for any prior ERIT activity … If their name sounded familiar."). However, even if a Microsoft investigator is somehow aware of other complaints against an accused, this knowledge does not inform Microsoft's investigation. *Id*. 92:14-24; 94:2-8; 89:4-14 (to consider repeated gender bias offenses would not be "proper" or "fair").

---

*Footnote continued from previous page*
experience were earning more, "HR told me there was nothing they could do.").
[52] MSFT_MOUSSOURIS_00816432.
[53] MSFT_MOUSSOURIS_00632037 at 042.

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR
-25-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

1       Nor does ERIT monitor for retaliation in response to raising a complaint.  *Id*. 83:6-20;

2    85:19-8619, and women at Microsoft "fear reprisals if they openly challenge the gender hostile

3    culture."[54]  For example, when a female Microsoft employee asserted that her male manager's

4    attempts to demote her from ▓▓▓▓▓ constituted gender discrimination, "her manager cautioned

5    her that if she makes those claims in writing, she would likely be terminated from Microsoft."[55]

6    *See also*, MSFT_MOUSSOURIS_00815540 at 542 (after raising sexual harassment complaint

7    with ERIT and HR, female employee's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ retaliated

8    against her by scrutinizing her use of work time to attend a training, made negative comments

9    about her performance, and questioned whether she had a future at Microsoft);

10   MSFT_MOUSSOURIS_ 00815228 at 232 (female employee alleged she was denied a

11   promotion and received a negative performance review in retaliation for reporting gender

12   discrimination); MSFT_MOUSSOURIS_ 00065680 at 682 (female employee received first

13   negative performance review in ▓▓▓▓▓▓ at Microsoft after complaining about gender

14   discrimination at a Microsoft women's event); MSFT_MOUSSOURIS_00623396 at 398 (female

15   employee alleged ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ retaliated against her for raising

16   a gender discrimination complaint by giving her a negative performance review and removing

17   her from her role).

18       Finally, in determining what discipline to impose on a founded complaint, Microsoft

19   defers to business leaders—*i.e.*, "[t]he manager or management of the subject of the

20   complaint"—rather than Human Resources or Legal for the "final say" in any corrective action.

21   *Id*. 192:1-3; 193: 11-14.  Thus, it is unsurprising that Microsoft employees believe HR and ERIT

22   defend management,[56] do not follow their own policies or the law, and that ERIT investigations

23   are a "farce," "pretextual," and a "subterfuge".[57]

---

24   [54] MSFT_MOUSSOURIS_00064918 at 929.

25   [55] MSFT_MOUSSOURIS_00064918 at 930.

     [56] MSFT_MOUSSOURIS_00059215 at 217.

26   [57]MSFT_MOUSSOURIS_00865592 at 597.

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR
-26-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

**4.      Microsoft Fails to Train Employees on Basic Principles of Anti-Harassment/Discrimination or Managers regarding Complaints.**

Despite the large number of complaints, Microsoft does not require employees to attend anti-harassment/discrimination training, nor managers to attend training on handling internal complaints.  The only mandatory training that all Microsoft employees undergo is an annual Standards of Business Conduct training.  De Lanoy Sept. 18, 2017 Tr. 35:12-14; 38:18-39:2. This is not anti-discrimination training. For example, the 2017 Standards of Business Conduct was a 45-minute video training that did not touch on gender bias. *Id.* 36:10-23.  Indeed, in 2013, counsel representing employees in an earlier systemic gender bias investigation suggested that Microsoft implement "mandatory training for all managers on the EEO complaint handling process."[58]  Microsoft declined to do so.

**5.      Microsoft Knows its D&I Programs are Little More than Window-Dressing that Fail to Produce Meaningful Results.**

Internally, HR employees acknowledge that Microsoft's D&I initiatives are little more than window dressing and do not affect the underlying problems.  MSFT_MOUSSOURIS_ 00677712 at 713 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬; MSFT_MOUSSOURIS_ 00072044 at 046 ("We've learned over the years that a lot of activities in the name of diversity and inclusion does not equal meaningful progress"); MSFT_MOUSSOURIS_ 00432789 at 791 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬ MSFT_MOUSSOURIS_ 00243465 at p. 31 ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ MSFT_MOUSSOURIS_00067920 at p.2 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬.

---

[58] MSFT_MOUSSOURIS_00859406 at 425.

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR

-27-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

Employees within the D&I department, who are tasked with reporting out progress on D&I for their organizations over time, similarly express frustration at the lack of impact their programs make.  MSFT_MOUSSOURIS_ 00259655 at 656 ███████████████████████████████████████████████████████████████████████████████████;

MSFT_MOUSSOURIS_00150613 at p.4 ████████████████████████████████████████ MSFT_MOUSSOURIS_00677712 at 717 ███████████████████████████████████████████████████████████████████████████;

MSFT_MOUSSOURIS_00441086 at 087 ("we show up poorly");

MSFT_MOUSSOURIS_00441092 (efforts "simply not enough");

MSFT_MOUSSOURIS_00074974 ██████████████████████████████████████████████ MSFT_MOUSSOURIS_00074988 ("haven't made material forward progress."); MSFT_MOUSSOURIS_00420916 at 919 █████████████████████████████████████████████████████████ MSFT_MOUSSOURIS_00342925 at 927 ███████████████████████████████████████████.

In sum, Microsoft has long been aware of the gender discrimination against female employees, has not remedied the problem, and instead has focused its efforts on misleading announcements about pay equity and unproductive D&I initiatives that merely check the box on commitment.

## III.    ARGUMENT

### A.    Legal Standards

#### 1.    Federal Rule of Civil Procedure 23

The Court may certify a class if the requirements of Federal Rule of Civil Procedure 23(a) are met, along with one of the prongs of Rule 23(b).  *Dukes,* 564 U.S. at 344.  Although "a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free ranging

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR
-28-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) (quoting *Dukes*, 564 U.S. at 351) (quotation marks omitted). *See also id.* at 1195 ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

Here, Plaintiffs seek certification of their claims for injunctive relief under 23(b)(2), for monetary damages under 23(b)(3), and for liability under 23(b)(2), (b)(3), and/or (c)(4) of the following class:

> All women who have worked at Microsoft within the Engineering and/or I/T Operations Professions in the United States at any time from September 16, 2012 to the present in Stock Levels 59 to 67, inclusive.

As described below, Plaintiffs readily satisfy the standards for certification.

### 2. Liability Under Title VII and WLAD

To determine whether the requirements of Rule 23 are met, the Court must first look to the elements of the underlying substantive claims. *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014); *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1114 (9th Cir. 2014). Here, Plaintiffs bring class claims for disparate impact and disparate treatment under Title VII and WLAD. The claims under both statutes are co-extensive and Plaintiffs' arguments herein apply to both. *Oliver v. Pac. Nw. Bell Tel. Co.*, 106 Wash. 2d 675, 678 (1986) (finding that disparate impact and treatment theories are available under WLAD, and that WLAD "is patterned after Title VII" and "decisions interpreting the federal act are persuasive authority for the construction of [WLAD]"). "Generally, litigation of both disparate treatment and disparate impact claims are divided into two phases: liability and remedial." *Williams v. Boeing Co.*, 225 F.R.D. 626, 634 (W.D. Wash. 2005).

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-29-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

### a.     Disparate Impact Liability

"Disparate impact claims assert that the employer has a facially neutral policy or practice that causes a disparate impact on a protected group, even if the employer has no intent to discriminate." *Williams*, 225 F.R.D. at 634 (citation omitted). To establish a prima facie case of disparate impact, a plaintiff must "identif[y] the specific employment practice that is challenged," "show that there are statistical disparities in the employer's work force," and the "statistical disparities must be sufficiently substantial that they raise such an inference of causation." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-95 (1988). If the prima facie case is established, the burden shifts to the employer to show that its employment practices are based on legitimate business reasons, and that there was no less discriminatory alternative. *Id*. at 998; *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 505 (2012). This is commonly referred to as the "liability phase."

If liability is established, the entire class is entitled to a presumption of make whole relief. *Ellis*, 285 F.R.D. at 505. A class member seeking relief "need only show that he or she suffered an adverse employment action and therefore was a potential victim of the proved discrimination. After such a showing, the employer bears the burden of persuading the trier of fact that its decision was made for lawful reasons; otherwise, the employee is entitled to individualized relief[.]" *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (citations and alterations omitted). This is commonly referred to as the "remedial" or "damages" phase.

### b.     Disparate Treatment

Disparate treatment claims arise where the employer "utilizes a pattern or practice of intentional discrimination" such that it is "the employer's standard operating procedure." *Williams*, 225 F.R.D. at 634. In contrast to disparate impact claims, "disparate treatment does not require the identification of a specific employment policy responsible for the discrimination." *Rollins v. Traylor Bros.*, No. C14-1414 JCC, 2016 WL 258523, at *7 (W.D. Wash. Jan. 21,

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-30-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

2016) (citing *Brown v. Nucor Corp.*, 785 F.3d 895, 915 (4th Cir. 2015)).[59] It does, however, require "significant proof" that Defendants "operated under a general policy of discrimination." *Dukes*, 564 U.S. at 353. Significant proof of such a policy can be shown entirely through statistics and anecdotal evidence that demonstrate "a pattern of discrimination." *Rollins*, 2016 WL 258523, at *7; *Beck v. Boeing Co.*, 60 F. App'x 38, 39 (9th Cir. 2003) (stating plaintiffs may establish prima facie case "through statistics alone").[60] If the prima facie case is established, the burden shifts to the employer to "demonstrate that the plaintiffs' statistical evidence 'is either inaccurate or insignificant.'" *Id.* (quoting *Teamsters*, 431 U.S. at 360). Whoever prevails on the preponderance of the evidence wins the liability phase.

If plaintiffs prevail, they are entitled to "a rebuttable inference that all class members were victims of the discriminatory practice, [which] will justify 'an award of prospective relief' such as 'an injunctive order against the continuation of the discriminatory practice.'" *Dukes*, 564 U.S. at 352 n.7 (quoting *Teamsters*, 431 U.S. at 361). "If individual relief is sought, as it is here, "a 'district court must usually conduct additional proceedings to determine the scope of individual relief.' At this phase, the burden of proof will shift to the company, but it will have the right to raise any individual affirmative defenses it may have, and to 'demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.'" *Id.* (quoting *Teamsters*, 431 U.S. at 361-62). This is the "damages phase" in the disparate treatment case.

### B. Plaintiffs' Disparate Impact and Disparate Treatment Claims Satisfy Rule 23(a).

Rule 23(a) requires that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

---

[59] *Rollins* was subsequently decertified for failure to satisfy the numerosity requirement. 2016 WL 5942943 (W.D. Wash. May 3, 2016).

[60] *See also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.").

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-31-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Together, these requirements seek to "limit the class claims to those fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349.

### 1. The Class Is Sufficiently Numerous.

While there is no threshold number of class members required, "[g]enerally, 40 or more members will satisfy the numerosity requirement." *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1326-27 (W.D. Wash. 2015). The question is whether joinder of all potential plaintiffs would be impracticable. *Id.* Here, there are approximately 8,630 proposed Class members, readily satisfying this requirement. Farber ¶ 11.

### 2. There Are Common Questions of Law and Fact That Will Drive the Resolution of Plaintiffs' Claims.

To satisfy commonality, class members' claims must share common questions of fact or law that are "capable of class wide resolution." *Dukes*, 564 U.S. at 350. A contention is capable of classwide resolution if "the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Commonality poses a "limited burden" because it "only requires a single significant question of law or fact." *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 589 (9th Cir. 2012).

#### a. Disparate Impact Commonality

Plaintiffs' disparate impact claim raises the common questions of whether Microsoft's Calibration process has a disparate impact on women in pay and promotions. These questions are capable of class wide resolution because a determination—yes or no—will establish whether plaintiffs have met their prima facie case of disparate impact. If they have, two other significant common questions arise: whether the practice is based on business necessity and whether there is a less discriminatory alternative. Together, the answers to these common questions will establish or defeat liability for the Class.

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR
-32-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

As other courts have held, commonality is easily satisfied in these circumstances. For instance, in *Ellis*, the plaintiffs challenged "specific employment practices within Costco's promotion system," such as a tap-on-the-shoulder appointment process, a lack of posting for open positions, and reliance on common but unvalidated criteria for assessing candidates. 285 F.R.D. at 531. The court held that, "Plaintiffs' argument—that such companywide practices lead to disparate outcomes—is a common question subject to classwide proof and rebuttal." *Id.* Similarly, in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012), the plaintiffs alleged that their employer's teaming and account distribution policies caused an adverse impact on African American brokers. The court found that, "whether [the teaming policy] causes racial discrimination and whether it nonetheless is justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination. And likewise with regard to account distributions." *Id.* at 489. *See also Parra v Bashas', Inc.*, 291 F.R.D. 360, 375 (D. Ariz. 2014) (where, like here, company used common pay scales to vary pay for white employees versus comparable Hispanic employees causing disparate impact on Hispanic employees, commonality satisfied because "if a trier of fact finds that Bashas' wage scales lead to disparate outcomes, that is a common question subject to classwide proof and rebuttal") (citing *Ellis*, 285 F.R.D. at 531). As these authorities make clear, Plaintiffs' disparate impact claims raise common questions that will "generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350.

### b. <u>Disparate Treatment Commonality</u>

Plaintiffs' disparate treatment claim raises the common question of whether discrimination was Microsoft's "standard operating procedure," to be shown through "significant proof" that Microsoft "operated under a general policy of discrimination." *Dukes*, 131 S. Ct. at 2553. This question is capable of class wide resolution because its determination—yes or no— will establish whether plaintiffs have met their prima facie case of disparate treatment. If they have, another significant common question arises: whether Plaintiffs' statistical evidence "is

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-33-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

either inaccurate or insignificant." *Beck*, 60 F. App'x at 39. Together, the answers to these common questions will establish or defeat liability for the Class.

Here, Plaintiffs' evidence of a general policy of discrimination is substantial, including: 1) statistically significant evidence of discrimination in the common Calibration process; 2) evidence that Microsoft's senior leadership knew of the pay and promotion disparities and yet did not fix the problem; and 3) evidence that Microsoft has a corporate culture hostile to women, and that the HR organizations tasked with investigating and curbing discrimination failed at both.

Other courts have relied on the same categories of evidence to support a finding of commonality for a disparate treatment claim. *See, e.g., Ellis*, 285 F.R.D. at 510-531 (finding commonality satisfied with "significant proof that the entire class was subject to the same allegedly discriminatory practices," falling into three categories: common promotions practices relying on common criteria, a companywide culture, and statistical evidence of gender disparities); *Rollins*, 2016 WL 258523 at *7-10 (finding commonality satisfied by substantial anecdotal evidence of discrimination in the workplace and statistical evidence of racial disparities); *Brown v. Nucor Corp.*, 785 F.3d 895, 914 (4th Cir. 2015) (same) ("[T]he workers' statistical and anecdotal evidence, especially when combined, thus provide precisely the 'glue' of commonality that *Wal-Mart* demands."); *Beck v. Boeing*, 203 F.R.D. 459, 464 (W.D. Wash. 2001) ("[S]tatistically significant results of adverse impacts on female employees in every facility and at every level within the Puget Sound area [] establishes sufficient indicia of class-wide disparate treatment to satisfy the certification criteria of commonality and typicality."), *vacated in part on other grounds*, 60 F. App'x 38 (9th Cir. 2003). The evidence proffered here is on par with or more substantial than these and other cases finding commonality.

### 3. The Representative Plaintiffs' Claims Are Typical of the Class Claims.

"Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-34-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

1    identical." *Parsons,* 754 F.3d at 685 (quotation marks and citations omitted). "Typicality refers

2    to the nature of the claim or defense of the class representative, and not to the specific facts from

3    which it arose or the relief sought." *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497,

4    508 (9th Cir. 1992).

5         Here, Representative Plaintiffs Moussouris and Muenchow both worked in the

6    Engineering profession during the class period, and Plaintiff Muenchow worked in the I/T

7    Operations profession as well. More importantly, the nature of their claims is co-extensive with

8    the class claims for discrimination in pay and promotions. Plaintiff Moussouris alleged that

9    Microsoft paid her less than her male peers throughout her tenure at the company and

10   discriminated against her in the promotion process. Sec. Am. Compl., ¶¶ 65-68; *see also*

11   Moussouris Dec., ¶¶ 3-5. For example, "[f]rom 2010 to 2014, Microsoft passed her over for

12   promotions in favor of less qualified and less experienced men." Sec. Am. Compl., ¶¶ 66-68; *see*

13   *also* Moussouris Dec., ¶ 4. Similarly, Ms. Muenchow alleges that she has been paid less than

14   comparable male coworkers and that men have been promoted to higher levels for which she was

15   qualified and not considered. Sec. Am. Compl., ¶¶ 75-76; *see also* Muenchow Dec., ¶¶ 3-4.[61]

16   Typicality is satisfied.

17              **4.    The Representative Plaintiffs and Class Counsel Will Adequately
                        Protect the Interests of the Class.**

18   To determine whether Representative plaintiffs will adequately represent a class, courts

19   must resolve two questions: "'(1) do the named plaintiffs and their counsel have any conflicts of

20   interest with other class members and (2) will the named plaintiffs and their counsel prosecute

21   the action vigorously on behalf of the class?'" *Ellis,* 657 F.3d at 985 (quoting *Hanlon v.*

22   *Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Here, neither the Representative Plaintiffs

23

---

24   [61] *See also* Alberts Decl., ¶¶ 5-6; Boeh Decl., ¶¶ 5-6; Dove Decl., ¶¶ 5-7; Hutson Decl., ¶ 5;
25   Miller Decl., ¶¶ 5-6; Smith Decl., ¶¶ 5-6; Sowinska Decl., ¶¶ 5-6; Underwood Decl., ¶ 5; Vaughn
     Decl., ¶ 5; Warren Decl., ¶¶ 5-6 (collectively describing experiencing discrimination in pay and
26   promotions).

nor their counsel have any conflicts of interest with the Class; to the contrary, their interests in remedying the systemic gender discrimination at Microsoft are directly aligned with the interests of the Class. Also, the Representative Plaintiffs and counsel have demonstrated that they will vigorously prosecute this action on behalf of the Class. The Representative Plaintiffs have demonstrated their commitment to the Class throughout this litigation by answering document requests and interrogatories, appearing for depositions, and serving as advisors to counsel. Moussouris Dec., ¶ 8; Muenchow Dec., ¶ 8. Counsel for Plaintiffs have also prosecuted this action vigorously—by, *e.g.*, litigating multiple motions to dismiss and motions to compel, and engaging in extensive discovery (over 220,000 documents exchanged and 13 depositions taken) through which counsel have demonstrated their dedication to the Class—and will continue to do so. Shaver Decl., ¶ 4. Further, counsel have extensive experience in prosecuting gender discrimination class actions and will continue to commit the time and resources to represent this Class. Dermody Decl., ¶¶ 4-8; Klein Decl., ¶¶ 4-7, Subit Decl., ¶¶ 6-8.

## C. Certification Under Rule 23(b)(2) is Warranted for Liability and Injunctive Relief.

"Rule 23(b)(2) permits class actions for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.' Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (citations omitted). *See also Parsons*, 754 F.3d at 686 ("[T]he primary role of this provision has always been the certification of civil rights class actions."). In fact, "subdivision (b)(2) was added to Rule 23 in 1966 in part to make it clear that civil-rights suits for injunctive or declaratory relief can be brought as class actions." Wright & Miller, 7AA *Fed. Prac. & Proc. Civ.* § 1776 (3d ed.).

In *Dukes*, the Supreme Court has explained:

> The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. In other words, Rule

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR
-36-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

> 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.

*Dukes*, 564 U.S. at 360 (quotation marks and citation omitted). Here, Plaintiffs seek a declaration that Microsoft's existing Calibration process is unlawful (*i.e.*, declaratory relief), and an order enjoining Microsoft from using it to make pay and promotion decisions in the future. All class members have been subjected to the Calibration process, and an order pronouncing it unlawful and preventing its further use would provide relief to the Class as a whole. Not only would it stop the use of a discriminatory practice, but it would also entitle all Class members to a presumption of make whole relief in the damages phase of the case. *Ellis*, 285 F.R.D. at 505; *Dukes*, 564 U.S. at 352 n.7, 366 (quoting *Teamsters*, 431 U.S. at 361). *See also Parsons*, 754 F.3d at 688 ("[Rule 23(b)(2)'s] requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole.").[62]

For exactly these reasons, courts have long recognized that disparate impact and disparate treatment claims for declaratory and injunctive relief are appropriate for certification under 23(b)(2). *See, e.g., McReynolds*, 672 F.3d at 491-92 (certifying (b)(2) class for liability and injunctive relief in disparate impact case); *Houser v. Pritzker*, 28 F. Supp. 3d 222 (S.D.N.Y. 2014) (same); *Easterling v. Connecticut Dep't of Correction*, 278 F.R.D. 41, 47 (D. Conn. 2011)

---

[62] *Parsons* is an Eighth Amendment case in which plaintiffs alleged that a class of inmates was subjected to common policies and practices of the Department of Corrections that created a substantial risk of serious harm, injury, or death. 754 F.3d at 663. The common practices that plaintiffs complained of included inadequate staffing, denials of dental care, lack of emergency treatment, failure to stock and provide critical medication, substandard dental care, and failure to provide therapy and psychiatric medication to mentally ill patients. *Id.* The court found that "these policies and practices are the 'glue' that holds together the putative class; either each of the policies and practices is unlawful as to every inmate or it is not." *Id.* at 678. Though not a Title VII case, *Parsons* is still instructive as to the Ninth Circuit's application of the requirements of 23(a)(2) and (b)(2) to class claims for liability and injunctive relief against a common set of policies and practices, as Plaintiffs present here.

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-37-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

1  (same); *Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, 907 F. Supp. 2d 492, 509

2  (S.D.N.Y. 2012), *aff'd sub nom. Gulino v. Bd. of Educ. of New York City Sch. Dist. of City of*

3  *New York*, 555 F. App'x 37 (2d Cir. 2014) (same); *Ellis*, 285 F.R.D. at 537 (certifying (b)(2)

4  class for liability and injunctive relief in disparate treatment and disparate impact case); *Scott v.*

5  *Family Dollar Stores, Inc.*, No. 3:08-cv-00540, 2016 U.S. Dist. LEXIS 105267 (W.D.N.C. June

6  24, 2016) (same); *Williams*, 225 F.R.D. at 632, 638 (same); *Beck*, 60 F. App'x at *39 (affirming

7  certification of (b)(2) class for liability and injunctive relief in disparate treatment case).  The

8  claims in this case also warrant certification for liability and injunctive relief.

**D.  Certification Under Rule 23(b)(3) is Warranted for Liability and Monetary Damages.**

11  The Supreme Court has clarified that "individualized monetary claims belong in Rule

12  23(b)(3)." *Dukes*, 564 U.S. at 362.  Rule 23(b)(3) requires that common issues predominate over

13  individual issues, and that a class action be superior to other available methods for the fair and

14  efficient adjudication of the case.  Fed. R. Civ. P. 23(b)(3).  "Predominance is not, however, a

15  matter of nose-counting.  Rather, more important questions apt to drive the resolution of the

16  litigation are given more weight in the predominance analysis over individualized questions

17  which are of considerably less significance to the claims of the class." *Torres v. Mercer*

18  *Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (citation omitted).

**1.  Common Questions of Liability and Damages Predominate Over Individual Damages Issues.**

21  For both Plaintiffs' disparate impact and disparate treatment claims, common questions

22  of liability and damages predominate over individual damages issues.

23  With respect to Plaintiffs' disparate impact claim, whether Microsoft's Calibration

24  process has a disparate impact on women in pay and promotions, whether that practice is

25  nonetheless justified by business necessity, and whether alternative less-discriminatory practices

26  exist, are common issues which will be proved or disproved using only common evidence. *Ellis*,

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR
-38-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

285 F.R.D. at 538. The first question will be determined based on statistical evidence, and the second based on common, classwide evidence about the policies themselves, including the testimony of the parties' Industrial Organizational psychology experts. These common issues of liability clearly predominate; indeed, "adjudicating these issues on a classwide basis is necessary before any individualized proceeding can occur." *Id. See also Moore v. Napolitano*, 926 F. Supp. 2d 8, 33-34 (D.D.C. 2013) (holding predominance satisfied where "all members of the class will rely on the same statistical evidence to make the same [disparate impact] claim"); *Parra*, 291 F.R.D. at 392 (adopting the rationale of *Ellis* and holding that "the common questions regarding liability as to the pay claim are 'a significant aspect of this case and they can be resolved for all members of the class in a single adjudication'"); *Easterling*, 278 F.R.D. at 48-49 (certifying liability and damages claims under Rule 23(b)(3) because both prima facie case of disparate impact and defenses thereto are subject to generalized proof).

With respect to Plaintiffs' disparate treatment claim, whether Microsoft operated under a general policy of discrimination, such that all class members are entitled to a presumption of discrimination under *Teamsters*, is a common question that will be proved or disproved based on common evidence. First and foremost, Plaintiffs offer statistical evidence of significant disparities in pay and promotions for females in Engineering and I/T Operations. Second, Plaintiffs offer evidence of a pervasive companywide culture that underlies and informs the Calibration process from which these disparities emerge. Third, Plaintiffs offer evidence that senior leadership at Microsoft knew of both the disparities and the cultural bias, and failed to correct them. This evidence is substantial and is common to the class. Similarly, Microsoft's predicted defense to this claim—that Plaintiffs' statistical evidence is inaccurate or insignificant—also rests on common evidence. "This pattern and practice question predominates because it has a direct impact on every class member's effort to establish liability and on every class member's entitlement to . . . monetary relief." *Ellis*, 285 F.R.D. at 538 (quoting *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001). *See also Scott*, 2016 U.S. Dist.

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-39-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

1    LEXIS 105267 at *26 ("[T]he predominance standard of Rule 23(b)(3) is satisfied because

2    plaintiffs have proffered evidence of class-wide pattern-or-practice and/or disparate impact that

3    could establish liability, and result in class-wide entitlement to: (1) affirmative injunctive and

4    declaratory relief to undo the effects of such disparate impact and/or class-wide pattern-or-

5    practice; and (2) a presumption of individualized harm for each class member."); *Sellars v. CRST*

6    *Expedited, Inc.,* No. C15-117-LTS, 2017 WL 1193730, at *21-22 (N.D. Iowa Mar. 30, 2017)

7    (certifying liability phase of disparate treatment claim under Rule 23(b)(3) and holding that

8    "[t]he potential need for individual damage calculations at a later stage is typically not decisive

9    of the predominance factor").

10           Although every Title VII case presents some individualized questions with respect to

11    class member entitlement to relief, the Ninth Circuit has long held that individualized damages

12    issues do not defeat predominance.  *See, e.g., Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514

13    (9th Cir. 2013) ("The amount of damages is invariably an individual question and does not defeat

14    class action treatment.") (quoting *Blackie v. Barrack,* 524 F.2d 891, 905 (9th Cir.1975)).  This is

15    no less true in the Title VII context than any other, as every case cited herein certifying a Title

16    VII claim makes clear.  The Court may deal with damages issues in one of at least two

17    recognized ways.  First, the Court may employ the *Teamsters* framework, whereby individual

18    class members will present their eligibility for relief in a second phase of trial if liability is

19    established.  Importantly, these "individualized hearings that may be conducted in the second

20    phase of the trial 'are narrow in scope and significance when compared to the threshold, class-

21    wide issues subject to generalized proof."  *Rollins*, 2016 WL 258523 at *15 (quoting *Ellis,*

22    *supra*).  They also are made more efficient by the "presumption of individualized harm for each

23    class member" afforded by a class victory in the liability phase.  *Scott*, 2016 U.S. Dist. LEXIS

24    105267 at *26.  Alternatively, the Court may choose to certify both liability and damages for

25    class treatment based on the common issues presented with respect to damages, which include:

26    classwide calculation of baseline backpay on a year-by-year basis; class-wide determination on

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR                                          -40-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

how to calculate compensation for lost promotions; class-wide establishment of what non-discriminatory bases Microsoft may use to claim a plaintiff would not have been promoted; and a class-wide process to collect information from plaintiffs regarding mitigation. *See Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, No. 96 CV 8414 KMW, 2013 WL 4647190, at *11 (S.D.N.Y. Aug. 29, 2013) (certifying liability and damages in disparate impact case under 23(b)(3) where "resolving common issues with respect to damages at a class-wide proceeding will save substantial time and prevent the relitigation of common claims"). *See also Easterling*, 278 F.R.D. at 48-49 (certifying liability and damages in disparate impact case under 23(b)(3) because common issues as to damages, including the total amount of back pay that should be awarded to the class, predominated over individual issues, which included each member's eligibility to be in the class and qualification for position).

Plaintiffs' proposed trial plan (set forth below) reflects the Court's options. While Plaintiffs believe that both liability and damages should be certified here, at minimum the Court should certify the liability phase under Rule 23(b)(2), (b)(3) or (c)(4) (issue certification).

## 2. Plaintiffs Satisfy Superiority.

The superiority inquiry directs the Court to consider four factors—the class members' interests in controlling litigation, the nature and extent of litigation, the desirability of concentrating the litigation of the claims, and the manageability of the case as a class action. Fed. R. Civ. P. 23(b)(3).

All four factors readily support certification. Plaintiffs are not aware of any pending gender discrimination litigation commenced by or against Class members on the same issues. Class members' interests are not served by individual suits under their control. As this Court has recognized, these are "negative value" claims such that the cost of prosecuting them would exceed the potential income, particularly "against a resource-heavy organization such as defendants'." *Beck*, 203 F.R.D. at 466-67. In addition, Class members benefit from remaining anonymous, rather than risking their reputations and careers by bringing a lawsuit in their own

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR
-41-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

names.  Likewise, Plaintiffs have already conducted extensive discovery and litigation in this forum.  It would be far more efficient and convenient to continue litigating common questions here. *Easterling*, 278 F.R.D. at 50.

As for manageability, Plaintiffs' proposed trial plan shows how this case may be efficiently litigated as a class action:

**Stage One: Liability**

1) Disparate Treatment Liability: the parties will litigate whether Microsoft is liable for disparate treatment.  This claim will be tried to a jury.  Plaintiffs will have the initial burden to show that discrimination was Microsoft's standard operating procedure.  If that prima facie case is established, Microsoft will have the opportunity to rebut the Plaintiffs' evidence by showing it to be either inaccurate or insignificant.  Whichever party prevails on the preponderance of the evidence will win the liability phase.  If Plaintiffs prevail, the jury will determine whether punitive damages should be awarded, but not the amount of punitive damages.[63]

2) Disparate Impact Liability: the parties will litigate whether Microsoft is liable for disparate impact.  This claim will be tried to the Court.  Plaintiffs have the initial burden to show that Microsoft's Calibration process causes statistically significant pay and promotion disparities for the proposed Class.  If Plaintiffs establish their prima facie case, the burden will shift to Microsoft to prove, as an affirmative defense, that its Calibration process is based on legitimate business necessity.

---

[63] *See Ellis*, 285 F.R.D. at 542 ("The Court concludes that while the availability of punitive damages should be adjudicated in Stage One of the trial, determination of the aggregate amount and individual distribution of punitive damages should be reserved for Stage Two.  Such an arrangement will take advantage of the bifurcated trial procedure while safeguarding Defendant's right to ensure that any punitive damages award remains tethered to the compensatory damages actually awarded in Stage Two, consistent with State Farm.") (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)).

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR

-42-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

1  Plaintiffs will then have the opportunity to show that Microsoft could have used a
2  less discriminatory alternative practice.

3  3) <u>Result of Verdicts</u>:  If Plaintiffs prevail on either claim, the entire class is entitled
4  to a declaration of liability, a presumption of individual make-whole relief, and,
5  importantly, a class-wide injunction against the continuation of the discriminatory
6  practice as well as other reforms that may be fashioned by the Court, if warranted.
7  The case would then proceed to Stage Two.  If Plaintiffs do not prevail on either
8  claim, the case is over.

9  **Stage Two: Damages**

10  1) Option One: The Court first resolves common damages questions, which can
11  include the aggregate amount of backpay owed to the Class if the Court deems
12  that approach appropriate. Then the Court (or special master) will hold *Teamsters*
13  hearings, or use written questionnaires, to narrow and/or adjudicate issues around
14  individual class members' eligibility for relief, the amount of relief, and share of
15  punitive damages each is entitled to recover.

16  2) Option Two:  The Court (or special master) will hold *Teamsters* hearings to
17  adjudicate individual entitlement to backpay and compensatory damages, as well
18  as the individual's share of any punitive damages.

19  This proposed trial plan follows a well-trodden path in Title VII class litigation, both
20  before and after *Dukes*.  *See, e.g., Teamsters*, 431 U.S. at 361; *Ellis*, 285 F.R.D. at 505; *Robinson*
21  *v. Metro-North Commuter R.R Co.*, 267 F.3d 147, 161 (2d. Cir. 2001); *U.S. v. City of New York*,
22  276 F.R.D. 22, 32-33 (E.D.N.Y. 2011); *Velez v. Novartis Pharma. Corp.*, 244 F.R.D. 243, 243
23  (S.D.N.Y. 2007).

MOTION FOR CLASS CERTIFICATION
Case No.  2:15-cv-01483-JLR
-43-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

# IV. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant the motion for class certification, certifying liability issues under Rule 23(b)(2), (b)(3), and/or (c)(4); injunctive relief under Rule 23(b)(2); and damages under Rule 23(b)(3).

Dated: October 27, 2017             **FRANK FREED SUBIT & THOMAS LLP**


By:    /s/ Michael Subit
Michael Subit (Wash. Bar No. 29189)
705 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: (206) 682-6711
Facsimile: (206) 682-0401
E-Mail: msubit@frankfreed.com

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
Kelly M. Dermody (admitted *pro hac vice*)
Anne B. Shaver (admitted *pro hac vice*)
Michael Levin-Gesundheit (admitted *pro hac vice*)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
E-Mail: kdermody@lchb.com
E-Mail: ashaver@lchb.com
E-Mail: mlevin@lchb.com

Sharon M. Lee (Wash. Bar No. 37170)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
2101 Fourth Avenue, Suite 1900
Seattle, WA 98121
Telephone: (206) 739-9059
Facsimile: (415) 956-1008
E-Mail: slee@lchb.com

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-44-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008

Rachel J. Geman (admitted *pro hac vice*)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (202) 355-9500
Facsimile: (202) 355-9592
E-Mail: rgeman@lchb.com

Adam T. Klein (admitted pro hac vice)
Ossai Miazad (admitted pro hac vice)
Elizabeth V. Stork (admitted pro hac vice)
**OUTTEN & GOLDEN LLP**
3 Park Avenue, 29th Floor
New York, NY 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005
E-Mail: ATK@outtengolden.com
E-Mail: OM@outtengolden.com
E-Mail: estork@outtengolden.com

*Attorneys for Plaintiffs and the Proposed Class*

MOTION FOR CLASS CERTIFICATION
Case No. 2:15-cv-01483-JLR

-45-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. 415.956.1000 • Fax 415.956.1008