1

The Honorable James L. Robart

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

WESTERN DISTRICT OF WASHINGTON

10

SEATTLE DIVISION

11

KATHERINE MOUSSOURIS, HOLLY
MUENCHOW, and DANA PIERMARINI,
on behalf of themselves and a class of those
similarly situated,

Plaintiffs,

v.

MICROSOFT CORPORATION,

Defendant.

12

13

14

15

16

17

18

Case No.  2:15-cv-01483-JLR

**MICROSOFT'S MOTION FOR
SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:
APRIL 6, 2018**

**ORAL ARGUMENT REQUESTED**

**REDACTED VERSION**

19

20

21

22

23

24

25

26

27

28

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................... 1

II.    UNDISPUTED FACTS ........................................................................................... 3

    A.     Microsoft's Pay and Promotion Processes ................................................. 3

    B.     Undisputed Facts Relating to Katherine Moussouris ................................ 4

    C.     Undisputed Facts Relating to Holly Muenchow ....................................... 5

    D.     Undisputed Facts Related to Dana Piermarini ......................................... 6

    E.     The Nature of Plaintiffs' Claims .............................................................. 7

III.   ARGUMENT ......................................................................................................... 8

    A.     The Statutes of Limitations Bar All Claims Before September 16, 2012
        and All Title VII Claims Before July 18, 2013 .................................... 9

    B.     Piermarini Has Not Exhausted Administrative Remedies ........................ 9

    C.     No Plaintiff Suffered Disparate Treatment on Account of Her Gender ........... 10

        1.     No Plaintiff Can Meet Her Prima Facie Burden ................................. 11

            a.     Moussouris Cannot Satisfy Her Prima Facie Burden.............. 11

                (1)     Moussouris's Performance Rating Was Not
                       Adverse ..................................................................... 12

                (2)     Moussouris Has No Evidence That Similarly
                       Situated Men Were Treated More Favorably............... 13

            b.     Muenchow Cannot Satisfy Her Prima Facie Burden .............. 13

                (1)     Critiques of Muenchow's Performance Do Not
                       Constitute Adverse Employment Action..................... 14

                (2)     Muenchow Has No Evidence That Microsoft
                       Treated Similarly Situated Men More Favorably......... 15

                  (3)     Muenchow Was Not Denied a Promotion
                       Because of Her Gender ................................................. 15

            c.     Piermarini Cannot Satisfy Her Prima Facie Burden ............... 16

                (1)     Critiques of Piermarini's Performance Do Not
                       Constitute Adverse Employment Action..................... 16

                  (2)     Piermarini Cannot Show That Similarly Situated
                       Males Received Promotions She Did Not................... 17

         2.     Microsoft Has Legitimate Nondiscriminatory Reasons for Its
            Employment Actions........................................................................... 17

        3.     No Plaintiff Can Establish Pretext ..................................................... 18

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR

i

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

TABLE OF CONTENTS
(continued)

Page

4.    The Pay Claims Are Derivative of the Defective Performance Feedback and Promotion Claims............................................................ 19

D.    Moussouris's Constructive Discharge Claim Fails ........................................... 20

E.    The Court Should Dismiss Plaintiffs' Disparate Impact Claims..................... 21

F.    The Court Should Dismiss the Retaliation Claims........................................... 22

1.    No Evidence Supports Moussouris's Time-Barred Retaliation Claim ......................................................................................................... 23

2.    No Evidence Supports Piermarini's Retaliation Claim ....................... 23

G.    Microsoft is Entitled to Summary Judgment on Plaintiffs' Request for Punitive Damages........................................................................................... 24

IV.    CONCLUSION ........................................................................................................ 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) ..................................................................................................8

*Baskerville v. Culligan Int'l Co.*,
  50 F.3d 428 (7th Cir. 1995) .....................................................................................19

*Bradley v. Harcourt, Brace & Co.*,
  104 F.3d 267 (9th Cir. 1996) .............................................................................12, 16

*Bryant v. Compass Group USA Inc.*,
  413 F.3d 471 (5th Cir. 2005) ...................................................................................14

*Cecala v. Newman*,
  532 F. Supp. 2d 1118 (D. Ariz. 2007), *aff'd*, 379 F. App'x 584 (9th Cir. 2010) ................20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..................................................................................................8

*Chapman v. AI Transp.*,
  229 F.3d 1012 (11th Cir. 2000) ...............................................................................14

*Chew v. City & Cty. of San Francisco*,
  2017 WL 5041403 (9th Cir. Nov. 3, 2017) .........................................................18, 19

*Coghlan v. Am. Seafoods Co.*,
  413 F.3d 1090 (9th Cir. 2005) ..................................................................................11

*Cousineau v. Microsoft Corp.*,
  6 F. Supp. 3d 1167 (W.D. Wash. 2014) ....................................................................8

*Dearmon v. Ferguson Enters., Inc.*,
  2015 WL 6550734 (D. Or. Oct. 28, 2015) ...............................................................20

*Del Castillo v. Wash., Dep't of Soc. & Health Servs.*,
  2007 WL 2713035 (W.D. Wash. Sept. 14, 2007) ....................................................12

*Draper v. Coeur Rochester, Inc.*,
  147 F.3d 1104 (9th Cir. 1998) ..................................................................................20

*EEOC v. Fry's Elecs. Inc.*,
  770 F. Supp. 2d 1168 (W.D. Wash. 2011) ...............................................................10

*EEOC v. Swissport Fueling, Inc.*,
  916 F. Supp. 2d 1005 (D. Ariz. 2013) ......................................................................20

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR

iii

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel +1-206-839-4300

*Evers v. Alliant Techsystems, Inc.*,
    241 F.3d 948 (8th Cir. 2001) ........................................................................14

*Gibson v. King Cty.*,
    397 F. Supp. 2d 1273 (W.D. Wash. 2005) ....................................................20

*Hoffman v. Winco Holdings, Inc.*,
    2008 WL 5255902 (D. Or. Dec. 16, 2008) ...................................................20

*Hutchinson v. Seagate Tech., LLC*,
    2004 WL 1753391 (N.D. Cal. Aug. 3, 2004), *aff'd*, 147 F. App'x 647 (9th
    Cir. 2005) ......................................................................................................12

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977) ......................................................................................21

*Kariotis v. Navistar Int'l Trans. Corp.*,
    131 F.3d 672 (7th Cir. 1997)..........................................................................14

*Katz v. Regents of the Univ. of Cal.*,
    229 F.3d 831 (9th Cir. 2000) .........................................................................22

*Kolstad v. Am. Dental Ass'n*,
    527 U.S. 526 (1999) ......................................................................................24

*Kortan v. California Youth Auth.*,
    217 F.3d 1104 (9th Cir. 2000)................................................................. *passim*

*Lyons v. England*,
    307 F.3d 1092 (9th Cir. 2002) .......................................................................12

*Manatt v. Bank of Am., NA*,
    339 F.3d 792 (9th Cir. 2003)..........................................................................22

*McMillan v. Abbott Labs., Inc.*,
    2013 WL 1003136 (W.D. Wash. Mar. 13, 2013).....................................12, 14

*Mieczkowski v. York City Sch. Dist.*,
    414 F. App'x 441 (3d Cir. 2011) ...............................................................14, 17

*Mitchell v. Superior Ct. of Cal. Cnty. Of San Mateo*,
    312 F. App'x. 893 (9th Cir. 2009)..................................................................23

*Mondero v. Salt River Project*,
    400 F.3d 1207 (9th Cir. 2005)...................................................................18, 19

*Moussouris v. Microsoft Corp.*,
    2016 WL 4472930 (W.D. Wash. Mar. 7, 2016)..............................................10

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR

iv

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

*Moussouris v. Microsoft Corp.*,
2016 WL 6037978 (W.D. Wash. Oct. 14, 2016)...................................................9

*Ng v. Potter*,
2009 WL 3836045 (W.D. Wash. Nov. 12, 2009) ................................................9

*Noble v. Brinker Int'l, Inc.*,
391 F.3d 715 (6th Cir. 2004)............................................................19

*Peterson v. Hewlett-Packard Co.*,
358 F.3d 599 (9th Cir. 2004)............................................................10

*Ray v. Henderson*,
217 F.3d 1234 (9th Cir. 2000)...........................................................23

*Ricci v. DeStefano*,
557 U.S. 557 (2009) .....................................................................10

*Rose v. Wells Fargo & Co.*,
902 F.2d 1417 (9th Cir. 1990)...........................................................21

*Russell v. Placeware, Inc.*,
2004 WL 2359971 (D. Or. Oct. 15, 2004) .............................................14

*Schueller v. Shin-Etsu Handotai Am., Inc.*,
2004 WL 691794 (W.D. Wash. Feb. 9, 2004) .........................................21

*Texas Dep't of Cmty. Affairs v. Burdine*,
450 U.S. 248 (1981) ..................................................................11, 18

*Thompson v. N. Am. Terrazzo, Inc.*,
2015 WL 926575 (W.D. Wash. Mar. 4, 2015) ..........................................9

*Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*,
594 F.2d 730 (9th Cir. 1979)............................................................8

*Vasquez v. Cty. of Los Angeles*,
349 F.3d 634 (9th Cir. 2003), *as amended* (Jan. 2, 2004)........................... *passim*

*Webb-Edwards v. Orange Cnty. Sheriff's Office*,
525 F.3d 1013 (11th Cir. 2008).........................................................19

*Weil v. Citizens Telecom Servs. Co.*,
2016 WL 5851868 (W.D. Wash. Oct. 6, 2016).....................................10, 11, 15

*Winters v. City of Kent*,
2010 WL 2595250 (W.D. Wash. June 22, 2010) .......................................20

*Wood v. City of San Diego*,
   678 F.3d 1075 (9th Cir. 2012) .......................................................................................10

*Yount v. Regent Univ., Inc.*,
   2009 WL 995596 (D. Ariz. Apr. 9, 2009) ...............................................................23, 24

**State Cases**

*Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160*,
   151 Wn. 2d 203 (2004) ................................................................................................24

*Chen v. State*,
   86 Wn. App. 183 (1997) ........................................................................................12, 16

*Goodman v. Boeing Co.*,
   75 Wn. App. 60 (1994), *aff'd*, 127 Wn. 2d 401 (1995) ..............................................9

*Martini v. Boeing Co.*,
   137 Wn. 2d 357 (1999) ................................................................................................24

*Oliver v. Pac. Nw. Bell Tel. Co.*,
   106 Wn. 2d 675 (1986) ................................................................................................21

**Federal Statutes**

42 U.S.C. § 1981a(b)(1) ....................................................................................................24

42 U.S.C. § 2000e-5(e) .......................................................................................................9

**State Statutes**

RCW 4.16.080(2) .................................................................................................................9

RCW 49.60.030(2) .............................................................................................................24

**Rules**

Fed. R. Civ. P. 56(a) ...........................................................................................................8

**Other Authorities**

http://www.businessinsider.com/other-amazing-perks-for-parents-beyond-paid-
   leave-2015-8 ...............................................................................................................6

https://careers.microsoft.com/benefits/usbenefits .............................................................6

https://news.microsoft.com/?p=400138 .............................................................................1

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

I.   **INTRODUCTION**

Microsoft invests heavily in recruiting talented women and helping them succeed—as it did for the three Plaintiffs.  All three made important contributions to Microsoft and were recognized for those contributions in the form of positive reviews, increased compensation, and promotions.  Katherine Moussouris helped create her own uniquely tailored position and consistently received high performance ratings.  She received two promotions within her first three years—with substantial salary increases and bonuses. She became the highest paid employee in her group, earning more than the men, including her supervisor.  Holly Muenchow received five promotions from five separate managers.  Dana Piermarini received consistently strong performance reviews, significant bonuses, and a promotion.

Despite their success, Plaintiffs allege Microsoft discriminated against them because of their gender.  Microsoft takes discrimination claims very seriously, investigates them thoroughly, and acts on them when they have merit.[1]  But Plaintiffs' claims have no merit.  They cannot point to any evidence that Microsoft took an adverse employment action against them.  They cannot point to any comparable male employees who received more favorable treatment.  And they cannot, therefore, prove the required elements of their claims, or any pretextual reason for Microsoft's treatment of them.  Because no genuine dispute of material fact exists, Microsoft requests the Court to grant summary judgment in its favor.

First, many of Plaintiffs' claims are procedurally barred.  The applicable statutes of limitation bar claims for actions occurring before September 2012, yet Moussouris and Muenchow base their claims on facts going back a decade.  Piermarini has not exhausted administrative remedies on her federal claims and cannot piggyback on Moussouris's EEOC charge because she is not a member of the putative class Moussouris seeks to represent.

Second, no Plaintiff can establish a prima facie case of disparate treatment.  None of

---

[1] In attempting to undermine the investigation process, Plaintiffs focus selectively on the results of a limited subset of ERIT investigations (i.e., only what they were entitled to obtain through discovery) across a company with tens of thousands of employees.  Plaintiffs ignore facts in the record that show Microsoft investigates and takes action to remedy sexual harassment and gender discrimination complaints.  *See* Dkt. 388 at 35.  After Plaintiffs sought to unseal these unrepresentative results, ensuing media coverage presented a misleading picture of ERIT's vital role as a resource for Microsoft employees—which Microsoft deemed important to correct for its employees.  *See* https://news.microsoft.com/?p=400138.

1  them was fired, demoted, or denied pay increases.  And while each plaintiff was successful at

2  Microsoft, it is undisputed that each of them had important areas for improvement that

3  Microsoft worked with them to address.  Despite her success, Moussouris did not work

4  effectively with others and struggled in managing employees (which led her to voluntarily

5  resign a supervisory role).  Although her managers documented these observations,

6  Moussouris claims that receiving the *second* highest performance rating in 2013, rather than

7  the *highest* possible rating, was because of gender bias—not her own need for improvement.

8  Moussouris cannot identify a male employee with a comparable position and performance who

9  was paid more or promoted more quickly.

10      Muenchow rose through the ranks at Microsoft, but received consistent constructive

11  feedback from male and female managers that she needs to improve communication skills,

12  relationship building, and team management.  Muenchow now complains this feedback was

13  "gendered" and resulted in lower pay and delayed promotions.  Yet she admitted the same

14  deficiencies in her contemporaneous self-assessments.  Muenchow conceded she lacked an

15  understanding of her teams' skills, which prevented projects from "go[ing] more smoothly."

16  She admitted "personal distractions . . . hurt [her] ability to focus on work" and agreed with

17  managers that an appropriate "communication style" was a skill she was "still developing."

18  Given her agreement with the feedback, she cannot establish any adverse employment action.

19      Piermarini's discrimination claims center on her working relationship with one

20  manager who she concedes was tough on both male and female employees.  But Title VII and

21  WLAD do not guarantee a harmonious work environment.  To show gender discrimination,

22  Piermarini must do more than allege her boss was tough.  She has no factual basis to tie what

23  she perceived as unfair pay or a failure to promote to her gender.

24      <u>Third</u>, Plaintiffs' disparate impact claims fail because they have no evidence linking

25  the review systems they challenge to disparities in their pay and promotions.  Their expert

26  admits his analysis shows no differences in pay or promotion rates due to the review systems.

27  And Piermarini has no statistical evidence *at all* since she is not part of the putative class.

28      <u>Fourth</u>, Moussouris's constructive discharge claim fails because she continued to work

long after she claims conditions became intolerable.  In similar circumstances, courts reject constructive discharge claims as a matter of law.

Finally, Moussouris's and Piermarini's retaliation claims fail.  Moussouris's was brought four years too late and neither of their complaints resulted in any adverse action.

## II.   UNDISPUTED FACTS[2]

### A.   Microsoft's Pay and Promotion Processes

During the relevant period, Microsoft used two different performance review systems. From 2011 to 2013, Microsoft evaluated employee performance contributions relative to peers. Managers assigned an initial 1 to 5 performance rating (with 1 being the highest score and most employees expected to receive a 3) based on performance results (the "what"), how the results were delivered (the "how"), and the employee's proven capability over time. MSFT881, 2278; Ex. 2 100:20-101:3[3]; Dkt. 301 ¶4; Dkt. 313 ¶5.  Managers then met in calibration meetings where they could adjust ratings based on comparisons to larger groups. Promotions depended on (1) employee readiness, (2) business need, and (3) available budget. MSFT2235.  Promotions at lower levels, such as 59 and 60, occurred more frequently. MSFT1984.  Promotions to higher levels, generally took longer, as employees acquired the skills and experience necessary to handle positions with greater scope and responsibility.  *See, e.g.*, MSFT1984; Ex. 8 476:4-477:2; Dkt. 301 ¶30; Dkt. 310 ¶14; Dkt. 313 ¶10.

In 2014, Microsoft redesigned its performance and rewards approach.  MSFT4130.  It eliminated its 1 to 5 rating system, no longer uses an approximate ratings distribution, and now evaluates the impact of each employee's performance on its business.  Microsoft eliminated calibration meetings and implemented "people discussions."  Dkt. 301 ¶¶31-32; Dkt. 306 ¶4. Before a people discussion, managers engage in "Connects"—one-on-one meetings with employees to provide ongoing feedback on their impact.  Dkt. 315 ¶17; Dkt. 313 ¶7. Managers address promotions during people discussions.  Dkt. 295 ¶¶14-15; Dkt. 294 ¶7.

---

[2] These include facts drawn from records produced for each Plaintiffs, which include their personnel files, performance reviews, mid-year check-ins, individual results reports, compensation history, training transcripts, job histories, review audit reports, and time and absence reports.
[3] Unless otherwise specified, all exhibit references are to exhibits to the Declaration of Mark Parris filed herewith.

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

1    Only Muenchow and Piermarini had performance evaluated under the new system.

2    **B.    Undisputed Facts Relating to Katherine Moussouris[4]**

3    Microsoft hired Moussouris in April 2007 as a Security Program Manager working in

4    Microsoft's Trustworthy Computing Group. Ex. 5 22:4-24:16. After she told male managers

5    of her interest in the specialized area of cybersecurity vulnerability disclosure, they created a

6    new role specifically for her. *Id.* 16:23-17:20. Her role was so unique that Moussouris was

7    unaware of anyone at Microsoft who did similar work. *Id.* 276:17-24, 279:2-17. Moussouris

8    received her first promotion—to Senior Program Manager, Level 63—with a salary increase

9    and bonus in 2008 shortly before taking maternity leave. *Id.* 29:4-24. She received another

10   promotion to a Level 64 role, with another salary increase and bonus, in September 2010, after

11   she returned from leave. P37; Ex. 5 30:3-8. Her male managers supported these promotions

12   and consistently gave strong reviews to Moussouris's performance, including the highest

13   possible rating of 1 in 2011, along with raises and bonuses. *Id.* 30:9-11; 82:15-83:6.[5]

14   By 2012, Moussouris's total pay was $227,079; in 2013, she made $208,300; and in

15   2014, her pay was set to be $229,602. Dkt. 385 App'x 1 at 143. Plaintiffs' expert's model

16   predicts (based on her gender, performance rating, Discipline, and Standard Title) she would

17   make much less in each year: $187,603 in 2012; $167,385 in 2013; and $197,646 in 2014. *Id.*

18   Moussouris had the highest salary in her group in 2012, 2013, and 2014, and the highest total

19   pay in her group in 2012 and 2014. *Id.* ¶¶41-42. Her 2014 pay was higher even than her

20   supervisor's, who had been at Microsoft twice as long. *Id.* ¶42.

21   Despite her success in delivering results, Moussouris struggled with managerial and

22   collaborative aspects of her job as her role expanded. *Every* employee Moussouris supervised

23   expressed unhappiness with her management. Ex. 5 149:10-17; 150:23-25. Managers

24   documented her struggles interacting with other Microsoft teams. *Id.* 86:8-17. Peer feedback

25   commented on her "hostility and spite" and that "it's always about what's best for Katie."

26   ---

[4] Paragraphs 4-6 of the Declaration of Carolyn Lee filed herewith set forth certain relevant details of Plaintiffs'
27   employment history at Microsoft, including their salary, promotions, titles, and leaves. Exhibit 14 to the Parris
Declaration provides a demonstrative illustration of that information.
[5] While advancing their claims, Plaintiffs chose not to seek sealing of their otherwise confidential performance
28   reviews and compensation information.

MSFT844201.  One peer noted "[t]here has been more than one occasion where I searched the term 'hostile work environment' on HRWeb after meetings with her."  *Id.*  Another comment stated, "I have never seen behavior this bad. I have often noted Katie can only be taken in small doses, but in the past, she at least worked with people. Now – it's just the Katie show, and I'm tired of watching."  *Id.*

Eventually, Moussouris chose to relinquish her managerial duties and return to an individual contributor ("IC") role.  She testified she "wanted to stay an IC" so she "wouldn't have the managerial burden anymore."  Ex. 5 247:12-249:6.  To help Moussouris position herself for promotion opportunities as an IC, her male manager took the initiative to "jump through some hoops" and get a special exception so she could receive executive coaching generally reserved for more senior employees.  *Id.* 51:19-52:21, 53:11-54:1; 55:9-17.

In January 2014, Moussouris began telling colleagues, supervisors, and HR personnel she planned to resign, and she ultimately did so in May 2014.  *Id.* 34:22-35:21; 36:15-37:10.

### C.     Undisputed Facts Relating to Holly Muenchow

Microsoft recruited Muenchow from Wellesley and hired her in 2002 as a Level 58 Software Test Engineer in the Engineering Profession.  Ex. 6 26:18-25; 27:9-12; 28:17-21; 151:8-15.  She later held a variety of roles in the IT/Operations Profession.  Five different Microsoft supervisors (including several men) promoted Muenchow.  She was last promoted to a Level 63 role in March 2016.  *Id.* 49:20-50:6.

Several of Muenchow's managers (men *and* women) identified organization and communication as skills for her to improve.  Some reported Muenchow would go "dark," leaving her "status on work unknown."  MSFT318.  Other managers noticed she struggled with "communicating … information in an organized and reliable way."  P865.  Muenchow admitted these performance issues in her self-reviews.  In 2013, she said she was "still developing [her] ability to modify [her] communication style to best fit differing audiences."  MSFT316.  In 2014, Muenchow acknowledged:  "I had many personal distractions that hurt my ability to focus" and, as a result, "I don't feel like I delivered as high quality or complete a work."  P809.  In 2015, she recognized her need to build better relationships:  "Things would

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

have gone more smoothly if I took the time to understand each teams' (and my teammate's) skills and test infrastructure better to leverage their unique qualities."  P877.

In her self-assessments, Muenchow either agreed with the performance rating given by her managers or rated her performance even lower than her managers did.  *See* MSFT367 (self-assessed 3.5; manager assessed 3)[6]; MSFT373 (both assessed 3); MSFT387 (self-assessed 4; manager assessed 3.5); MSFT336-37 (both assessed "underperformed" certain commitments); P862, P85, P804, P798 (both assessed "achieved" from 2007 through 2010).[7] Muenchow never received—nor did she contemporaneously assert she was entitled to—the highest performance rating.

**D.  Undisputed Facts Related to Dana Piermarini**

Piermarini joined Microsoft in September 2006 as a Solution Sales Specialist at Level 62, focused on selling Microsoft's products to the federal government.  MSFT435; Ex. 7 21:10-19; 61:10-13.  Piermarini remained in the same group throughout her tenure at Microsoft as an IC and she never supervised other employees.  Ex. 7 38:13-18.  Piermarini's decision to leave her former employer, Oracle, and join Microsoft was informed by Microsoft's supportive policies for working women, including its superior maternity leave policy.  *Id.* 17:1-5; 18:18-24.[8]  She took three maternity leaves at Microsoft in less than four years, during which time, she consistently received strong performance reviews, substantial bonuses, and a promotion to a Level 64 role.[9]  *Id.* 25:20-26:17; 28:19-23; 31:17-32:4; 34:20-35:3; 47:23-48:19.

Piermarini generally agreed with the reviews she received and cannot identify a single fact suggesting gender played a role in them.  *Id.* 23:16-24:6; 29:4-12; 43:1-24; 52:1-20; 54:15-25; 57:15-24.  For example, in 2011, when Piermarini had what she considered her "best year ever" at Microsoft, she received a performance rating of "1" (the highest possible rating),

---

[6] According to the scale in place at the time, lower scores were better, so 3 was a better review score than 3.5.
[7] Starting in 2011, employees no longer made bottom-line self-assessments as part of their reviews.
[8] Microsoft's market leading benefits for working parents include up to 20 weeks' paid leave for new mothers and subsidized back-up care for children when there is an unexpected disruption in regular care.  *See* https://careers.microsoft.com/benefits/usbenefits; http://www.businessinsider.com/other-amazing-perks-for-parents-beyond-paid-leave-2015-8.
[9] She started her leaves in December 2008, August 2010, and October 2012. Lee Decl. ¶6.

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR                          - 6 -

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

she was promoted to a Level 64 role by her male manager, and she received a bonus equal to 25 percent of her salary.  MSFT505; MSFT23270; Ex. 7 31:21-24; 35:1-3; 39:15-19.

In ▮▮▮, with Piermarini's encouragement, ▮▮▮▮▮▮▮▮, until then one of her ▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮.  Ex. 7 50:3-10.  Piermarini's claims arise out of complaints she had about ▮▮▮▮.  *See* P5949 ("this all started" in November 2014).  While Piermarini and ▮▮▮ previously had a good working relationship, she alleges it deteriorated when ▮▮▮ became ▮▮▮▮▮▮▮.  This came to a head in early 2015 when she was working from home while caring for a child.  *Id.*  She says she told ▮▮▮ "it's been tough with this winter and the school closings and all of my children being pretty sick, I'm a mom so I'm going to stay home."  P5947.  According to Piermarini, ▮▮▮ responded she should not "be doing child care during working hours."  *Id.*  Thinking this response unfair, Piermarini made a formal complaint to ERIT.  ERIT investigated and closed the complaint with "no finding of a violation of Microsoft's Anti-Harassment and Anti-Discrimination Policy (including its Anti-Retaliation provision)."  MSFT23102.  Around this time, Piermarini disagreed with certain feedback in one of her Connects and requested that it be removed from the review.  Ex. 7 232:12-233:13.  The Connect was edited and Piermarini agreed the final review was "fair."  *Id.* 233:14-19.  In 2015, she received a salary increase and a bonus of approximately $21,000.  *See* Lee Dec. ¶6.  Piermarini resigned from Microsoft in 2016.

### E.  The Nature of Plaintiffs' Claims

On May 14, 2014, Moussouris filed an EEOC charge asserting gender discrimination claims under Title VII.  *See* Dkt. 55 ¶20.  She filed this putative class action on September 16, 2015, asserting gender discrimination claims based on disparate treatment and disparate impact theories under Title VII and the WLAD, as well as retaliation and constructive discharge claims.  *See* Dkt. 1.  Muenchow and Piermarini were added as plaintiffs later.  Plaintiffs filed the SAC, now the operative pleading, on April 6, 2016.  Dkt. 55.  Both the disparate treatment and disparate impact claims arise out of alleged gender bias in Microsoft's performance review, pay and promotion processes.  Plaintiffs allege that Microsoft's "stack ranking" and "calibration process" discriminated against female "technical employees" across the company,

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR          - 7 -

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

1    allegedly causing them to receive less pay and fewer promotions. *Id.* ¶¶22-52.

2           At an individual level, Moussouris's only timely complaints are that her 2 performance

3    rating in 2013 should have been a 1 and that she was not promoted to a principal-level role in

4    2013. *Id.* ¶¶64-69.  She also takes issue with earlier performance feedback and claims to have

5    been retaliated against after making an internal sexual harassment complaint in 2008. *Id.* ¶70.

6           Muenchow's timely complaints primarily concern four pieces of feedback in

7    performance reviews and Connects that she claims to have been "gendered" (Ex. 11 at 6, 17-

8    18), although she does not identify any specific impact that feedback had on pay or promotion

9    outcomes (Ex. 6 166:7-22).  She also complains that a male employee received a promotion

10   that should have been hers in 2015.  Ex. 11 at 16, 30.

11          Piermarini complains about a specific comment from her manager that she found

12   insensitive, although she does not allege any impact that comment had on pay or promotion

13   outcomes.  Ex. 7 57:21-24; 58:18-59:12; 136:23-25; 139:12-22; 233:14-19.  She also

14   complains she did not receive a promotion to a principal-level role in 2015.  Ex. 12 at 14-15.

15   **III.    ARGUMENT**

16          Microsoft is entitled to summary judgment because "there is no genuine dispute as to

17   any material fact" that would allow Plaintiffs' individual claims to proceed to trial.[10]  Fed. R.

18   Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[11]  Microsoft may

19   meet its burden on summary judgment by either (1) negating an essential element of the claim,

20   *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-60 (1970), or (2) showing there is no evidence

21   to support the claim, which may take the form of showing Plaintiffs lack evidence to support a

22   finding in their favor on an essential element, *Celotex*, 477 U.S. at 325.  Plaintiffs cannot rely

23   on conclusory and speculative testimony in affidavits or unsupported allegations to create a

24   genuine dispute sufficient to survive summary judgment.  *Thornhill Pub. Co. v. Gen. Tel. &*

25   *Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

26   _____

     [10] The Court can resolve this motion before reaching the pending Motion for Class Certification, as summary
     judgment dismissing Plaintiffs' claims would moot the class issue.  *See Cousineau v. Microsoft Corp.*, 6 F. Supp.

27   3d 1167, 1168-69 (W.D. Wash. 2014) (granting summary judgment, denying certification motion as moot).
     [11] Throughout this brief, all emphasis is added and all internal citations and quotations are omitted unless

28   otherwise specified.

**A.**     **The Statutes of Limitations Bar All Claims Before September 16, 2012 and All Title VII Claims Before July 18, 2013**

Under Title VII, an employee must file a charge with the EEOC within 300 days of the allegedly unlawful employment practice, if, as here, the alleged discrimination occurred in a state with its own anti-discrimination agency and enforcement mechanism.  *See* 42 U.S.C. § 2000e-5(e).  Moussouris filed her EEOC charge on May 14, 2014; Muenchow did not file her own charge, instead relying on Moussouris's.[12]  *Moussouris v. Microsoft Corp.*, 2016 WL 6037978, at *6 (W.D. Wash. Oct. 14, 2016).  Accordingly, their Title VII claims are limited to events that post-date July 18, 2013, 300 days before Moussouris filed her charge.

WLAD claims are subject to a three-year statute of limitations.  *See* RCW 4.16.080(2); *Goodman v. Boeing Co*., 75 Wn. App. 60, 77 (1994), *aff'd*, 127 Wn. 2d 401 (1995).  As this Court previously held, the filing of an EEOC charge does not toll the limitations period for a WLAD claim.  *Moussouris*, 2016 WL 6037978, at *8; *see also Thompson v. N. Am. Terrazzo, Inc*., 2015 WL 926575, at *8 (W.D. Wash. Mar. 4, 2015).  The WLAD claims are limited to events that occurred after September 16, 2012, three years before this case was filed.

The Court should enter summary judgment on all federal claims based on conduct before July 18, 2013, and all state claims based on conduct before September 16, 2012.

**B.**     **Piermarini Has Not Exhausted Administrative Remedies**

Piermarini did not file an EEOC charge before joining this lawsuit as a plaintiff and made no effort to exhaust her administrative remedies until June 2017.  Even then, she challenged only alleged retaliation and her 2016 performance evaluation.  Ex. 13.  The allegedly adverse action Piermarini described in the SAC is not part of her EEOC charge.

Her failure to file an EEOC charge about the allegations in the SAC means she failed to exhaust administrative remedies as to them.  *See Ng v. Potter*, 2009 WL 3836045, at *5-6 (W.D. Wash. Nov. 12, 2009).  Piermarini may argue the single-filing rule allows her to rely on Moussouris's charge for exhaustion purposes, but that rule only "allows a putative class representative to represent all ***class members*** whose claims were not already time-barred at the

---

[12] For purposes of this motion only, Microsoft assumes that Muenchow may rely on Moussouris's charge.

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

1    time he filed his [EEOC] charge, irrespective of whether the class members had filed charges

2    of their own." *Moussouris v. Microsoft Corp.*, 2016 WL 4472930, at *5 (W.D. Wash. Mar. 7,

3    2016). "In order for a non-charging party to be exempt from the exhaustion requirement under

4    the single filing rule, district courts typically require that the claims be ***nearly identical*** to the

5    claims raised by the charging individuals." *EEOC v. Fry's Elecs. Inc.*, 770 F. Supp. 2d 1168,

6    1172 (W.D. Wash. 2011).

7         Because Plaintiffs narrowed the putative class, Piermarini is ***not*** a class member and

8    therefore cannot rely on the single filing rule.  Nor are her claims "nearly identical" to

9    Moussouris's.  They worked in different business units with different management chains,

10   worked in different professions, held different job titles, and allege discrimination in different

11   places at different times.  They have identified different purported comparators who allegedly

12   received more favorable treatment.  There is thus no basis to permit Piermarini to invoke the

13   single-filing rule to excuse her failure to exhaust administrative remedies.  Even the claims she

14   did file with the EEOC have not yet been exhausted, as the EEOC has not issued a right to sue

15   letter.  Parris Dec. ¶15.  The Court should thus grant summary judgment dismissing

16   Piermarini's federal claims for her failure to exhaust administrative remedies.

17         **C.**    <u>**No Plaintiff Suffered Disparate Treatment on Account of Her Gender**</u>

18         Disparate treatment claims require proof "that the defendant had a discriminatory intent

19   or motive for" taking adverse employment action.  *Wood v. City of San Diego*, 678 F.3d 1075,

20   1081 (9th Cir. 2012) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).  To show a prima

21   facie case, a plaintiff must "offer evidence that give[s] rise to an inference of unlawful

22   discrimination, either through the framework set forth in *McDonnell Douglas Corp. v. Green*

23   or with direct or circumstantial evidence of discriminatory intent." *Vasquez v. Cty. of Los*

24   *Angeles*, 349 F.3d 634, 640 (9th Cir. 2003), *as amended* (Jan. 2, 2004).  Where, as here,

25   Plaintiffs have no direct evidence of discriminatory intent, *McDonnell Douglas* requires them

26   to prove:  (1) they are members of a protected group; (2) they qualified for the positions; (3)

27   they suffered an adverse employment action; and (4) similarly situated men were treated more

28   favorably.  *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004); *Weil v.*

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR          - 10 -

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

1   *Citizens Telecom Servs. Co.*, 2016 WL 5851868, at *6 (W.D. Wash. Oct. 6, 2016).[13]

2         Merely proving the prima facie case is insufficient.  A defendant can rebut the prima

3   facie case by "articulat[ing] a legitimate, nondiscriminatory reason for its allegedly

4   discriminatory conduct." *Vasquez*, 349 F.3d at 640.  The bar for doing so is low.  A "defendant

5   need not persuade the court that it was actually motivated by the proffered reasons." *Texas*

6   *Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  Rather, the defendant satisfies its

7   burden if it "simply explains what he has done or produc[es] evidence of legitimate

8   nondiscriminatory reasons." *Id.* at 256.  Once the defendant makes that showing, it is entitled

9   to summary judgment unless the plaintiff produces substantial evidence demonstrating that the

10  non-discriminatory reasons are not honest, but instead pretextual.  *Vasquez*, 349 F.3d at 640.

11               **1.**      **No Plaintiff Can Meet Her Prima Facie Burden**

12                 **a.**      **Moussouris Cannot Satisfy Her Prima Facie Burden**

13        Moussouris suffered no adverse action.  She was highly compensated, having been

14  paid considerably more than her own expert's model predicts.  Dkt. 385 App'x 1 at 143.  She

15  had the highest base salary in her group from 2012–2014 and the highest total pay in her group

16  in 2012 and 2014.  *Id.* ¶¶ 41-42.  Her expert's model also shows that Moussouris was not

17  expected to be promoted, with only a 21.4% chance of being promoted in 2013.  *Id.* App'x 1 at

18  144.  Given that she made more than Plaintiffs' expert predicts she should have and received

19  the most likely promotion outcome, she cannot establish any adverse action.

20        Recognizing the problems in Dr. Farber's statistical analyses for Moussouris's claims,

21  Plaintiffs urge the Court to ignore how she fares under their expert's model.  Dkt. 340 at 6, 25

22  n.54.  They argue the aggregate statistics analyzed by Dr. Farber are not probative of

23  Moussouris's individual claims and, instead, her own circumstances should control.  *Id.*[14]  But

24  those individual circumstances *also* do not show any adverse employment action.  Moussouris

25  cannot meet her prima facie burden as to her complaints about her 2013 performance rating

---

[13] The WLAD "largely parallels federal law under Title VII," so a court's "treatment of [a party's] Title VII claim thus applies also to [her] similar claim under Washington law."  *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094 n.4 (9th Cir. 2005).

[14] Of course, if Dr. Farber's models do not provide results that are probative to Moussouris's individual claims, they also could not be used to demonstrate causation or damages for *any* of the putative class members.

and not receiving a promotion to Principal Security Strategist (Level 65) in 2013.

**(1)    Moussouris's Performance Rating Was Not Adverse**

"[U]nwarranted performance reviews may constitute adverse employment actions," but only "where such reviews lead to negative consequences." *McMillan v. Abbott Labs., Inc.*, 2013 WL 1003136, at *6 (W.D. Wash. Mar. 13, 2013). "[M]ere criticism without more is insufficient." *Id.* Even a "mediocre" performance rating does not violate Title VII if the rating "did not give rise to any further negative employment action." *Lyons v. England*, 307 F.3d 1092, 1118 (9th Cir. 2002) (citing *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000)); *Hutchinson v. Seagate Tech., LLC*, 2004 WL 1753391, at *9 (N.D. Cal. Aug. 3, 2004), *aff'd*, 147 F. App'x 647 (9th Cir. 2005). Moreover, disagreement with a manager's opinion of performance is not enough to defeat summary judgment. *See Del Castillo v. Wash., Dep't of Soc. & Health Servs.*, 2007 WL 2713035, at *9 (W.D. Wash. Sept. 14, 2007) (granting summary judgment because "other than [plaintiff's] opinion that her negative evaluations were unwarranted, she produces no evidence to the contrary of the [employer's] proffer of her performance-related issues") (Robart, J.); *Chen v. State*, 86 Wn. App. 183, 191 (1997) ("An employee's assertion of good performance to contradict the employer's assertion of poor performance does not give rise to a reasonable inference of discrimination."); *see also Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (employee's "subjective personal judgments of her competence alone do not raise a genuine issue of material fact").

Moussouris did not receive a negative or mediocre review. Her 2013 performance rating of 2 was the second highest possible. MSFT2279; Ex. 5 34:4-5. It reflected that she "surpassed expectations with performance and business impact greater than [the] majority of [her] peers"; only about ███ of employees received a higher score. MSFT2279. For Moussouris, it marked an improvement from the prior year. Ex. 5 34:4-7. And her review did not adversely affect her pay; she received a 4.8% salary increase and a $27,499 bonus that was her largest, both as a percentage of her salary and in raw dollars, exceeding her bonuses in years in which her performance was rated higher. P37. Her salary increase, too, equaled her 2011 increase when her performance rating was 1. *Id.* Her 2013 performance rating was not

1   adverse in any sense of the word.

2   **(2)    Moussouris Has No Evidence That Similarly Situated
        Men Were Treated More Favorably**

3

4       The test for whether individuals are similarly situated is whether "they have similar

    jobs and display similar conduct." *Vasquez*, 349 F.3d at 641.  None of the comparators

5   Moussouris identifies are similarly situated as to job and conduct.  Moussouris admits her

6   position at Microsoft was unique.  Soon after being hired, her male supervisors worked with

7   her to create a job that did not previously exist and was tailored to her specific interests.  Ex. 5

8   277:11-20.  She cannot name *anyone* at Microsoft with similar duties.  *Id.* 279:2-17.  As a

9   result, she can point to no comparators who had "similar jobs." *Vasquez*, 349 F.3d at 641.

10      Setting aside the uniqueness of her role, Moussouris has no evidence Microsoft treated

11  the people she alleges are comparators more favorably.  Moussouris cannot identify any

12  employee who was promoted to the role of Principal Security Strategist (Level 65) instead of

13  her in 2013.  Still, Moussouris alleges five comparators were treated differently with respect to

14  promotions of some kind: ████████████████████████████████████████

15  ███████████████ Ex. 10 at 36;  None of these men are similarly situated.  ██████ has

16  been at Microsoft for ██ years and has been in a Level ████████████. Lee Dec. ¶13.

17  ██████ was not promoted to a Level ██ role while Moussouris was at Microsoft; in fact, he

18  was not even promoted to a Level ██ role until ████, after Microsoft promoted Moussouris to

19  a role at the same level. *Id.* ¶10.  ██████████ was not promoted to a Level ██ role while

20  Moussouris was at Microsoft. *Id.* ¶11.  ██████ was promoted to a Level ██ role in ███—

21  the year Moussouris was promoted to a Level ██ role—after nearly ███ years in a Level ███

22  role. *Id.* ¶9.  He was still in a Level ██ role when Moussouris resigned in 2014. *Id.*

23  ████████, who was promoted to a Level ██ role in 2012, held a different title, reported to

24  different managers, and changed professions shortly after receiving his promotion. *Id.* ¶12.

25  **b.    Muenchow Cannot Satisfy Her Prima Facie Burden**

26      Muenchow primarily challenges four performance feedback comments:  (1) her

27  "[c]ommunication style can be too direct at times" (Ex. 11 at 6 (citing MSFT324)); (2) "at

28

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR                    - 13 -

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

1    times she can be perceived as being too direct" *(id.* (citing MSFT318)); (3) she should "learn[]

2    to choose [her] battles" and not "push[] too far instead of effectively compromising" (P809;

3    Ex. 6 85:22-87:8); and (4) her female manager saying she should "focus on building the right

4    relationships" and "improve [her] listening skills" (P878; Ex. 6 203:2-205:17).  These

5    comments are not adverse employment actions.  Muenchow also has no evidence she was

6    qualified for a promotion or a similarly situated male was promoted in her place.

**(1)     Critiques of Muenchow's Performance Do Not
                Constitute Adverse Employment Action**

8            Criticism of an employee's performance does not constitute an adverse action unless it

9    effects "a material change in the terms or conditions" of employment.  *Mieczkowski v. York*

10   *City Sch. Dist.*, 414 F. App'x 441, 447 (3d Cir. 2011); *see Kortan*, 217 F.3d at 1112-13;

11   *McMillan*, 2013 WL 1003136, at *6.  Courts go no further because they are "careful not to

12   punish employers for making valid business decisions."  *Russell v. Placeware, Inc.*, 2004 WL

13   2359971, at *10 (D. Or. Oct. 15, 2004); *see also, e.g.*, *Evers v. Alliant Techsystems, Inc.*, 241

14   F.3d 948, 957 (8th Cir. 2001) (courts do not "sit as a 'super-personnel department' to second

15   guess the wisdom of a business's personnel decisions"); *Bryant v. Compass Group USA Inc.*,

16   413 F.3d 471, 478 (5th Cir. 2005) (discrimination laws not for "second-guessing of business

17   decisions" or transforming courts into "personnel managers"); *Chapman v. AI Transp.*, 229

18   F.3d 1012, 1030 (11th Cir. 2000); *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 677

19   (7th Cir. 1997).  Muenchow concedes she cannot connect the challenged comments to any

20   material change in the terms or conditions of her employment.  Ex. 6 166:7-22.

21           Muenchow's self-evaluations—completed *before* she received manager feedback—

22   corroborate the feedback she now criticizes.  In the review identifying her need to improve

23   relationship building, she says:  "Things would have gone more smoothly if I took the time to

24   understand each teams' (and my teammate's) skills and test infrastructure better to leverage

25   their unique qualities."  P877.  In the review noting she was at times too direct, she says:  "I

26   am still developing my ability to modify my communication style to best fit differing

27   audiences."  MSFT316.  And Muenchow admitted in 2014 that "personal distractions" "hurt

[her] ability to focus on work," meaning she didn't deliver as "high quality or complete work" as in the past.  P809; Ex. 6 82:13-21.  Her own words show she was not fully performing to Microsoft's "legitimate expectations," *Vasquez*, 349 F.3d at 640 n.5, and cannot establish she was "qualified" to receive more favorable reviews.  *Weil*, 2016 WL 5851868, at *9.  As this Court has explained, "self-evaluations" corroborating a plaintiff's poor performance mean the plaintiff cannot "raise a genuine dispute of material fact" on her prima facie case.  *Id.*

> **(2)** **Muenchow Has No Evidence That Microsoft Treated Similarly Situated Men More Favorably**

Muenchow cannot establish that similarly situated males were treated more favorably. She identified several alleged comparators, including ███████████████████████████ ████████████████████████████████████████████████████ ███████.  Ex. 11 at 29-30; Ex. 6 57:2-8; 66:11-67:21; 85:22-86:15.[15]  But these individuals are not proper comparators.  None worked in the IT Operations Program Management discipline, as Muenchow did.  Lee Dec. ¶¶14-22.  ████████████████████████████ were not the same level as Muenchow during any relevant year; ███████████████ ██████, in particular, were in roles several levels higher.  *Id.* ¶¶14-16, 19, 22.  ██████ ████, in contrast, were almost always in roles leveled below Muenchow's level.  *Id.* ¶¶17, 20. ████████ had been in a Level ███ role for ██████ years longer than Muenchow before being promoted to a Level ██ role.  *Id.* ¶21.  And ████████ performance was consistently exemplary, earning strong performance ratings.  *Id.* ¶18.

> **(3)** **Muenchow Was Not Denied a Promotion Because of Her Gender**

Despite receiving five promotions, Muenchow believes "male colleagues have been promoted to higher levels for which she was qualified and not considered."  Ex. 11 at 15-16. Muenchow challenges only one promotion she did not receive within the limitations period—a promotion to a Level 63 role in 2015, which she claims went to ████████████ instead.  *Id.* at 16, 30.  But Muenchow cannot show that she was considered for, but denied, a promotion in

---

[15] For one additional alleged comparator, ████████████, Muenchow does not allege that he received better performance feedback or promotions.  *See* Ex. 11 at 29.  He is thus not someone who was treated more favorably with respect to the alleged adverse employment actions about which Muenchow complains.

2015.  Dr. Farber's model predicts she would not be promoted then.  Dkt. 385 App'x 1 at 144.

As discussed above, her self-reviews confirm she was not fully performing to Microsoft's

legitimate expectations.  *See supra* §§ II.C; III.C.1.b.  Muenchow also cannot show that ▮▮▮

was similarly situated to her.  ▮▮▮ had a long history of exemplary performance with

performance ratings of 1, 2, and 1 in 2011, 2012, and 2013, respectively.  Lee Dec. ¶18.

While she speculates they "performed work of similar quality" (Ex. 11 at 16), that is not

enough to raise a triable issue of fact that ▮▮▮ was promoted despite having the same issues

that held Muenchow back.  *See Bradley*, 104 F.3d at 270; *Chen*, 86 Wn. App. at 191.

### c.   Piermarini Cannot Satisfy Her Prima Facie Burden

#### (1)   Critiques of Piermarini's Performance Do Not Constitute Adverse Employment Action

Piermarini has not established her 2014 or 2015 performance reviews were adverse.

Although she claims those reviews contained more negative feedback than previous ones, she

testified the 2014 review was "on-track" and "positive."  Ex. 7 57:8-9.  While she initially

disagreed with certain peer feedback in her 2015 review, that feedback was removed from the

final review, which she agreed was "fair."  *Id.* 233:14-19.[16]  Piermarini also acknowledged she

has no basis to connect alleged gender-based feedback in her reviews to her pay.  *See id.*

57:21-24.  To the contrary, she recognized that nondiscriminatory factors affected her pay,

such as a year "that no one got merit increases across the board."  *Id.* 58:18-59:12.

Piermarini's primary complaint relates to a comment by ▮▮▮ that "you can't be

doing child care during work hours."  *Id.* 136:23-25; 139:12-22.  Although she speculates

▮▮▮ made this comment because she is a woman, there is nothing unlawful about stating

that an employee should not be providing childcare when she is being paid to work.  While

Piermarini may have found the comment insensitive, it is insufficient to establish gender

discrimination.  Moreover, Piermarini has no evidence to suggest that ▮▮▮ comment

materially changed the terms or conditions of her employment.  *See Kortan*, 217 F.3d at 1112-

---

[16] Piermarini believes ▮▮▮ was responsible for soliciting this peer feedback but has no evidence to support that belief. Ex. 7 230:4-14. All she can point to is an instance when ▮▮▮ was allegedly involved in soliciting negative feedback to provide to other male employees. *Id.* 230:15-231:11.

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR        - 16 -

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

13; *Mieczkowski*, 414 F. App'x at 447. ███████ comment was not an adverse action.

### (2) Piermarini Cannot Show That Similarly Situated Males Received Promotions She Did Not

Piermarini attacks her failure to receive a promotion to a Level 65 role in 2014 and 2015. She alleges Microsoft promoted four individuals to Level 65 roles during this period when she was not: ███████████████████████████████████. Ex. 12 at 14-15, 25. These individuals are not similarly situated. ███████ was already in a Level ██ role by ████ and was promoted to a Level ██ role ██ years before Piermarini alleges she first should have been considered for the role. Lee Dec. ¶23. ███████ also held a different job title and worked in a different profession and discipline. *Id.* ███████ was not a salesperson, like Piermarini; instead, his focus was sales strategy and technical support for the sales team. *Id.* ¶24. He worked in a different profession and reported to different supervisors. *Id.* ████████ ████ had been promoted to Level ██ roles before Piermarini. *Id.* ¶¶25-26.

### 2. Microsoft Has Legitimate Nondiscriminatory Reasons for Its Employment Actions

Because no Plaintiff can meet her prima facie burden, the Court need not reach the issue of Microsoft's legitimate, nondiscriminatory reasons for its various actions as to each Plaintiff. But even if the Court gets to this point, the undisputed evidence establishes that Microsoft had legitimate, non-discriminatory reasons for its actions.

***Moussouris***. Although Moussouris's performance improved in 2013—resulting in a positive "2" performance rating—she still needed to improve "how" she performed in her role. *See* MSFT154. Moussouris's manager received "concerning comments" about her from others. *Id.* He explained: "It is still clear that you do not 'suffer fools gladly' and there are times when tensions develop if it appears that others are putting your programs at risk." MSFT159. He urged her to "find a strategy that w[ould] enable [her] to navigate time critical obstructions without confrontation or escalation." *Id.* But Moussouris continued to struggle in team settings. MSFT160 ("there remain areas for growth when working in the more challenging team situations"). Recognizing her deficiencies, Moussouris chose to relinquish her managerial role. *Id.* Accordingly, Moussouris's reviews provide ample "evidence of

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR                    - 17 -

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

1   legitimate nondiscriminatory reasons" for the only timely employment actions she challenges.

2   *Burdine*, 450 U.S. at 256.

3   **_Muenchow_**.  As described above, Muenchow's self-assessments echo feedback that

4   she needed to improve communication, coordination, and teamwork skills.  *Supra* §§ II.C;

5   III.C.1.b.  Muenchow's managers and peers saw the same weaknesses.  *Id.*  Moreover,

6   Muenchow concedes the areas of needed improvement were "critical" components of her job

7   duties and of successful performance at Microsoft.  Ex. 6 113:12-114:7; 118:8-13.  Thus, by

8   Muenchow's own self-assessment, the feedback reflected the merits of her work, and the pace

9   of her promotions was not out of line with her performance.

10   **_Piermarini_**.  Piermarini's performance reviews describe legitimate, performance-

11   related feedback that justify her not receiving the significant promotion to a principal-level

12   role.  Her reviews identify many areas for improvement, such as "improve her product

13   knowledge" and develop "crucial component[s]" of sales transactions to not just "clos[e] the

14   deal" but ensure that consumption of the product was "agreed upon by the customer."

15   MSFT11019.  She was also counseled not to skip training to improve her product knowledge

16   and to avoid "unnecessary conflict" with other sales teams that "could have been improved

17   with better communication."  MSFT11031-32.

### 3.   No Plaintiff Can Establish Pretext

19   Since Microsoft has legitimate, nondiscriminatory reasons for its actions, Plaintiffs

20   bear the burden to show those reasons are merely pretextual through specific evidence the

21   actions were taken because of their gender.  *See Vasquez*, 349 F.3d at 640.  Evidence of pretext

22   must be *specific to* the decisions challenged *and* the individuals at Microsoft who made those

23   decisions.  *See Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2005).  "Direct

24   evidence of pretext is evidence which, if believed, proves the fact [of discriminatory animus]

25   without inference of presumption.  It typically consists of clearly sexist, racist, or similarly

26   discriminatory statements or actions by the employer." *Chew v. City & Cnty. of San Francisco*,

27   2017 WL 5041403, at \*3 (9th Cir. Nov. 3, 2017).  Indirect evidence of pretext is evidence

28   "sufficient to support the claim that discriminatory animus more than likely motivated" the

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR          - 18 -

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

1   decision in question or that the "proffered explanation is unworthy of credence." *Id*. at *4.  The

2   record reflects no evidence of animus, direct or indirect, by the various managers whose

3   decisions affected Plaintiffs.  Plaintiffs instead rely on hearsay descriptions of isolated

4   incidents that had no relation to their reviews, pay, promotion decisions, or supervisors.

5          For example, Moussouris alleges sexual harassment of others by Microsoft employee

6   ███████████ in 2008.  But ████████ was not Moussouris's direct supervisor when the

7   alleged events happened.  Nor was he her supervisor when the review and promotion decisions

8   she timely challenges occurred.  He was not responsible for her performance evaluations and

9   ratings, promotions, or pay during the relevant period.  Ex. 5 195:15-196:8.[17]

10         Plaintiffs allege Microsoft hired "scantily-clad" female dancers to perform at certain

11  conferences and parties.  Ex. 10 at 15-16.  But none of these allegations involves a supervisor

12  who made Plaintiffs' performance rating, pay, or promotion decisions.  Similarly, they cite

13  ambiguous, offhand comments about conduct in meetings—such as that Moussouris should

14  "uncross her arms"—to try to show pretext.  *Id.* at 16; *see* Ex. 11 at 7-9.  But none alleges the

15  individuals who supposedly engaged in this conduct were involved in Plaintiffs' performance

16  review, pay, or promotion decisions, which is fatal to their claim.  *Mondero*, 400 F.3d at 1213.

17  "Unless the statements or conduct of nondecisionmakers can be imputed to the ultimate

18  decisionmaker, such statements or conduct cannot suffice to satisfy the plaintiff's burden of

19  demonstrating animus."  *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 724 (6th Cir. 2004).

20         **4.     The Pay Claims Are Derivative of the Defective Performance**
                  **Feedback and Promotion Claims**

21

22         Plaintiffs' assertion they were paid less than similarly situated men rests entirely on

23  their claims they (a) were not promoted when they believe they should have been ("with

24  promotions, come salary increases") and (b) received less favorable performance feedback

25  than they believe they should have ("even without a promotion, a higher review score results

26  ────────────────────
    [17] Moussouris testified Microsoft investigated ████████ and took disciplinary action against him.  Ex. 5 196:22-

27  198:8.  And Muenchow's complaint that male co-workers made two non-sexual comments regarding her clothing
    or physical attributes over 15 years (Ex. 11 at 7) has nothing to do with her reviews or promotions and does not

28  rise to the level of a hostile work environment.  *See e.g., Webb-Edwards v. Orange Cnty. Sheriff's Office*, 525
    F.3d 1013, 1027-28 (11th Cir. 2008); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995).

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR                      - 19 -

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

1  in greater salary rewards"). *See, e.g.*, Ex. 11 at 18. They do not even allege, much less offer

2  evidence of, any specific discrimination as to the pay they received. Because Plaintiffs'

3  discrimination claims with respect to performance reviews and promotion are legally defective

4  for the reasons described above, their claims for pay discrimination fail as well.

5         **D.**     **Moussouris's Constructive Discharge Claim Fails**

6         To establish constructive discharge, employment conditions must have become so

7  intolerable as to cause a reasonable person to quit. *Draper v. Coeur Rochester, Inc.*, 147 F.3d

8  1104, 1110 n.2 (9th Cir. 1998). Moussouris alleges she was "forced" to resign in May 2014.

9  Dkt. 55 ¶72. Receiving generally positive performance reviews and not being promoted are

10  not conditions so intolerable that they would compel a reasonable person to quit. *See Winters

11  v. City of Kent*, 2010 WL 2595250, at *9 (W.D. Wash. June 22, 2010) (conditions not

12  intolerable as a matter of law where "the plaintiff was not demoted, did not receive a cut in

13  pay, was not encouraged to resign or was not disciplined"); *Gibson v. King Cnty.*, 397 F. Supp.

14  2d 1273, 1281 (W.D. Wash. 2005). "[D]enial of a promotion" is not "a sufficiently extreme

15  condition to support a constructive discharge claim." *EEOC v. Swissport Fueling, Inc.*, 916 F.

16  Supp. 2d 1005, 1030 (D. Ariz. 2013). Similarly, a "feeling of being unfairly criticized" is "not

17  so intolerable as to compel a reasonable person to resign." *Cecala v. Newman,* 532 F. Supp.

18  2d 1118, 1168 (D. Ariz. 2007), *aff'd*, 379 F. App'x 584 (9th Cir. 2010).

19         Moussouris voluntarily worked in allegedly "intolerable" conditions for months. She

20  threatened to leave as early as January 2014 and even when she ultimately decided to resign in

21  May 2014, she gave two weeks' notice and kept working. Ex. 5 34:11-37:10. When, as here,

22  employees do not "quit working immediately' and instead "continue working" after the

23  allegedly intolerable conditions develop, workplace conditions are "not so 'intolerable' that a

24  reasonable person in plaintiff's condition would have felt that she was forced to quit."

25  *Hoffman v. Winco Holdings, Inc.*, 2008 WL 5255902, at *6 (D. Or. Dec. 16, 2008) (two

26  weeks' notice defeated constructive discharge claim); *accord Dearmon v. Ferguson Enters.,

27  Inc.*, 2015 WL 6550734, at *9 (D. Or. Oct. 28, 2015) (no constructive discharge when

28  "plaintiff did not quit immediately").

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR          - 20 -

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

### E.  The Court Should Dismiss Plaintiffs' Disparate Impact Claims

Because none of the Plaintiffs suffered any adverse employment action, their disparate impact claims are equally defective as their disparate treatment claims.  Moreover, disparate impact claims predicated upon discretionary decision-making, such as those advanced by Plaintiffs, are not cognizable under the WLAD.  *See Schueller v. Shin-Etsu Handotai Am., Inc.*, 2004 WL 691794, at *8 (W.D. Wash. Feb. 9, 2004) ("In Washington disparate impact analysis does not extend to subjective, discretionary employment practices."); *Oliver v. Pac. Nw. Bell Tel. Co.*, 106 Wn. 2d 675, 680-81 (1986) (same).

Plaintiffs' disparate impact claims should be dismissed for the additional reason that each Plaintiff fails to show any causal connection between the practice she challenges and the alleged disparate impact on the protected group to which she belongs.  A disparate impact claim requires a plaintiff to "(1) identify the specific employment practices or selection criteria being challenged; (2) show disparate impact; and (3) prove causation; 'that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question" caused adverse employment action because of their membership in a protected group.  *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990) (affirming grant of pre-class certification summary judgment based on inadequate statistical evidence).

As shown in other briefing, Plaintiffs' statistical evidence in support of their disparate impact claims is fundamentally flawed, rendering the evidence unreliable.  *See* Dkt. 285 at 23-24; Dkt. 362 at 10-12.  But even taking the statistical evidence at face value, the Court should grant summary judgment because Plaintiffs cannot show that the "Calibration Process" they challenge caused any alleged disparate impact.  Dkt. 232 at 5.

By its nature, a disparate impact claim requires an initial group-based, rather than individual, showing.  *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (disparate impact claims ask whether a practice or policy "in fact fall[s] more harshly on one *group* than another").  Here, Plaintiffs define the group by profession—women in Engineering and IT Operations—and argue the "cause" of any disparate impact on the group is the facially neutral "Calibration Process," which they define as meetings in which "managers

compare employees within peer groups to determine performance, pay, and promotion outcomes."[18]  Dkt. 232 at 1, 5, 32.  To make that showing, Plaintiffs must establish not only that women experienced fewer promotions or otherwise disparate pay, but also that those disparities were unjustified and attributable to gender.  They have no evidence to prove any of this.

Plaintiffs' experts affirmatively disavow any ability to opine on causation.  For instance, Dr. Ann Marie Ryan agrees her report does not "contain any conclusion that women [we]re unfairly evaluated," "denied promotion," or "paid at Microsoft based on their gender." Ex. 9 25:19-22, 26:4-8, 26:14-18.  Because she has no opinion on whether gender bias even exists at Microsoft, Dr. Ryan has nothing to offer as to theoretical causes of any such bias.  Dr. Farber likewise conceded his statistical analysis does not support the argument that "differences in promotion rates were due specifically to calibration meetings" or "people discussions."  Ex. 4 264:13-24.  And neither expert offered any statistics or opinion *at all* concerning the Sales group, where Piermarini worked.

The absence of statistical evidence (for Piermarini) and Plaintiffs' experts' express disavowal of any opinion about a cause of any disparities (for Moussouris and Muenchow) means they have "failed to demonstrate causation, which requires substantial statistical evidence sufficient to raise an inference that the disparate impact fell upon employees" of a protected group.  *Katz v. Regents of the Univ. of Cal.*, 229 F.3d 831, 836 (9th Cir. 2000). Plaintiffs' failure to offer group-wide causation evidence dooms their disparate impact claims.

### F.      The Court Should Dismiss the Retaliation Claims

To establish a prima facie case of retaliation, a plaintiff must show: (1) statutorily protected activity, such as filing a discrimination complaint, (2) the employer subjected her to an adverse employment action, and (3) a causal link.  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 800 (9th Cir. 2003).  If a plaintiff makes this showing, the burden shifts to the employer

---

[18] Plaintiffs wrongly contend that from 2011 to May 2014, Microsoft used the term "calibration meetings" to refer to the "Calibration Process," and since May 2014, the process is referred to as "People Discussions."  Dkt. 232 at 5.  Microsoft does not use "calibration" to refer to any aspect of the post-May 2014 review process.  *See* Dkt. 301 ¶¶4, 31; Dkt. 313 ¶¶5-8; Dkt. 315 ¶¶4, 15.

to articulate a legitimate, nondiscriminatory reason for the adverse action, after which the plaintiff must prove pretext.  *Id*.  Neither Moussouris nor Piermarini can meet her burden.

### 1.    No Evidence Supports Moussouris's Time-Barred Retaliation Claim

Moussouris alleges that in 2008 she complained that a group director sexually harassed other women in the group.  Dkt. 55 ¶70.  She asserts the subject of that complaint retaliated by adjusting her bonus downward.  This claim pertains to events that allegedly transpired nearly a decade ago.  It is time barred.  *Supra* § III.A.  But even on the merits, Moussouris has no evidence her bonus was adjusted downward as a result of making a harassment complaint.  She received the typical bonus for promoted employees in the group (P37; Ex. 5 201:15-202:22) and her bonus percentage was the same as when she was next promoted in 2010 (12%), when she does not allege any retaliation (P37).

### 2.    No Evidence Supports Piermarini's Retaliation Claim

Piermarini claims Microsoft retaliated against her after she made a complaint in April 2015.  She cannot show she suffered an adverse employment action "reasonably likely to deter employees from engaging in protected activity" after raising her internal complaint.  *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000).  Although she criticizes feedback she received in 2015 and 2016, Piermarini testified her 2015 performance review was "positive" and "fair" after corrections were made.  Ex. 7 233:14-19.  Her 2016 Connects also contained many positive comments.  MSFT11027; MSFT11019.  Positive and fair performance reviews do not constitute adverse employment actions.  *Kortan*, 217 F.3d at 1112-13.[19]  In any event, Piermarini has no evidence that any of her feedback was motivated by retaliatory intent, as opposed to legitimately related to her managers' opinions of the quality of her performance. The mere fact these reviews came after her internal complaint is insufficient.  *Mitchell v. Superior Ct. of Cal. Cnty. Of San Mateo*, 312 F. App'x 893, 894-95 (9th Cir. 2009); *Yount v.*

---

[19] In her deposition, Piermarini also claimed ███ retaliated against her by giving an account she covered (the Army account) to a male counterpart. Ex. 7 233:23-10.  Even if true, this is not an adverse employment action because she testified she could not link the Army account reassignment to any impact on her compensation.  *Id.* 237:2-11.  Moreover, ███ explained the legitimate nondiscriminatory reason for the reassignment of the Army account—it aligned with the other accounts of the employee to whom it was assigned.  *Id.* 234:11-16.

1   *Regent Univ., Inc.*, 2009 WL 995596, at \*9 (D. Ariz. Apr. 9, 2009).

2       **G.    Microsoft is Entitled to Summary Judgment on Plaintiffs' Request for Punitive Damages**

3

4       Plaintiffs have no basis to seek punitive damages.  Punitive damages are not available

5   under the WLAD.  *See Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No.*

6   *160*, 151 Wn. 2d 203, 216 (2004); *Martini v. Boeing Co.*, 137 Wn. 2d 357, 368 (1999); RCW

7   49.60.030(2).  Under Title VII, punitive damages cannot be recovered in the absence of malice

8   or reckless indifference to an employee's Title VII rights.  *See* 42 U.S.C. § 1981a(b)(1).

9   Moreover, employers which make good faith efforts to comply with Title VII are not liable for

10  punitive damages.  *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 544-45 (1999).

11      Plaintiffs cannot recover punitive damages because their claims do not rise to the level

12  of malice or reckless indifference to their Title VII rights and Microsoft makes extensive good

13  faith efforts to comply with Title VII.  Microsoft has robust EEO policies overlaying its pay

14  and promotion processes.  MSFT58110-11.  "All employees share in the responsibility for

15  fulfilling Microsoft's commitment to equal employment opportunity."  MSFT867.

16      Microsoft also has an ERIT to investigate EEO policy issues and provide training to

17  HR.  Ex. 3 31:2-8, 48:19-25.  Each ERIT investigator is a licensed attorney with years of

18  investigation experience and training.  *Id*. 30:17-31:1; 102:20-103:7; 132:24-133:7; 175:4-25.

19  Microsoft publicizes various ways to raise concerns on its internal portals, providing for

20  anonymous submission if preferred, and takes action upon receiving concerns.  *Id*. 57:6-59:14;

21  129:7-130:3.  Indeed, Plaintiffs' ERIT complaints were thoroughly investigated.  In light of

22  these efforts, Microsoft cannot be liable for punitive damages.

23  **IV.    CONCLUSION**

24      For all the reasons set forth above, Microsoft respectfully requests the Court to grant

25  Microsoft's motion for summary judgment in its entirety.

26

27

28

MICROSOFT'S MOTION FOR SUMMARY
JUDGMENT 2:15-cv-01483-JLR    - 24 -

Orrick Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington  98104-7079
tel+1-206-839-4300

1    Dated: March 15, 2018                     ORRICK, HERRINGTON & SUTCLIFFE LLP

2                                              By:  /s/ Mark S. Parris
3                                                   /s/ Lynne Hermle
                                                    /s/ Jessica R. Perry
4                                              Mark S. Parris (WSBA No. 13870)
                                               mparris@orrick.com
5                                              701 Fifth Avenue
                                               Suite 5600
6                                              Seattle, Washington  98104
                                               Telephone:  +1-206-839-4300
7                                              Facsimile:  +1-206-839-4301
8                                              Attorneys for Defendant

9                                              Lynne Hermle (admitted pro hac vice)
                                               lchermle@orrick.com
10
                                               Jessica R. Perry (admitted pro hac vice)
11                                             jperry@orrick.com
12
                                               1000 Marsh Road
13                                             Menlo Park, CA  94025-1015
                                               Telephone:  +1-650-614-7400
14                                             Facsimile:  +1 650-614-7401
15
16   Dated: March 15, 2018                     MICROSOFT CORPORATION
                                               By:  /s/ David Howard
17                                             David Howard (WSBA No. 45211)
                                               Corporate Vice President and Deputy General
18                                             Counsel, Litigation
                                               dhoward@microsoft.com
19                                             1 Microsoft Way
20                                             Redmond, Washington  98052
                                               Telephone:  +1-425-704-8685
21
22
23
24
25
26
27
28

1

## **CERTIFICATE OF SERVICE**

2    I hereby certify that on March 15, 2018, I caused the foregoing document to be

3 electronically filed with the Clerk of the Court using the CM/ECF system which will send

4 notification of the filing to all counsel of record.

5

6 DATED:  March 15, 2018                    ORRICK, HERRINGTON & SUTCLIFFE LLP

7

8                                          By:   _s/Mark S. Parris_
                                                Mark S. Parris (WSBA No. 13870)
9                                               mparris@orrick.com

10                                              701 Fifth Avenue, Suite 5600
11                                              Seattle, WA  98104-7097
                                                Telephone:   206-839-4300
12                                              Facsimile:    206-839-4301

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28