# EXHIBIT E

**REDACTED VERSION**

```
 1                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
 2                        AT SEATTLE

 3   _____

 4   KATHERINE MOUSSOURIS, HOLLY
     MUENCHOW, and DANA PIERMARINI,
 5   on behalf of themselves and a
     class of those similarly
 6   situated,

 7             Plaintiffs,

 8      vs.                          Case No. 2:15-cv-01483-JLR

 9   MICROSOFT CORPORATION,

10             Defendant.

11   _____

12          ** CONTAINS CONFIDENTIAL PORTIONS **

13      VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

14                        OF

15                 DANA PIERMARINI

16   _____

17

18

19

20

21

22

23   DATE:  June 9, 2016

24   REPORTED BY:  Holly J. Buckmaster, RPR

25               CSR No. 2859
```

```
 1   Q.    So after ██████ birth on August 17, 2010, did you

 2         stay out on maternity leave through late November of

 3         2010?  Again, roughly three months.

 4   A.    It was in November.  I'm not sure at what point in

 5         November.

 6   Q.    Okay.  I show November 18th, but if you have a

 7         different recollection, I would love to hear about it.

 8   A.    I don't recall the exact date in November.

 9   Q.    Do you recall coming back before or after

10         Thanksgiving, in other words, did you add on

11         additional vacation to your leave, if you recall?

12   A.    I don't recall.

13   Q.    While you were out on the second maternity leave for

14         ██████ birth, did you receive a review in the late

15         fall of 2010?

16   A.    The review periods and time frames have changed over

17         the years, so I don't recall if at that time we were

18         getting reviews in the late fall.

19   Q.    Do you have a recollection that while you were out on

20         your second maternity leave, you received a positive

21         per -- performance review from Mr. Vasquez?

22   A.    Javier Vasquez consistently gave me good performance

23         reviews.

24   Q.    Before we get into those, was there anything about

25         2008, the year in which you were promoted, that was
```

1          discriminatory based on your gender?

2                    MS. MIAZAD:  Objection.

3     Q.   (BY MS. HERMLE) That is completely overbroad and it's

4          not what I meant to ask you.  Was there anything in

5          your compensation treatment in 2008 that was in your

6          view discriminatory based on your gender?

7     A.   I don't know.

8     Q.   Are you aware of any facts that suggest your

9          compensation treatment in 2008 was based on your

10         gender?

11                   MS. MIAZAD:  Objection.

12                   THE WITNESS:  I don't know.

13    Q.   (BY MS. HERMLE) When did Mr. Vasquez first become

14         your supervisor, was it in 2009?

15    A.   I don't recall the exact year.

16    Q.   You said Mr. Vasquez consistently gave you positive

17         performance reviews.  Did Mr. Vasquez do anything to

18         you that you consider to be discriminatory based on

19         your gender?

20                   MS. MIAZAD:  Objection.

21                   THE WITNESS:  Mr. Vasquez did not do anything

22         discriminatory.  However, when I asked for a promotion

23         in 2010, he said that he put me up for a promotion and

24         that that -- it was -- it went to Curt Colcun and Curt

25         Colcun decided to deny me the promotion to see what I

1      can do when I get back from leave.

2  Q.    (BY MS. HERMLE) And was that based on gender in your

3      view?

4  A.    Yes.

5  Q.    Why?

6  A.    Because I had consistently been a high performer and

7      it was portrayed that my promotion was denied because

8      I was just getting back from leave.

9  Q.    And when you say that, do you mean -- are you talking

10      about Mr. Vasquez telling you that Curt Colcun had

11      said, "Let's see what you can do when back from

12      leave," or something else?

13  A.    Can you rephrase the question?

14  Q.    Yeah.  When you say it was -- it was portrayed that

15      it was denied because you were just getting back from

16      leave, what do you mean by that?

17  A.    As I understood it, I did not get a promotion because

18      they wanted to see what I could do when I got back

19      from leave.

20  Q.    And the "they" is Mr. Carlsen -- or I'm sorry,

21      Mr. Colcun; is that correct?

22  A.    That's what I was told.

23  Q.    And you're basing this on what Mr. Vasquez told you;

24      is that correct?

25  A.    Yes.

1    Q.    And so this would have been -- your return was, you

2          told me, in November of 2010, so this would have been

3          a promotion you wanted to level 64?

4    A.    Yes.

5    Q.    And you'd been a level 63 for approximately two years

6          at that time; is that correct?

7    A.    I don't recall those exact dates.

8    Q.    And had you done anything to indicate your desire for

9          promotion before Mr. Vasquez told you that he had put

10         you up and heard this in response?

11   A.    I don't recall.

12   Q.    So this second maternity leave from Microsoft, you

13         told me, ended in approximately November of 2010, so

14         the next evaluation cycle would have been the fall of

15         2011; is that correct?

16   A.    Can you rephrase the question?

17   Q.    Yes.  Is it correct that about seven months after you

18         came back from your second maternity leave you were

19         promoted to level 64?

20   A.    I'm not sure of the dates.

21   Q.    Do you have a recollection of your second promotion

22         have -- happening on a different time than September

23         of 2011?

24   A.    I was promoted in 2011 to a 64.

25   Q.    And did it happen approximately six to seven months

1          after you returned from your second maternity leave?

2    A.    I don't know if that's the correct number of months.

3    Q.    Do you have a different recollection than that?

4    A.    I don't remember.

5    Q.    In 2011, you have a recollection that Microsoft was

6          using performance reviews that assigned numbers to

7          overall ratings?

8    A.    Yes.

9    Q.    And that was the first time that had happened in your

10         experience at Microsoft?

11   A.    I don't remember if that was the first or second

12         time.

13   Q.    All right.  Do you remember getting "achieved"

14         reviews each year until the first year you got a

15         numerical review at Microsoft?  Is that question clear

16         to you, because I can rephrase it if it isn't?

17   A.    That would be great.

18   Q.    Okay.  So do you have a recollection that before

19         Microsoft went to the numerical overall rating, you

20         had ach -- you had achieved -- let me start that

21         again.

22               Do you have a recollection that before

23         Microsoft assigned a numerical rating to performance

24         reviews, you had been given an "achieved" rating each

25         year?

1    A.    I recall consistently getting good reviews.

2    Q.    Do you recall those consistent good reviews being

3          anything other than an overall "achieved" rating

4          before 2011?

5    A.    Can you repeat the question?

6    Q.    Yes.  Did you get any rating other than an overall

7          "achieved" before 2011?

8    A.    I believe I received at least an "achieved."

9    Q.    And possibly higher?

10   A.    I don't know.

11   Q.    When you -- when you formed the belief that the

12         failure to promote you in 2010 was associated with

13         your leave, did you complain about it to anyone?

14   A.    I don't remember.

15   Q.    Why did you believe that the statement Mr. Vasquez

16         told you that Mr. Colcun had made was because of your

17         gender?

18   A.    Because women have longer -- have the ability to be

19         out longer for -- after having a baby.

20   Q.    Do you mean that women employees at Microsoft can

21         take longer post-baby leaves than men can?

22               MS. MIAZAD:  Objection.

23               THE WITNESS:  Yes.

24   Q.    (BY MS. HERMLE) Okay.  In -- coming back to 2011 when

25         you got the promotion, this was the year you would

```
 1        have returned from your second maternity leave; is
 2        that correct, with ███?
 3               MS. MIAZAD:  Objection.
 4               MS. HERMLE:  Did I get that wrong?
 5               MS. MIAZAD:  I think you said 2011, coming
 6        back in 2011.
 7               MS. HERMLE:  Right.  That's what I -- oh, oh,
 8        I see what you're saying.
 9               MS. MIAZAD:  Uh-huh.
10  Q.   (BY MS. HERMLE) So ███ was born in August of 2010
11        and you believed you returned in November.  You may
12        have taken some additional vacation, but you think you
13        returned before the end of the year in 2010, correct?
14  A.    Yes.
15  Q.    And so the next review cycle after your return would
16        have been the review cycle in 2011, correct?
17  A.    Again, the -- the periods that we had reviews has
18        changed over the years, so I don't know if it was the
19        midyear or --
20  Q.    That's why I phrased the question I did because I can
21        tell you're not sure about that, but regardless, after
22        you returned from the maternity leave in late 2010,
23        the next review cycle would have been the one in 2011,
24        regardless of what time in 2011, correct?
25  A.    Yes.
```

1    Q.    Did he say anything else?

2    A.    That it was her fault that I didn't get promoted.

3    Q.    In 2013?

4    A.    Yes.

5    Q.    And what about that leads you to believe she may not

6          be honest?

7    A.    I didn't say that that leads me to believe that she's

8          not honest.

9    Q.    Did you speak with her about that?

10   A.    No.

11   Q.    Well, I had asked you, are you aware of any facts

12         that suggest she's dishonest and this is what your

13         answer was.  Is there anything about what Mr. Walker

14         told you that leads you to believe that Noah Sandidge

15         is dishonest?

16   A.    The manner that he said it in made it seem like it

17         was done intentionally.

18   Q.    And what about that leads you to believe she may be

19         dishonest versus not believing you were qualified for

20         promotion at that time or some other reason?

21   A.    Again, I didn't say that that leads to me to believe

22         that she was dishonest.  You asked if I knew of any

23         facts and that's the fact that I knew.

24   Q.    And if Ms. Sandidge did choose not to put you up for

25         a promotion in 2013, would that have been in your view

1        discriminatory?

2    A.   I don't know.

3    Q.   In 2014, Mr. Walker was responsible for your review;

4        is that correct?

5    A.   Mr. Walker became my manager after Noah.

6    Q.   Did he give you your review in 2014?

7    A.   I believe so.

8    Q.   Was it an on-track positive review in 2014?

9    A.   That sound -- the initial ones, that sounds right.

10   Q.   Did you get a -- a bonus that year of over $24,000?

11   A.   I don't recall the bonus number but I believe I

12       reported to Noah and David Walker --

13   Q.   Okay.

14   A.   -- so it was split during that year.

15   Q.   The compensation treatment, the bonus and salary

16       treatment of 2014 during the year that you reported to

17       Mr. Walker and Ms. Sandidge, was that treatment

18       discriminatory in any way in your view?

19            MS. MIAZAD:  Objection.

20            THE WITNESS:  I don't know.

21   Q.   (BY MS. HERMLE) Are you aware of any facts that

22       suggest your compensation treatment in 2014 was based

23       on or related to your gender?

24   A.   I don't know.

25   Q.   In the fall of 2013, you had a five-year-old, a

```
 1              three-year-old and a one-year-old child?
 2    A.    Fall of 2013?
 3    Q.    Yes.
 4    A.    That sounds right.
 5    Q.    And did your husband work full time?
 6    A.    Yes.
 7    Q.    And did he travel for work?
 8    A.    In 2013.
 9    Q.    I'm asking about 2014.
10    A.    2014?
11    Q.    Yes.
12    A.    Yes, I believe he traveled in 2014.
13    Q.    In 2015, was David Walker your manager?
14    A.    Yes.
15    Q.    In that year, did you receive an on-track review?
16    A.    Can you explain what you mean by "an on-track
17          review"?
18    Q.    Well, let me ask you this way.  In the compensation
19          treatment you received in 2015 while Mr. Walker was
20          your manager, did you receive a merit increase and
21          bonus?
22    A.    In 2015?
23    Q.    Correct.
24    A.    There was a year that no one got merit increases
25          across the board and I don't recall what year that
```

```
 1    Q.    No, post your return from leave at the end of January

 2          or -- what I show as February 1st, but I don't get to

 3          testify.

 4    A.    So additional leave after February?

 5    Q.    Additional time off to deal with problems you were

 6          having healing from the spinal fusion surgery?

 7    A.    I don't recall.

 8    Q.    You reported to Noah Sandidge for some period of

 9          time, was there a time at Microsoft that your skip

10          level manager was Nina Somerville?

11    A.    Yes.

12    Q.    Over what period of time was Nina your second-level

13          manager?

14    A.    From the time she took the position after Lance

15          Horne.  I don't recall those dates.

16    Q.    Was it approximately 2013?

17    A.    I don't remember.

18    Q.    You do remember that when you reported to

19          Ms. Sandidge, she reported to Ms. Somerville?

20    A.    Yes.

21    Q.    And when you reported to Mr. Walker for some period

22          of time, he reported to Ms. Somerville?

23    A.    He also reported to Ms. Sandidge.

24    Q.    Right.  But there was a period of time when he was

25          your supervisor that his supervisor was
```

```
 1           Ms. Somerville?
 2    A.     Yes.  That was after his supervisor was Ms. Sandidge.
 3    Q.     The group in which you worked throughout your time at
 4           Microsoft, has that typically been known as federal
 5           solutions?
 6    A.     Uh-huh.  Yes.
 7    Q.     And that's been true the -- throughout the entire
 8           time you've worked there, correct?
 9    A.     Yes.
10    Q.     And within federal solutions, the organization has
11           typically been focused on selling to the federal
12           government?
13    A.     Yes.
14    Q.     And that's been --
15    A.     And the systems integrators.
16    Q.     I have no idea what that means, so what is that?
17    A.     We have some systems integrators that we categorize
18           as federal customers but they're not federal entities.
19    Q.     Give me an example.
20    A.     General Dynamics.
21    Q.     Okay.
22    A.     Lockheed Martin.
23    Q.     All right.  And --
24    A.     Northrop Grumman.
25    Q.     And is it generally correct within the organization
```

1     of federal systems that there are more women than men

2     in the roles that sell to the federal government?

3           MS. MIAZAD:  Objection.

4   Q.   (BY MS. HERMLE) If you know.

5   A.   Can you be more specific?

6   Q.   Sure.  Are you aware of any facts that suggest that

7     there's been gender bias in hiring within the

8     organization in which you've worked throughout your

9     time at Microsoft?

10           MS. MIAZAD:  Objection.

11           THE WITNESS:  When Mr. Walker wanted to hire

12     ██████████ -- or he had a couple of candidates he was

13     looking at, he said, "I know I'm supposed to have a

14     diversity candidate but whatever," and blew it off.

15   Q.   (BY MS. HERMLE) Who -- what other candidates were in

16     the running for the job that ████ was hired for?

17           MS. MIAZAD:  Objection.

18           THE WITNESS:  I interviewed ████████ and

19     ████████.

20   Q.   (BY MS. HERMLE) Are you aware of any women that

21     applied for that job -- let me fix my grammar, are you

22     aware of any women who applied for that job?  My

23     mother would not approve of that.

24   A.   I don't know.

25   Q.   Are you aware of any women who applied for any

```
 1            position within the federal organization who were not

 2            hired?

 3                      MS. MIAZAD:  Objection.

 4                      THE WITNESS:  The entire federal

 5            organization?

 6   Q.    (BY MS. HERMLE) Yes.

 7   A.    I don't know.

 8   Q.    Other than Ms. Somerville -- by the way, she had a

 9            general manager title during the time she was your

10            second level manager at Microsoft?

11   A.    That sounds right.

12   Q.    Are you --

13   A.    I get confused between general manager and vice

14            president and those.

15   Q.    Do you have a general understanding of how large her

16            team was while she had that role?

17   A.    I'd say at least 60 people.

18   Q.    And above Ms. Somerville, in the federal

19            organization, were there other senior women during

20            your time there?

21   A.    During my time -- could you repeat the question?

22   Q.    Yes.  Was the CTO of federal systems a woman during

23            the time that you've worked there?

24                      MS. MIAZAD:  Objection.

25                      THE WITNESS:  Yes.  But I didn't see her
```

```
 1            above Nina, I saw her as Nina's equivalent.
 2   Q.    (BY MS. HERMLE) Okay.  Other than -- that -- that
 3            woman's name is ████; is that correct?
 4   A.    No --
 5   Q.    I forget her name.
 6   A.    -- it's ██████████.
 7   Q.    Oh, that's what it is, █████.
 8                Other than ███████ and Nina Somerville,
 9            are you aware of other women in the federal
10            organization at that level or above?
11   A.    Not that I recall.
12   Q.    Let me show you some exhibits.
13                THE COURT REPORTER:  1.
14                MS. HERMLE:  Okay.
15                       (Exhibit 1 was marked for
16                        identification.)
17   Q.    (BY MS. HERMLE) If you could take a look at what the
18            court reporter has marked as Exhibit 1, please,
19            Ms. Piermarini, I'm going to ask you a few questions
20            about this document.
21                       (Exhibit 2 was marked for
22                        identification.)
23   Q.    (BY MS. HERMLE) So a couple of questions about
24            Exhibit 1, Ms. Piermarini.
25   A.    May I have a few more minutes here?
```

1          sorry about that.

2                    MS. HERMLE:  No problem.

3                    MS. MIAZAD:  I'll turn that off.

4                    THE WITNESS:  Can you repeat the question?

5     Q.    (BY MS. HERMLE) Yes.

6                    You -- you recognize this as an e-mail that

7          discusses the change of the performance appraisal

8          system and the removal of the numerical rating system?

9     A.    Yes.

10    Q.    Did you receive, regardless of whether it was this

11         one, notice that Microsoft was changing that system?

12    A.    Yes.

13    Q.    Did you attend meetings in which the new system was

14         discussed?

15    A.    I don't recall the specific meetings, but I recall

16         there were many of them in addition to our managers

17         discussing it as well.

18    Q.    And would that have been, at this time, Ms. Sandidge

19         and Mr. Walker who discussed that with you?

20    A.    In 2013, that would be -- yes.

21    Q.    What do you recall Ms. Sandidge saying about the

22         change of the appraisal system?

23    A.    I don't remember anything specific other than I think

24         just delivering the facts that it, you know, was a 1

25         through 5, one being the best and five being the

```
 1              worst.
 2      Q.      Do you remember learning that there would be a
 3              process by which you could provide the names of people
 4              who could give input into your review?
 5      A.      Yes.
 6      Q.      And was that true for the various different types of
 7              appraisal systems at Microsoft or only the numerical
 8              rating system?
 9                        MS. MIAZAD:  Objection.
10                        THE WITNESS:  I don't remember.
11      Q.      (BY MS. HERMLE) Who's currently on the team with you
12              reporting to Mr. Walker?
13      A.      Would you like me to name the people?
14      Q.      I would.  And their titles if you can think of it
15              while you go.
16      A.      Sure.  So in addition to myself, there is ████
17              ████, who was in SSP productivity; ████████████,
18              who was in SSP productivity; ████████, who was in SSP
19              productivity; ████████████ who was in SSP productivity;
20              ████████, SSP productivity; ████████████, SSP
21              productivity; ████████████, who's a TSP, their titles
22              kind of go back and forth or are relative -- I don't
23              know if they're discretionary, but a lot of them
24              change them, so I'm going to call him a TSP.  ████████
25              ████, also a TSP; ████████████, also a TSP; ████████
```

```
 1              ████████, also a TSP.

 2    Q.        Man or woman?

 3    A.        Female.  She was recently hired.

 4    Q.        By Mr. Walker or someone else?

 5    A.        By Mr. Walker.

 6    Q.        Anyone else?

 7    A.        ██████████████, TSP.

 8    Q.        Earlier you said to something about Mr. Walker saying

 9              that he knew he was supposed to have a diversity

10              candidate that he was going to hire ██████████?

11    A.        ██████.

12    Q.        ██████.

13    A.        Uh-huh.

14    Q.        Thank you.

15    A.        Actually --

16    Q.        ██████ is the lake.

17    A.        -- I didn't say that he -- he said he -- that he

18              would hire █████, it was that he knew the candidates

19              that he wanted.

20    Q.        Okay.  That's the conversation I want to take you to

21              now.

22    A.        Okay.

23    Q.        So in terms of the specifics of what he said, what

24              did he say?

25    A.        He said, "I know I'm supposed to have a diversity
```

1           question?

2   A.      No.  Could you repeat it?

3   Q.      Yeah, I will repeat it, but what I'm trying to ask

4           you is, had you heard from any source that it might be

5           more difficult to get promoted, for example, to a 65

6           than a 62?

7   A.      Oh.

8   Q.      In other words, as the promotions got higher, that

9           they were more difficult to achieve?

10  A.      Yes, I had heard that.

11  Q.      And what type of sources had you heard that from?

12  A.      Oh, many.  I -- too many to name.  It was kind of

13          known that it --

14  Q.      Okay.

15  A.      -- it gets harder to get promoted as you get higher.

16  Q.      With respect to the promotion process at Microsoft,

17          did you have an understanding that there were a

18          limited number of open slots or that employees

19          generally who were eligible for a promotion, say to

20          65, level 65, could be promoted?

21  A.      It was my understanding that there were a certain

22          number of slots.

23  Q.      And where did you get that understanding?

24  A.      I don't recall specifically who said that, but it was

25          kind of known as well.  People would even try to

1      figure out who else would be eligible for a promotion

2      and then also try to figure out how many spots they

3      would be getting based on attainment.

4   Q.   Are you aware of whether the review systems outside

5      of the federal organization at Microsoft were the same

6      or different as the ones in which you participated?

7   A.   I don't know.  I've only been federal.

8   Q.   When were you first qualified in your view to be

9      promoted to level 65?

10  A.   I would say certainly by 2014.

11  Q.   Do you mean by the review cycle in 2014 or some

12     different time in the year?

13  A.   Well, it was my understanding that there were also

14     midyear promotions.

15  Q.   Okay.  So when in 2014 in your view were you first

16     qualified for a promotion to level 65?

17              MS. MIAZAD:  Objection.

18              THE WITNESS:  I don't know.  It was a general

19     feeling that I felt I was ready for a promotion.  I

20     even spoke to Nina about it and she had indicated that

21     David said that I was -- or she had indicated that I

22     was on David's list.

23  Q.   (BY MS. HERMLE) And what did you say and what did

24     Nina Somerville say in that conversation?

25  A.   I said, so -- I don't completely recall how I asked

1     the question but I inquired somehow about a promotion

2     and she said, "Oh, yeah, you're on David's list."

3 Q.   Was anything else discussed between the two of you in

4     that conversation?

5 A.   Not to my knowledge.

6 Q.   What did you understand Nina to mean when she said,

7     "You're on David's list"?

8 A.   That at some point in the near future I would be

9     submitted for a promotion.

10 Q.   Why in your view were you qualified for a promotion

11     to level 65 beginning in 2014?

12 A.   Because I had consistently been a high performer, I

13     was consistently asked to be a part of or lead larger

14     efforts such as very large EA renewals, involved in

15     very large, you know, contract proposals.

16         At one point in 2012 I was told -- I believe

17     it was 2012, it was when Lance Horne was still our STU

18     director and when Javier was exiting, I was told that

19     I was named as all of the STU manager's successor.

20 Q.   Who told you that?

21 A.   Lance Horne.

22 Q.   Any other reason you were qualified for a promotion

23     to level 65?

24 A.   I was very good at what I do -- and still am.

25 Q.   When you said earlier that your view of your

```
 1            husband's managers changed related to his termination,

 2            that -- was it your understanding that Mr. Horne made

 3            the decision to terminate your husband?

 4      A.    I wasn't privy to --

 5      Q.    You don't know?

 6      A.    -- whose decision ultimately it was.  But, you know,

 7            people kind of had a general feeling from what people

 8            would say, things like, oh, yeah, Lance didn't like

 9            him, kind of thing.

10      Q.    And is Mr. Horne still with Microsoft?

11      A.    Mr. Horne is deceased.

12      Q.    And how long ago did that happen?

13      A.    It hasn't been that long.  I don't -- I don't recall

14            exactly.

15      Q.    Let me ask you some questions about your duties

16            before you break for lun -- before we break for lunch.

17            Is it a key part of your duties to interact directly

18            with customers?

19      A.    Yes.

20      Q.    And is that the key duty that you have, to work with

21            customers, to assist them with their needs?

22      A.    Well, I would say that's the priority, yes, but based

23            on my role, we also look at the account team units as

24            our internal customers as well.

25      Q.    What does that mean, who are your customers and what
```

```
1                 MS. HERMLE:  No, I'm very food oriented.  All

2          right.

3                 MS. DAMRELL:  Well, we can take the

4          opportunity to --

5                 MS. HERMLE:  I know.

6    Q.    (BY MS. HERMLE) With respect to the criteria for

7          promotion to level 65, Ms. Piermarini, have you seen

8          documents which lay that out?

9    A.    I believe there is something online called the core

10         competencies of each level, so, you know, level -- I

11         think it's a level, not a band.  And I had a difficult

12         time finding the 65 core competencies because I was

13         searching for those for Mr. Walker at one point.

14   Q.    Why were you doing that?

15   A.    Because I had approached Mr. Walker during my Connect

16         about being promoted to 65 and he said that -- I asked

17         him, you know, am I -- this was after the conversation

18         with Nina where she said I was on his list and so I

19         thought I would check in, like, okay, are you planning

20         to submit me for a promotion, you know, midyear, this

21         was about November time frame, so midyear was coming

22         up and he said no, I don't think you're ready and I

23         said --

24   Q.    Can I stop you?

25   A.    Sure.
```

1    Q.    I just want to make sure I've got the whole

2          situation.

3    A.    Uh-huh.

4    Q.    So you're about to tell me about what you said and

5          what David Walker said in the meeting, which was when?

6    A.    It was a Connect meeting.

7    Q.    So --

8    A.    And I believe it was November.

9    Q.    Of 2014?

10   A.    Yes.

11   Q.    And this meeting with Mr. Walker in November of 2014

12         was one that would have regularly taken place through

13         the appraisal process, correct?  When you say "

14         Connect," you're talking about a --

15   A.    Cur --

16   Q.    -- conversation between the two of you about your

17         performance?

18   A.    Yes.

19   Q.    And you initiated this discussion because

20         Ms. Somerville had told you you'd be on a list; is

21         that correct?

22              MS. MIAZAD:  Objection.

23              THE WITNESS:  I initiated the conversation

24         because I was interested in a promotion.

25   Q.    (BY MS. HERMLE) Okay.  And when you initiated the

```
 1            conversation with Mr. Walker in November of 2014, what
 2            did you say?
 3    A.      I said, "So what are your thoughts on a promotion to
 4            65 for me," and he said, "You're" -- "I don't think
 5            you're ready."
 6    Q.      And what else did he say or you say in the course of
 7            this discussion?
 8    A.      I said, "Okay, well, what can I do to get ready?"
 9            And he said, "You will need to take on a big project."
10    Q.      And was anything else said in the conversation?
11    A.      Yes.
12    Q.      What else was said?
13    A.      I said, "Well, how about if I take on consumption?"
14            Consumption was a new effort, you know, in the
15            company, so cloud consumption.  You know, everyone we
16            sold cloud to, we wanted to make sure that they were
17            actually using it and consuming it and so it was
18            something that was going to be a large endeavor and
19            have a lot of visibility and would be a very good
20            opportunity to, you know, do well and become a 65.
21    Q.      And what else was said after you said, "How about if
22            I take on cloud consumption"?
23    A.      Mr. Walker said, "Okay."
24    Q.      And was --
25    A.      "Great."
```

1   Q.    -- there anything else said other than -- after

2         "okay, great"?

3   A.    I said, "Okay, how about if I put together a

4         presentation on my thoughts on how we can manage

5         consumption within federal for Office 365

6         specifically.  There's a whole other side of

7         consumption that we, you know, aren't responsible

8         for," and -- and he said -- and in that meeting, he

9         said, "Okay, you know, put the presentation together

10        and, you know, get back to me," kind of thing.

11  Q.    Now have you told me everything that was said between

12        you and Mr. Walker?

13  A.    In that meeting.

14  Q.    In that meeting?

15  A.    Yeah.  And -- and I do have to put on record, I'm not

16        100 percent sure that that was my Connect meeting.  I

17        feel like it was because we were talking about my

18        growth and such, but I'm not 100 percent sure that was

19        a Connect meeting.

20  Q.    And what is a Connect meeting?

21  A.    Well, those are where you look at how you're doing

22        against your commitments and just kind of a general

23        how are you doing and what -- what could you be doing

24        and, you know, it's an opportunity for your manager to

25        talk to you about that stuff.  It is just a set, you

1           know, time frame that we're supposed to be talking

2           about that stuff.

3    Q.     When Mr. Walker first became your manager, were you

4           pleased about that?

5    A.     I was.

6    Q.     And you had a good relationship with him for some

7           period of time?

8    A.     I did, during the time that he was reporting to Noah.

9    Q.     And over what period of time was it that you had a

10          good relationship with Mr. Walker when he was your

11          manager?

12   A.     Up until the time that he then stopped reporting to

13          Noah.

14   Q.     My question is when was that?

15   A.     Can we ask Noah?

16   Q.     No, but that's all right.  If you don't know, that's

17          fine.

18   A.     I don't know for sure.

19   Q.     Okay.  So your view was -- and you had a relationship

20          with Mr. Walker, if I understand your earlier

21          testimony, before he became your manager, correct?

22   A.     I mean, I would say we were co-workers and we had,

23          you know, a positive relationship.  We worked, you

24          know, together on deals and opportunities and we would

25          talk about deals and opportunities and I voiced -- you

```
 1            for higher ratings for the people who reported

 2            directly to her?

 3   A.     Well, the conflict --

 4                  MS. MIAZAD:  Objection.

 5                  THE WITNESS:  The conflict was that he --

 6            well, I can't surmise what he thought, so --

 7   Q.     (BY MS. HERMLE) I'm asking what he conveyed to you,

 8            what was the conflict in the way that he conveyed it

 9            to you?

10   A.     That -- I explained it.  That he had his people, she

11            had her people and in those calibration meetings, they

12            were essentially fighting, you know, against each

13            other because the team as a whole, Noah as the person

14            who heads up the entire team gets a certain number of

15            1s, 2s, 3s, 4s and 5s, and that he would then have to

16            fight for his people and if -- and this is the way I

17            understood it, if he fought too hard, that may then

18            make her, you know, not want to give him a fair rating

19            or what have you.

20   Q.     Do you know whether the federal systems organization

21            had the same number of available 1s and 2s ratings as

22            in other organizations?

23   A.     It was always said or, you know, we always heard that

24            you got those ratings or number 1s depending on how

25            well you attained, so --
```

```
 1   Q.     What does that mean?

 2   A.     So -- so I think they are handed out on a public

 3          sector level, so if federal did not do as well as

 4          state and local, that state and local would get more

 5          1s than federal.

 6   Q.     So the number of available 1s depended on how well

 7          the organization did, to your understanding?

 8   A.     That was my understanding.

 9   Q.     So the number of available 1s could vary from group

10          to group?

11   A.     That was my understanding.

12   Q.     And all of this to your understanding was within

13          the --

14   A.     Public sector.

15   Q.     The public sector, as you call it.

16   A.     Which is what Curt Colcun runs.

17   Q.     Are you aware of any facts suggesting that Mr. Colcun

18          treated employees in any particular way because of

19          their gender?

20                 MS. MIAZAD:  Objection.

21                 THE WITNESS:  I don't know.

22                 MS. HERMLE:  What was the answer?

23                 THE COURT REPORTER:  I don't know.

24                 MS. HERMLE:  Thank you.

25                         (Exhibit 4 was marked for
```

```
 1                                identification.)

 2                     MS. HERMLE:  4?  Is it 4?

 3                     THE COURT REPORTER:  Yes.

 4                     MS. HERMLE:  Okay.

 5   Q.    (BY MS. HERMLE) If you could please take a look at

 6         Exhibit 4, Ms. Pier -- Piermarini, which purports to

 7         be your letter from Microsoft.

 8                            (Exhibit 5 was marked for

 9                             identification.)

10   Q.    (BY MS. HERMLE) So as to Exhibit 4, Ms. Piermarini,

11         I'm happy to direct you to particular areas I'm going

12         to ask you about, my first question for you is going

13         to be, do you recognize the first three pages of

14         Exhibit 4 as being your -- the confirmation of an

15         offer of employment for you?

16   A.    Yes.

17   Q.    And according to the second sentence, your effective

18         start date was Monday, September 11, 2006, do you have

19         a different memory of your effective start date?

20   A.    I do.

21   Q.    What do you remember it to be?

22   A.    September 15th.

23   Q.    So September 15th of 2006, according to your memory,

24         is your official start date at Microsoft?

25   A.    Yes.
```

1       Office and Office is talking to, you know, whomever

2       else and I thought that was pretty positive.

3   Q.   In the past year or two at Microsoft, have you seen

4       posters about growth mindset in meeting rooms related

5       to how meetings should work under the growth mindset

6       concept?

7   A.   I haven't noticed them.

8   Q.   What did Mr. Myers say about growth mindset?  I think

9       you said, "I'm not sure yet," or something?

10  A.   Yeah, it just seemed like he was, you know -- I don't

11      remember the words that he said, you know,

12      specifically, but it was something like, yeah, the

13      jury's still out, I'm still kind of waiting to see how

14      I feel about this whole thing, you know.

15          Greg isn't -- is not really the warm and --

16      or I'm sorry, let me take that back, he's not really

17      kind of the fluffy type stuff.  We are a sales

18      organization, so kind of a little different.

19  Q.   I want to ask you, Ms. Piermarini, about the

20      conversation with Mr. Walker in which you discussed

21      the child care comment?

22  A.   Uh-huh.

23  Q.   And this was after November of 2014; is that correct?

24  A.   Yes.

25  Q.   And was this a phone conversation or a face-to-face

1          conversation?

2    A.    A phone conversation.

3    Q.    In between that November '14 meeting that may have

4          been a Connect in which you discussed the promotion

5          and this phone conversation, had you had any other

6          interactions with Mr. Walker that had been negative or

7          conflicting?

8    A.    Between November and the time I had that

9          conversation?

10   Q.    Yes.

11   A.    Yes.

12   Q.    How many had there been?

13   A.    More than one.  I don't know the exact number.

14   Q.    What was the next negative or conf -- or -- what was

15         the next negative interaction you had with Mr. Walker

16         after the November '14 interaction?

17   A.    Well, like I said, I -- or as I was explaining

18         before, I wanted to take on the consumption project,

19         so I built the presentation to talk about how I, you

20         know, could manage the consumption project and we were

21         to then -- we were then going to present that to Nina

22         and so I followed up with him at least twice

23         explaining, you know -- or asking, hey, I've been

24         ready to go with the presentation, can we go ahead

25         with the next step and he, you know, the first time

1    said, let me talk to Nina, and then the second time it

2    was, oh, well, this has taken on a whole life of its

3    own and then, you know, he just -- I didn't really

4    hear much about that -- about that project.

5           And, you know, so I kind of just kept my head

6    down and kept working and doing what I was supposed to

7    do, I figured that -- I believe him when he said it

8    took on a life of its own so I thought maybe there was

9    somebody else that was going to be owning the

10   consumption and not us anymore.  I didn't know.  I

11   just figured that, you know, David was telling me, you

12   know, the truth.

13          And then there was another -- there was a

14   case where my daughter was very ill and she had the

15   flu and pneumonia and I was at the doctor with her and

16   the doctor was deciding whether they were going to

17   admit her to the hospital and I had let David know

18   that, that, you know, I'm having this emergency

19   situation and I would be out for the day and after

20   that, he sent me an e-mail saying, "Are you going to

21   answer this," which was in reference to kind of an

22   auto generated e-mail that comes from corporate about

23   reserving equipment, actual physical, you know,

24   hardware and I thought that that was -- I felt

25   harassed by that, being that he knew that I was taking

1          care of my daughter.

2                  And then I believe there were a few other

3          issues that, you know, made me really say, wow,

4          this -- this doesn't seem to be going well and so I

5          called Nina and I said, "Hey, I feel like I've got

6          some issue going on with Walker.  I'm not really sure

7          what happened, you know, am I being pushed out, is

8          something going on here that I don't know about?" and

9          she assured me that, "No, you are held in high regard

10         and you're a high performer and there's not any, you

11         know, notion of you being pushed -- pushed out."

12                 And then she said, "Well, you know, you have

13         the ability to go and make a complaint if you feel,

14         you know, you need to, you know, or you can talk to

15         David," and I said, "Well, let me talk to David,"

16         because, you know, we had had previously a good

17         relationship and I thought I should address it with

18         him first before, you know, making a formal complaint.

19         Maybe he had something going on in his life and he

20         didn't realize that he was treating me that way, I

21         didn't know.

22                 So I set up an appoint -- a meeting with him

23         and I told him, you know, I said, "Hey, I just feel

24         like you have been different with me and I'm not sure

25         what's going on and you haven't brought any

1    performance issues to my know -- you know, up to me,

2    so I -- I just don't know why you are treating me this

3    way."

4            And he got extremely defensive and said he

5    didn't know what I was talking about and I was wrong

6    and just kind of kept throwing things out and he said,

7    you know, he had made a comment -- I'm trying to

8    recall the exact comment.  He had made a comment

9    about, he said that I -- he said, "Well, now that

10   you -- now that you mention it, over the past" -- I

11   forgot however many days he said, "you've been

12   disconnected."  And I don't know what that meant, to

13   be honest with you.  I didn't know if that meant

14   physically disconnected, mentally disconnected, I

15   didn't know what that meant and I didn't ask.

16           I just said, "Well, you know, I've been

17   really busy and, you know, I have also had a couple of

18   challenges going on with sick kids and" -- at the time

19   we had some very extreme weather in the D.C. area and

20   schools were closed, all schools were closed and so I

21   said, "You know, I've been kind of managing that as

22   well as my workload."

23           And he said, "Well, you can't be doing child

24   care during working hours," and so I went back to Nina

25   and said, "I think we have a problem."

```
1   Q.    Okay.  Let me ask you about some of what you told me

2         about.  So when you said you felt harassed because he

3         sent you an a e-mail saying, "are you going to take

4         care of this," what about that made you feel harassed?

5   A.    Well, he knew the situation I was in with my daughter

6         and he still sent the e-mail.  I would have expected

7         him to say, "hey, can I take care of this for you" or

8         you know, something of that nature, but it was a

9         very -- just a quick, one sentence, are you going to

10        take -- "are you going to respond to this?"

11  Q.    After his e-mail, did you respond to the request he'd

12        forwarded to you?

13  A.    Not that day, but in the next day or when I was able

14        to -- when my daughter was better, I believe, and I

15        was back, you know, kind of off of being off -- you

16        know, from being off.

17  Q.    Was that in your review, the inquiry about whether

18        you were going to respond, related in any way to your

19        gender?

20  A.    I don't know.

21  Q.    When you called Nina and said you had an issue with

22        Walker and she told you, "No, you're held in high

23        regard, you're a high performer, you're not being

24        pushed out and that you had the ability to make a

25        complaint," you told her, "Let me go to David and have
```

1           a discussion with him" --

2    A.     Uh-huh.

3    Q.     -- was there anything else you or Nina said in that

4           conversation that you didn't list?

5                   MS. HERMLE:  Can somebody pass the water

6           down.  Thank you.

7                   THE WITNESS:  I don't recall if there was

8           anything else.

9    Q.     (BY MS. HERMLE) You've told me everything you can

10          recall about that conversation?

11   A.     Yes.

12   Q.     So the conversation in which you've just --

13                  MS. HERMLE:  Thank you so much.

14   Q.     (BY MS. HERMLE) -- which you've just described for me

15          in which you asked him about how he was treating you

16          and he said you'd been disconnected, was that face to

17          face or phone?

18   A.     Phone.

19   Q.     And was it after he said, now that you mention it,

20          you've been disconnected that you told him about the

21          challenges you'd been having with sick kids and the

22          school closures?

23   A.     Uh-huh.  Yes.

24   Q.     And what were the challenges you were describing that

25          you had been having with sick kids?

1  A.    Just that, you know, they -- they kept consistently

2        getting sick.  It was just a really bad winter.  Lots

3        of viruses and things going around.

4  Q.    And what was the challenge with respect to schools

5        closing?

6  A.    Well, if the schools were closed, then kids were

7        home, you know, during the day and there was no

8        alternative care.

9  Q.    Did you have child care?

10 A.    I did, but it was closed.  It was a school and my

11       kids go to a preschool/day care type environment.

12       Actually, that reminds me, in that same conversation,

13       David suggested that -- or implied that I should get a

14       nanny.  He said that --

15 Q.    What did he say?

16 A.    He said, well, you know -- I think he even mentioned

17       Noah, I know he mentioned Nina, but he said, Nina has

18       a nanny, you know, why don't you look at doing that

19       kind of thing or you should get a nanny and I said,

20       well, you know, I -- I choose -- it's not a decision

21       my husband and I have made for our child care for our

22       children.

23 Q.    This statement that you can't be doing child care

24       during working hours, did you find that statement

25       inappropriate or offensive in any way?

```
1   A.    I definitely found it offensive and I told him that
2         on the spot.
3   Q.    What was offensive to you?
4   A.    That he was implying that I was only focused on doing
5         child care and not doing my job.
6   Q.    And to you, was that a statement he'd made for
7         reasons relating to your gender?
8   A.    Yes.  Because the guys on my team were also in the
9         same situation.  I was the only woman on my team up
10        until ████ being hired, which was very recently, and
11        so there were only men on my team and I know that the
12        guys on the team had wives that worked and so they,
13        you know, would share in the child care
14        responsibilities and they were doing the same thing,
15        which was working, managing, you know, their -- their
16        workday while kids were home.
17  Q.    Did Mr. Walker say to you before you told him about
18        the challenges with sick kids and schools closing that
19        he had looked at your calendar?
20  A.    I don't know if it was in that conversation, but
21        yeah, there -- he was very stuck on my calendar around
22        that time, very stuck on it.
23  Q.    In the conversations you had with him about your
24        calendar, did he tell you that he'd noticed that you
25        had either no or few customer meetings on your
```

1          calendar?

2   A.     He -- I don't recall him saying that then.  He said

3          that recently, recently with Lynne Crunkleton, who is

4          our new HR person, she has attended my previous one --

5          or past one-on-ones, that he set up a meeting because

6          he basically wanted me to count how many customer

7          meetings I had.

8   Q.     Well, my question is back?

9   A.     Back then?

10  Q.     Yeah, in the period between November -- well, when

11         was this conversation --

12  A.     Well, so the -- the calendar stuff that he was --

13         that he had brought up then was really around -- you

14         know, at the time we were doing a lot of Office 365

15         upgrades internally and so things were happening with

16         our calendars and, you know, settings that we had in

17         our calendars, like viewing permissions and things

18         like that were kind of going on and off and what he

19         brought up about my calendar then was that he couldn't

20         see my calendar and he was very angry about that, and

21         I don't know if it was in that exact conversation, but

22         it was around that time, that's what I recall about a

23         calendar at the time.

24  Q.     When was the conversation in which he told you you

25         had been disconnected and you told him about the

1          challenges you were having?

2    A.    That phone call that I was referring to.

3    Q.    Right.  I'm trying to find out when that was.

4    A.    Oh, it was in March.

5    Q.    March of 2015?

6    A.    Of 2015.  Uh-huh.

7    Q.    How did you know that Mr. Walker was angry about not

8          being able to see your calendar?

9    A.    Because he told me.  He said that he --

10   Q.    What did he say?

11   A.    He said that he spent hours with IT trying to figure

12         out why he couldn't see my calendar.

13   Q.    Did he tell --

14   A.    And he seemed agitated about it and I kept telling

15         him, "listen, I'm sorry, I am trying to apply the

16         permissions, I don't know why it's not sticking.  If

17         you want me to send you a screenshot of my calendar,

18         I'm happy to do that."

19   Q.    Are you aware that Mr. Walker looked at the calendars

20         of all of the folks that reported to him?

21   A.    I don't know.

22   Q.    Do you have any reason to believe he didn't do that?

23              MS. MIAZAD:  Objection.

24              THE WITNESS:  I don't -- I don't know if he

25         did that.  No one discussed it with me.

```
 1   Q.      (BY MS. HERMLE) Who were the men you were referring

 2           to whose wives worked and were in the same situation

 3           that you were?

 4   A.    Well, thinking about the people on my team that have

 5         kids and wives that work.  ████████, ████████.  At

 6         the time, I think that's all that I can think of.

 7   Q.    You were telling me about the --

 8   A.    I'm sorry, in fact, I had a conversation with ████

 9         about that.  I asked him, you know, basically I just

10         wanted to confirm that he was in the same boat and I

11         said, "Hey, what are you doing, you know, since your

12         kid, you know, since schools are closed?"

13              It was kind of an epidemic.  It was a little

14         anomaly in most -- you know, that doesn't really

15         happen in our area, where all the schools were shut

16         down, including daycares and such.

17              And I said, "Well, you know, what are you

18         doing?"  He said, "I'm doing the same thing you are

19         doing, I'm trying to manage my workload with my kids

20         at home."

21   Q.    Did you have any reason to believe --

22   A.    Oh, I'm sorry, and I asked him if David had said

23         anything to him about it, and he said no.

24   Q.    Did either ████ or David tell you that David viewed

25         ████ as being disconnected?
```

```
 1   A.    Did either of them tell me that?

 2   Q.    Yes.

 3   A.    No, neither of them told me that.

 4   Q.    Did either David Walker or ███ tell you that David

 5         viewed ███ as being disconnected?

 6   A.    No, neither of them told me that.

 7   Q.    Shoot, I had a question in my head that just left.

 8               When did you first make a complaint -- oh,

 9         here's what it was.  Did you tell Mr. Walker in this

10         telephone conversation, in which he told you -- which

11         you told him about the challenges, that your husband

12         was traveling a lot?

13   A.    Yes, I believe that was around the time that my

14         husband was traveling a lot.  Especially when my

15         daughter was about to be hospitalized, he was actually

16         overseas and if I was going to have to be in the

17         hospital, I also needed to find care for my boys.

18   Q.    When you talked to Mr. Walker about the challenges

19         you were having with sick kids, the schools closing

20         and your husband traveling, did you begin to cry?

21   A.    It was during that conversation I did get choked up

22         and I kind of took a minute and said, let me catch my

23         breath, but I was still able to talk through what, you

24         know, I needed to talk through.

25   Q.    When you got choked up, was that in the course of
```

1          not having designated any vacation for over a year?

2   A.     In that meeting?  I don't recall.

3   Q.     In any of the meetings in which he discussed your

4          calendar with you, did he say anything to you about

5          the fact that you had not put any vacation or time off

6          on your calendar?

7   A.     He did say something about vacation and time off.  I

8          believe he was referring to entering that into the

9          time off system.

10  Q.     When did he say that and what did he say?

11  A.     I don't recall when he said it, to be honest with

12         you.  He kind of harps on it a lot to the team as far

13         as time and reporting.  But he had -- he said, I

14         noticed you haven't put any -- I think, honestly, I

15         don't know the exact words, but it was to, you know,

16         to that effect, which was, you know, I noticed you

17         haven't put any time off.  I don't recall him having a

18         specific time frame as you mentioned, but he said, you

19         know, I noticed you haven't put any time off, you

20         know, there had to have been some vacation that you

21         had taken.

22  Q.     And what did you say?

23  A.     I said, okay, you're probably right.  I actually

24         didn't take like an extended vacation for quite some

25         time at that point, just -- just it happened to be

1        that way.  Um, but anyhow, I believe that I did go in

2        and look back and take off some time that I knew I had

3        had on my calendar like -- or the day that I had to

4        take off with my daughter.

5   Q.   When he said -- when you said he harps on it a lot to

6        the team, what -- what did you mean?

7   A.   He -- he just says it often, you know, he says it in

8        team meetings and, you know, he's just kind of always

9        saying, don't forget to, you know, put your time off

10       in the tool and that sort of thing.

11  Q.   So it was something he had emphasized to the entire

12       team?

13  A.   Yes.

14  Q.   The meeting that you had with Nina Somerville and

15       David Walker in --

16  A.   Uh-huh.  Uh-huh.

17  Q.   -- in March of 2015, how long did it last?

18  A.   I would say an hour at least.

19  Q.   And where was it?

20  A.   It was in David Walker's office in Ruston, Virginia.

21  Q.   And how did the meeting begin?

22  A.   Nina trying to kind of, you know, ease in and, you

23       know, I guess provide a platform for both of us to

24       kind of air our grievances and talk about things,

25       that's how it kicked off.

1    Q.    What did she say?

2    A.    She said, you know, "Dana, you've voiced some -- some

3           concerns about how David's treated you, let's talk

4           about some of those concerns and, you know, kind of

5           figure out if there is ways that we can fix it, work

6           on it, make it better."

7    Q.    And what was discussed next?

8    A.    I don't remember all of the details of the meeting,

9           but David, again, became very defensive and agitated

10          and, you know, basically anything I said, he was

11          defensive about.

12    Q.    And what was discussed specifically?

13    A.    Well, we talked about the way that he had been

14          treating me and how I felt that it was different than

15          the others.  We talked about the child care comment.

16          We talked about how he wasn't supportive when I was

17          out with my daughter.  I think that there was some

18          other examples in there about like customer examples

19          and how he and Jason Apergis, who is my TSP and very

20          close with David, we talked about how, you know, David

21          and Jason would -- I felt that they had -- they were

22          ganging up on me in regard to, you know, customer

23          situations and things like that.

24             And, you know, again, he kept getting

25          defensive.  He made a few comments about -- he made an

```
 1          offensive comment about me getting emotional within

 2          the first minute of the conversation.  He also, in

 3          reference to talking about the teams that I support,

 4          he said, "Well, ██████████' team didn't want you, so

 5          that's why we had to put you on the Navy team," and

 6          that bothered me because I had not -- not heard that

 7          in the past and I reported to Noah when I supported

 8          █████ and I asked Noah if that was true, if █████ had

 9          not wanted me and she said, "No, that wasn't true."

10  Q.      So I want you to stay on the meeting, if you could.

11  A.      Okay.

12  Q.      Have you now told me everything that Mr. Walker said

13          and you said and Nina said in the meeting or was there

14          more?

15  A.      There's more.

16  Q.      What else was said during the meeting?

17  A.      So you know, Nina just kind of sat there, I think

18          probably seeming -- not -- not knowing what to do

19          because -- or you know, it just was very adversarial

20          again, he was, you know, really agitated and kind of

21          angry and defensive and she said -- she kind of

22          wrapped it up because it didn't look like it was going

23          anywhere, and said, "Well, okay, let's work on this,

24          let's continue to work on this.  I recommend, you

25          know, you guys including me in your future
```

1        conversations."

2                    And she even said in front of David, you

3        know, feel -- "you can go to talk to Dick Hoell," who

4        was our HR person at the time.  And then she said, "So

5        Dana, what do you want?"  And I said, "Well, it's

6        March, we're getting close to Q4, I just want to be

7        able to keep my head down and do my job and focus on

8        closing out the year and not feel like I have a target

9        on my back," which is the way that I felt.  She said,

10       "Okay."  And the meeting ended.

11   Q.   When Nina said, "You can go to Dick Hoell," did you

12       understand her to be talking to you?

13   A.   Yeah.  Yes.  Sorry.

14   Q.   And to be saying you could raise a concern with HR if

15       you wish to do that?

16   A.   Yes.

17   Q.   Okay.  Did anyone ever tell you that you and David

18       Walker were having issues because you're both so hard

19       headed?

20   A.   Not that I recall.  Actually, I don't recall anyone

21       referring to me as hard headed.

22   Q.   When you talked to Mr. Walker in the meeting about

23       the way he was treating you being different, did you

24       tell him he was treating you differently than he used

25       to treat you, than the way he used to treat you?

```
 1   A.     Yes.

 2   Q.     What did you say about that?

 3   A.     I said that the way that he treats me now has changed

 4          or that his treatment of me has changed.

 5   Q.     Did you say what you meant by that?

 6   A.     I don't recall.

 7   Q.     Did you tell him he treated you differently in 2014?

 8   A.     Than in 2014, that he treated me differently than in

 9          2013 -- or 2014?

10   Q.     Yes.

11   A.     I didn't give him the year.  I just said you are

12          treating me differently than you have in the past.

13   Q.     So after the meeting that you've just described -- by

14          the way, do you know when that was in March of 2015?

15   A.     I believe March 26th.

16   Q.     After that meeting, did you have further negative

17          interactions with Mr. Walker before you raised a

18          complaint?

19   A.     Well, it was only about two weeks before I raised a

20          complaint, so --

21   Q.     In those two weeks?

22   A.     I'm not sure I have anything jumping out at me

23          between -- in those two weeks.

24   Q.     Why did you wait two further weeks before raising a

25          complaint?
```

1   A.   Oh, raising a complaint is serious and so I wanted to

2        think about it.

3   Q.   And you chose -- you decided you would do that?

4   A.   To raise a complaint?

5   Q.   Yes.

6   A.   I decided that I would go talk to Dick Hoell about

7        it.

8   Q.   Okay.

9   A.   I've never raised a complaint before, so I really

10       wasn't sure what it was going to entail, but I had

11       decided to go talk to Dick Hoell and tell him my

12       experiences.

13  Q.   And did you have a relationship with Dick Hoell when

14       you --

15  A.   No.

16  Q.   -- did -- you didn't know him?

17  A.   No.

18  Q.   And for how long did you meet with Mr. Hoell when you

19       described your experiences with him?

20  A.   Like less than 30 minutes.  I believe it was around

21       20 minutes.

22  Q.   And what happened in that meeting?

23  A.   I told him, you know, what was going on and

24       everything and he kind of asked about David and he

25       said -- he was asking me questions.  You know,

1     basically I would tell him, I told him what had

2     happened as far as, you know, I had the phone call

3     with David and then I had had the in-person meeting

4     with David and Nina and when I was describing some of

5     the things that David was saying, like you got

6     emotional in the first minute and David -- ███████

7     didn't want you and those things, he kept -- he a few

8     times confirmed that Nina was in the room when David

9     said those things and he just, you know, continued to

10    listen to me.

11            And then he said basically, you have a couple

12    of choices, you can stay where you are under David and

13    figure out how to work it out or you can find another

14    job.

15  Q.  Before I ask you more about that, have you now told

16    me everything that was said in the meeting between

17    you, Mr. Walker and Ms. Somerville on March 26th?

18  A.  Everything that I can recall right now.

19  Q.  Did you take any notes about that meeting?

20  A.  I did take notes about that meeting.

21  Q.  When did you do that?

22  A.  After the meeting.

23  Q.  Immediately after the meeting?

24  A.  Sometime after the meeting.

25  Q.  How long after the meeting?

1    A.    I don't recall.

2    Q.    Was it the same day?

3    A.    I don't recall.

4    Q.    Was it the same week?

5    A.    Likely.

6    Q.    How did you take notes?

7    A.    I had a document that I was taking notes on -- on the

8          experiences that I had had and it was just kind of

9          like my raw notes.

10   Q.    And when did you start taking those notes?

11   A.    When I started to feel like David was possibly coming

12         after me.

13   Q.    When?

14   A.    I honestly can't tell you the date.  It must have

15         been around that time frame of November when I had had

16         the Connect.

17   Q.    And did you take them electronically?

18   A.    I kept them in a Word document.

19   Q.    And how long was the document when you finished

20         putting all your notes into it?

21   A.    Well, I kept it over a period of time, so, you know,

22         it -- it probably got to two, maybe three pages.

23   Q.    And when was the last time you put notes into it?

24   A.    I don't recall the exact date but I continued to keep

25         my notes.

```
 1                    THE VIDEOGRAPHER:  The time is 3:13 p.m.,
 2           this is the end of disk 3, we're off the record.
 3                         (A break was taken.)
 4                    THE VIDEOGRAPHER:  The time is 3:22 p.m.,
 5           this is the beginning of disk 4, deposition of Dana
 6           Piermarini, we're now on the record.
 7    Q.     (BY MS. HERMLE) Ms. Piermarini, was there anything
 8           said in the conversation between you and Dick Hoell
 9           other than what you've already told me about?
10    A.     In that conversation --
11    Q.     Yes.
12    A.     -- because I had another conversation with Dick
13           Hoell.
14    Q.     I'm asking about that conversation.
15    A.     In that conversation, that's what I recall at the
16           moment.
17    Q.     What was -- and would this conversation with Dick
18           Hoell have been in March or April?
19    A.     That conversation, I believe, was April.  I feel like
20           the 15th, tax -- tax day was sticking out at me.
21    Q.     And did you have any particular feelings about that
22           conversation with Mr. Hoell?
23    A.     Uh, yeah.
24    Q.     What were they?
25    A.     I thought it wasn't helpful.
```

```
 1   Q.    And what did you do next with respect to your
 2         concern?
 3   A.    I thought on it and I decided to go back to Dick
 4         Hoell and perhaps describe, you know, how I felt a
 5         little bit more stronger.
 6   Q.    And how -- how much later than April 15th was the
 7         second conversation with Dick Hoell?
 8   A.    I feel like it was less than a month, but I believe
 9         it was sometime in May.
10   Q.    And in May -- this is May of 2015, correct?
11   A.    Yes.
12   Q.    In May of 2015, when you met against -- again with
13         Mr. Hoell, how long was the meeting?
14   A.    Probably about 30 minutes, maybe slight -- no,
15         probably about 30 minutes.
16   Q.    And how did the meeting begin?
17   A.    I told him that I had been thinking about it more
18         since, you know, last we spoke and that, you know, I
19         really felt that Dick had been -- I'm sorry, that
20         David had been treating me that way because I was a
21         woman and that I felt that the -- his treatment was
22         discriminatory, you know, the fact that I -- he never
23         responded to me about, you know, owning the
24         consumption project and then, you know, he then
25         subsequently gave the consumption project to my
```

1    counterpart and I felt that that was done on purpose.

2    I told Dick Hoell that.

3         I had told him that I was aware of

4    Microsoft's anti-harassment -- anti-discrimination and

5    harassment policy and that Microsoft had a zero

6    tolerance policy for that type of behavior and that

7    based on, you know, my experiences and how he was

8    taking things from me and giving them to my male

9    counterpart -- counterparts, because, you know, in

10   addition to the consumption project, you know, there

11   were also other things, so like accounts and, you

12   know, specific account alignment and things like that,

13   that I felt like -- oh, and then there was, you know,

14   the child care, you know, issue, I felt like he was

15   doing that to me because, you know, I was a woman and

16   that I didn't feel that he was doing that to my male

17   counterparts.

18        And I also told him that he was very

19   demeaning to me by, you know, commenting on me getting

20   emotional within a minute and I felt like that he

21   would -- had only done that to me because I was a

22   woman.  There was an instance of one of the males on

23   my team crying at a customer event and he seemed to be

24   very sympathetic to the fact that my male counterpart

25   was crying.

1          So I described all of these events to Dick
2     again and in -- and said, you know, explicitly that I
3     felt like David was treating me differently because I
4     was a woman and that he was discriminating against me
5     because I was a woman.
6  Q.   Had you said to Mr. Hoell in the first conversation
7     anything about discrimination?
8  A.   I don't recall if I used the term discrimination in
9     that first conversation.
10 Q.   In the first conversation, had you said anything to
11    suggest that Mr. Walker was treating you a particular
12    way because you were a woman?
13 A.   I'm sorry, repeat the question.
14 Q.   Had you said anything to Mr. Hoell in the first
15    conversation about Mr. Walker treating you differently
16    because you were a woman?
17 A.   I don't know if I used those words specifically.  The
18    first time I went to see Dick Hoell, I felt like he
19    would kind of read between the lines and I thought
20    that maybe, you know, HR would -- I wouldn't have to
21    say the words discrimination, I -- I guess I just
22    didn't think that I had to be that explicit in that.
23 Q.   Did you say anything whatsoever about your gender or
24    anyone else's gender in your first meeting with Dick
25    Hoell?

1    A.    I don't recall.

2    Q.    Why did you think HR would read between the lines to

3          see a gender issue?

4    A.    It just seems so, you know, apparent to me.  I

5          thought it would be to them as well, just the

6          treatment in general and treating me differently than

7          the men on my team and not allowing me to take on a

8          project so that I could work towards a promotion, even

9          though we had discussed it.

10   Q.    Are you referring to telling Dick Hoell at the first

11         meeting that Mr. Walker had taken the consumption

12         project away from you and given it to someone else?

13   A.    Yes, I believe that I discussed that with him in the

14         first meeting.

15   Q.    After you said these things that you've described to

16         me to Mr. Hoell, was there any other discussion in the

17         second meeting with him?

18   A.    Well, I mean, he really just let me talk and he

19         didn't say much.  When I was done talking, he said,

20         okay, I'm going to hand this over to the

21         investigations team.  They'll be in touch with you

22         within a week and that was it.

23   Q.    When you said that Mr. Walker had taken things away

24         from you, you said consumption was one and you said

25         there were other things, what were the other things

1    Q.    What were they?

2    A.    I don't recall the specifics.  I just remember there

3          were, you know, a couple of times where, you know,

4          Nina or Greg were -- was asking for, you know, it

5          could be help with putting together presentations --

6    Q.    Do you have any specifics in mind?

7    A.    -- being involved in ISU, I mean, that's kind of

8          just -- I'm thinking of possible examples.  I don't

9          recall the exact specifics in that time frame.

10   Q.    Do you remember any specific examples that actually

11         occurred in that time period, other than the

12         consumption project?

13   A.    It just, you know, seemed that there were things that

14         he would elect other people to -- to take on.

15   Q.    What were they?

16   A.    I don't recall.

17   Q.    So I want to ask you some questions about the

18         consumption project.  You told us about the initial

19         volunteering that you'd done to work on this

20         project --

21   A.    Uh-huh.

22   Q.    -- in the November 2014 conversation?

23   A.    Right.

24   Q.    After the volunteering, how much time did you spend

25         working on the project?

```
 1   A.     Well, I didn't get, you know, an opportunity to get
 2          too far in the project.  The first step was for me to
 3          build a presentation that we would then deliver to
 4          Nina and/or Greg about how we would manage the
 5          consumption process.
 6   Q.     How much time did you spend on the presentation?
 7   A.     Um, likely a couple hours.  I had already been
 8          thinking about it and, you know, so I had already, you
 9          know, thought about how I wanted to approach it, so it
10          didn't take me too long to put it into a presentation.
11          That's kind of what I do for a living.
12   Q.     After you created that presentation and before you
13          learned ████████ was picking up a consumption
14          project, were you aware of any changes to the project?
15   A.     Well, I -- the first time I checked in with David,
16          which, you know -- I sent him the presentation as soon
17          as I built it for his review and then a couple of days
18          to a week later I checked back in and said, "Hey, you
19          know, is this okay, can we present this," and he said,
20          "I need to talk to Nina."
21                And then I checked back in with him a few
22          days later, maybe a week or so later and he said, "oh,
23          it's taken on a life of its own," so I didn't know if
24          that meant changes, but he said it's taken on a life
25          of its own.
```

```
1   Q.    Were you aware of any changes that happened from the
2         time you presented him with the presentation through
3         the present, any changes to the consumption project?
4   A.    I wasn't aware of any changes.
5   Q.    So when he said the project had taken on a life of
6         its own, what did you understand him to mean?
7   A.    I just figured that maybe corporate was, you know,
8         changing how they were going to manage it and maybe it
9         wasn't something that we were going to do, "we" being,
10        you know, STU, you know, maybe it wasn't something
11        that we were, you know, going to manage and that's
12        what I assumed he meant taking on a life of its own.
13  Q.    Is that somebody's phone?  Okay.
14              Did you ever come to learn that the
15        consumption project as taken on by ████████ was
16        different from the one that you had created a
17        presentation for?
18  A.    Can you repeat the question?
19              MS. HERMLE:  Would you read it back, please.
20                    (Question read.)
21              THE WITNESS:  No.  I had even talked to ███
22        about it because when the e-mail came out saying that
23        ███ was the lead for the project, that was the next
24        time I had heard about consumption and so I
25        immediately reached out to ███ and said, "Hey, when
```

```
 1          did you get this project," because in December, when
 2          we had our team meeting, David had announced in a
 3          slide that I would be the consumption lead and he
 4          said -- ███ said, "Yeah, I remember that.  In fact, I
 5          don't -- I don't know why -- I wondered myself why
 6          David had me doing this consumption project."
 7  Q.      (BY MS. HERMLE) When -- you told us that Mr. Hoell
 8          told you that the complaint team would be reaching out
 9          to you?
10  A.      Uh-huh.
11  Q.      How quickly did that happen after your second meeting
12          with Mr. Hoell in May?
13  A.      I'd say no more than a week.
14  Q.      And who reached out to you?
15  A.      Melinda De Lanoy.
16  Q.      Did you know her before she reached out to you?
17  A.      No.
18  Q.      Did she reach out to you by phone?
19  A.      Yes.
20  Q.      And what did you and Melinda discuss in the first
21          call?
22  A.      Well, she, you know, set up the meeting and she kind
23          of kicked it off by saying that she was a member of
24          this team, this investigations team and that, you
25          know, even though I sought -- I would see her -- LCA
```

```
 1          next to her name and her title, that, you know, she

 2          really wasn't a lawyer in that capacity, that she was

 3          an investigator and that, you know, I could feel free

 4          to reach out to her if -- if I had any further

 5          questions.  And she was very clear that Microsoft took

 6          their anti-harassment and anti-discrimination and

 7          anti-retaliation very seriously and that, you know,

 8          she wanted to hear what my complaint was.

 9                   So I told her my complaint and gave her, you

10          know, the chronological order and the dates and she

11          wondered why it took so long for it to get to her when

12          I first complained to Dick in April.

13    Q.    When she said what she said about being a lawyer, did

14          she tell you she wasn't operating as a lawyer but she

15          was on the ERIT team?

16    A.    Right, she said you'll see LCA in my title -- or in

17          my name, e-mail address or what have you, but don't

18          think of me as a lawyer, I -- I believe she said, I'm

19          not acting as a lawyer, I'm acting as an investigator,

20          my job is to, you know, investigate everything, you

21          know, unbiased.

22    Q.    After you told her -- well, what did you tell her

23          about your complaint?

24    A.    I would just give her all of the information, you

25          know, in chronological order, that I had had the phone
```

1          MS. HERMLE:  I'll give you a minute while you

2     get some water.

3          THE WITNESS:  Okay.

4          MS. HERMLE:  Should we take a short break?

5          MS. MIAZAD:  Sure.

6          THE VIDEOGRAPHER:  The time is 4:22 p.m. and

7     we are now off the record.

8                    (A break was taken.)

9                    (Noah Sandidge not present in

10                    deposition.)

11                   (Whereupon, the testimony from

12                    pages 194-220 have been marked

13                    confidential, excerpted, and

14                    bound separately)

15

16

17

18

19

20

21

22

23

24

25

```
1                    **** ATTORNEY'S EYES ONLY ****

2                    THE VIDEOGRAPHER:  The time is 4:35 p.m.

3            This is the beginning of disk 5 in the deposition of

4            Dana Piermarini, we are now on the record.

5    Q.      (BY MS. HERMLE) We're back on the record and Noah is

6            not with us.  Who was the Microsoft employee who said

7            multiple times that he really liked your shirt?

8    A.      Kevin Bratton.

9    Q.      And what role does he have?

10   A.      He was a TSP on my team.

11   Q.      Is he still employed?

12   A.      He's no longer with the company.

13   Q.      Do you have an understanding as to how he left the

14           company?

15   A.      He moved back to this area, from what I understand,

16           or to another area.  He just moved and took another

17           job.

18   Q.      You mean outside of Microsoft?

19   A.      Outside of Microsoft, yes.

20   Q.      When was that?

21   A.      Maybe a year to a year and a half ago.

22   Q.      The ██████ who looked the woman up and down at the

23           event, who was that?

24   A.      ██████████.

25   Q.      And what was his role at the time?
```

```
 1   A.    ███████████████████████.

 2   Q.    And is he still with the company?

 3   A.    Yes.

 4   Q.    The -- I cannot read ████████ writing, so let me try

 5         and look at my own notes.  The person who was staring

 6         at the direct report was who?

 7   A.    Well, that was ████████████.

 8   Q.    Well, so were there two events where a ████████ was

 9         looking a woman up and down or only one?

10   A.    There was one.

11   Q.    The person who tried to kiss you, you still don't

12         know his name, correct?

13   A.    I can't say for sure.

14   Q.    The person who patted you on the leg in 2007 -- or

15         you had said stroked your leg?

16   A.    Rubbed my leg.  Uh-huh.

17   Q.    The person who rubbed your leg in 2007, who was that?

18   A.    George Cross.

19   Q.    And is he still with the company?

20   A.    No.

21   Q.    When did he leave?

22   A.    I'm not sure.

23   Q.    Did you complain to Melinda in any way about ██████

24         ████████?

25   A.    Well, I didn't complain.  I told her about, you know,
```

```
 1        yourself did not do the search?

 2  A.    I did, just to double check, you know, to make sure I

 3        recalled correctly, you know, that I -- I didn't have

 4        anything else.

 5  Q.    Do you have a resume?

 6  A.    I do.

 7  Q.    Did you produce it to your lawyers?

 8  A.    I did.

 9  Q.    When did you do that?

10  A.    I don't recall when --

11  Q.    Was --

12  A.    -- I produced it.

13  Q.    -- it before yesterday?

14  A.    Yes.

15  Q.    Was it several weeks before yesterday?

16  A.    I would say it was within a week.

17  Q.    Before yesterday?

18  A.    A week prior to yesterday, something --

19  Q.    Did you --

20  A.    -- in that time frame.

21  Q.    Did you produce any additional documents any sooner

22        than a week ago?

23              MS. MIAZAD:  Objection.

24              THE WITNESS:  I'm --

25  Q.    (BY MS. HERMLE) Here's what I want to know.  My
```

1          understanding is a whole bunch of documents got mailed

2          last night without a password that relate to your

3          deposition that I haven't had a chance to see, so I

4          want to know how long ago was it that you last gave

5          documents to your lawyers?

6      A.    I believe the last documents I gave were the resumes

7          and that was, like I said, you know, at some point a

8          week prior to --

9      Q.    Okay.

10     A.    -- yesterday.

11             MS. MIAZAD:  And Lynne, just to clarify --

12             MS. HERMLE:  Yeah.

13             MS. MIAZAD:  -- those aren't new documents,

14         those are just in response to our request for certain

15         information to be unredacted, and we agreed, so

16         they're not --

17             MS. HERMLE:  Including, you redacted a

18         resume?

19             MS. MIAZAD:  No, it wasn't -- not the resume,

20         but I mean, the past e-mail -- the password issue that

21         you're referring to.

22             MS. HERMLE:  Okay.

23     Q.    (BY MS. HERMLE) So going back to some earlier

24         questions, Ms. Piermarini, were there men promoted to

25         level 65 during the period you believed yourself to be

```
 1          qualified for that promotion?
 2   A.      Yes.
 3   Q.      Who you viewed as less qualified than you for that
 4          promotion?
 5   A.      Yes.
 6   Q.      And who were they?
 7   A.      ███████████ and ████████████.
 8   Q.      And why in your view is ██████ less qualified than you
 9          for any rule -- sorry, level 65 promotion?
10   A.      Well, he wasn't as high of a performer.
11   Q.      When?
12   A.      Most of the time that he's been on the same team as
13          me.
14   Q.      That's your opinion or you understand that to be his
15          supervisor's assessment?
16   A.      I -- I understand that to be his supervisor's
17          assessment.
18   Q.      Which supervisor?
19   A.      Multiple.
20   Q.      Who?
21   A.      David Walker, Javier Vasquez and I don't know about
22          Noah.
23   Q.      And who do you understand made the decision to
24          promote -- I'm not understanding the last name you're
25          saying?
```

```
 1  A.   ████.  ████.

 2  Q.   I'm just pronouncing it differently in my head.

 3  A.   Uh-huh.

 4  Q.   ████.

 5  A.   Uh-huh.

 6  Q.   ████.

 7  A.   Uh-huh.

 8  Q.   Who do you understand made the decision to promote

 9       ████ to level 65?

10  A.   Javier Vasquez.

11  Q.   Have you ever spoken to Mr. Vasquez about why he

12       believed ████ to be qualified for that promotion?

13  A.   No.

14  Q.   Have you ever spoken to Mr. Vasquez about his opinion

15       of ████ qualifications as compared to your

16       qualifications for that promotion?

17  A.   No.

18  Q.   Any other reason you believe yourself to be more

19       qualified than ████ for the promotion Mr. Vasquez

20       gave him to level 65?

21  A.   I'm a much stronger presenter than he is.

22  Q.   Do you have any understanding as to what ████

23       responsibilities were at the time he got the promotion

24       to level 65?

25  A.   Yeah, they were the same as mine.
```

1    Q.    And what facts are you aware of, if any, that suggest
2          that the promotion -- the decision by Mr. Vasquez to
3          promote ███████ was related in some way to gender?
4    A.    Well, that was at the time that I didn't get a
5          promotion because Curt had denied it, Curt Colcun had
6          denied it, stating that he wanted to see how much more
7          I could do when I got back from leave.
8    Q.    Any other reason?
9    A.    None that I can think of.
10   Q.    And on what do you base your statement that
11         Mr. Vasquez considered ███████ to be a lesser
12         performer than you?
13   A.    It was a general feeling that I got.  I recall ████
14         █████ making comments like, you know, Javier wants me
15         to do this, Javier doesn't like that I do that, Javier
16         wants me to work with you on improving my presentation
17         skills.  That's it.
18   Q.    When was the promotion of ███████?
19   A.    In ████.
20   Q.    And at the time, what was your level?
21   A.    I was a 63.
22   Q.    And how long had you been a 63 in ████ when ████████
23         was promoted?
24   A.    I don't know.
25   Q.    And what facts are you aware of that suggest that

1           ███████████    was less qualified than you were for a

2           promotion to level 65?

3    A.     He had not been at the company any -- as long as I

4           had, and he did not have as much experience that I

5           had.

6    Q.     Anything else?

7    A.     And that's all I can think of right now.

8    Q.     Who made the decision to promote ██████████ to level

9           65?

10   A.     Noah Sandidge.

11   Q.     Are you aware of any facts that suggest that her

12          decision to promote ██████████ was based on gender or

13          related in any way to gender?

14   A.     I don't know.

15   Q.     When was the promotion to level 65?

16   A.     I believe late fall of 2014.

17   Q.     Okay.  In the role that you have, Ms. Piermarini,

18          what percentage of your time do you spend selling or

19          trying to sell?

20   A.     Well, ultimately we're always selling.

21   Q.     What percentage of your time do you spend actually

22          communicating with customers in an attempt to

23          encourage them to buy Microsoft products?

24   A.     What percentage of my time?

25   Q.     Yes.

```
 1   A.    A large percentage of my time.

 2   Q.    What is your estimate as to what that is?

 3   A.    I wouldn't know how to quantify that.  It's, you

 4         know, a majority of my day.  It could be -- it's a

 5         high -- I would say it's a high percentage.

 6   Q.    More than 50 percent --

 7   A.    Yes --

 8   Q.    -- of the time?

 9   A.    -- absolutely.

10   Q.    Do you believe that ████████ was promoted to level

11         65 based in any part on his work on the consumption

12         project?

13   A.    I don't know.

14   Q.    Who made the decision to promote him?

15              MS. MIAZAD:  Objection.

16              THE WITNESS:  I don't know.

17   Q.    (BY MS. HERMLE) To whom was he reporting when he got

18         the promotion?

19   A.    David Walker.

20   Q.    Have you spoken to any current or former Microsoft

21         employees about this lawsuit?

22   A.    Yes.

23   Q.    And who are the current employees with whom you've

24         spoken about the lawsuit?

25
```

1          that you made?

2    A.    David Walker.

3    Q.    And what did he do to treat you differently because

4          of the complaints that you made?

5    A.    He tried to provide very kind of disproportionate --

6          disproportionate information in my Connects and

7          made -- very negative information in my Connects,

8          specifically that he cut and pasted a feedback that I

9          had gotten, and he continued to consistently treat me

10         poorly and differently than the rest of the guys on my

11         team.

12   Q.    Okay.  I want to ask you about the specifics of that,

13         Ms. Piermarini.  When did he try to provide

14         disproportionate info that was very negative into your

15         reviews?

16   A.    The first time?

17   Q.    Sure.

18   A.    That would have been my review, my FY15 final review,

19         annual review.

20   Q.    And when did you receive that from Mr. Walker?

21   A.    I don't see it here.

22   Q.    You don't?

23   A.    So -- huh-uh.

24   Q.    If I missed it, I'm going to take another look

25         through here, but I thought I had given you

```
 1              everything.
 2                      MS. DAMRELL:  Is this it right here?
 3                      MS. HERMLE:  Oh.  I'm going to --
 4    Q.    (BY MS. HERMLE) Let me show you this.  You can -- I
 5          don't think -- you don't have it in front of you,
 6          Ms. Piermarini?
 7    A.    I don't.  It would look --
 8    Q.    Let me ask you if this is it.
 9                             (Exhibit 23 was marked for
10                              identification.)
11    Q.    (BY MS. HERMLE) Is Exhibit 23 the document to which
12          you refer?  Is it stapled to it?  Is it stapled to
13          that document, Ms. Piermarini?
14    A.    There -- it looks like there's multiple documents
15          stapled here.
16    Q.    Thus, my confusion.  There's been --
17    A.    There's a --
18    Q.    -- a filing error.
19    A.    -- Q4 Connect and a Q2 FY16 Connect, which I believe
20          I already have right here, so neither of these seem to
21          be --
22    Q.    So what is that document which is currently in front
23          of you, which is Exhibit 23?
24    A.    A Q4 Connect, but it doesn't look like the one that I
25          know about.
```

1    Q.    But you believe you did get a review for that period?

2    A.    I did, and I requested that that review be edited

3          twice.

4    Q.    Okay.  So tell me about that process.  You received

5          the review about which you're referring from

6          Mr. Walker when?

7    A.    It would have been August of 2015.

8    Q.    And what did you see in the review that you believed

9          was, as you put it, disproportionately negative?

10   A.    It was a negative feedback request that seemed very

11         out of -- out of the norm.  My other feedback requests

12         had always been very positive and this one was just

13         pretty outlandish.

14   Q.    What did it say?

15   A.    I don't recall the exact words, but what stands out

16         to me is it said Dana only knows the licensing aspects

17         and doesn't know the technical detail and isn't

18         willing to work with the Navy team.

19   Q.    And is that the comment you're saying was cut and

20         pasted from somebody else's input into your review?

21   A.    Yes.

22   Q.    Who was the person who gave that input?

23   A.    It wasn't --

24               MS. MIAZAD:  Objection.

25               THE WITNESS:  It hasn't been told to me, I

```
 1            don't know.

 2   Q.    (BY MS. HERMLE) Well, who do you believe it was?

 3   A.    You know -- I don't know.  I do suspect that it was

 4         solicited.

 5   Q.    My question is, who do you believe it was?

 6   A.    I was going into that.

 7                MS. MIAZAD:  Objection.

 8   Q.    (BY MS. HERMLE) Well, we're kind of late in the day,

 9         so it would be helpful if you could give me --

10   A.    Okay.

11   Q.    -- if not the person, then the list of possible names

12         you believe it could be.

13   A.    Well, I believe that it was solicited and if I

14         believe it was solicited, I think about who could have

15         solicited it and that would have been David Walker and

16         Jason Apergis and they would be comfortable going to

17         perhaps Mark Mueller or John Hertz.

18   Q.    So are you saying that you believe the negative

19         feedback was from Mueller or Hertz?

20                MS. MIAZAD:  Objection.

21                THE WITNESS:  You asked me to guess, I

22         believe.

23   Q.    (BY MS. HERMLE) No, I didn't.  I asked you what your

24         belief is, who do you believe provided that negative

25         input?
```

```
 1              MS. MIAZAD:  Objection, it's calling for
 2         speculation.
 3              THE WITNESS:  I really don't know.
 4    Q.   (BY MS. HERMLE) Well, what facts are you aware of
 5         that suggest anyone solicited feedback that was
 6         negative?
 7    A.   Because that feedback was, again, very outlandish and
 8         not like the most of the other feedback I had received
 9         and David wasn't willing to tell me who wrote it.  And
10         I know that David was involved in helping solicit
11         negative feedback from other people in the
12         organization because I witnessed him telling someone
13         that and so when I saw it, my thought was that it was
14         also solicited.
15    Q.   What was the solicitation by Mr. Walker that you
16         witnessed?
17    A.   He had told ███████ that ██████████ was going
18         to be sending him feedback requests for ████
19         ████████ and ██████████, and that he should make them
20         good.  "Good" meaning negative.
21    Q.   How did you know that "good" meant negative?
22    A.   Because they were talking about how they were trying
23         to push out ██████████ and ██████████.
24    Q.   Are those folks men?
25    A.   Yes.
```

 1   Q.   So it's your belief that Mr. Walker was pushing out
 2        ███ and ████?
 3   A.   He wasn't, it was ████████.
 4   Q.   Which was who?
 5   A.   ██████████.
 6   Q.   But your belief was that Mr. Walker was assisting
 7        ████████ of pushing out these men by soliciting
 8        negative feedback?
 9   A.   Based on what he said in front of me, which was,
10        "Hey, ██████ is about to send you feedback requests
11        for ████ and █████, make sure they're good."
12   Q.   And when was that?
13   A.   I believe in 2014.
14   Q.   Any connection with the review process?
15   A.   Possibly 2013.
16   Q.   Was this in connection with the review process?
17   A.   Yes.
18   Q.   And was it the annual review process for either 2013
19        or 2014?
20   A.   I'm not sure.
21   Q.   I don't believe I have that document, which is the
22        review, but I want to take you back to what you said
23        about requesting changes.
24   A.   Uh-huh.
25   Q.   So after you received this review, did you request a

1        change?

2   A.    I spoke to Melinda about it.  Because I called her

3        and told her that I felt that I was being retaliated

4        against and, you know, gave her the description of why

5        I felt that way and such and she, you know, asked for

6        all of the information.  I forgot your initial

7        question, I'm sorry.

8   Q.    I'm trying to -- are you getting tired?

9   A.    No.

10  Q.    Okay.  Good.  My question was about the process.

11  A.    Uh-huh.

12  Q.    Did you request that the review be changed?

13  A.    Oh, yes.  So in speaking to Melinda, you know, she

14        said that she would investigate the retaliation charge

15        and then I said well, what about my review, this is a

16        big deal, it has got negative information that's not

17        fair.  She said, you can go ahead and request through

18        HR that that information be removed.

19  Q.    Did you make such a request?

20  A.    I did.

21  Q.    Were there any changes made to the review?

22  A.    There were.  Initially.

23  Q.    And what changes were made after you requested

24        changes be made?

25  A.    David basically took the comment and just put it in

1         bullet form, and I wrote back again and said that I

2         didn't think that that was sufficient, that it still

3         gave a negative connotation as to my performance for

4         that year when I had not had any performance issues

5         for that year and he then went and edited them again.

6    Q.   And what edits did he make that time?

7    A.   He made edits that I felt were more in line with --

8         that were more fair.

9    Q.   What edits were those?

10   A.   Do you mean like specifically what were the words?

11   Q.   What did he do to edit it?

12   A.   He changed his wording so that it wasn't as negative.

13        It was more positive.

14   Q.   After he changed it the second time to be more

15        positive, did you believe the review was fair?

16   A.   I did.

17   Q.   And was that the final version of the review?

18   A.   Yes, that's the final version that I see when I log

19        in.

20   Q.   And you're still able to log in and see that; is that

21        correct?

22   A.   Yes.

23   Q.   And you suggested when I asked you about him treating

24        you negatively that there were other instances or

25        occasions of unfair treatment after you raised

```
 1         complaints, what other specific -- specifics are
 2         there, what other unfair treatment occurred after you
 3         raised complaints?
 4    A.    Well, he would -- he gave certain accounts to my male
 5         counterparts that he knew I wanted and that had -- I
 6         had a history with, so specifically the Army.
 7         Normally managers would talk about that kind of
 8         alignment, you know, with the people who would be
 9         aligned and instead he just made the decision without
10         discussing it with at least myself.
11    Q.    Did he explain to you why he gave the Army account to
12         someone other than you?
13    A.    He did.
14    Q.    What did he say?
15    A.    He felt that ████ should have it because he has Air
16         Force and the Air Force aligns to the Army more.
17    Q.    Did he say anything about you talking about having
18         a -- a heavy workload already?
19    A.    Not that I recall.
20    Q.    Did he say anything at all about your workload in
21         explaining why the Army account went to ████?
22    A.    Not in that context.  When I complained that I wanted
23         the Army account, he said that -- to be honest, I'm
24         trying to recall the exact conversation, but he felt
25         the Army was bigger than joint but he doesn't --
```

1    Q.    Sorry.

2    A.    That's okay.  But he doesn't know the DOD well enough

3          to know that the Army actually is usually managed

4          predominantly as a whole customer, whereas the joint

5          accounts are managed individually and there's 50 of

6          them, therefore making my workload much heavier than

7          my male counterparts.

8    Q.    Did you tell Mr. Walker that your workload was

9          heavier than those of your colleagues -- of your

10         colleagues?

11   A.    I believe I did make reference to it, I just don't

12         recall exactly when that was.

13   Q.    Was it before or after he assigned the Army to ████?

14   A.    After.

15   Q.    And was that a true statement?

16   A.    That?

17   Q.    That your workload was heavier than your colleagues

18         in your view?

19   A.    Yes.

20   Q.    Even without the Army account?

21   A.    Right.  Well, so I had gotten the joint account.  Had

22         I gotten the Army account, it may have been more

23         balanced.

24   Q.    So you're saying that the Army account was a smaller

25         account or took less time than the one that you were

1                    **C E R T I F I C A T E**

2   STATE OF WASHINGTON )
                        ) ss.
3   COUNTY OF KING      )

4       I, the undersigned Washington Certified Court Reporter,
    pursuant to RCW 5.28.010 authorized to administer oaths and
5   affirmations in and for the State of Washington, do hereby
    certify:

6

7       That the annexed and foregoing deposition transcript of
    the witness named herein was taken Stenographically before
    me and reduced to a typed format under my direction; that
8   the transcript is a full, true and complete transcript of
    the proceedings, including all questions, objections,
9   motions and exceptions of counsel, made and taken at the
    time of the foregoing proceedings, to the best of my
10  abilities;

11      That I am not a relative, employee, attorney or counsel
    of any party to this action or relative or employee of any
12  such attorney or counsel, and that I am not financially
    interested in the said action or the outcome thereof;

13

14      That the witness, before examination, was by me duly
    sworn, and the transcript was made available to the witness
    for reading and signing upon completion of transcription,
15  unless indicated herein the waiving of signature;

16      I further certify that I am sealing the deposition in
    an envelope with the title of the above cause and the name
17  of the witness visible, and I am delivering the same to the
    appropriate authority;

18

19      I further advise you that as a matter of firm policy,
    the Stenographic notes of this transcript will be destroyed
    three years from the date appearing on this Certificate
20  unless notice is received otherwise from any party or
    counsel hereto on or before said date;

21

22      IN WITNESS WHEREOF, I have hereunto set my hand on this
    19th day of June, 2016, at Mountlake Terrace, Washington.

23

24                     _____

25                     Holly J. Buckmaster, CCR # 2859.