The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KATHERINE MOUSSOURIS, HOLLY MUENCHOW, and DANA PIERMARINI, on behalf of themselves and a class of those similarly situated,

Plaintiff,

v.

MICROSOFT CORPORATION,

Defendant.

Case No. 2:15-cv-01483-JLR

**PLAINTIFF KATHERINE MOUSSOURIS' OBJECTIONS AND RESPONSES TO DEFENDANT MICROSOFT CORPORATION'S FIRST SET OF INTERROGATORIES TO PLAINTIFF KATHERINE MOUSSOURIS**

PROPOUNDING PARTY: Defendant MICROSOFT CORPORATION

RESPONDING PARTY: Plaintiff KATHERINE MOUSSOURIS

SET NUMBER: ONE (1)

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff, by her attorneys, Lieff Cabraser Heimann & Bernstein, LLP and Outten & Golden LLP, makes the following responses and objections to Defendant Microsoft Corporation's First Set of Interrogatories to Plaintiff Katherine Moussouris (the "Document Requests"), dated May 3, 2016.

## PRELIMINARY STATEMENT

Plaintiffs have not completed their investigation of the facts related to this case, have not

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

completed discovery in this action, and have not completed preparation for trial. While on May 3, 2016, the Court ordered Plaintiff Holly Muenchow to respond to similar Interrogatories, Plaintiff Moussouris reserves her right to supplement these responses and objections at an appropriate time before trial, as Plaintiff discovers additional facts relevant to her claims.

Plaintiff's responses or objections to any Interrogatory or part of an Interrogatory are not an admission of any fact set forth or assumed by that Interrogatory. In addition, each of Plaintiff's responses to an Interrogatory or part of an Interrogatory is not a waiver of part or all of any objection she might make to that Interrogatory, or an admission that such answer or objection constitutes admissible evidence.

This preliminary statement is incorporated into each response by this reference.

## GENERAL OBJECTIONS

The following General Objections are applicable to and incorporated into each interrogatory response:

1. Plaintiff objects to each Interrogatory to the extent that it is premature at this early stage in discovery.

At this time, most material facts supporting Ms. Moussouris' contentions remain uniquely in Defendant's custody and control. To date, Defendant has not produced a substantial quantity of documents responsive to Plaintiffs' requests, few Rule 30(b)(6) depositions have taken place, and Plaintiffs have not received class-wide data. Without class-wide data, the process of expert statistical analysis cannot begin. Such statistical analysis will be an indispensable part of Plaintiffs' factual record. In addition, the parties are still in the process of negotiating regarding search-term based custodial discovery, and documents obtained via these searches will provide substantial relevant information, as will 30(b)(6) witness depositions on the topics of performance evaluations, compensation, promotions, and internal complaints and compliance.

Federal Rule of Civil Procedure 33(a)(2) authorizes courts to protect litigants from

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-2-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

abusive interrogatories, particularly those served before discovery is complete. Referencing an interrogatory that "asks for an opinion or contention," the rule provides that "the court may order that an interrogatory need not be answered until designed discovery is complete, or until a pretrial conference or some other time." Fed. R. Civ. Pr. 33(a)(2).

There is also overwhelming support for Plaintiffs' position in the Ninth Circuit. For example, courts have recognized that "[c]ontention interrogatories which 'systematically track all of the allegations in an opposing party's pleading, and that ask for 'each and every fact' and application of law to fact that support the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'" *Miles v. Shanghai Zhenhua Port Mach. Co.*, No. 08-5743, 2009 WL 3837523, at *1 (W.D. Wash. Nov. 17, 2009) (quoting *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D.N.M. 2007)) (allowing a plaintiff, eleven months into discovery, to rest on the allegations in the complaint in response to a contention interrogatory). Courts are particularly wary of defendants' use of contention interrogatories as an attempt to prematurely narrow a plaintiff's case. For example, in *Advocare International, L.P. v. Scheckenbach*, No. 08-85332, 2009 WL 3064867, at *1 (W.D. Wash. Sept. 24, 2009), the court denied a motion to compel a response to an "overly broad" contention interrogatory as "an attempt to prevent the plaintiff[] from using any evidence or argument, other than that already provided." The court denied that motion to compel fifteen months after the case had been filed and with only two months left to complete discovery—*i.e.*, far later in the discovery process than the parties find themselves now.

Courts have also recognized that it is inefficient and burdensome to require plaintiffs to provide responses to contention interrogatories that would undoubtedly be incomplete given the posture of the case, as would be true here. For example, in *In re eBay Seller Antitrust Litigation*, No. 07-1882, 2008 WL 5212170, at *2 (N.D. Cal. Dec. 11, 2008), the court denied a motion to compel responses to contention interrogatories early in discovery because the plaintiff's answers "likely would be materially incomplete," and given "the tentative nature of any responses



LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 Fourth Avenue, Suite 1900
Seattle, Washington 98121
Tel. 206.739.9059

generated at this stage," they "would be of questionable value to the goal of efficiently advancing the litigation." Likewise, in *Campbell v. Facebook, Inc.*, No. 13-5996, 2015 WL 3533221 (N.D. Cal. June 3, 2015), a court denied a motion to compel responses to contention interrogatories for much the same reason. There, the interrogatories were served nine months before class certification and summary judgment motion deadlines. The court noted that the defendant, like Defendant, had "better access to the information" sought. *Id.* at *5. The court also rejected the defendant's argument that the court should compel the plaintiff to answer the interrogatories and require the plaintiff to update answers as the factual record developed, stating, "It strikes the Court as unnecessarily burdensome to constantly revise and update such responses." *Id.* at *6. Defendant's contention interrogatories served on Plaintiff are inappropriate at this time for the same reasons.[1] (Objection on the ground of "**Prematurity**.")

2. Plaintiff objects to each Interrogatory to the extent that it calls for information protected by the attorney-client privilege, the work product doctrine, or any other constitutional, statutory, or common law privilege or protection, including Plaintiff's privacy rights, or the privacy rights of others, or any other lawfully recognized privilege or immunity from disclosure that may attach to information requested by the interrogatory. (Objection on the ground of "**Privilege**" or "**Privacy.**")

---

[1] Further, similar examples of courts in this circuit taking issue with early contention interrogatories are legion. *See, e.g.*, *Amgen, Inc. v. Sandoz, Inc.*, No. 17-4741, 2016 WL 1039029, at *4 (N.D. Cal. Mar. 15, 2016) ("[Defendant] has not demonstrated that its interrogatory is appropriate at this stage as it has not shown how responding to its interrogatories before substantial discovery has been conducted will contribute meaningfully to clarifying the issues in the case or narrowing the scope of the dispute."); *Cardoza v. Bloomin' Brands, Inc.*, Case No. 2:13-cv-01820-JAD-NJK, 2015 WL 3875916, at *1-2 (D. Nev. Jun. 22, 2015) (holding that contention interrogatories served shortly after the opening of discovery and ten months before its close were premature); *Folz v. Union Pac. R.R. Co.*, No. 13-579, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[C]ourts are reluctant to allow contention interrogatories, especially when the responding party has not yet obtained enough information through discovery to respond."); *S.E.C. v. Berry*, No. 07-4431, 2011 WL 2441706, at *4 (N.D. Cal. June 15, 2011) ("Contention interrogatories asking for 'each and *every* fact,' or application of law to fact, that supports particular allegations in an opposing pleading may be held overly broad and unduly burdensome." (quoting Schwarzer et. al., Cal. Prac. Guide: Fed. Civ. Pr. Before Trial § 11:1682 (The Rutter Group 2010))). Microsoft itself has objected to answering premature contention interrogatories. *Microsoft Corp. v. Motorola, Inc.*, 10-1823 (W.D. Wash.), Roberts Decl., May 1, 2013, Ex. E, at 42, 52, Dkt. 683-1 ("Microsoft further objects that this is a premature contention interrogatory. Microsoft is not obligated to respond to premature contention interrogatories until the parties have *substantially completed* discovery.") (emphasis added).

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-4-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

3. Plaintiff objects to each Interrogatory to the extent that it purports to impose any duty upon Plaintiff that is inconsistent with, or beyond that required by, the rules of this Court and the Federal Rules of Civil Procedure. (Objection on the ground of "**Scope**.")

4. Plaintiff objects to each Interrogatory that seeks information that is (a) neither relevant nor material to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence, or (b) which bears only such slight relevance to the subject matter of this action that the expenditure of resources necessary to produce such information would be grossly disproportionate to that relevance. Under such circumstances, responding would be unduly burdensome and oppressive. (Objection on the ground of "**Relevance**.")

5. Plaintiff objects to each Interrogatory to the extent that it seeks information for the illegitimate purposes of harassing, annoying, or embarrassing Plaintiff. (Objection on the ground of "**Harassment**.")

Plaintiff asserts these objections without waiving or intending to waive any objections as to competency, relevancy, materiality, or privilege.

In addition to the General Objections set forth above, Plaintiff will also state specific objections to Interrogatories where appropriate, including objections that are not generally applicable to all of the Interrogatories. By setting forth such specific objections, Plaintiff does not intend to limit or restrict the General Objections set forth above. To the extent that Plaintiff responds to Interrogatories to which she objects, such objections are not waived.

## RESPONSES TO FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:**

If YOU contend that Microsoft operated under a general policy of discrimination against women in the purported class, state all material facts supporting that contention.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff incorporates the general objections stated above and reserves her right to

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her allegations in the Second Amended Complaint. Plaintiff also incorporates her answers to all the Interrogatories herein.

Plaintiff made many observations of gender discrimination at Microsoft during her employment. These include the following:

Microsoft Leadership Discourages Women From Voicing Concerns

Plaintiff is aware that Microsoft leaders all the way up to Microsoft's Chief Executive Officer, Satya Nadella, have urged women in the tech industry not to report concerns about their compensation or to request raises. Plaintiff is aware of a widely-publicized report that that Mr. Nadella, speaking at a conference about the role of women in the tech industry, stated, "It's not really about asking for a raise, but knowing and having faith that the system will give you the right raise." *See, e.g.*, Nick Wingfield, *Microsoft's Nadella Sets Off a Furor on Women's Pay*, NEW YORK TIMES, Oct. 9, 2014, http://bits.blogs.nytimes.com/2014/10/09/microsofts-nadella-backtracks-from-comment-about-women/?_r=0 At the same event, Mr. Nadella further suggested that "it's good karma" for women not to ask for a raise. *Id.* Plaintiff and a number of other women who commented on the incident understood this to mean that Microsoft's top leader did not understand the issue of pay inequity. Mr. Nadella's comments resulted in widespread public ridicule.

Gender-Based Critiques in Performance Reviews of Plaintiff

Plaintiff observed that her performance evaluation scores suffered due to the stack ranking process on account of her gender.

Plaintiff received conflicting messages from Microsoft regarding expectations for her performance. On the one hand, as a Microsoft employee, Plaintiff was encouraged to be an innovator. On the other hand, when Plaintiff fulfilled that goal by developing and pushing new ideas through the Microsoft organization that also transformed the industries she worked in, she

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-6-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

was chastised at Microsoft for being too pushy, direct, "prickly," harsh, or aggressive. These gendered personality criticisms were complemented by suggestions that Plaintiff should be more cooperative or collaborative. Ironically, Plaintiff's work at Microsoft was so successful in part because Plaintiff's partners external to Microsoft recognized that she exhibited those very personality traits (e.g., diplomacy, teamwork, cooperation, collaboration) along with subject-matter expertise.

Plaintiff's accomplishments were groundbreaking and influential, as recognized by the industry partners outside of Microsoft. Even within Microsoft, Plaintiff's manager Michael Reavey candidly admitted to her that her performance and scope dwarfed that of many of her colleagues, including those who were Principals (Level 65 or greater). Yet Plaintiff was repeatedly told that, although her performance merited a higher performance evaluation score, she had been penalized during calibration meetings by other managers who criticized her for the "how" of her work rather than the "what." Plaintiff heard this refrain about the "how" several times when she was passed over for promotion or when she received performance evaluation scores lower than those merited by her performance. The "how" that led her to be disfavored in calibration meetings—which, Plaintiff observed, were attended by a majority of male employees—was often a manifestation of the same gender bias and focus on her perceived personality traits, including her communication style. Plaintiff observed that because she was a woman, behaviors that were otherwise praised in men—such as substance matter expertise, innovation, boldness, assertiveness, and creativity—became a liability for her as a woman. For example, in her role, Plaintiff often worked with the marketing team to make public announcements about initiatives she had spearheaded, created, or developed. During this process, members of the marketing team often challenged Plaintiff's subject matter expertise or authority, encroachments that Plaintiff resisted when necessary based on her professional judgment about Microsoft's best interests and her in-depth knowledge of the subject matter. Plaintiff observed that her exercise of professional judgment was seen by other Microsoft

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-7-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

employees through a gendered lens, resulting in gendered feedback that she was purportedly "harsh," "prickly," "aggressive," or not sufficiently "cooperative." Microsoft's flawed performance evaluation system did not insulate Plaintiff from such gendered feedback, but rather cemented it, lowering Plaintiff's performance evaluation scores, limiting Plaintiff's compensation and promotion opportunities, and otherwise impeding her business and professional opportunities. For example, in her 2010 Performance Review, Plaintiff was told "[a]n important component for you to focus on is to continue to listen and accept feedback, and demonstrate that you're willing to change direction or approaches based on constructive feedback from your peers, partners, teams, managers, or directs." MSFT_MOUSSOURIS_00000118. In her 2011 Performance Review, Plaintiff was told that "there are times when you find it difficult to balance your feelings of ownership of a program with the activities of others working to deliver against their specific commitments." MSFT_MOUSSOURIS_00000139. Plaintiff also recalls that similar gendered critiques were made in her 2012 Annual Performance Review, but Defendant has not yet produced this document despite Plaintiff's request for it. In her 2013 Performance Review, Plaintiff was told that she had to "find a strategy that will enable you to navigate time critical obstructions without confrontation or escalation." MSFT_MOUSSOURIS_00000159. Plaintiff has not observed men criticized for standing by the merits of their professional judgment in a similar way, but other women have discussed receiving similar critiques from managers.

Plaintiff is also informed that gendered comments regarding Plaintiff were made during calibration meetings about Plaintiff's performance. Plaintiff was told by Ellen Cram-Kowalczyk and Leah Lease, managers who participated in calibration meetings in which Plaintiff's performance was reviewed, that she had been described as "prickly" by male managers in one meeting around 2010 or 2011, and that this was cited as a reason to lower her stack rank even though the managers agreed that her performance and impact far exceeded other employees in her peer group. This is the type of comment Plaintiff has not heard as a negative about men in

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

the company.

Plaintiff knows that her performance scores were lowered during the stack ranking calibration process, and believes that the reduction in her scores was based on her gender. She has been told by her managers that her performance merited a higher score, but that her score was lowered through stack ranking and calibration meetings. For example, in May 2012, Plaintiff's manager, Mark Oram, told her that she had outstanding performance and had earned a rating of 2. However, after the stack ranking process, Plaintiff instead received a 3. Similarly, in May 2013, Mr. Oram again commended her performance and told her that her performance warranted a 1. However, Plaintiff received a 2 after the stack ranking process because managers at the calibration meeting found Plaintiff's communication style too aggressive. Mr. Reavey told her, "It's not the WHAT, Katie, it's the HOW."

<u>Gender-Based Critiques in Performance Reviews of Others</u>

For several years during her employment, from 2010-2013, Plaintiff had supervisory duties and responsibilities over other Microsoft employees, her direct reports. Pursuant to Microsoft's policies for performance evaluation and review, Plaintiff made annual recommendations of performance scores for her direct reports. Plaintiff's evaluations and score recommendations were informed by her direct observations of her direct reports' performance according to Microsoft's policies, guidelines, and criteria for performance evaluation. Plaintiff then participated in calibration meetings with other managers in her organization to conduct the "stack ranking" process for her direct reports and their peer group. During this process, Plaintiff observed the gender-discriminatory effects of Microsoft's performance evaluation review policies and procedures first-hand. Plaintiff observed that the majority of managers participating in the stack ranking process were male Microsoft employees, and that gender bias affected the way male and female employees were reviewed and evaluated.

For example, Plaintiff recalls how the stack ranking process negatively affected . In or around  was a

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

[redacted]1. Based on [redacted]'s exceptional performance exceeding expectations, Plaintiff recommended that [redacted] receive a 1 and that she be promoted. Through the stack ranking process, however, [redacted]'s score was ultimately lowered to a 3, despite agreement by all the managers participating in the calibration meeting that [redacted]'s performance was excellent and no manager made any negative or critical comments regarding [redacted]. Plaintiff believes that [redacted]'s score was lowered because the other managers valued the work performed by male employees more than the work performed by female employees like [redacted], even though [redacted]'s work was essential to the success and mission of Microsoft. Despite unanimous agreement that [redacted]'s work was exceptional (a fact reflected in [redacted]'s promotion to a higher level that same review cycle), [redacted] received a lower score after stack ranking which Plaintiff believes ultimately reduced [redacted]'s compensation, based on Microsoft's compensation policies and their relationship to performance evaluation.

Plaintiff also recalls how stack ranking negatively affected [redacted]. [redacted] was a Program Manager and [redacted]. In [redacted], Plaintiff Moussouris determined that [redacted] deserved a 2 performance rating under Microsoft's performance evaluation policies based on her observations that [redacted]'s performance exceeded all expectations, that [redacted] completed all work that someone in her role would normally assume and also took on additional work, and that [redacted] took initiative in her position. However, after a stack ranking calibration meeting, [redacted] received a 5, the lowest possible score. Plaintiff lobbied extensively to obtain an exception to [redacted]'s stack ranking score so that it would be raised to a 4. Plaintiff believes that [redacted]'s stack ranking score ultimately reduced [redacted]'s compensation, promotion, and mobility within the company. During the previous review cycle, another male employee, [redacted], in the same job position received a 3, even though his performance was inferior to [redacted] performance.

During her tenure, Plaintiff observed a male employee receive *higher* scores after stack

ranking than the score she had recommended. For example, in or around [redacted], Plaintiff recommended that [redacted], [redacted], receive a 4 under Microsoft's performance evaluation policies and guidance because he did not fulfill all of his obligations or commitments. Plaintiff did not participate in the calibration meeting because she was on maternity leave, but her direct supervisor, Mark Oram, presented her recommendations on her behalf and recommended [redacted] receive a 4. Despite negative evaluations from his own managers, however, [redacted] ultimately received a 3 after stack ranking, an outcome that surprised Plaintiff and Mr. Oram. Plaintiff does not recall observing a female employee receive a higher score after stack ranking than was recommended by her manager.

During her tenure at Microsoft, Plaintiff also observed that female employees were more likely to be scrutinized for their personality traits, rather than the substance of their work. For example, Plaintiff recalls that the feedback received by [redacted] [redacted], after she took charge of [redacted], often focused on personal traits, such as the fact that she was "so nice" or had a "great personality," rather than the substance of her work.

In her capacity as a manager, Plaintiff also observed that female employees were disproportionately more likely to receive lower scores after stack ranking, in the range of 3, 4, or 5. Other female managers have corroborated Plaintiff's direct observations that women are disproportionately more likely to receive lower scores under Microsoft's stack ranking practice, including [redacted]. Plaintiff and these women have discussed with one another that the majority of female employees end up in the lower ends of the stack ranks, an outcome that it is mathematically unlikely or impossible based on chance. Plaintiff believes these anecdotal observations will be corroborated by a data analysis and expert report of data that is currently in Microsoft's exclusive possession. A lower performance evaluation score translates directly into lower compensation, fewer promotional opportunities, and reduced mobility within Microsoft.

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-11-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

Denial of Promotion Opportunities

During her seven-year tenure at Microsoft, Plaintiff only received two promotions: from Job Level 62 to 63 in 2008, and from Job Level 63 to 64 in 2010. Since 2010, Plaintiff was repeatedly passed over for promotions in favor of less qualified and less experienced men, despite her industry-leading and groundbreaking efforts in the security industry. In June 2012, Plaintiff did not receive a promotion to Level 65, Principal Security Strategist, despite being eligible. The previous year, Plaintiff had been responsible for the highest-rated news announcement for Microsoft Trustworthy Computing that year, the payout of over $250,000 in defensive security research prizes in a contest called the BlueHat Prize which Plaintiff created.

The following year, in May 2013, Plaintiff's manager, Mark Oram, put her up for promotion to Principal Security Strategist (Level 65), but the promotion was denied. Mr. Oram also recommended that Plaintiff report to the new MSRC Senior Director, Chris Betz. Despite Mr. Oram's recommendation, Microsoft did not promote Plaintiff and did not have her report to the Senior Director. Instead, Microsoft promoted Plaintiff's male colleague, Jerry Bryant, to be her manager. Mr. Bryant was less qualified than Plaintiff and also had not been put forward for a promotion by Mr. Oram. Michael Reavey—who became Plaintiff's manager after Mr. Oram left the company—explained to Plaintiff after the review cycle that although the impact, quality, and scope of her work had been "Principal level" (i.e., Level 65 or greater) for years, the "how" of her work kept her from being promoted.

During the same [REDACTED] review cycle, two less qualified males in the [REDACTED] ([REDACTED] and another man) were promoted to Principal level (Level 65), even though they had not performed the same scope of work that Plaintiff had, and had not attained the same level of recognition or accomplishment in the security industry as she had.

Plaintiff also believes that women are promoted more slowly than men despite performing work of similar quality and scope. For example, Plaintiff is aware that men are

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

sometimes promoted two levels at a time. However, Plaintiff is not aware of any woman at Microsoft who has been promoted two levels at a time.

Plaintiff's promotion opportunities were also limited because Plaintiff was hired at a level lower than she should have been hired given her experience and the scope and quality of her work. Plaintiff believes she should have been hired as a Level 63, and should have been promoted to a Level 64 in 2008.

Sexual Harassment & Hostile Work Environment

Plaintiff has observed and learned of incidents of sexual harassment and hostile work environment at Microsoft.

In or around 2008, Plaintiff learned from three other women employed at Microsoft ([REDACTED]) that they had been subjected to unwanted and unwelcome sexual harassment by Andrew Cushman, who was then-Director of the Trustworthy Computing Group. [REDACTED] told Plaintiff that Mr. Cushman had once told [REDACTED] that his marriage was going south, and that he felt he and [REDACTED] were having an "emotional affair." [REDACTED] responded that they absolutely were not. Plaintiff also learned from [REDACTED] that Mr. Cushman had made inappropriate comments about Ms [REDACTED] appearance at a Microsoft social event. At the event, Mr. Cushman had whispered to [REDACTED] that [REDACTED]—who was nearby—was "not the kind of hot you notice right away" but rather "the kind that creeps up on you." [REDACTED] thought this comment was inappropriate and unwelcome. Plaintiff also recalls that on one occasion, Mr. Cushman attempted to touch [REDACTED] inappropriately during a meeting in Plaintiff's office. At that meeting, Mr. Cushman attempted to tickle [REDACTED]'s foot while she was not looking. It was evident that [REDACTED] was caught off guard, and she gave absolutely no indication that the conduct was welcome. When Plaintiff noticed what was happening, she intervened stating there would be no touching in her office. Mr. Cushman also referred to Plaintiff, [REDACTED] as "Andrew's Angels." Plaintiff also learned from [REDACTED] that on one occasion, Mr. Cushman had interrupted a

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

meeting in the "war room" (a conference room for emergency situations) to state that his teenage daughter had informed him that the date in question was "steak and blowjob day," and then suddenly left the room. Mr. Cushman's behavior was so offensive and pervasive that Plaintiff felt she had no choice but to transfer to another group at Microsoft. When Plaintiff shared with [redacted] that her move was motivated by Mr. Cushman's harassment and inappropriate behavior towards women in the group, [redacted] told her that a male manager had inappropriately run his hands up her thighs when she first started working at Microsoft. She stated that she regretted not doing anything about it and, as a result, she would tell HR to speak with Plaintiff. Microsoft HR spoke with Plaintiff and investigated the allegations, concluding that Mr. Cushman had in fact been sexually harassing female employees. Yet Microsoft's response was to re-assign Mr. Cushman to another part of the Trustworthy Computing Group, while retaining his level and opportunities for advancement. Before he was transferred, however, Mr. Cushman retaliated against Plaintiff by assigning her a low bonus. Plaintiff complained about retaliation but Microsoft took no action. Since that time, Mr. Cushman's managerial privileges have been reinstated and he has been promoted to Senior Director. Plaintiff has heard from other Microsoft employees that Mr. Cushman has inappropriately touched another Microsoft female employee, [redacted], on at least two occasions as recently as 2014. Further, in September 2015, Plaintiff became aware that another woman who had been previously employed at Microsoft, [redacted] reported that sexual harassment by Mr. Cushman was one reason that she had left Microsoft in 2005. *See* Bates P005786. [redacted] also reported that when she returned to Microsoft, she was sexually harassed and bullied a second time by another man, an incident which she reported to HR. *Id.* Microsoft HR told her that her harasser "really didn't mean anything by it and was just being immature," and that she "had to continue to work with him- one desk away- until [she] moved to a new group." *Id.* She stated that she was "counseled" not to "make an issue about it, because that would prevent [her] from ever being able to get rehired at MS in the future." *Id.* Further, a

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

Microsoft manager told her that she "SHOULD leave MS- because as a woman the company would NEVER value [her] contribution." *Id.* [REDACTED] described Microsoft as a "good old boys network." *Id.*

Plaintiff is also aware that another woman employed at Microsoft, [REDACTED] has reported "dealing with sexist harassment" at Microsoft, treatment that made her feel like she should leave the company. *See* Bates P001551.

Plaintiff became aware in March 2016 via the mainstream media that female dancers dressed as scantily-clad schoolchildren had been hired to perform atop tables at a Microsoft Game Developers conference. This culture of objectifying women was so deeply entrenched at Microsoft that, in 2012, Plaintiff made a point to specifically request from the Microsoft marketing team organizing the BlueHat Conference in Las Vegas that no scantily clad women be placed on stage during the BlueHat Prize award ceremony, an award that Plaintiff herself created during her tenure at Microsoft. At the time, the marketing team member in charge, Chris Peletier, resisted Plaintiff's request by telling her that although he understood where she was coming from, she needed to think about what her audience wanted. Plaintiff clearly understood from Mr. Peletier that he believed that the use of scantily-clad women at the event was appropriate based on the expectations of Microsoft's audience. Plaintiff disagreed and emphasized that the use of scantily-clad women at a Microsoft event sent a message of non-inclusiveness that objectified women. None of the other Microsoft employees present at the meeting where Mr. Peletier defended the need for Microsoft to hire scantily-clad women for the event voiced any disagreement with Mr. Peletier. Despite receiving assurances that the event would *not* feature, scantily-clad women, Plaintiff later learned from one of her colleagues, [REDACTED] [REDACTED] that Plaintiff's directive was ignored by the marketing team and that scantily clad women were in fact on stage until [REDACTED] physically removed them from the stage. Plaintiff believes that her stance against the use of scantily-clad women at the BlueHat award ceremony led to negative feedback on her performance evaluations from the marketing team

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

characterizing her as uncooperative, despite the obviously inappropriate stance taken by the marketing team. Microsoft's performance evaluation policies and practices cemented such gendered criticisms, rather than filter them out.

Plaintiff also observed that Microsoft hired "go go dancers" to be present at its annual "MS Party." Plaintiff has heard a number of female Microsoft employees comment that the environment at MS Party was uncomfortable and unsafe for women due to an atmosphere that sexualizes and objectifies women. For example, Plaintiff recalls [redacted], another Microsoft employee, recall being cornered by a group of men at an MS Party and feeling physically unsafe.

Plaintiff has also received comments regarding her physical appearance or behavior during her work at Microsoft. For example, Plaintiff has been told that she should uncross her arms at meetings so that her body language would suggest to other Microsoft employees that she was easier to work with.

Attitudes Toward Female Participation in Discussions and Meetings

Plaintiff has observed that women are much more likely to be interrupted or cut-off at meetings. Plaintiff observed this problem happen so frequently at Microsoft that she developed her own way of responding to ensure that all Microsoft employees, including women, were heard at company meetings. For example, if Plaintiff observed a woman who was interrupted shortly after she started speaking in a meeting, Plaintiff would intervene to ask if the woman who had been interrupted had finished her thought. Plaintiff also observed on several occasions that women who shared their ideas at work were often ignored, but that the same or similar idea later presented by a male colleague would be acknowledged and congratulated. Thus, not only did Plaintiff observe that women faced challenges being heard at work, but that they also were often not recognized for their contributions, or their ideas were undervalued or viewed with skepticism. Such problems were so pervasive that Plaintiff recalls having conversations about them with other female employees and managers at Microsoft.

Plaintiff also observed that women were much more likely to be challenged on the merits

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

than men, meaning that their expertise or judgment was more likely to be called into question. For example, Plaintiff observed that [REDACTED]'s ideas, proposals, and budgets were often subjected to much greater scrutiny than those of Jerry Bryant, a lower ranked and less experienced male manager in her group.

Additionally, Plaintiff has observed male colleagues exclude female colleagues from important discussions or business opportunities. For example, [REDACTED] were excluded from conversations and opportunities to take Michael Reavey's position when he left the company despite being qualified to fill the role, which was ultimately assigned to [REDACTED] [REDACTED], a less qualified and less experienced male.

This pattern of excluding women, dismissing their contributions, questioning their credentials, and challenging their judgment is consistent with Plaintiff's observations of a culture at Microsoft that tended to view female employees as fulfilling administrative functions rather than technical roles. For example, Plaintiff was sometimes mistaken for an administrative assistant by male employees at Microsoft, even by people who had previously met her. Further, although Plaintiff was the content director for the BlueHat conference and the innovator of the BlueHat Prize, Microsoft employees often treated her as merely an event planner responsible for logistics, while Microsoft or other male employees took credit for her substantive accomplishments.

Job Assignments

Plaintiff has observed that men and women with similar credentials are not offered the same opportunities, and that men with fewer qualifications and less experience are provided responsibilities and assignments more valuable than those given to more experienced and more qualified women.

For example, starting in 2013, Plaintiff's manager, Jerry Bryant, systematically undermined her by reducing the scope of her role, even though her high performance never changed. For example, he took away several of Plaintiff's responsibilities and re-assigned them

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

to a less-qualified and less-experienced man two levels below Plaintiff. He also began to assign Plaintiff low-level tasks that he never asked men at Plaintiff's level to do. In January 2014, Plaintiff complained about this unfair treatment to Chris Betz, the Senior Director, and Dietrich Thomas, a Human Resources Generalist, but Microsoft did nothing to stop Mr. Bryant's behavior.

Furthermore, Plaintiff has observed that women were solicited to perform non-business related tasks, like helping to organize charity events. Such activities would normally be handled by an executive assistant or administrative staff, but women technical employees were encouraged to assume responsibility for them rather than being offered business-related work opportunities.

The Impact of Maternity Leave and Childcare on Performance Reviews and Assignments

Plaintiff has observed that women who take maternity leave are adversely affected on their performance reviews, compensation, and promotion opportunities.

For example, Plaintiff did not receive a promotion to Level 65 in June 2012, despite being eligible and despite exceptional performance the previous year. The same year, Plaintiff received the lowest performance evaluation score of her career at Microsoft, a "3," while she was out on maternity leave. Plaintiff was notified of this review score by her manager, Mark Oram, in September 2012.

Furthermore, Plaintiff observed that her use of an alternate work hours arrangement as well as maternity leave or bed rest adversely affected the *perception* of how much Plaintiff contributed to the organization, which in turn adversely affected the outcome of her performance evaluation in the stack ranking calibration process.

Plaintiff's EEOC Charge

Plaintiff filed an EEOC charge on May 13, 2014. Plaintiff incorporates the EEOC charge into this response.

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-18-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

Other Microsoft Materials

Certain material relevant to Plaintiff's claims in this case has been produced to Plaintiff's attorneys as highly confidential information. Accordingly, Plaintiff does not have access to that information, but believes that additional facts exist therein that are responsive to this interrogatory.

**INTERROGATORY NO. 2:**

If YOU contend that Microsoft operated under a general policy of discrimination that manifested itself in promotion practices impacting the purported class, state all material facts supporting that contention.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1.

Plaintiff observed that her gender affected her promotion opportunities during her tenure at Microsoft.

Over her career at Microsoft, Plaintiff has also observed men advance through the company faster than women performing similarly. Below are examples:

- In or around [REDACTED], [REDACTED] was a level 64 who was considered for promotion to level 65 but was passed over.
- In 2012, Plaintiff was not promoted to Level 65, Principal Security Strategist, for which she was eligible and eminently well qualified. In the year prior, Plaintiff had been responsible for an industry-leading initiative that resulted in the highest-rated news announcement for the Microsoft Trustworthy Computing Group. However, Microsoft instead promoted two less qualified men, [REDACTED] and another man.

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

- In 2013, Plaintiff was again passed over for promotion to Level 65, despite newsworthy new initiatives she created that are still referred to in the security industry. Plaintiff also observed that other male colleagues were promoted to Level 65 that year.
- Plaintiff also saw other female technical employees passed over for promotion in favor of less-qualified men. For example, two Principal-level women who had worked for Michael Reavey [REDACTED] were not even considered or given the chance to interview for his role when he left. Instead, Microsoft hired [REDACTED] a less-qualified male from [REDACTED] with little to no relevant work experience in managing the specifics of large scale security response in a company with the size and scope of Microsoft. Further, before hiring [REDACTED], Microsoft also considered a former Microsoft employee (who had left the company a few years earlier as a Level 64) as a candidate for the position. The male former employee was less qualified and less experienced than [REDACTED] yet they were never given the opportunity to interview for the position.
- The following men started at approximately the same time as Plaintiff did in [REDACTED] at Microsoft in similar roles and have been promoted to the title of Principal while Plaintiff has not, despite similar or better performance: [REDACTED] started more than [REDACTED] [REDACTED] Plaintiff and eventually became a Principal (Level 65) at Microsoft; [REDACTED] joined the [REDACTED] [REDACTED] Plaintiff and became a Principal (level 65) in or around [REDACTED]; [REDACTED] started employment with Microsoft [REDACTED] Plaintiff, and he was promoted to Principal in or around [REDACTED]; and [REDACTED] joined Microsoft in [REDACTED] and has been promoted to a Principal (level 65). Plaintiff has also observed that Microsoft promotes men

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

faster than women. For example, Plaintiff has observed that over the years, other women failed to receive promotions despite strong performance. These individuals include [REDACTED] [REDACTED] did not receive promotions she deserved, even though Microsoft more readily promoted a similarly situated male who joined Microsoft around the same time, [REDACTED]. Plaintiff is also aware that Microsoft provided [REDACTED] with more career opportunities, coaching, and other support than it provided to [REDACTED], affecting her promotion opportunities. In some cases, women have left Microsoft after hitting the glass ceiling, including [REDACTED].

**INTERROGATORY NO. 3:**

If YOU contend that Microsoft operated under a general policy of discrimination that manifested itself in performance evaluation practices impacting the purported class, state all material facts supporting that contention.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1-2.

Plaintiff observed that her gender affected her performance evaluation during her tenure at Microsoft.

The gendered stereotypes involving Plaintiff's communication style have also harmed her in calibration meetings.

Plaintiff received conflicting messages from Microsoft regarding expectations for her performance. On the one hand, as a Microsoft employee, Plaintiff was encouraged to be an innovator. On the other hand, when Plaintiff fulfilled that goal by developing and pushing new

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-21-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

ideas through the Microsoft organization that also transformed the industries she worked in, she was chastised at Microsoft for being too pushy, direct, "prickly," harsh, or aggressive. These gendered personality criticisms were complemented by suggestions that Plaintiff should be more cooperative or collaborative. Ironically, Plaintiff's work at Microsoft was so successful in part because Plaintiff's partners external to Microsoft recognized that she exhibited those very personality traits (e.g., diplomacy, teamwork, cooperation, collaboration) along with subject-matter expertise.

Plaintiff's accomplishments were groundbreaking and influential, as recognized by the industry partners outside of Microsoft. Even within Microsoft, Plaintiff's manager Michael Reavey candidly admitted to her that her performance and scope dwarfed that of many of her colleagues, including those who were Principals (Level 65 or greater). Yet Plaintiff was repeatedly told that, although her performance merited a higher performance evaluation score, she had been penalized during calibration meetings by other managers who criticized her for the "how" of her work rather than the "what." Plaintiff heard this refrain about the "how" several times when she was passed over for promotion or when she received performance evaluation scores lower than those merited by her performance. The "how" that led her to be disfavored in calibration meetings—which, Plaintiff observed, were attended by a majority of male employees—was often a manifestation of the same gender bias and focus on her perceived personality traits, including her communication style. Plaintiff observed that because she was a woman, behaviors that were otherwise praised in men—such as substance matter expertise, innovation, boldness, assertiveness, and creativity—became a liability for her as a woman. For example, in her role, Plaintiff often worked with the marketing team to make public announcements about initiatives she had spearheaded, created, or developed. During this process, members of the marketing team often challenged Plaintiff's subject matter expertise or authority, encroachments that Plaintiff resisted when necessary based on her professional judgment about Microsoft's best interests and her in-depth knowledge of the subject matter.

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-22-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

Plaintiff observed that her exercise of professional judgment was seen by other Microsoft employees through a gendered lens, resulting in gendered feedback that she was purportedly "harsh," "prickly," "aggressive," or not sufficiently "cooperative." Microsoft's flawed performance evaluation system did not insulate Plaintiff from such gendered feedback, but rather cemented it, lowering Plaintiff's performance evaluation scores, limiting Plaintiff's compensation and promotion opportunities, and otherwise impeding her business and professional opportunities. For example, in her 2010 Performance Review, Plaintiff was told "[a]n important component for you to focus on is to continue to listen and accept feedback, and demonstrate that you're willing to change direction or approaches based on constructive feedback from your peers, partners, teams, managers, or directs." MSFT_MOUSSOURIS_00000118. In her 2011 Performance Review, Plaintiff was told that "there are times when you find it difficult to balance your feelings of ownership of a program with the activities of others working to deliver against their specific commitments." MSFT_MOUSSOURIS_00000139. Plaintiff also recalls that similar gendered critiques were made in her 2012 Annual Performance Review, but Defendant has not yet produced this document despite Plaintiff's request for it. In her 2013 Performance Review, Plaintiff was told that she had to "find a strategy that will enable you to navigate time critical obstructions without confrontation or escalation." MSFT_MOUSSOURIS_00000159. Plaintiff has not observed men criticized for standing by the merits of their professional judgment in a similar way, but other women have discussed receiving similar critiques from managers.

Plaintiff is also informed that gendered comments regarding Plaintiff were made during calibration meetings about Plaintiff's performance. Plaintiff was told by Ellen Cram-Kowalczyk and Leah Lease, managers who participated in calibration meetings in which Plaintiff's performance was reviewed, that she had been described as "prickly" by male managers in one meeting around 2010 or 2011, and that this was cited as a reason to lower her stack rank even though the managers agreed that her performance and impact far exceeded other employees in

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-23-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

her peer group. This is the type of comment Plaintiff has not heard as a negative about men in the company.

Plaintiff knows that her performance scores were lowered during the stack ranking calibration process, and believes that the reduction in her scores was based on her gender. She has been told by her managers that her performance merited a higher score, but that her score was lowered through stack ranking and calibration meetings. For example, in May 2012, Plaintiff's manager, Mark Oram, told her that she had outstanding performance and had earned a rating of 2. However, after the stack ranking process, Plaintiff instead received a 3. Similarly, in May 2013, Mr. Oram again commended her performance and told her that her performance warranted a 1. However, Plaintiff received a 2 after the stack ranking process because managers at the calibration meeting found Plaintiff's communication style too aggressive. Mr. Reavey told her, "It's not the WHAT, Katie, it's the HOW."

Plaintiff also observed that gender-based criticisms affected other women's performance reviews, too. For several years during her employment, from 2010-2013, Plaintiff had supervisory duties and responsibilities over other Microsoft employees, her direct reports. Pursuant to Microsoft's policies for performance evaluation and review, Plaintiff made annual recommendations of performance scores for her direct reports. Plaintiff's evaluations and score recommendations were informed by her direct observations of her direct reports' performance according to Microsoft's policies, guidelines, and criteria for performance evaluation. Plaintiff then participated in calibration meetings with other managers in her organization to conduct the "stack ranking" process for her direct reports and their peer group. During this process, Plaintiff observed the gender-discriminatory effects of Microsoft's performance evaluation review policies and procedures first-hand. Plaintiff observed that the majority of managers participating in the stack ranking process were male Microsoft employees, and that gender bias affected the way male and female employees were reviewed and evaluated.

For example, Plaintiff recalls how the stack ranking process negatively affected 

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY



[redacted]. In or around [redacted], [redacted] was a [redacted] Program Manager at level 61. Based on [redacted] exceptional performance exceeding expectations, Plaintiff recommended that [redacted] receive a 1 and that she be promoted. Through the stack ranking process, however, [redacted] score was ultimately lowered to a 3, despite agreement by all the managers participating in the calibration meeting that [redacted]'s performance was excellent and no manager made any negative or critical comments regarding [redacted]. Plaintiff believes that [redacted]'s score was lowered because the other managers valued the work performed by male employees more than the work performed by female employees like [redacted], even though [redacted]'s work was essential to the success and mission of Microsoft. Despite unanimous agreement that [redacted]'s work was exceptional (a fact reflected in [redacted]'s promotion to a higher level that same review cycle), [redacted] received a lower score after stack ranking which Plaintiff believes ultimately reduced [redacted]'s compensation, based on Microsoft's compensation policies and their relationship to performance evaluation.

Plaintiff also recalls how stack ranking negatively affected [redacted]. [redacted] was a Program Manager and [redacted]. In [redacted] Plaintiff Moussouris determined that [redacted] deserved a 2 performance rating under Microsoft's performance evaluation policies based on her observations that [redacted]'s performance exceeded all expectations, that [redacted] completed all work that someone in her role would normally assume and also took on additional work, and that [redacted] took initiative in her position. However, after a stack ranking calibration meeting, [redacted] received a 5, the lowest possible score. Plaintiff lobbied extensively to obtain an exception to [redacted] stack ranking score so that it would be raised to a 4. Plaintiff believes that [redacted] stack ranking score ultimately reduced [redacted] compensation, promotion, and mobility within the company. During the previous review cycle, another male employee, [redacted], in the same job position received a 3, even though his performance was inferior to [redacted]'s performance.

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

During her tenure, Plaintiff observed a male employee receive *higher* scores after stack ranking than the score she had recommended. For example, in or around [REDACTED], Plaintiff recommended that [REDACTED] receive a 4 under Microsoft's performance evaluation policies and guidance because he did not fulfill all of his obligations or commitments. Plaintiff did not participate in the calibration meeting because she was on maternity leave, but her direct supervisor, Mark Oram, presented her recommendations on her behalf and recommended [REDACTED] receive a 4. Despite negative evaluations from his own managers, however, [REDACTED] ultimately received a 3 after stack ranking, an outcome that surprised Plaintiff and Mr. Oram. Plaintiff does not recall observing a female employee receive a higher score after stack ranking than was recommended by her manager.

During her tenure at Microsoft, Plaintiff also observed that female employees were more likely to be scrutinized for their personality traits, rather than the substance of their work. For example, Plaintiff recalls that the feedback received by [REDACTED] [REDACTED], after she took charge of the [REDACTED], often focused on personal traits, such as the fact that she was "so nice" or had a "great personality," rather than the substance of her work.

In her capacity as a manager, Plaintiff also observed that female employees were disproportionately more likely to receive lower scores after stack ranking, in the range of 3, 4, or 5. Other female managers have corroborated Plaintiff's direct observations that women are disproportionately more likely to receive lower scores under Microsoft's stack ranking practice, including [REDACTED]. Plaintiff and these women have discussed with one another that the majority of female employees end up in the lower ends of the stack ranks, an outcome that it is mathematically unlikely or impossible based on chance. Plaintiff believes these anecdotal observations will be corroborated by a data analysis and expert report of data that is currently in Microsoft's exclusive possession. A lower performance evaluation score translates directly into lower compensation, fewer promotional opportunities,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

and reduced mobility within Microsoft.

**INTERROGATORY NO. 4:**

If YOU contend that Microsoft operated under a general policy of discrimination that manifested itself in compensation practices impacting the purported class, state all material facts supporting that contention.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1-3.

Plaintiff observed that her gender has affected her compensation during her tenure at Microsoft. Plaintiff believes that Microsoft has paid her less than similarly situated males throughout her career at the firm. Plaintiff is aware that Microsoft paid other female technical employees less than similarly situated male technical employees. For example, [REDACTED], even after being promoted to a Level 62, made approximately $10,000 a year less than [REDACTED] who was also a Level 62.

Plaintiff has also observed men, such as [REDACTED] rise through the ranks faster at Microsoft, and Plaintiff understands that with promotions, come salary increases. Therefore, male colleagues performing work of similar quality receive greater compensation. Additionally, Plaintiff is aware that even without a promotion, a higher review score results in greater salary rewards (e.g., bonuses or raises), and that women are treated differently in reviews. Plaintiff observed women receiving lower performance evaluation scores than men with comparable performance. Plaintiff herself has observed and also has heard from others that women are often criticized for personality traits considered to be strengths in men, are not credited for their contributions, and receive review scores upon returning from maternity leave that are not commensurate with their contributions. This practice reduces female

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-27-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

compensation vis-à-vis male compensation.

**INTERROGATORY NO. 5:**

If YOU contend that Microsoft operated under a general policy of discrimination that had the effect of denying the purported class members business opportunities, state all material facts supporting that contention.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1-4.

Plaintiff believes that the delays in promotional opportunities and the glass ceiling for women at Microsoft causes women to be excluded from important leadership and career opportunities at the company.

**INTERROGATORY NO. 6:**

If YOU contend that Microsoft operated under a general policy of discrimination that had the effect of providing purported class members with inferior terms and conditions of employment, state all material facts supporting that contention.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1-5.

**INTERROGATORY NO. 7:**

If YOU contend that each nonresident putative class member had sufficient contact with the state of Washington to apply the Washington Law Against Discrimination (RCW § 24 49.60.010 et seq.) ("WLAD") to their claims, state all material facts supporting that contention.

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-28-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial.  Plaintiff also objects on the ground that this Interrogatory calls for a legal conclusion.  Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff believes that a majority of technical employees work in Washington State. Plaintiff believes that the performance, compensation, and promotion policies at issue were developed and implemented by company leadership and/or human resources in Washington State, and all members of the putative class would be subject to these same policies.  Plaintiff believes company training materials are generated by employees in Washington State.  Plaintiff understands that the employee agreement she received in 2007 states that Washington Law applies to her employment, and Plaintiff believes similar statements are made in the employee agreements of others, regardless of whether they work primarily in Washington.

**INTERROGATORY NO. 8:**

If YOU contend that the WLAD does not conflict in any material way with ANY other state anti-discrimination laws applicable to the putative class, state all material facts supporting that contention.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial.  Plaintiff also objects on the ground that this Interrogatory calls for a legal conclusion.

**INTERROGATORY NO. 9:**

State all material facts supporting YOUR contention that Microsoft implemented its performance evaluation policies "despite knowing that they have a longstanding disparate impact on female employees."

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR
-29-
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1-8.

In or around [redacted], Plaintiff observed that [redacted] received a "5" after stack ranking even though Plaintiff had recommended she receive a "2" based on her exceptional performance. Plaintiff engaged in discussions with several levels of management in Microsoft to report this problem and to lobby for [redacted] to receive a "4." Based on her pro-active efforts to correct the scope given to [redacted] through the stack rank, Plaintiff believes Microsoft was or should have been aware about the discriminatory impact its performance evaluation policies had on women.

Plaintiff discussed with managers (and is aware of female coworkers who did the same), including [redacted], that women's communication style is harshly criticized and gender-biased. Plaintiff has complained about gender bias at Microsoft to Microsoft human resources (including to Dietrich Thompson and Judy Mims), and she knows that others have made such complaints as well.

Further, Plaintiff herself participated in calibration meetings as a manager, and the results showing that women were receiving lower scores than men would be readily observable at the meetings and over the years. [redacted] also told Plaintiff that they had raised concerns at calibration meetings when they observed women disproportionately receive performance scores of a 4 or 5, but that their concerns were dismissed by male managers.

Plaintiff is aware of a general perception at Microsoft that if a woman is perceived as a complainer, it will hurt her career, and managers will not want to work with her.

**INTERROGATORY NO. 10:**

State all material facts supporting YOUR contention that Microsoft implemented its pay

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-30-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

policies "despite knowing that they have a longstanding disparate impact on female employees."

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1-9.

Plaintiff observed how women's pay was affected by the performance evaluations and promotions. Plaintiff discussed with managers (and is aware of female coworkers who did the same) that women's communication style was harshly criticized and gender-biased. Plaintiff spoke with managers about bias in compensation. Plaintiff has complained about gender bias at Microsoft to Microsoft human resources (including Judy Mims and Dietrich Thompson), and she knows that others have made such complaints as well.

Plaintiff is aware of a general perception at Microsoft that if a woman is perceived as a complainer, it will hurt her career, and managers will not want to work with her.

Plaintiff is aware of other women raising concerns about being denied career opportunities with managers with no resulting correction.

Further, Plaintiff herself participated in calibration meetings as a manager, and the results showing that women were receiving lower scores than men would be readily observable at the meetings and over the years. [REDACTED] also told Plaintiff that they had raised concerns at calibration meetings when they observed women disproportionately receive performance scores of a 4 or 5, but that their concerns were dismissed by male managers. Plaintiff is aware that a lower performance score means that an individual will receive lower compensation, including lower bonuses and lower salary raises.

**INTERROGATORY NO. 11:**

State all material facts supporting YOUR contention that Microsoft implemented its promotion policies "despite knowing that they have a longstanding disparate impact on female

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

employees."

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1-10.

Plaintiff made numerous complaints to her managers about being promoted, including in the years 2011-2014. Over the years, Plaintiff heard many women describe complaining to managers when they observed male peers being promoted above them.

Plaintiff has observed a dearth of female employees at more senior levels within her organization and other portions of the technical workforce.

Plaintiff discussed with managers (and is aware of female coworkers who did the same) that women's communication style was harshly criticized and gender-biased. Plaintiff spoke with managers about bias in performance reviews. Plaintiff has complained about gender bias at Microsoft to Microsoft human resources (including Judy Mims and Dietrich Thompson), and she knows that others have made such complaints as well. Further, Plaintiff herself participated in calibration meetings as a manager, and the results showing that women were receiving lower scores than men would be readily observable at the meetings and over the years. [REDACTED] also told Plaintiff that they had raised concerns at calibration meetings when they observed women disproportionately receive performance scores of a 4 or 5, but that their concerns were dismissed by male managers. Plaintiff is aware that a lower performance score means that an individual is less eligible for promotion or for internal mobility within Microsoft. Plaintiff is also aware that promotion recommendations are discussed at the same calibration meetings at which performance score recommendations are determined.

Plaintiff is aware of a general perception at Microsoft that if a woman is perceived as a complainer, it will hurt her career, and managers will not want to work with her.

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-32-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

**INTERROGATORY NO. 12:**

If YOU contend that Microsoft implemented ANY policy that caused an adverse impact on women, specifically identify each such policy.

**RESPONSE TO INTERROGATORY NO. 12:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1-11. Plaintiff contends that the performance review, compensation, and promotion policies at issue have an adverse impact on women.

**INTERROGATORY NO. 13:**

If you identified a policy or policies in response to Interrogatory No. 12 above, state all material facts supporting your contention that the policy or policies caused the alleged adverse impact.

**RESPONSE TO INTERROGATORY NO. 13:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1-12. Plaintiff has observed for herself and has heard managers say that women are paid and promoted less and calibrated differently than men.

**INTERROGATORY NO. 14:**

If YOU identified a policy or policies in response to Interrogatory No. 12 above, and YOU contend that Microsoft implemented the policy or policies because of their alleged adverse impact on women, state all material facts supporting that contention.

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

**RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff does not allege that "Microsoft implemented the policy or policies because of their alleged adverse impact on women" in the Second Amended Complaint. Plaintiff alleges that Microsoft implemented discriminatory policies and practices regarding performance reviews, compensation, and promotions; that those policies had an adverse impact on women; that Microsoft maintained those policies and practices with knowledge of their adverse impact; that those policies and practices are not and cannot be justified by business necessity; and that even if those policies and practices could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity. Plaintiff incorporates her response to Interrogatory number 1-13.

**INTERROGATORY NO. 15:**

If YOU contend that Microsoft implemented ANY practice that caused an adverse impact on women, specifically identify each such practice.

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1-14, and specifically her response to number 12.

**INTERROGATORY NO. 16:**

If YOU identified a practice or practices in response to Interrogatory No. 15 above, state all material facts supporting your contention that the practice or practices caused the alleged adverse impact.

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

**RESPONSE TO INTERROGATORY NO. 16:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff incorporates her response to Interrogatory number 1-15, and specifically her response to number 13.

**INTERROGATORY NO. 17:**

If YOU identified a practice or practices in response to Interrogatory No. 15 above, and YOU contend that Microsoft implemented the practice or practices because of their adverse impact on women, state all material facts supporting that contention.

**RESPONSE TO INTERROGATORY NO. 17:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

Plaintiff does not allege that "Microsoft implemented the practice or practices because of their adverse impact on women" in the Second Amended Complaint. Plaintiff alleges that Microsoft implemented discriminatory policies and practices regarding performance reviews, compensation, and promotions; that those policies had an adverse impact on women; that Microsoft maintained those policies and practices with knowledge of their adverse impact; that those policies and practices are not and cannot be justified by business necessity; and that even if those policies and practices could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity. Plaintiff incorporates her response to Interrogatory number 1-16.

**INTERROGATORY NO. 18:**

If YOU contend that your WLAD disparate impact claim is not based on discretionary performance decisions, state all material facts that support that contention.

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-35-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

**RESPONSE TO INTERROGATORY NO. 18:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Additionally, Plaintiff objects on the ground that this Interrogatory calls for a legal conclusion.

**INTERROGATORY NO. 19:**

Identify all individuals by name and by job title who YOU consider to be YOUR comparators for the disparate treatment and disparate impact claims you allege against Microsoft.

**RESPONSE TO INTERROGATORY NO. 19:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Plaintiff also objects that the term comparator is vague and ambiguous. To the extent that Plaintiff can guess at the meaning and subject to and without waiving these objections, Plaintiff responds as follows:

[redacted]

**INTERROGATORY NO. 20:**

If YOU identified individuals in response to Interrogatory No. 19 above, state all material facts to support YOUR contention that these individuals are YOUR comparators.

**RESPONSE TO INTERROGATORY NO. 20:**

Plaintiff incorporates the general objections stated above and reserves her right to supplement her response before trial. Subject to and without waiving these objections, Plaintiff responds as follows:

[redacted]

Mr. [redacted] also worked in the [redacted] Group and was [redacted] against Plaintiff for a time. Mr. [redacted] started employment with Microsoft approximately [redacted]

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 Fourth Avenue, Suite 1900
Seattle, Washington 98121
Tel. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

[redacted] before Plaintiff. Plaintiff and [redacted] were both [redacted]. At the time [redacted] was promoted to Principal in [redacted], Plaintiff's work had greater impact than his, and she was no less qualified than [redacted] Further, [redacted] had also been criticized for the "how" of his performance due to his personality, but he was promoted nevertheless.

[redacted]

[redacted] also worked in the [redacted] Group as a Program Manager and was [redacted] against Plaintiff for a time. [redacted] started employment with Microsoft approximately [redacted] Plaintiff. Although [redacted] left the company in [redacted] for less than a year, he returned in [redacted] and, in [redacted], was promoted to Principal while Plaintiff was not. At the time of [redacted]s promotion, Plaintiff's work had greater impact than his, and she was no less qualified than [redacted].

[redacted]

[redacted] transferred into the [redacted] Group in [redacted] after Plaintiff started working there. [redacted] was a [redacted] at the same time as Plaintiff. Plaintiff and [redacted] were calibrated against each other for a time. [redacted] was promoted to principal in [redacted], while Plaintiff was not. At the time of [redacted] promotion, Plaintiff's work had greater impact than his, and she was no less qualified than him.

[redacted]

[redacted] joined Microsoft in [redacted] and was promoted to Principal in [redacted]. At the time of [redacted] promotion, Plaintiff's work had greater impact than his, and she was no less qualified than him.

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-37-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

**VERIFICATION**

I, Katherine Moussouris, verify subject to the penalty of perjury that the foregoing answers to interrogatories are true and correct to the best of my knowledge and belief.

Dated: June 2, 2016 By: ______________________
Katherine Moussouris

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

Dated: June 2, 2016

By: /s/ Yaman Salahi

Kelly M. Dermody (*pro hac vice*)
Anne B. Shaver (*pro hac vice*)
Michael Levin-Gesundheit (*pro hac vice*)
Yaman Salahi (*pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
E-Mail: kdermody@lchb.com
E-Mail: ashaver@lchb.com
E-Mail: mlevin@lchb.com
E-Mail: ysalahi@lchb.com

Sharon M. Lee (Wash. Bar No. 37170)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
2101 Fourth Avenue, Suite 1900
Seattle, Washington 98121
Telephone: (206) 739-9059
Facsimile: (415) 956-1008
E-Mail: slee@lchb.com

Rachel J. Geman (*pro hac vice*)
**LIEFF CABRASER HIEMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
E-Mail: rgeman@lchb.com

Adam T. Klein (*pro hac vice*)
Cara E. Greene (*pro hac vice*)
Ossai Miazad (*pro hac* vice)
Elizabeth V. Stork (*pro hac vice*)
Cara Chomski (*pro hac vice*)
**OUTTEN & GOLDEN LLP**
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Facsimile: (646) 509-2060
E-Mail: ATK@outtengolden.com
E-Mail: CEG@outtengolden.com
E-Mail: OM@outtengolden.com
E-Mail: estork@outtengolden.com

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-39-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

Jahan C. Sagafi (*pro hac vice*)
Katrina L. Eiland (*pro hac vice*)
**OUTTEN & GOLDEN LLP**
One Embarcadero Center, 38th Floor
San Francisco, California 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
E-Mail: jsagafi@outtengolden.com
E-Mail: keiland@outtengolden.com

Michael Subit (Wash. Bar No. 29189)
**FRANK FREED SUBIT & THOMAS LLP**
705 Second Avenue, Suite 1200
Seattle, Washington 98104
Telephone: (206) 682-6711
Facsimile: (206) 682-0401
E-Mail: msubit@frankfreed.com

*Attorneys for Plaintiffs and the proposed Class*

OBJECTIONS AND RESPONSES TO INTERROGATORIES
CASE NO. 2:15-CV-01483-JLR

-40-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2101 FOURTH AVENUE, SUITE 1900
SEATTLE, WASHINGTON 98121
TEL. 206.739.9059

HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY