1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

KATHERINE MOUSSOURIS, et al.,

CASE NO. C15-1483JLR

11

Plaintiffs,

ORDER DENYING CLASS
CERTIFICATION

v.

12

MICROSOFT CORPORATION,

13

Defendant.

14

## I.    INTRODUCTION

15

16       Before the court is Plaintiffs Katherine Moussouris and Holly Muenchow's

17  (collectively, "Plaintiffs") motion for class certification.  (MCC (Dkt. ## 228 (sealed),

18  381 (redacted)).)  Defendant Microsoft Corporation ("Microsoft") opposes the motion.

19  (Resp. (Dkt. # 474).)  Microsoft also filed a surreply to strike portions of Plaintiffs' reply.

20  (Surreply (Dkt. # 349).)  The court has considered the motion, the submissions filed in

21  support of and in opposition to the motion, the relevant portions of the record, and the

22  applicable law.  The court also heard oral argument from the parties on June 11, 2018.

1    (*See* Min. Entry (Dkt. # 503).)  Being fully advised, the court DENIES the motion for the

2    reasons detailed below.

## II.    BACKGROUND

4        Microsoft is a "global provider of software and software-related services as well as

5    hardware devices."  (SAC (Dkt. # 55) ¶ 2.)  Microsoft recognizes that diversity "is an

6    integral and inherent part of [its] culture, fueling [its] business growth while allowing [it]

7    to attract, develop, and retain [the] best talent."  (Parris Decl. (Dkt. ## 288 (sealed), 287

8    (redacted)) ¶ 3, Ex. 1 ("Resp. Docs.") at 354.)[1]  To that end, Microsoft devotes significant

9    resources to various diversity and inclusion ("D&I") initiatives, including D&I training

10   courses, D&I plans to recruit and retain diverse employees, and D&I toolkits to aid

11   internal discussions regarding diversity.  (Dhillon Decl. (Dkt. ## 297 (sealed), 387

12   (redacted)) ¶¶ 6-13.)  Microsoft's official policy ("Anti-Harassment/Anti-Discrimination

13   policy") prohibits all workplace discrimination and expresses zero tolerance for any form

14   of workplace harassment.  (Resp. Docs. at 18, 173.)  Microsoft's Employment Relations

15   Investigation Team ("ERIT") investigates any alleged violations of that policy.  (Parris

16   Decl. ¶ 7, Ex. 5 ("DeLanoy Dep.") at 31:3-8.)

17       Plaintiffs—former and current Microsoft employees (SAC ¶¶ 6, 8)—challenge

18   Microsoft's "continuing policy, pattern, and practice of sex discrimination against female

19   //

20   //

21   ───────────────
         [1] For the set of Microsoft corporate documents filed with the responsive briefing, the
22   court cites the page number located at the bottom center of the exhibit.  (*See generally* Resp.
     Docs.)

1   employees in technical and engineering roles . . . with respect to performance

2   evaluations, pay, promotions, and other terms and conditions of employment." (*Id.* ¶ 1.)

3   Plaintiffs claim that, as a result of Microsoft's employment policies and practices, female

4   technical employees "receive less compensation and are promoted less frequently than

5   their male counterparts." (*Id.* ¶ 3; *see also id.* ¶ 25 ("Microsoft discriminates against

6   female technical employees in (1) performance evaluations; (2) compensation; and (3)

7   promotions.").)  Plaintiffs now seek to certify a proposed class of female employees in

8   Stock Levels 59-67 working in the Engineering and/or the I/T Operations Professions

9   from September 16, 2012, to the present.  (MCC at 1.)

10      The court details Microsoft's structure, relevant employment practices, and history

11   with gender equity issues before summarizing Plaintiffs' employment and the relevant

12   procedural background.

13   **A.      Microsoft's Structure**

14      Microsoft categorizes its employees into various groups.  First, Microsoft groups

15   its employees into Professions, the "highest level in Microsoft's taxonomy" (Whittinghill

16   Decl. (Dkt. ## 321 (sealed), 320 (redacted)) ¶ 7), defined as "a group of functional areas

17   . . . with common functional skillsets, business results, and success differentiators,"

18   (Shaver Decl. (Dkt. ## 229 (sealed), 233 (redacted)) ¶ 5, Ex. A ("MCC Docs.") at 757).[2]

19   Within Professions, Microsoft classifies employees into Disciplines, subgroups that

20   //

---

21      [2] For the set of Microsoft corporate documents filed with Plaintiffs' motion, the court
cites the ECF-generated page number at the upper right-hand corner of the exhibit. (*See*

22   *generally* MCC Docs.)

represent "a different area of focus within a Profession." (Whittinghill Decl. ¶ 8.) Microsoft further breaks down Disciplines into Standard Titles, which "represent a different role within a Discipline." (*Id.* ¶ 10.) For example, an employee can be in the Engineering Profession in the Program Management Discipline with the Standard Title of Program Manager. (Shaver Decl. ¶ 9, Ex. E ("Whittinghill Dep.") at 103:20-104:1.)

Microsoft further divides Standard Titles into areas of specialization. (*See* Whittinghill Decl. ¶ 21.) This further subdivision, called a "functional hierarchy," features six tiers of division. (*See id.* ¶ 22.) Oftentimes, this functional hierarchy—rather than the larger groupings of Profession, Discipline, or Standard Title—tracks reorganizations in the business that may affect an employee's responsibilities. (*Id.*) Thus, an employee may "keep the same Standard Title, Career Stage, and Stock Level, but end up working on very different products and/or services." (*Id.*)

The functional hierarchy reveals that there may be numerous subdivisions within a Standard Title. (*See id.* ¶¶ 34-35.) For example, within the Data & Applied Scientist Standard Title, the functional hierarchy describes 268 unique positions that employees hold. (*Id.* ¶ 35, Ex. C.) As a result, job positions with the same Standard Title may describe significantly different roles. (*See id.* ¶¶ 39-40, Ex. D (comparing a "Software Engineer II" on the Azure, Internet of Things team to a "Software Engineer II" on the Xbox team).) The number of unique positions varies from year to year because Microsoft alters its team structure in response to market demands. (*Id.* ¶ 37.) Thus, in any given year, Microsoft is likely to form new teams or eliminate old teams. (*See id.*) Those changes can generate or remove employee roles. (*See id.*)

1    Microsoft also utilizes Stock Level and Career Stage classifications.  Stock Level,

2    also known as "Pay Level," represents "compensation ranges" that are set "relative to the

3    professions [Microsoft] employ[s] and the markets in which [Microsoft] work[s]."  (MCC

4    Docs. at 760; *see id.* ("Pay levels (such as levels 50, 59, or 64) represent salary ranges,

5    based on an ongoing analys[i]s of local and discipline-specific labor markets and

6    Microsoft's compensation strategy.").)  Stock Levels range from 59 to 98 (*see* Shaver

7    Decl. ¶ 10, Ex. F ("Ritchie Dep.") at 521:10-13; Farber Rep. (Dkt. ## 332 (sealed), 384

8    (redacted)) ¶ 20), and pay increases as the Stock Level increases (*see* Farber Rep. ¶ 20;

9    Saad Rep. (Dkt. ## 354-1 (sealed); 385 (redacted)) ¶ 145).  Career Stage "indicates at a

10   high level the general degree of scope and impact of a role."  (Whittinghill Decl. ¶ 15.)

11   There are three Career Stage designations.  An "Individual Contributor" ("IC") is "an

12   entry-level employee with little or no relevant experience."  (*Id.* ¶ 16.)  A "Lead" is "a

13   professional who primarily contributes as an IC but also supervises a small team of ICs."

14   (*Id.* ¶ 17.)  A "Manager" "manag[es] ICs and/or other managers."  (*Id.* ¶ 18.)

15   **B.    Microsoft's Pay and Promotion Processes**

16   Plaintiffs challenge a specific aspect of Microsoft's employee evaluation process:

17   the Calibration Process, during which managers compare and standardize employees'

18   performance ratings across a cohort of similarly-leveled colleagues.  (*See* Ritchie Dep. at

19   136:24-137:4, 157:6-8; *see also* Resp. Docs. at 55; DeCaprio Decl. (Dkt. # 295) ¶ 4; Helf

20   Decl. (Dkt. ## 301 (sealed), 300 (redacted)) ¶ 4.)  The Calibration Process took two

21   forms over the course of the class period.  From 2011 to 2013, Microsoft called the

22   comparison processes "calibration meetings," with "a focus on the results achieved by the

employee and how he or she achieved those results." (Wilson Decl. (Dkt. # 322) ¶ 9.) In May of 2014, Microsoft altered components of this process and renamed calibration meetings "people discussions." (DeCaprio Decl. ¶ 4.) The court discusses "calibration meetings" and "people discussions" before addressing the evaluation of the Calibration Process conducted by Plaintiffs' expert Dr. Ann Marie Ryan.

   1. Calibration Meetings

   Managers held calibration meetings to discuss employees' performance ratings relative to their similarly-positioned peers to determine the final performance ratings for each employee. (Resp. Docs. at 55; Helf Decl. ¶ 4.) Managers held those meetings at the end of the assessment process, after they had reviewed self-evaluations, feedback from others, and their own observations to recommend an initial Performance Rating from 1 to 5, with 5 as the lowest and 1 as the highest. (*See* Resp. Docs. at 39; Helf Decl. ¶ 9.) Managers based their initial ratings on three inputs: "**What** results were achieved, **How** they were achieved, and [the] **Proven Capability**" of the employee over time. (Resp. Docs. at 39 (bolding in original).) To aid managers' evaluation of the "what" and the "how," Microsoft provided general definitions and a rubric describing what each numerical rating represented. (*Id.* at 50-51.) For instance, Microsoft defined the "What" as evaluating the employee's "[r]esults against commitments for the past fiscal year." (*Id.* at 50.) Additionally, Microsoft noted that a "1" should be given out to approximately 20% of employees who "[g]reatly surpassed expectations with performance and business impact greater than the vast majority of peers." (*Id.* at 51.)

//

Managers then handed over their initial performance ratings to and discussed them with the Calibration Manager, who represented a number of employees at a calibration meeting.  (*Id.* at 52-53.)  At the calibration meeting, Calibration Managers explained the reasoning for employees' initial performance rating and compared the relative performance of employees doing similar work.  (DeCaprio Decl. ¶ 4.)  Employees were grouped by Stock Level into peer groups for these comparisons.  (MCC Docs. at 13.) The goal of the meeting was to "ensure there was consistency to how performance was evaluated and rated vis-à-vis the performance of [an employee's] peers."  (Wilson Decl. ¶ 9.)  Microsoft encouraged managers to refrain from making "artificial distinctions . . . simply to meet an approximate distribution" of how many employees should receive a certain rating.  (Resp. Docs. at 55.)  Thus, Microsoft recognized that an "extraordinary high-performing group may . . . justify a distribution that is skewed to the higher end of an approximate distribution," whereas an "underperforming group may . . . justify a distribution that is skewed to the lower end."  (*Id.*)

Beyond this guidance, Microsoft sought to "empower leaders and managers to use their judgment in evaluating the performance of their employees" by localizing the evaluation process to each group.  (Wilson Decl. ¶ 11; *see also* Helf Decl. ¶ 6 (stating that the calibration meetings "looked different depending on the level of the roles for the employees involved and . . . the way the leader wanted to run the meeting").)  Microsoft encouraged every meeting leader to create the approach to be used in his or her calibration meeting, including what issues and topics to discuss; how the meeting would be conducted; and the specific qualities that each group would look for in evaluating

employees.  (Wilson Decl. ¶ 13; *id.* ¶ 21 (describing calibration meetings as "designed to be flexible").)  Thus, although Calibration Managers ran the meetings according to Microsoft's framework, "the managers participating in the calibration meeting" determined "the common core priorities . . . for the larger group," any "common objectives," and "what good work looked like."  (DeCaprio Decl. ¶ 8.)

As a result, "the personalities in the room" largely dictated how calibration meetings unfolded.  (Wilson Decl. ¶ 15; *see also* Helf Decl. ¶ 15 ("No two [c]alibration [m]eetings that I attended were the same.").)  Calibration meetings thus varied "both structurally and substantively."  (DeCaprio Decl. ¶ 9.)  Structurally, the meeting leader determined how the discussion would be held, such as through the use of a PowerPoint versus the use of physical cards to sort employees.  (*Id.*)  Substantively, the discussions focused on different issues, such as budgetary needs versus employee talent.  (*Id.* ¶ 10.)

Managers similarly discussed promotions during calibration meetings.  In determining promotions, managers considered business need, demonstrated employee readiness, and available budget.  (Helf Decl. ¶ 30; Resp. Docs. at 38.)  Microsoft, as with the performance ratings, provided general definitions of the three promotion criteria.  (*See* Resp. Docs. at 38.)  Because promotions depended upon the budget in any given year, promotions varied across levels, locations, Professions, and year.  (*See id.* at 36.)

The calibration meeting recommendations were provided, or "rolled up," to the next level of management for review.  (*See* Wilson Decl. ¶ 24.)  In other words, the recommendations reached by lower-level managers "cascaded upwards" for approval by higher-level managers.  (*See* Helf Decl. ¶ 21.)  Higher-level managers did not usually

1   make significant adjustments to the individual recommendations but would instead

2   "focus[] on the budget and ensur[e] the actual distribution was in line with the budget."

3   (*Id.* ¶ 27.)  The roll up process continued until the recommendations reached the

4   Executive Vice President ("EVP"), who "in practice . . . did not change recommendations

5   made at" lower-levels.  (*Id.*; *see also* Wilson Decl. ¶ 24.)

6       2. <u>People Discussions</u>

7       Since 2014, Microsoft "moved away from lengthy meetings for comparing and

8   evaluating employees" (Helf Decl. ¶ 31) and instead shifted its evaluation process to

9   focus on "the impact the employee's performance makes on his or her organization and

10  across the company in light of his or her role" (Wilson Decl. ¶ 10).  In this new

11  evaluation process, managers held "people discussions" to evaluate the impact of an

12  employee's performance.  (*Id.*)  Unlike before, Microsoft no longer had "numerical

13  performance ratings or a company-wide anticipated distribution of performance ratings or

14  annual rewards."  (*Id.*; *see also* DeCaprio Decl. ¶ 4.)  Thus, the "people discussion"

15  meeting often focused on "what rewards are right for each individual employee based on

16  the impact that particular employee's performance had on the group and the company."

17  (Wilson Decl. ¶ 23; *see also* Helf Decl. ¶ 4.)

18      Aside from the change in focus, the people discussions resembled the calibration

19  meetings.  Like calibration meetings, the process rolled upwards, with higher-level

20  managers reviewing the recommendations made by lower-level managers.  (*See* Helf

21  Decl. ¶ 36.)  And as was the case previously, higher-level managers are less likely to

22  substantively change recommendations, especially those concerning lower-level

1   employees.  (*See id.*)  This roll-up process continued until the head of the organization

2   approved the recommendations.  (*See id.*; Wilson Decl. ¶ 24.)

3       The people discussion process "empower[ed] managers to own the assessment by

4   focusing solely on the individual employee instead of on the individual as compared to

5   others." (Helf Decl. ¶ 31.)  Thus, Microsoft "encourage[d] leaders to take more direct

6   ownership of the evaluation process." (*Id.* ¶ 35.)  Managers "ha[d] much more latitude to

7   determine the priorities for their organization and how to accomplish those priorities,"

8   including what inputs to consider during the people discussions and which employees to

9   discuss.  (*Id.*; DeCaprio Decl. ¶ 14 (observing variations in people discussions, such as

10  who was discussed and how those discussions were run).)  Managers could even define

11  for themselves "what high impact for different types of roles looks like, such as what type

12  of impact do [they] expect of a Level 59 software engineer role." (DeCaprio Decl. ¶ 14.)

13  As a result, "there is a lot of discretion as to how [managers] reach [their] end results,"

14  and the people discussions "var[ied] significantly" based on who was leading the

15  meeting.  (*Id.* ¶¶ 35, 42-43.)

16      Managers also discussed promotions during people discussions, as they did

17  previously during calibration meetings.  They viewed the promotion criteria with a focus

18  on employee impact.  (*See* Helf Decl. ¶ 39.)  Managers had "complete discretion" as to

19  their justifications for a promotion.  (*Id.*)

20      3.  Dr. Ryan's Evaluation

21      To challenge Microsoft's Calibration Process, Plaintiffs submit the expert report

22  of Dr. Ann Marie Ryan, a professor of organizational psychology.  (*See* Ryan Rep. (Dkt.

## 231 (sealed), 379 (redacted)) ¶ 1.)  Dr. Ryan reviewed the process Microsoft implemented to make pay and promotions decisions and examined how Microsoft's processes aligned with best practices for employee evaluation.  (*See id.* ¶¶ 5, 11.)  After reviewing the relevant materials, Dr. Ryan found "no evidence that compensation and promotion decisions are made reliably at Microsoft."  (*Id.* ¶ 12.)  Specifically, Dr. Ryan takes issue with the lack of "sufficient standardization" in the Calibration Process, which "undermines the reliability and validity" of personnel decisions.  (*Id.* ¶ 13.)

Overall, Dr. Ryan criticizes Microsoft for not providing managers sufficient guidance on how to make pay and promotion decisions.  For instance, Dr. Ryan observes that Microsoft "does not provide evidence to support how compensation level and promotion decisions are determined," as reflected in the fact that managers are allowed to give open-ended promotion justifications that do not need to be tied to the promotion criteria.  (*Id.* ¶¶ 18-19 (emphasis removed).)  As a result, managers may "use varied criteria across individuals for the same decision"; use "irrelevant criteria"; or "use different standards or weighting of the same criteria."  (*Id.* ¶ 20.)  Additionally, Dr. Ryan takes issue with the fact that Microsoft did not prescribe any weights to the underlying "what," "how," and "capacity" criteria, so that managers could weigh these criteria differently.  (*Id.* ¶¶ 26-31.)

Moreover, Dr. Ryan observes a lack of uniformity in what information managers considered and the process for considering that information.  (*See id.* ¶ 32.)  For example, while Microsoft gave "general guidance" to consider "work products and conversations," "the quantity and nature of information serving as input into compensation level and

1    promotion decisions varied." (*Id.* ¶ 34.) Dr. Ryan also finds variation in "how the

2    process of evaluating employee performance . . . was conducted" and "how it was

3    determined which employees were discussed." (*Id.* ¶ 35.)

4         Lastly, Dr. Ryan critiques Microsoft for inadequately monitoring the Calibration

5    Process to ensure the validity of outcomes. (*See id.* ¶¶ 40-42.)  No reports are generated

6    with regard to monitoring, so it was "unclear" whether the monitoring was consistently

7    done, and if so, the quality of the monitoring efforts. (*Id.* ¶ 42.)  Microsoft allegedly does

8    not train managers on how to weigh criteria in relation to job requirements or how to

9    justify pay and promotion decisions with reference to the criteria used. (*Id.* ¶ 43.)  Nor

10   does Microsoft provide feedback to its managers as to how their decisions are or are not

11   calibrated to the relevant criteria. (*Id.*)

12   **C.    Microsoft Experience with Gender Equity Issues**

13        Microsoft is no stranger to the issue of gender pay equity.  In October 2014, the

14   Chief Executive Officer ("CEO") of Microsoft, Satya Nadella, sent a company-wide

15   email stating that "the overall differences in base pay among genders . . . (when we

16   consider level and job title) is consistently within 0.5% at Microsoft." (MCC Docs. at

17   38.)  Microsoft also published an Equal Pay Study in April 2016, in which it stated that

18   women at Microsoft earn 99.8¢ for every $1.00 earned by men with the same job title and

19   level.  *See* Katherine Hogan, *Ensuring Equal Pay for Equal Work*, Official Microsoft

20   Blog (Apr. 11, 2016), https://blogs.microsoft.com/blog/2016/04/11/ensuring-equal-pay-

21   equal-work/ (last visited June 21, 2018).  After both announcements, Microsoft

22   employees responded that these studies, which only analyzed pay within the same levels,

portray a false equity and hide disparity in promotions.  (*See, e.g.*, MCC Docs. at 516-17.)  As one employee put plainly, "[t]here is an important distinction between equal pay for equal level, and equal pay for equal work."  (*Id.* at 771.)

In response to employee concerns and as acknowledgement of the work remaining to address the pay gap, the Senior Leadership Team ("SLT") at Microsoft "meet[s] on a regular basis" to "review and act on the [D&I] data."  (*Id.* at 1071.)  For example, the 2015 SLT D&I Core Priorities Action Plan details several "accountabilities" that various SLT members "own," including measuring and tracking promotion trends and time in role for women; reviewing the recruitment, hiring, and development processes for unconscious bias; updating and requiring all employees to complete an unconscious bias training; and creating sponsorship opportunities for higher-leveled female employees. (*Id.* at 270-73.)  Microsoft also employs ERIT as a tool against discrimination.  From 2010 to 2016, ERIT received 238 complaints by female employees, 118 of which concerned gender discrimination.  (*See* Shaver Decl. ¶ 7, Ex. C.)  Of these 118, ERIT concluded only once that the complaint was founded—that is, the conduct complained of violated the Anti-Harassment/Anti-Discrimination policy.  (*See id.* at 5.)  However, even when ERIT determines a complaint is unfounded, ERIT may still discipline the alleged offender.  (*See, e.g.*, Resp. Docs. at 283.)

Additionally, as a federal government contractor, Microsoft has been audited by the Department of Labor's Office of Federal Contract Compliance Programs ("OFCCP") for compliance with federal law and regulations.  The OFCCP conducted several audits of Microsoft's locations without findings of violation.  (*See* Parris Decl. ¶ 21, Ex. 19.)

1   On one occasion, however, in 2016, the OFCCP issued a Notice of Violation letter

2   regarding ████████████████████████████████████████████

3   ████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████ (*See id.*)

8   **D.   Plaintiffs' Employment at Microsoft**

9          Ms. Moussouris and Ms. Muenchow both worked at Microsoft—Ms. Moussouris

10  in the Engineering Profession and Ms. Muenchow in both the Engineering and I/T

11  Operations Professions.  Plaintiffs also offer several female employees' declaration

12  testimony detailing their experiences at Microsoft.  The court summarizes each in turn.

13         1.   Katherine Moussouris

14         Ms. Moussouris worked at Microsoft from April 2007 to May 2014.  (SAC ¶ 6;

15  Moussouris Decl. (Dkt. # 242) ¶ 2.)  Microsoft hired Ms. Moussouris in April of 2007 as

16  a Level 62 Security Program Manager for the Trustworthy Computing Group.

17  (Moussouris Decl. ¶ 2; SAC ¶ 62.)  Her position, involving work as a security strategist,

18  featured what Ms. Moussouris calls "unique elements" because she created "new

19  programs that didn't exist before."  (Moussouris Dep. (Dkt. # 288-5) at 279:4-11.)  Thus,

20  ────────────────────────

21  [3] ████████████████████████████████████████

    ██████████████████████████████████████████

22  ████████████

1   she was not aware of another employee whose role or responsibilities were similar to

2   hers.  (*See id.* at 279:4-17.)

3       Microsoft promoted Ms. Moussouris to a Level 63 Program Manager II in 2008

4   and to a Level 64 Senior Program Manager in 2010.  (Moussouris Decl. ¶ 2.)  After 2010,

5   however, Ms. Moussouris received no more promotions, despite purportedly being

6   "responsible for groundbreaking efforts in the security industry" and obtaining

7   "substantial defensive security research prizes."  (*See id.* ¶¶ 4-5.)  In 2012, despite her

8   eligibility for promotion to a Level 65 Principal Program Manager, "two less qualified

9   men in [her] group were promoted over [her], even though they had not performed the

10   same scope of work nor received the same level of recognition in the industry."  (*Id.* ¶ 4.)

11   Her direct manager gave her an initial performance rating of 2 out of 5; her performance

12   rating was bumped down to a 3 during the Calibration Process.  (Moussouris Dep. at

13   68:12-13; 93:10-94:4.)  After her performance rating was downgraded, her manager

14   reportedly expressed regret that she "was not given the score that he believes [she]

15   deserved."  (*Id.* at 94:2-4.)  Ms. Moussouris believes that gender discrimination affected

16   her 2012 performance review.  (*Id.* at 260:4-6.)  The following year, in 2013, Ms.

17   Moussouris was up for a promotion but again passed over; another male colleague

18   secured leadership of the team.  (Moussouris Decl. ¶ 4.)  Her manager made an initial

19   performance rating recommendation of a 1 out of 5, which was bumped down to a 2

20   during the Calibration Process.  (SAC ¶ 64.)

21       Ms. Moussouris, as a manager herself, supervised several employees.  (*See*

22   Moussouris Dep. at 147:12-24.)  Some of those employees disagreed with her

1    management style.  (*Id.* at 149:10-14, 150:23-25.)  As a manager, Ms. Moussouris

2    participated in the Calibration Process by reviewing her employees and attending

3    calibration meetings.  (*See id.* at 103:16-23, 104:19-21.)  Some employees under Ms.

4    Moussouris had their initial performance recommendations downgraded.  (*See id.* at

5    119:4-18.)

6         Ms. Moussouris describes the Microsoft culture as "hostile towards women."

7    (Moussouris Decl. ¶ 6.)  She claims that female employees were "frequently interrupted";

8    "talked over at meetings"; ignored when they shared ideas that male counterparts would

9    later raise and receive praise for; and excluded from important discussions and business

10   opportunities.  (*Id.*)  She also contends that women's judgment and expertise were "much

11   more likely to be called into question than men's."  (*Id.*)  Ms. Moussouris describes this

12   problem as "pervasive" and one that female employees and managers regularly discuss.

13   (*Id.*)

14        Making complaints to Human Resources ("HR"), Ms. Moussouris attests, "does

15   not make any difference."  (*Id.* ¶ 7.)  In fact, Ms. Moussouris made three complaints to

16   HR while at Microsoft.  First, she complained about the Director of her group who

17   allegedly sexually harassed women he oversaw.  (*Id.*)  Although HR found that he "had

18   in fact sexually harassed these women," the Director was "merely re-assigned to a

19   different group, while retaining his title and influence."  (*Id.*)  Before he was re-assigned,

20   he gave Ms. Moussouris a low bonus.  (*Id.*)  Ms. Moussouris complained about this

21   retaliation but again, HR took no action.  (*Id.*)  Lastly, Ms. Moussouris complained when

22   her new supervisor—a man who was promoted over her—replaced her responsibilities

1   with "low-level tasks that no men in [the] group were asked to do." (*Id.*)   Once again,

2   HR allegedly took no action. (*Id.*)

3       2. Holly Muenchow

4       Ms. Muenchow has worked for Microsoft since September 2002. (Muenchow

5   Decl. (Dkt. # 243) ¶¶ 1-2.)   Microsoft initially hired her as a Level 58 Software Test

6   Engineer in the Engineering Profession. (*Id.* ¶ 2; SAC ¶ 73.)   She then became a Level

7   59 Software Design Engineer in 2005. (*Id.*)   Microsoft promoted Ms. Muenchow to a

8   Level 60 employee in the beginning of 2008 and a Level 61 employee later that same

9   year. (*Id.*)   In 2012, Ms. Muenchow transferred to the I/T Operations Profession to

10  become a Level 62 Senior Program Manager. (*Id.*)   In 2016, she switched back to the

11  Engineering Profession as a Senior Operations Program Manager. (*Id.*)   Ms. Muenchow

12  is currently a Level 63 employee. (*See id.* ¶ 4.)

13      Like Ms. Moussouris, Ms. Muenchow believes that Microsoft compensated her

14  less than her similarly-situated male colleagues. (*Id.* ¶ 3.)   Additionally, Ms. Muenchow

15  asserts that Microsoft denied her promotions that were instead given to less qualified men

16  and that the promotions she did receive should have occurred sooner. (*Id.* ¶ 4; *see*

17  Muenchow Dep. (Dkt. ## 288-6 (sealed), 287-4 (redacted)) at 60:1-7.)   She believes her

18  managers discriminated against her by requiring her to adhere to expectations rooted in

19  gender stereotypes—such as tone of voice—that would not apply to her male colleagues.

20  (Muenchow Dep. at 52:17-53:6, 55:1-12.)   This gender bias in expected behavior, she

21  asserts, informed much of the negative feedback she received and resulted in her

22  achievements not being acknowledged as her male colleagues' efforts were. (*See, e.g.*,

1    *id.* at 177:10-16, 190:25-191:10.)  Although Ms. Muenchow never advanced higher than

2    a Level 63, she saw "male colleagues be promoted to high levels for which [she] was

3    qualified and not considered." (Muenchow Decl. ¶ 4.)  She also observed "men generally

4    advanc[ing] more rapidly than women, despite similar scope of work and performance."

5    (*Id.* ¶ 5.)

6           Ms. Muenchow also describes a culture of hostility at Microsoft towards women.

7    (*See id.* ¶ 6.)  She states that women are "held to a different standard than men."  (*Id.*)

8    For instance, women are labeled as "too aggressive" when they speak up in meetings,

9    whereas men "routinely interrupt or talk over women without criticism."  (*Id.*)  Her

10   former manager, who was female, revealed to Ms. Muenchow that she could not

11   "advocat[e] passionately" for her employees during calibration meetings because of this

12   perceived bias.  (*Id.*)

13          Like Ms. Moussouris, Ms. Muenchow has also filed complaints with HR to no

14   avail.  (*See id.* ¶ 7.)  Ms. Muenchow complained to HR about the "culture of bias towards

15   women."  (*Id.*)  In response, HR informed her that Microsoft would introduce "bias

16   training," but Ms. Muenchow reports that the training has not resolved the issue.  (*Id.*)

17   Ms. Muenchow has also requested to see Microsoft's data regarding compensation and

18   promotion rates for female employees, but HR stated that it did not have access to that

19   data.  (*Id.*)

20          3.  Other Employees

21          Nine other female employees echo Ms. Moussouris and Ms. Muenchow's

22   sentiments.  (*See, e.g.*, Dove Decl. (Dkt. # 239) ¶ 4.)  The female employees, through

declarations submitted by Plaintiffs, report similar claims of compensation

discrimination, contending that they were paid less than their similarly-situated male

counterparts (*see* Miller Decl. (Dkt. # 241) ¶ 5) and at times, even below the pay of

less-qualified male colleagues (*see* Smith Decl. (Dkt. # 244) ¶ 5).  At least one woman,

Debra Dove, reports that her pay disparity resulted from the Calibration

Process, during which "someone had to receive zero rewards, and that someone became

[her] because of [her] gender."  (Dove Decl. ¶ 5.)

These female employees also report that they were denied promotions ultimately

given to similarly-situated or less qualified male employees.  (*See, e.g.*, Albert Decl.

(Dkt. # 237) ¶ 6; Smith Decl. ¶ 6.)  For instance, Heidi Boeh sought a promotion after

returning from maternity leave.  (Boeh Decl. (Dkt. # 238) ¶ 5.)  Her manager stated that

he "did not want to 'waste' a promotion on [her] in case [she] became pregnant again,"

due to his understanding that she "would want to 'time' [her] children to be close in age."

(*Id.*)  Olga Hutson inquired about a promotion but "was told repeatedly that it was not

possible . . . to receive a promotion to Level 65 because almost no one made it to that

level."  (Hutson Decl. (Dkt. # 240) ¶ 5.)  But, while she remained at a Level 64 for her

six-year tenure, Microsoft promoted several men to Level 65.  (*Id.*)  Suzanne Sowinska,

while participating as a manager in the Calibration Process, noticed that women were

"disadvantaged compared to men with no greater qualifications."  (Sowinska Decl. (Dkt.

# 245) ¶ 5.)  Male employees' projects were "valued more highly than similar projects

managed by women . . . even when the technical difficulty and value to the company was

greater for the women's projects."  (*Id.*)

Moreover, the nine declarants describe Microsoft's culture of hostility towards women, leading female employees to feel undervalued and marginalized.  Many describe observations of sexual harassment, including inappropriate comments regarding female employees' looks, figures, or clothing; groping and other unwanted touching; and other characteristics of a "male-dominated culture" within which female employees struggled to operate.  (Sowinska Decl. ¶ 7; *see also, e.g.*, Warren Decl. (Dkt. # 248) ¶ 7 (describing a Microsoft party with "scantily clad women dancing on tables"); Miller Decl. ¶ 8 (describing inappropriate comments regarding her clothing, unwanted touching, and manager inquiries into her marriage status).)  Some were harassed themselves.  (*See, e.g.*, Boeh Decl. ¶ 7.)  Mary Smith described how a male colleague "screamed and cursed . . . and threatened to kill [her]."  (Smith Decl. ¶ 8.)  When she informed her manager, he acknowledged that the male colleague was "sexist" but did nothing further.  (*Id.*)

Almost all of the female employees recount how Microsoft excluded them from business opportunities and applied double-standards—rooted in gender stereotypes about behavior—to dictate how female employees should behave.  (*See, e.g.*, Vaughn Decl. (Dkt. # 247) ¶ 6.)  For instance, Jennifer Underwood states Microsoft did not give her the staff, support, and funding to attend industry events while male peers received "significant financial and administrative support to fulfill the same job duties." (Underwood Decl. (Dkt. # 246) ¶ 7.)  Microsoft allegedly downgraded Ms. Sowinska's performance rating in the Calibration Process because she "did not smile enough." (Sowinska Decl. ¶ 7.)  Kristen Warren observed that "men are praised for exhibiting strong opinions and being assertive, while women are admonished for the same

behavior." (Warren Decl. ¶ 7.)  In fact, managers told her to "control [her] 'emotions' after [she] expressed opinions in meetings, even though men making similar comments did not receive negative feedback." (*Id.*)

None of the female employees believes that the HR complaint process is effective. Many complained to HR regarding their lack of promotions (Vaughn Decl. ¶ 7), their performance ratings (Dove Decl. ¶ 9), or their inability to secure necessary resources (Underwood Decl. ¶ 9).  HR allegedly responded that there was nothing it could do.  (*See, e.g.*, Vaughn Decl. ¶ 7.)  Other women complained of their treatment upon returning from maternity leave, but HR failed to respond or follow up.  (*See* Albert Decl. ¶ 8; Boeh Decl. ¶ 8.)  HR similarly did not investigate complaints regarding threats or harassment.  (*See* Smith Decl. ¶ 9.)  When HR did follow up, female employees were dissatisfied with the ensuing investigation.  For instance, when investigating Ms. Hutson's complaint, HR acknowledged that the manager "acted inappropriately" but nonetheless found no violation of Microsoft's Anti-Harassment/Anti-Discrimination policy.  (Hutson Decl. ¶ 6.)  The female employees also state that female complainants face retaliation.  Ms. Smith recounts that after complaining about threats and hostility from male colleagues, Microsoft assigned her responsibilities outside the normal scope of her position.  (Smith Decl. ¶ 10.)

**E.    Procedural History**

Plaintiffs filed their original complaint on September 16, 2015, challenging Microsoft's continuing policy, pattern, and practice of sex discrimination against female employees in technical and engineering roles.  (Compl. (Dkt. # 1) ¶ 1.)  Plaintiffs

1    amended their complaint on October 27, 2015 (*see* FAC (Dkt. # 8)), and Microsoft filed a

2    motion to dismiss for failure to state a claim, or alternatively, a motion for a more definite

3    statement (MTD (Dkt. # 23) at 1).  The court granted in part and denied in part

4    Microsoft's motion.  (*See* MTD Order (Dkt. # 52) at 2.)  The court denied the motion as

5    to Plaintiffs' disparate treatment claims and Ms. Moussouris's retaliation claims (*id.* at

6    20, 24-28) but dismissed, with leave to amend, Plaintiffs' disparate impact claims for

7    failing to allege "any facts from which the court can plausibly infer the allegedly

8    offending employment practice causes the alleged disparate impact" (*id.* at 21, 29).

9          Plaintiffs amended the complaint on April 6, 2016.  (*See* SAC.)  This second

10   amended complaint described in detail the Calibration Process (*id.* ¶¶ 27-32, 37-40) and

11   asserted that Microsoft systematically undervalued female technical employees in this

12   process because female employees received, on average, lower rankings despite equal or

13   better performance (*id.* ¶ 34).  Microsoft again moved to dismiss Plaintiffs' disparate

14   impact claims.  (*See* 2d MTD (Dkt. # 62).)  This time, the court denied the motion, noting

15   that Plaintiffs sufficiently identified a challenged employment practice (2d MTD Order

16   (Dkt. # 134) at 9) and alleged sufficient facts for the court to draw the reasonable

17   inference that Microsoft's Calibration Process led to arbitrary differentiations between

18   employees and disparately impacted women (*id.* at 10).

19          The Plaintiffs subsequently filed their motion for class certification.  (*See* MCC.)

20   Both parties then submitted motions to exclude various experts proffered in support of

21   and in opposition to class certification.  (*See* Farber MTE (Dkt. # 362); Saad MTE (Dkt.

22   # 364); Young MTE (Dkt. ## 367 (sealed), 368 (redacted)).)  The court denied

Microsoft's motion to exclude the expert opinion of Dr. Henry S. Farber and the majority of Plaintiffs' motion to exclude the expert opinion of Dr. Ali Saad.  (MTE Order (Dkt. # 467) at 16-23, 29-33.)  However, the court excluded (1) Dr. Saad's "business need" word search analysis because it was not the product of reliable principles and methods (*id.* at 26-28); and (2) Rhoma Young's evaluation of the ERIT process because it was not based on sufficient facts or data (*id.* at 33-39).  The court now considers the class certification motion.

### III.   ANALYSIS

Plaintiffs move to certify a nationwide class of female Microsoft employees, leveled 59 to 67, who worked in the Engineering and/or I/T Operations Professions from September 16, 2012, to the present.  (MCC at 1.)  All class members have a claim of discrimination in pay, and class members in Levels 60 to 64 have claims for discrimination in promotion.  (*Id.*)  Plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(2) for their injunctive relief claims, Rule 23(b)(3) for their damages claims, and Rules 23(b)(2), 23(b)(3), and/or 23(c)(4) for certification of the liability phase.  (*Id.* at 2-3); *see* Fed. R. Civ. P. 23(b)-(c).

Microsoft not only opposes class certification on the merits but also seeks to strike portions of Plaintiffs' reply brief and accompanying documents.  (*See* Resp.; Surreply.) The court addresses the surreply before moving to the class certification issue.

### A.   Microsoft's Surreply

Pursuant to Local Civil Rule 7(g), Microsoft moves to strike the following materials connected with Plaintiffs' reply:  (1) legal argument in the declaration of

1    Plaintiffs' counsel; (2) Dr. Ryan's reply report; and (3) a footnote in the reply that makes

2    allegedly unsupported allegations regarding pay discrepancies.  (Surreply at 1.)  The

3    court addresses each in turn.

4           First, Microsoft challenges as improper legal argument Plaintiffs' chart entitled

5    "Microsoft's alleged variation in the pay and promotion process is not material and/or is

6    not supported by the evidence it cites to."  (*See* Reply Shaver Decl. (Dkt. ## 343 (sealed),

7    359-2 (redacted)) ¶ 4, Ex. A ("Reply Chart") at 1.)  In Plaintiffs' reply, they argue that

8    "Microsoft offers a few immaterial variations in how pay or promotion decisions were

9    internally documented or communicated across groups."  (Reply (Dkt. ## 342 (sealed),

10   359-1 (redacted)) at 3.)  After addressing one example, Plaintiffs point the court to their

11   chart that addresses how the remaining variations are "immaterial and/or unsupported by

12   the record."  (*Id.*)  For instance, in regards to Microsoft's assertion that each team

13   handled calibration meetings differently, Microsoft relies in part on deposition testimony

14   regarding how HR members varied in their documentation of calibration meetings.

15   (Reply Chart at 7.)  Plaintiffs state in their chart that the "presence or absence of other

16   HR team members in the room, or the identity of the person documenting common

17   information, are irrelevant to the common criteria challenged in this action."  (*Id.*)

18          The court agrees that Plaintiffs' chart should be stricken as improper legal

19   argument outside the court-approved page limit.  (*See id.* at 1-2.)  "Declarations . . .

20   should not be used to make an end-run around the page limitations . . . by including legal

21   arguments outside of the briefs."  *King Cty. v. Rasmussen*, 299 F.3d 1077, 1082 (9th Cir.

22   2002) (citing Fed. R. Civ. P. 56(e)).  Plaintiffs' chart, while couched in factual assertions,

1   contains significant argument regarding why several of Microsoft's assertions are

2   erroneous.  (*See, e.g.*, Reply Chart at 7.)  Such argument goes beyond what is appropriate

3   for a declaration.  *See* Fed. R. Civ. P. 56(e); *see also Sierra Club v. BNSF Ry. Co.*,

4   No. C13-0976JCC, 2017 WL 3141899, at *1 (W.D. Wash. July 25, 2017) (striking legal

5   arguments in declarations that were "an attempt to circumvent the reply brief page

6   limits").  Thus, the court will not consider Plaintiffs' chart in its determination of the

7   class certification motion.[4]

8          Second, Microsoft seeks to strike Dr. Ryan's reply report as an improper rebuttal

9   report.  The court agrees.  Plaintiffs offer Dr. Ryan's "Reply Expert Report" to "respond

10  to the portions of Microsoft's [response] . . . that address the topics of [her original

11  report]."  (Ryan Reply (Dkt. # 359-11) ¶ 1.)  But rebuttal reports are proper only "'to

12  contradict or rebut evidence on the same subject matter' from an opposing party's

13  expert."  *Theoharis v. Rongen*, No. C13-1345RAJ, 2014 WL 3563386, at *1 (W.D.

14  Wash. July 18, 2014) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)).  Plaintiffs readily point

15  out that Microsoft "leaves Dr. Ryan's opinions *unrebutted*, offering no expert opinion

16  opposing hers."  (Reply at 4.)  Thus, Dr. Ryan's additional report "attempts to augment

17  //

18  //

---

19          [4] Microsoft also seeks to strike paragraph 5 of Plaintiffs' counsel's declaration, in which
    she attests to the law firm Lane Powell's involvement as counsel for both class member

20  declarants and Microsoft.  (*See* Surreply at 2 (citing Reply Shaver Decl. ¶ 5).)  This paragraph
    sets out factual allegations regarding Lane Powell's representation of putative class members

21  during their depositions.  (*See* Shaver Decl. ¶ 5, Ex. B (copies of Lane Powell engagement
    letters).)  These factual allegations are appropriate for a declaration.  Indeed, Microsoft does not

22  identify how this paragraph constitutes legal argument in its one-sentence argument on this point.
    (*See* Surreply at 2.)  Thus, the court declines to strike the paragraph.

1    [Plaintiffs'] reply by attacking a legal argument from [Microsoft's] counsel."[5]  *See*

2    *Johnson v. Hartford Cas. Ins. Co.*, No. 15-cv-04138-WHO, 2017 WL 2224828, at *3

3    (N.D. Cal. May 22, 2017).  As Plaintiffs' counsel conceded in oral argument, such use of

4    a rebuttal report is improper.[6]  Accordingly, the court strikes Dr. Ryan's reply report and

5    does not consider it further.

6        Third, and lastly, Microsoft seeks to strike a footnote in Plaintiffs' reply that

7    makes pay discrepancy allegations.  (Surreply at 3.)  Specifically, Plaintiffs state that

8    "[c]lass member[] witnesses have been paid less than comparable male coworkers" but

9    provide no citation for that statement.  (*See* Reply at 17 n.35.)  Microsoft contends that

10   the court should strike this unsupported allegation.  The court disagrees.  The court may

11   disregard arguments of counsel in briefing if they are "wholly unsupported" or if they

12   "conflict[] with the available evidence."  *Wilbur v. City of Mount Vernon*,

13   No. C11-1100RSL, 2012 WL 600727, at *2 (W.D. Wash. Feb. 23, 2012).  However,

14   arguments can also be based on "common sense inferences or limited/equivocal

15   //

16   //

17   _____

18       [5] Even though Dr. Ryan's reply report mentions Ms. Young's evaluation of ERIT, the
     reply report centers on rebutting Microsoft's arguments—not on Ms. Young's expert report.  For

19   example, Dr. Ryan addresses how Microsoft witnesses support her conclusions (Ryan Reply
     Rep. ¶ 3) and how Microsoft's assertions regarding training are inaccurate (*id.* ¶ 4).  Indeed, Dr.
     Ryan's reply report only briefly mentions Ms. Young's report.  (*See id.* ¶ 4.b.)  Thus, Dr. Ryan's

20   reply report is not a rebuttal of Ms. Young's report.

21       [6] This is true even though the report is labeled as a "reply report."  *See K&N Eng'g, Inc.
     v. Spectre Performance*, No. EDCV 09-1900CAP (DTBx), 2011 WL 13131157, at *9 (C.D. Cal.

22   May 12, 2011) (excluding an expert's reply report because neither the scheduling order nor the
     Federal Rules of Civil Procedure "permit 'reply' reports").

1  evidence." *Id.*  Thus, Plaintiffs' lack of citation for their statement may affect the weight

2  afforded, but it is unnecessary to strike the footnote.[7]  *See id.*

3       Accordingly, the court strikes the chart attached to Plaintiffs' counsel's declaration

4  and Dr. Ryan's reply report.  The remainder of the reply stands as filed.

5  **B.    Class Certification Motion**

6       Having determined the materials properly before the court, the court now turns to

7  the Plaintiffs' motion for class certification.  "The class action is 'an exception to the

8  usual rule that litigation is conducted by and on behalf of the individual named parties

9  only.'"  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v.*

10 *Yamasaki*, 442 U.S. 682, 700-01 (1979)).  "Class certification is governed by Federal

11 Rule of Civil Procedure 23."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

12 Under Rule 23(a), the party seeking certification must first demonstrate that:

13      (1) the class is so numerous that joinder of all members is impracticable;
        (2) there are questions of law or fact common to the class;

14      (3) the claims or defenses of the representative parties are typical of the
        claims or defenses of the class; and

15      (4) the representative parties will fairly and adequately protect the interests
        of the class.

16 Fed. R. Civ. P. 23(a).  Rule 23(a)'s four subparts are generally referred to as the

17 requirements of numerosity, commonality, typicality, and adequacy of representation.

18 Certification is proper "only if 'the trial court is satisfied, after a rigorous analysis, that

19

20 ─────────────────

21     [7] Moreover, contrary to Microsoft's contentions (*see* Surreply at 3), evidence does not
   need to be admissible to be considered at the class certification stage, *see Sali v. Corona Reg'l
   Med. Ctr.*, --- F.3d ----, 2018 WL 2049680, at *5 (9th Cir. May 3, 2018).  Thus, unlike the

22 summary judgment cases Microsoft cites (*see* Surreply at 3), the court is not limited to
   considering only admissible evidence.

1    the prerequisites of Rule 23(a) have been satisfied.'" *Dukes,* 564 U.S. at 350-51 (quoting

2    *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161 (1982)).

3         In addition to meeting the Rule 23(a) prerequisites, the action must also fall into

4    one of three categories under Rule 23(b).  *Id.* at 349.  For their injunctive relief claims,

5    Plaintiffs rely on Rule 23(b)(2), which applies when "the party opposing the class has

6    acted or refused to act on grounds that apply generally to the class, so that the final

7    injunctive relief or corresponding declaratory relief is appropriate respecting the class as

8    a whole." Fed. R. Civ. P 23(b)(2); (*see* MCC at 36-38.)  "[T]he key to the (b)(2) class is

9    the indivisible nature of the injunctive or declaratory remedy warranted*." Ellis v. Costco

10   Wholesale Corp.*, 657 F.3d 970, 987 (9th Cir. 2011) ("*Ellis I*") (internal quotation marks

11   omitted) (quoting *Dukes*, 564 U.S. at 360).  Plaintiffs additionally rely on Rule 23(b)(3)

12   for their damages claim.  (MCC at 38-43.)  Rule 23(b)(3) applies when a "question of law

13   or fact common to class members predominate over any questions affecting only

14   individual members, and that a class action is superior to other available methods for

15   fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

16        "[S]ometimes it may be necessary for the court to probe behind the pleadings

17   before coming to rest on the certification question." *Dukes*, 564 U.S. at 350 (internal

18   quotation marks omitted) (quoting *Falcon,* 457 U.S. at 160).  "The class determination

19   generally involves considerations that are enmeshed in the factual and legal issues

20   comprising the plaintiff's cause of action." *Id.* at 351 (internal quotation marks omitted)

21   (quoting *Falcon,* 457 U.S. at 160).  Nevertheless, at this stage, the court "is merely to

22   decide a suitable method of adjudicating the case" and "should not turn class certification

into a mini-trial on the merits." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015) (internal quotation marks omitted) (quoting *Ellis I*, 657 F.3d at 983 n.8).

"The party seeking class certification bears the burden of establishing that the proposed class meets the requirements of Rule 23." *Id.* at 1177. "A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 351; *Behrend*, 569 U.S. at 33 (requiring the party seeking certification to affirmatively demonstrate compliance with Rule 23 "through evidentiary proof"). The court may grant certification only after "a rigorous analysis . . . [determining] that the prerequisites of Rule 23(a) have been satisfied." *Dukes,* 564 U.S. at 350-51. If a court is not fully satisfied that the requirements of Rules 23(a) and (b) have been met, it should deny certification. *Falcon,* 457 U.S. at 161.

Of the four Rule 23(a) prerequisites, Microsoft challenges commonality, typicality, and adequacy.[8] (*See* Resp. at 15-41.) The court concludes that Plaintiffs have not affirmatively demonstrated that common questions of law or fact exist across the proposed class; that Plaintiffs' claims are typical of the absent class members' claims; or that Plaintiffs will fairly and adequately protect the interests of the class. The court addresses each prerequisite in turn.

//

---

[8] Microsoft does not challenge numerosity, and the court finds that the Plaintiffs' proposed class, consisting of over 8,000 putative members, satisfies the numerosity requirement. *See Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1326-27 (W.D. Wash. 2015) (accepting that 40 or more class members will generally satisfy numerosity).

1      1.   Commonality

2          As is true in many Title VII class actions, the "crux of this case is commonality."

3   *See Dukes*, 564 U.S. at 349.  Rule 23(a)(2) requires a plaintiff to show that "there are

4   questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The

5   requirements of commonality have been "construed permissively"; not all questions of

6   fact and law need to be common.  *Ellis I*, 657 F.3d at 981.  However, because any

7   competently crafted class complaint "literally raises common 'questions,'" not every

8   common question suffices.  *Dukes*, 564 U.S. at 349; *Ellis I*, 657 F.3d at 981.  For

9   instance, reciting questions such as "Do our managers have discretion over pay" or "Is

10  that an unlawful employment practice" are insufficient to obtain class certification.

11  *Dukes*, 564 U.S. at 349.  Instead, Plaintiffs' claims must "depend upon a common

12  contention" that is "of such a nature that it is capable of classwide resolution—which

13  means that determination of its truth or falsity will resolve an issue that is central to the

14  validity of each one of the claims in one stroke."  *Id.* at 350.  Put another way, Plaintiffs

15  must pose a "common question" that "will connect many individual promotional

16  decisions to their claim for class relief" and "produce a common answer to the crucial

17  question *why was I disfavored*?"  *Ellis I*, 657 F.3d at 981 (internal quotation marks

18  omitted) (quoting *Dukes*, 564 U.S. at 352).

19         At the outset, the court notes that from the time of their briefing to oral argument,

20  Plaintiffs' theory and arguments surrounding commonality have shifted.  In their briefing,

21  Plaintiffs make no distinction between their pay and promotion claims, arguing that

22  Microsoft's "common but unvalidated criteria," "set of common procedures," and the

1   "final approval by just four EVPs" cabined the discretion that lower managers exercised

2   in both pay and promotion determinations.  (*See* Reply at 12-13; *see also* MCC at 32-34

3   (making no distinction between pay and promotion in their argument on commonality).)

4   During oral argument, however, Plaintiffs presented a new theory that suggested different

5   analyses for pay and promotion:  They maintained that the use of Stock Levels removed

6   discretion for pay determinations whereas the common criteria and procedures cabined

7   discretion for promotion determinations.[9]  "It is inappropriate to present a new argument

8   at oral argument and deny the [c]ourt and opposing counsel a chance to review the merits

9   of such an argument."  *Value Home Auctions, Inc. v. X-Wire Techs., Inc.*, No. SACV

10  10-0153 AG (RNBx), 2011 WL 13225021, at *4 (C.D. Cal. Mar. 23, 2011).

11  Nonetheless, the court considers all of Plaintiffs' arguments and addresses Plaintiffs'

12  disparate impact and disparate treatment claims in turn.[10]

13  //

14  //

15  

16  

17  

18  

19  

20  

21  

22  

---

[9] Tellingly, when asked where in their briefing Plaintiffs made this argument regarding Stock Level, Plaintiffs pointed only to the briefing's background section.  (*See* MCC at 8-9 (justifying Dr. Farber's failure to control for Stock Level in his statistical analysis); *id.* at 12 ██████████████████████████ *id.* at 13-16 (citing employee complaints about Stock Level).)  Nowhere in the cited pages do Plaintiffs present Stock Level as a common corporate policy that eliminates the discretion surrounding pay determinations.

[10] The court recognizes that the distinction between a disparate impact claim and a disparate treatment claim, for commonality purposes, is often illusory because the "actual argument in support of class certification ultimately makes little distinction between the two."  *Dukes v. Wal-Mart Stores, Inc.*, 964 F. Supp. 2d 1115, 1119 (N.D. Cal. 2013) ("*Dukes II*"); *see also Jones v. Nat'l Council of Young Men's Christian Ass'ns*, 34 F. Supp. 3d 896, 909 (N.D. Ill. 2014) (recognizing overlap in the analysis of disparate impact and disparate treatment claims because of the "common cause for the injuries claimed").  Nonetheless, the court addresses each claim separately to fully flesh out its rationale, with the understanding that the analysis for the two intersects to some degree.

1             *a.  Disparate Impact Commonality*

2         Disparate impact claims under Title VII challenge "a facially neutral policy or

3 practice that causes a disparate impact on a protected group, even if the employer has no

4 intent to discriminate." *Williams v. Boeing Co.*, 225 F.R.D. 626, 634 (W.D. Wash. 2005).

5 To establish a prima facie case of disparate impact, plaintiffs must:  (1) show a significant

6 disparate impact on a protected class or group; (2) identify the specific employment

7 practices at issue; and (3) show a causal relationship between the challenged practices

8 and the disparate impact. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1190 (9th Cir.

9 2002).  If plaintiffs establish a prima facie case, the burden shifts to the employer to show

10 that its challenged practices are consistent with business necessity and that there was no

11 less discriminatory alternative. *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 505

12 (N.D. Cal. 2012) ("*Ellis II*").

13         The court first reviews the comprehensive legal landscape governing commonality

14 for disparate impact claims implicating managerial discretion.  The court then applies that

15 law to the circumstances here.

16             i.   Law Governing Disparate Impact Commonality

17     *Wal-Mart Stores, Inc. v. Dukes* directly addressed the issue of commonality in a

18 Title VII gender discrimination case that challenged the discretion exercised by

19 individual supervisors over pay and promotion matters.  *See* 564 U.S. at 344-45.  The

20 *Dukes* plaintiffs alleged that "local managers' discretion over pay and promotions [was]

21 exercised disproportionately in favor of men, leading to an unlawful disparate impact on

22 female employees." *Id.* at 344-45.  Plaintiffs' theory of commonality was that

Wal-Mart's "strong and uniform 'corporate culture' permits bias against women to infect . . . the discretionary decisionmaking of each one of Wal-Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice." *Id.* at 345.

The Supreme Court observed that "[t]he only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of *allowing discretion* by local supervisors over employment matters." *Id.* at 355.  Such a policy of discretion is, "[o]n its face . . . just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices." *Id.*  Although the Court recognized that in appropriate cases, granting unlimited discretion to lower-level supervisors could be the basis of Title VII liability, that possibility of liability "does not lead to the conclusion that every employee in a company using a system of discretion has such a claim in common." *Id.*  In fact, the Court surmised, the exact opposite is likely true:

> [L]eft to their own devices most managers in any corporation—and surely most managers in a corporation that forbids sex discrimination—would select sex-neutral, performance-based criteria for hiring and promotion that produce no actionable disparity at all.  Others may choose to reward various attributes that produce disparate impact—such as scores on general aptitude tests or educational achievements.  And still other managers may be guilty of intentional discrimination that produces a sex-based disparity.

*Id.*  Because "demonstrating the invalidity of one manager's discretion will do nothing to demonstrate the invalidity of another's," a party basing commonality on such a system of discretion "will be unable to show that all the employees' Title VII claims will in fact depend on the answers to common questions." *Id.* at 355-56.

But *Dukes* did not entirely foreclose the ability to establish commonality when the employer operates under a policy allowing discretion.  *See Ellis II*, 285 F.R.D. at 518 (noting that some discretion "does not in and of itself preclude class certification"); *accord Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 113-14 (4th Cir. 2013) (describing how a disparate impact claim challenging discretion may satisfy commonality post-*Dukes*).  Plaintiffs challenging a system of discretion must identify "a common mode of exercising discretion that pervades the entire company."  *Dukes*, 564 U.S. at 356.  In other words, when plaintiffs wish to challenge numerous employment decisions at once, they must point to "some glue holding the alleged *reasons* for all those decisions together."  *Id.* at 352.  Otherwise, it would be "quite unbelievable that all managers would exercise their discretion in a common way without some common direction."  *Id.* at 356.  The Court determined that both the plaintiffs' aggregated statistical evidence and anecdotal evidence fell "well short" of indicating a "common direction" from upper management, and thus, the plaintiffs failed to demonstrate the existence of common issues.  *Id.* at 356-58.

On remand, the *Dukes* plaintiffs narrowed their class significantly, from a nationwide class to three regional classes, all within California.  *Dukes II*, 964 F. Supp. 2d at 1118-19.  They additionally identified several corporate policies, such as a "tap on the shoulder" system for promotions and company-wide guidelines for pay decisions, which allegedly provided "common direction."  *Id.* at 1119.  For instance, plaintiffs alleged that Wal-Mart limited the managers' discretion by requiring them to consider various criteria, such as "communication skills" or "ability to learn."  *Id.* at 1126.  The

district court rejected the plaintiffs' characterization.  The court concluded that the identified criteria "were so vague or numerous that they imposed no real constraints," and additionally, Wal-Mart did not prohibit managers from considering other factors of their own choosing.  *Id.*

Thus, although plaintiffs identified some company-wide policies, the court noted that the plaintiffs were not challenging the policies themselves or the faithful application of those policies; instead, at its core, they continued to challenge the "broad discretion managers retain in applying the vague criteria."  *Id.* at 1126-27.  Put another way, the plaintiffs' argument still boiled down to the theory that "managers, who were left without meaningful guidance in applying the impossibly vague criteria, fell back on their own stereotyped views of women in making pay and promotion decisions."  *Id.* at 1127.  While this may be "a perfectly logical theory" for liability, the court observed that it "leaves [p]laintiffs right back where they started:  challenging Wal-Mart's practice of delegating discretion to local managers, which the Supreme Court specifically held was *not* a specific employment practice supplying a common question sufficient to certify a class."  *Id.*

Like *Dukes II*, other courts addressing similar challenges have concluded that commonality is lacking.  *See, e.g.*, *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1229 (10th Cir. 2013) (recognizing that courts "have generally denied certification when allegedly discriminatory policies are highly discretionary").  In *Jones v. National Council of Young Men's Christian Associations*, the plaintiffs argued that the company did not have "effective oversight" and thus allowed local managers' exercise of discretion to result in

1    adverse outcomes for the protected class.  34 F. Supp. 3d at 905.  Plaintiffs attempted to

2    "downplay[] the degree of discretion" by describing the entire evaluation and promotion

3    process as a mandatory company-wide policy.  *Id.* at 904.  The *Jones* court rejected this

4    attempt to "increas[e] the level of abstraction in defining the policy."  *Id.*; *see id.* at 905

5    (observing that at the level of abstraction the plaintiffs propose, "every company—even

6    Wal-Mart—could be said to have a company-wide policy").  Instead, the court

7    characterized the plaintiffs' challenge to oversight as "precisely the argument held to be

8    inadequate to support class certification in [*Dukes*]."  *Id.*; *see also Bolden v. Walsh*

9    *Constr. Co.*, 688 F.3d 893, 898 (7th Cir. 2012) ("[*Dukes*] tells us that local discretion

10   cannot support a company-wide class no matter how cleverly lawyers may try to

11   repackage local variability as uniformity.").

12          Accordingly, post-*Dukes*, the crux of the commonality inquiry for a system of

13   discretion lies in whether lower-level supervisors operate under "a common mode of

14   exercising discretion"—put differently, whether some company-wide policy provides

15   sufficient "common direction" such that individual exercises of discretion nonetheless

16   produce a common answer to the question "why was I disfavored."  *See* 564 U.S. at 352,

17   356 (emphasis removed); *see also Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174,

18   198 (D.D.C. 2017) (requiring the plaintiffs to demonstrate that "all managers would

19   exercise their discretion in a common way").  Courts considering the issue analyze

20   several factors in determining whether a common mode of exercising discretion pervades

21   the entire company.  Those factors include:  (1) the nature of the purported class; (2) the

22   //

process through which discretion is exercised; (3) the criteria governing the discretion; and (4) the involvement of upper management.

First, the nature of the purported class is, at the very least, relevant. Although class size "has no *per se* bearing on commonality," courts recognize that "when the claims focus in part on the exercise of managerial discretion, it is reasonable to suspect that the larger the class size, the less plausible it is that a class will be able to demonstrate a common mode of exercising discretion." *Ellis II*, 285 F.R.D. at 509. Thus, a "more centralized, circumscribed environment generally increases . . . the consistency with which managerial discretion is exercised." *Brown v. Nucor Corp.*, 785 F.3d 895, 910 (4th Cir. 2015); *see also Rollins v. Traylor Bros., Inc.*, No. C14-1414JCC, 2016 WL 258523, at *7 (W.D. Wash. Jan. 21, 2016), *abrogated on other grounds*, 2016 WL 5942943 (W.D. Wash. May 3, 2016). In *Brown*, for example, the proposed class consisted of about 100 putative members, all located in a single facility. *Id.* at 910. For a "localized, circumscribed class" of that size, a policy of subjective, discretionary decision-making can "more easily form the basis of Title VII liability." *Id.* at 916; *see also Chen-Oster v. Goldman, Sachs & Co.*, --- F.R.D. ----, 2018 WL 1609267, at *2 (S.D.N.Y. Mar. 30, 2018) (approving class of 1,762 to 2,300 people holding two job positions). On the other hand, for a nationwide class, "proving a consistent exercise of discretion will be difficult, if not impossible." *Brown*, 785 F.3d at 916.

Second, courts look to what procedures govern the discretion and analyze the rigidity of the process through which discretion is exercised. Simply showing a process in which discretion would be exercised is insufficient to establish commonality. *See*

1   *Valerino v. Holder*, 283 F.R.D. 302, 313 (E.D. Va. 2012).  In *Valerino*, the company set

2   up an evaluation and promotions process in which employees underwent several phases

3   of evaluation by local supervisors.  *Id.* at 304-07.  Plaintiffs argued that this

4   company-wide promotion process created a common mode of exercising discretion.  *Id.*

5   at 313.  The court disagreed.  Although the court acknowledged that the company "set[]

6   up a structure," that structure alone was insufficient because the process merely laid out

7   "points at which particular people exercise discretion."  *Id.*  The court remarked that

8   "[c]ertainly every application is subject to that structure, but so was every applicant in

9   Wal-Mart subject to a [promotions] structure."  *Id.* at 313-14.  Nothing about the process

10  constrained the exercise of discretion; thus, "[t]hat discretion itself cannot be said to be

11  the same or 'common.'"  *Id.* at 313.

12        In contrast, a structure that imposes specific requirements, beyond simply laying

13  out general steps in a process, may show sufficient common direction.  The *Ellis II* court

14  noted that the company not only had a single procedure that controlled the people

15  generally involved and the process by which they made decisions, but the company also

16  imposed several non-negotiable requirements, such as mandatory promotion from within

17  the company and a prohibition on posting job openings.  *See* 285 F.R.D. at 511.  Those

18  requirements—implemented across the company—distinguished the discretion at issue in

19  *Ellis II* from the unfettered discretion in *Dukes*.  *See id.* at 509; *see also McReynolds v.*

20  *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 490 (7th Cir. 2012) (holding

21  that two company-wide policies that required the managers to allow certain practices,

22  *//*

1    rather than leaving managers to make the decision themselves, sufficiently restrained

2    discretion).

3         Third, courts consider the criteria that govern the discretionary decisions.  Again,

4    whether a set of criteria creates a common mode of exercising discretion depends on the

5    rigidity of that criteria.  Subjective criteria, prone to different interpretations, generally do

6    not provide common direction.  *See, e.g.*, *Ross*, 267 F. Supp. 3d at 198.  In *Ross*, "[t]he

7    mere fact that all . . . supervisors used the same allegedly ill-defined numerical rubric . . .

8    says nothing about how individual supervisors exercised what discretion was left to

9    them."  *Id.*  Similarly, in *Jones*, managers had to consider "amorphous concepts," such as

10   "the organization's strategy, the employee's role in the organization, and the market

11   value of the employee's job," as criteria for determining pay and promotions.  34 F.

12   Supp. 3d at 906.  "That supervisors evaluate candidates according to specific, but

13   subjective factors . . . does not make the decisions produced by the process meaningfully

14   less discretionary."  *Id.*

15        On the other hand, objective criteria or criteria commonly understood throughout

16   the company may establish a common mode of exercising discretion.  In *Ellis II*, the

17   court observed that most of the criteria, such as the applicant's ability to relocate or an

18   applicant's prior experience in the position, was objective and thus not open to

19   interpretation by individual decision-makers.  *See* 285 F.R.D. at 514.  The remaining

20   criteria, while subjective, carried definitions within the company that were uniformly

21   understood.  *See id.*  For instance, the CEO attested that everyone in the company had a

22   "pretty clear understanding" of the company criteria and denied that this criteria "varied

1    based on the whims of local managers." *Id.* Thus, because even the subjective criteria

2    was interpreted in a uniform manner, the *Ellis II* court found that the criteria for

3    promotion differed from that in *Dukes* where "managers appl[ied] their own subjective

4    criteria when selecting candidates." *Id.* at 518.

5         Fourth, and lastly, the involvement of top management in the discretionary

6    decision-making is a key consideration. *See Dukes*, 564 U.S. at 350 (suggesting that

7    commonality may be satisfied if the class were limited to one supervisor); *Brown*, 785

8    F.3d at 916 (recognizing commonality if high-level personnel exercise the discretion at

9    issue). If, for instance, a single decision-maker or a "small, cohesive group" vetted all of

10   the pay and promotion decisions, then the involvement of that one individual, or small

11   group of individuals could constitute a common practice. *Jones*, 34 F. Supp. 3d at 908.

12   In *In re Johnson*, "every promotion decision was ultimately made by the Director of [the

13   company at issue]." 760 F.3d 66, 73 (D.C. Cir. 2014). Thus, although different

14   lower-level decision-makers may have injected some subjectivity, the fact that the

15   evaluation process ended with one individual provided the necessary "common

16   contention" capable of class-wide resolution. *See id.*; *see also Chen-Oster*, 2018 WL

17   1609267, at *4-5 (certifying a class where the upper management developed the list of

18   eligible candidates and "[u]ltimately, [the] management committee decide[d] who [wa]s

19   promoted").

20        Similarly, the *Ellis II* court focused on the "consistent[] and pervasive"

21   involvement of top management in the promotions process. 285 F.R.D. at 511-12.

22   Senior management chose the pool of candidates eligible for promotions by regularly

1    assessing potential candidates during "floor walks." *Id.* at 512-14.  The CEO conceded

2    that he gave "[a] lot" of instruction on how to fill the positions, *id.* at 512, including

3    "personally instruct[ing] his staff as to the criteria" for promotions, *id.* at 514.  Because

4    top management was intimately involved in both designing and executing the promotion

5    process, the court determined that even though lower-level managers had input regarding

6    promotion candidates, top management "actually ma[d]e the decisions." *Id.* at 515.

7         But mere approval of decisions by higher-level executives, without more, falls

8    short.  When "evidence establishes that the recommendations of lower level . . . managers

9    [are] almost always accepted," this "limited oversight" does not establish top

10   management as a common denominator. *Jones*, 34 F. Supp. 3d at 908.  In *Jones*,

11   plaintiffs pointed to "no evidence showing that any member of senior management

12   changed pay or promotion recommendations . . . with any frequency, much less that they

13   did so with [] regularity." *Id.*  This minimal level of involvement pales in comparison to

14   the level of involvement in *Ellis II*, and thus, the fact that higher-level personnel

15   approved lower-level managers' recommendations, standing alone, was insufficient to

16   establish commonality in a system of discretion. *See id.*

17            ii.  Application to Plaintiffs' Disparate Impact Claims

18        As evident from the above survey, whether commonality exists in a system of

19   discretion is a holistic inquiry that is highly dependent on the facts before the court. *See*

20   *supra* § III.B.1.a.i.  Applying the law on commonality to the case at hand, the court

21   concludes that Plaintiffs have not shown that their disparate impact claims depend upon a

22   //

1  common contention, the determination of which will resolve an issue that is central to the

2  validity of each class member's claims.  *See Dukes*, 564 U.S. at 350.

3  　　　At the outset, the court notes that Plaintiffs, in their briefing, unequivocally

4  predicate their challenge on the discretion allowed under Microsoft's Calibration

5  Process—precisely the argument that *Dukes* rejected as "just the opposite of a uniform

6  employment practice that would provide the commonality needed for a class action."  *See*

7  *id.* at 355.  Plaintiffs repeatedly attack the "lack of standardization" in the Calibration

8  Process, noting that the process was "inconsistent" in terms of who attended, how

9  managers compared employees, and what information managers considered.  (MCC at 6.)

10  Plaintiffs criticize how "evaluators were free to weight criteria for pay and promotions"

11  in ways that were unconstrained by Microsoft's job requirements (*id.*) and how Microsoft

12  did not exercise sufficient oversight to ensure that managers applied "the same standards

13  consistently with each other" (*id.* at 7).  Indeed, even Dr. Ryan's critique of the

14  Calibration Process boils down to Microsoft's lack of guidance, resulting in a lack of

15  uniformity across the process—in other words, unfettered discretion.  (*See* Ryan Rep.

16  ¶¶ 18-20, 26-31, 35-36.)

17  　　　At oral argument, Plaintiffs attempted to distance themselves from the system of

18  discretion they describe in their briefing, arguing for the first time that the use of Stock

19  Levels dictated an employee's pay, leaving no room for discretionary decision-making.

20  Put differently, Plaintiffs argued that after the managers submit their performance

21  //

22  //

ORDER - 42

ratings[11]—which Plaintiffs concede involve discretion—the employee's Stock Level mandates a certain pay with no discretion involved.  But this attempt to divorce pay determinations from discretion is unavailing.  It is true that peers were grouped, and thus compared, to others in similar Stock Levels (MCC Docs. at 13), but within those groups, managers still exercised discretion in comparing peers, resulting in various pay determinations, (*see, e.g.*, Resp. Docs. at 55-56).  Plaintiffs point to no evidence, and the court is not aware of any in the record, that an employee's Stock Level eliminates discretion because the Stock Level unequivocally determines one's pay.[12]

Of course, the fact that Plaintiffs' challenge centers on discretion does not foreclose commonality.  *See Ellis II*, 285 F.R.D. at 518.  But Plaintiffs must show that there is some common mode of exercising discretion that pervades the entire company and ties the alleged reasons for all those individual decisions together.  *See, e.g.*, *Dukes*, 564 U.S. at 352.  Plaintiffs broadly assert that Microsoft "uses common criteria in a uniform Calibration [P]rocess" but offer little analysis beyond labeling certain processes and criteria as "common."[13]  (*See* Reply at 4.)  Considering the size of the purported

---

[11] Plaintiffs concede that there is no gender disparity in the performance ratings.  (MCC at 7.)

[12] Moreover, Plaintiff's reliance on Stock Levels for pay determinations ultimately circles back to discretion.  Even if Stock Levels determine pay, Stock Levels themselves are determined by promotions.  (*See* Muenchow Decl. ¶ 2 (describing how Microsoft promoted her to higher Stock Levels).)  And Plaintiffs admit that promotion decisions, in turn, involve discretion exercised by lower-level managers.  Thus, even if women are disproportionately assigned to lower Stock Levels, the disproportionality itself is the result of discretionary decisions.

[13] Indeed, in their motion for class certification, Plaintiffs dedicate less than three pages to this critical issue of commonality.  (*See* MCC at 32-34.)  The argument is devoid of any

1   class, the Calibration Process's role as a mere framework, the subjective criteria set by

2   Microsoft, and the lack of upper management involvement, the court concludes that

3   Plaintiffs fail to identify a specific employment practice supplying a common question

4   sufficient to certify a class.

5          First, Plaintiffs seek to certify a class of more than 8,600 women in various offices

6   across the United States.  (MCC at 1, 32.)  Although 8,600 is a far cry from the 1.5

7   million in *Dukes*, 564 U.S. at 342, Plaintiffs' class is still many times the size of the

8   certified classes in *Ellis II*, 285 F.R.D. at 509 (700 members), *Chen-Oster*, 2018 WL

9   1609267, at *2 (about 2,000 members), and *Brown*, 785 F.3d at 910 (100 members).

10  Moreover, there is no indication that Plaintiffs' proposed class is "centralized" or

11  "localized."  *See Brown*, 785 F.3d at 910, 916.  Unlike *Ellis II*—where all class members

12  fell into two "closely related" positions sharing "a uniform job description across the

13  class," 285 F.R.D. at 509—or *Chen-Oster*—where class members fell into two positions,

14  2018 WL 1609267, at *2—Plaintiffs' proposed class covers a myriad of positions,

15  ranging from software engineers to game designers to data scientists, with an even more

16  varied set of responsibilities within those positions (Whittinghill Decl. ¶¶ 21-35; *see also*

17  *id.*, Ex. C).  Indeed, employees in the Engineering and IT Operations Professions fell into

18  more than 8,000 unique positions for the period of time Plaintiffs challenge.  (*Id.* ¶ 36.)

19  And unlike *Brown*, Plaintiffs' putative class members were not located in a single facility

20  that shared common spaces.  *See* 785 F.3d at 910.  Rather, they are located all over the

21

22  citation to the record and thus fails to identify any Microsoft policy more specific than the
    "Calibration [P]rocess."  (*See id.* at 32.)

United States, and even those employees in the Redmond headquarters are scattered across several facilities.  (*See* SAC ¶¶ 2, 22.)  Thus, Plaintiffs' proposed class is more akin to the expansive *Duke* class than the circumscribed classes in *Ellis II*, *Chen-Oster*, and *Brown*.

Second, the procedures Microsoft dictates act more as a framework than as constraints on discretion.  Plaintiffs are correct that broadly speaking, all putative class members are subject to the "same, uniform compensation and promotion process." (*See* Reply at 2.)  That is, all employees, including the putative class members, are first evaluated by their direct managers, then placed in peer groups of similar Stock Levels, and discussed in a broader meeting of managers—whether in a calibration meeting or a people discussion—with the consensus recommendation rolled up the management chain. (*See id.* at 2-3; Resp. Docs. at 39, 47-50.)  But simply pointing out that Microsoft "set[] up a structure" through which all employees are evaluated is insufficient.  *See Valerino*, 283 F.R.D. at 313.  Like the evaluation and promotion process in *Valerino*, the process identified by Plaintiffs reveals only various stages or phases, during which individual decision-makers exercised their discretion.  *See id.* at 313-14.  Identifying the framework says nothing about whether the discretion itself can "be said to be the same or 'common.'" *See id.* at 313.

And unlike in *Ellis II*, where the company imposed requirements on how decisions were made, 285 F.R.D. at 511, the process by which Microsoft managers made decisions was largely left up to those managers.  As Plaintiffs point out, it is true they had to hold a meeting.  (*See* Resp. Docs. at 52-53.)  But how they ran that meeting, and thus how they

came to their decisions, was entirely discretionary.  (*See* Helf Decl. ¶ 6; Wilson Decl.

¶ 15.)  Each meeting leader determined how the discussion would be held, resulting in a

"great deal of flexibility around the process and administration of the meeting."  (Parris

Decl. ¶ 6, Ex. 4 ("Coleman Dep.") at 31:19-21.)  One group may decide to use physical,

color-coded cards to represent each employee.  (DeCaprio Decl. ¶ 9.)  Another group

may utilize a PowerPoint presentation to visually display relevant rating and budgetary

information.  (*Id.*)  Still another group may dispense with visual props altogether,

launching instead into a roundtable discussion.  (*Id.* ¶ 10.)  Some groups may discuss

clusters of similarly-rated employees at a time; others may only focus on the high and

low performers for each manager.  (*See id.* ¶ 14.)  Some groups may require consensus

amongst the attending managers; others may not.  (*Id.* ¶ 15.)

Thus, "increasing the level of abstraction" to the Calibration Process does not alter

the flexibility granted to local managers, and nothing about the Calibration Process itself

provides the "common direction" necessary to establish that individual managers

exercised their discretion in a common way.  *See Jones*, 34 F. Supp. 3d at 904.  That

there was some structure to the Calibration Process "does not change the fact that the

structure reinforced the discretionary nature of the decisionmaking in this area."  *See id.*

at 906.  Plaintiffs seem to acknowledge as much, as they challenge the "lack of

standardization" in "the specific procedures for discussing and making compensation and

promotion decisions."  (MCC at 6.)

Third, Microsoft's general criteria do not sufficiently constrain discretion.  Quite

the opposite.  Microsoft's benchmarks are subjective and open to many interpretations—

1    indeed, Microsoft designed the criteria so that managers could adapt it to various

2    employees' roles.  For the calibration meetings, Microsoft offered general definitions of

3    the "what," "how," and "proven capability" criteria, as well as the 1-5 numerical rating

4    system.  For instance, Microsoft defined the "how" input as "[h]ow results were

5    accomplished for the past fiscal year."  (Resp. Docs. at 55.)  But Microsoft specifies that

6    the "degree to which each input factors into the overall assessment will likely vary by

7    role" and that the "[o]verall performance and ratings reflect the environment in which

8    results were achieved," all of which necessarily differs from team to team.  (*Id.* at 50-51;

9    *see also* Helf Decl. ¶ 16 ("[T]he criteria used to evaluate individuals' performance within

10   [different] groups were necessarily different.").)  And even within this general criteria,

11   managers were encouraged to come to their own understanding of "common objectives"

12   and "what good work looked like," which effectively allowed managers to consider any

13   other criteria as they saw fit.  (*See* DeCaprio Decl. ¶ 8.)  Thus, like the "communication

14   skills" or "ability to learn" criteria in *Dukes II*, Microsoft's subjective criteria were so

15   vague "that they imposed no real constraints."[14]  *See* 964 F. Supp. 2d at 1126.

16        After Microsoft transitioned from calibration meetings to people discussions, its

17   evaluation criteria became even less concrete:  Managers evaluate "the impact [a]

18   particular employee's performance had on the group and the company."  (*See* Wilson

19   //

20   _____

21        [14] When asked during oral argument what evidence Plaintiffs had that the "what," "how," and "proven capacity" criteria were uniformly understood by lower managers, Plaintiffs pointed to Microsoft's training on the criteria.  But Plaintiffs' reliance on Microsoft's training belies their own expert's evaluation:  Dr. Ryan chastised Microsoft's training as inadequate to provide

22   sufficient guidance.  (*See* Ryan Rep. ¶ 43.)  Plaintiffs cannot have it both ways.

Decl. ¶ 23.)  Like the "amorphous concepts" in *Jones*, 34 F. Supp. 3d at 906, it is hard to

imagine a criterion more susceptible to individual interpretation than the subjective

measure of a person's "impact."  Unsurprisingly then, managers in people discussions

"ha[d] much more latitude" in evaluating an employee's impact.  (Help Decl. ¶ 35.)

Indeed, "any metric can be considered, so long as it is relevant to the employees'

impact."  (*Id.*)  Such wide and varied considerations can hardly be said to be commonly

understood by all employees.  *See Ellis II*, 285 F.R.D. at 514.  Again, Plaintiffs seem to

recognize that reality, arguing that "decision makers were able to apply variable

standards in making compensation and promotion decisions."  (MCC at 6.)

Lastly, Plaintiffs have not shown sufficient involvement by top management.

Plaintiffs identify the four EVPs as the final approvers of all pay and promotion decisions

and correctly observe that the performance rating recommendations rolled up the ranks.

(Reply at 2-3, 12.)  But the evidence shows that the upper-level executives "almost

always accepted" the recommendations of lower-level managers.  *See Jones*, 34 F. Supp.

3d at 908.  Microsoft senior management rarely revisited the recommendations made at

the discretion of lower-level managers; indeed, it would be "highly unusual" for senior

management "to make a change to a rewards recommendation."  (Help Decl. ¶ 36; *see*

*also* Shepherd Decl. (Dkt. # 315) ¶ 13 ("[T]he partner-level managers typically approved

the individual recommendations made at the lower-level [c]alibration [m]eetings.");

DeCaprio Decl. ¶ 16 (observing that senior leadership will not closely review

recommendations for levels below Level 68); Jarvis Decl. (Dkt. # 306) ¶¶ 17-18 (noting

//

1    that there is "typically little movement for recommendations affecting employees in

2    Level 67 roles and below" by the time the process rolls up to the EVP).)

3        Thus, although EVPs approve pay and promotion decisions, their involvement is

4    more akin to the "limited oversight" in *Jones*, *see* 34 F. Supp. 3d at 908, than the

5    "consistent[] and pervasive" involvement in *Ellis II*, *see* 285 F.R.D. at 511-12.  As in

6    *Jones*, Plaintiffs provide almost no evidence that the EVPs changed pay or promotion

7    recommendations with "any frequency," much less that they did so with "regularity."[15]

8    *See* 34 F. Supp. 3d at 908.  There is additionally no evidence, as there was in *Ellis II*, that

9    the EVPs "actually make the decisions," *see* 285 F.R.D. at 515; the EVPs did not pick the

10   eligible candidates for promotion, conduct floor-walks to assess potential applicants, or

11   personally instruct lower-level managers on how to execute the Calibration Process,[16] *see*

12   *id.* at 512-14.  Accordingly, Plaintiffs' evidence of the EVPs as a core group who

13   influenced the discretionary decisions falls short.

14       On this issue of whether Plaintiffs have identified a common mode of exercising

15   discretion that pervades Microsoft, Plaintiffs' expert reports are of no assistance.  As

16   discussed above, Dr. Ryan, rather than identifying sufficient common discretion,

17   emphasizes the exact opposite:  the "lack of standardization in how factors are evaluated

18   //

---

19   [15] In support of this point, Plaintiffs at oral argument identified only one statement by
20   Senior HR Manager Shannon Shepherd that she has "seen . . . executive vice presidents modify
     promotion recommendations" for budgetary reasons.  (Shepherd Decl. ¶ 25.)  There is no
     indication that those modifications are regular practice.  (*See id.*)

21   [16] Plaintiffs conceded at oral argument that the role upper management played in *Ellis II*
22   was qualitatively different from the role Microsoft's upper management played in pay and
     promotion determinations here.

1    and the lack of standardization in the process itself."  (*See* Ryan Rep. ¶ 25; *see also* Parris

2    Decl. ¶ 15, Ex. 13 ("Ryan Dep.") at 209:2-213:17 (focusing critique on the managers'

3    freedom to apply and weigh criteria differently).)  Indeed, Dr. Ryan's report resembles

4    that of the plaintiffs' expert in *Dukes*, who could not calculate "whether 0.5 percent or 95

5    percent of the employment decisions . . . might be determined by stereotyped thinking."

6    *See* 564 U.S. at 354.  Such testimony, as the Supreme Court found, could be "safely

7    disregard[ed]."  *Id.*

8         Likewise, Dr. Farber's aggregate statistical analysis, which purports to establish

9    the disparate impact felt by female employees, sheds no light on whether Microsoft had a

10   company-wide policy constraining the discretion of lower-level managers.  (*See* Parris

11   Decl. ¶ 9, Ex. 7 ("Farber Dep.") at 264:13-23 (stating that analysis did not touch on the

12   Calibration Process's role in any identified disparities).)  "[S]tatistical

13   correlation cannot substitute for a specific finding of class-action commonality."

14   *Campbell v. Nat'l R.R. Passenger Corp.*, --- F. Supp. 3d ----, 2018 WL 1997254, at *31

15   (D.D.C. Apr. 26, 2018); *see Dukes*, 564 U.S. at 357 ("Merely showing that Wal-Mart's

16   policy of discretion has produced an overall sex-based disparity does not suffice.").

17   Thus, as in *Dukes*, even if Dr. Farber's report conclusively establishes disparities based

18   on gender, "that would still not demonstrate that commonality of issue exists."  *See* 564

19   U.S. at 357.

20        Indeed, Plaintiffs' proffered declarations reflect how Microsoft managers did not

21   exercise their discretion in a uniform manner.  The declarants concede that, although

22   some managers exercised discretion in a discriminatory manner, others did not.  (*See,*

1  *e.g.*, Parris Decl. ¶ 18, Ex. 16 ("Underwood Dep.") at 198:19-199:13 (agreeing that

2  whether a manager discriminated was "event-specific and person-specific" because the

3  choice to discriminate is specific "to that person themselves [sic]").)  Moreover, the

4  declarants' experiences varied and were based on a number of different policies or

5  practices.  For example, one declarant spoke of discrimination she saw from the

6  recruitment department when she was hiring candidates.  (Boeh Decl. ¶ 6.)  Another

7  described alleged retaliation from her direct supervisor after she complained to HR.

8  (Smith Decl. ¶ 10.)  Thus, Plaintiffs' declarations further illustrate how employees

9  experienced discrimination in different ways at the hands of different individuals.

10       The cases that Plaintiffs highlight in which courts certified Title VII classes all

11  feature some "glue" that tied the many discretionary decisions together—the very thing

12  that is missing here.  As the court has already discussed at length, several features

13  distinguish the case-at-hand from *Ellis II*.  Unlike *Ellis II*, the class size here is not as

14  limited in number or scope, *see id.* at 509; no companywide process imposes meaningful

15  requirements on lower-level managers, *see id.* at 511; and critically, top management is

16  not intimately involved with the pay and promotions process, *see id.* at 511-15.[17]

17  //

18  //

19  [17] Likewise, the proposed class here is distinguishable from that in *Chen-Oster*.  The
proposed class in *Chen-Oster* was four times smaller than the class here and spanned only two

20  job positions.  *See* 2018 WL 1609267, at *2.  Moreover, *Chen-Oster* featured more involvement
by upper-management, such as setting the budget that determined compensation (*id.* at *4),
developing a list of candidates for promotion with ranking to emphasize priority candidates (*id.*),

21  and personally selecting and training the people who evaluated the promotion candidates (*id.* at
*5).  Ultimately, the upper management "decide[d] who is promoted."  (*Id.*)  There is no such

22  evidence of upper management involvement here.

1    And unlike *McReynolds*, Plaintiffs do not identify a companywide policy that

2 required managers to allow the allegedly-discriminatory practice. *See* 672 F.3d at

3 489-90.  In *McReynolds*, plaintiffs challenged "teaming" and "account distribution"

4 policies that allowed employees to form their own teams for compensation purposes. *Id.*

5 at 488.  But these policies did not allow any discretion on the part of managers in

6 determining whether to allow teaming. *Id.* at 489.  Indeed, *McReynolds* recognized that if

7 the decision of whether to allow teaming was delegated to local management, the

8 resulting discrimination would be akin to that alleged in *Dukes*. *Id.* at 490.  Because the

9 challenged policies were mandated on a company-wide basis, however, the policies were

10 not an exercise of discretion by local managers. *Id*. at 489-90.  Plaintiffs identify no

11 comparable corporate policy here.[18]

12    In sum, Plaintiffs challenge Microsoft's policy of allowing discretion by

13 lower-level managers but have not identified a common mode of exercising discretion

14 that pervades the entire company.  As in *Dukes*, without some common direction, it is

15 "quite unbelievable" that all Microsoft managers supervising over 8,600 putative class

16 members "would exercise their discretion in a common way."  564 U.S. at 356.  Thus,

17 Plaintiffs are in the same position as the *Dukes* plaintiffs: "challenging [a] practice of

18 //

---

19    [18] The last case Plaintiffs identified also involved a mandatory system that left no room
for managerial discretion. (*See* MCC at 33 (citing *Parra v. Bashas', Inc.*, 291 F.R.D. 360, 375

20 (D. Ariz. 2013)).)  In *Parra*, plaintiffs challenged the company's use of two wage scales that
resulted in different pay for employees of different races. 291 F.R.D. at 373-74.  The court

21 explicitly recognized that the wage scales were "non-discretionary"—that is, local managers did
not have any choice in implementing the two wage scales and the corresponding pay levels. *Id.*

22 at 375.  By contrast, Microsoft's Calibration Process left significant choice to the lower-level
managers in determining how to arrive at pay and promotion decisions.

1   delegating discretion to local managers, which the Supreme Court specifically held was

2   *not* a specific employment practice supplying a common question sufficient to certify a

3   class." *See Dukes II*, 964 F. Supp. 2d at 1127.  Because Plaintiffs provide no convincing

4   evidence of "some glue" holding together the reasons behind the numerous employment

5   decisions they challenge, they have not established a common answer to the question

6   "why was I disfavored." *See Dukes*, 564 U.S. at 351.  Accordingly, the court concludes

7   that commonality is lacking for Plaintiffs' disparate impact claims.

8            *b.  Disparate Treatment Commonality*

9            Unlike disparate impact claims, disparate treatment claims do not require plaintiffs

10   to identify a specific companywide employment practice responsible for the

11   discrimination.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 n.16

12   (1977).  Instead, plaintiffs must provide evidence of a "systemwide pattern or practice" of

13   discrimination, such that the discrimination is "the regular rather than the unusual

14   practice."  *Id.* at 336.  This burden may be met through statistics alone.  *Id.* at 339-40.

15   Upon such a showing, the required discriminatory intent may be inferred.  *See id.*  If

16   plaintiffs establish a prima facie case, the burden shifts to the employer to show that the

17   plaintiffs' statistical evidence is either "inaccurate or insignificant."  *Id.* at 360.

18            There is a "wide gap" between an individual's claim that he was subjected to a

19   company's policy of discrimination, and the existence of a class of persons who have

20   suffered the same injury as that individual, such that the individual's claim and the class

21   claims will share common questions of law or fact.  *Dukes*, 564 U.S. at 352-53 (citing

22   *Falcon*, 457 U.S. at 157-58).  To bridge that gap, Plaintiffs must provide "significant

1   proof" that Microsoft "operated under a general policy of discrimination." *Id.* at 353.

2   Here, Plaintiffs point to (1) statistical evidence of gender-based disparities; (2) anecdotal

3   evidence illustrating female employees' experiences of discrimination at Microsoft; and

4   (3) documents evincing Microsoft's culture of hostility towards women.  (*See* Reply at

5   14.)  The court finds, however, that none of the proffered categories of evidence

6   constitute the necessary "significant proof."[19]

7           i.    Statistical Evidence

8         The court first addresses Plaintiffs' statistical evidence conducted by Dr. Farber.

9   The plaintiffs in *Dukes* offered a similar statistical study, in which regression analyses

10  revealed statistically significant disparities between men and women that "can be

11  explained only by gender discrimination."  564 U.S. at 356.  *Dukes* held that this

12  statistical evidence was insufficient because it suffered from a "failure of inference."  *Id.*

13  The evidence established only that there was a disparity at the national or regional level,

14  but information at that level did not establish the existence of disparities at individual

15  stores, let alone "the inference that a company-wide policy of discrimination is

16  implemented by discretionary decisions at the store and district level."  *Id.* at 356-57.

17  //

18  //

19       [19] As a preliminary matter, the court notes that much of the commonality analysis for
    Plaintiffs' disparate impact claims apply with equal force to the disparate treatment claims.  *See*

20  *Ellis II*, 285 F.R.D. at 511 (recognizing the identification of "common policies and practices" as
    a category of proof supporting commonality in disparate treatment claims).  Because Plaintiffs
    have not identified the existence of common pay and promotion practices that apply to the class

21  as a whole, *see supra* § III.B.1.a, they cannot predicate commonality for their disparate treatment
    claims on a "common, companywide promotion system . . . made up of numerous common

22  components," as the plaintiffs in *Ellis II* did.  *See id.* at 511-19.

1   Thus, these statistics could not produce a common answer to the question "why was I

2   disfavored." *Id.* at 352.

3        Post-*Dukes*, the statistical study must "conform[] to the level of decision for the

4   challenged practices." *Ellis II*, 285 F.R.D. at 523.  When decisions are made at the

5   discretion of each individual supervisor, courts generally find aggregated statistical

6   evidence inadequate because it is "derived from hundreds of employment decisions made

7   by myriad decision makers, at different times, under mutable procedures and guidelines,

8   in different departments, and in different office locations, concerning employees at

9   varying levels of experience, responsibilities, and education." *Jones*, 34 F. Supp. 3d at

10  909.  On the other hand, if plaintiffs demonstrate that practices are uniform across the

11  company, then courts have found "good reason to rely on nationwide statistics." *Ellis II*,

12  285 F.R.D. at 523 (relying on aggregated statistics because the CEO averred that the

13  promotion policies derived from the top management and were uniform across the

14  company).

15       Plaintiffs here have not shown, as the plaintiffs in *Ellis II* did, that promotion

16  policies and practices are uniform across Microsoft.  *Compare supra* § III.B.1.a, *with*

17  *Ellis II*, 285 F.R.D. at 511-18.  Thus, unlike in *Ellis II*, there is not the same "good reason

18  to rely on nationwide statistics."  *See* 285 F.R.D. at 523.  The relevant level of

19  decision-making for the challenged practices here remains at the individual manager, or

20  at best, the team level.  Dr. Farber's statistical study, however, is based on aggregate

21  figures, including all individuals in the Engineering or IT Operations Professions in Stock

22  Levels 59-67.  (Farber Rep. ¶ 50 n.45.)  At most, he disaggregates the data no further than

1    the level of the four EVPs, whom the court has already determined merely approved the

2    pay and promotion decisions.  (Farber Rebuttal (Dkt. ## 344 (sealed), 359-10 (redacted))

3    ¶ 16); *see supra* § III.B.1.a.  Therefore, even accepting the validity of Dr. Farber's

4    statistical analysis, his evidence "has the same problem as the statistical evidence in

5    [*Dukes*]: it begs the question."  *See Bolden*, 688 F.3d at 896.  Dr. Farber's finding of

6    disparity "may be attributable to only a small set of [Microsoft managers], and cannot by

7    itself establish the uniform, [manager-by-manager] disparity upon which the [P]laintiffs'

8    theory of commonality depends."[20]  *See* 564 U.S. at 357.  Consequently, Dr. Farber's

9    statistical evidence is insufficient to show any common issue that would permit a

10   nationwide class.[21]

11            ii.    Anecdotal Evidence

12           Plaintiffs' anecdotal evidence also do not constitute the necessary "substantial

13   proof."  In *Dukes*, the Supreme Court found the proffered anecdotal evidence "too weak"

14   because plaintiffs filed only 1 affidavit for every 12,500 class members—a ratio that

15   paled in comparison to the 1 for every 8 class members proportion the Court accepted in

16   *Teamsters v. United States*, 431 U.S. at 337-38.  *Dukes*, 564 U.S. at 358.  Courts

17   ────────────────────

18           [20] *Bolden* provides an example to illustrate this effect.  *See* 688 F.3d at 896.  For instance, if Microsoft had 25 managers, 5 of whom discriminated in making pay and promotion decisions,

19   aggregate data would show that female employees fared worse than male employees.  But "that result would not imply that all 25 [managers] behaved similarly, so it would not demonstrate commonality."  *Id.*

20           [21] Moreover, Dr. Farber's analysis does not link the gender disparity he found to the challenged Calibration Process.  (*See* Farber Rep.; Farber Dep. at 264:13-24.)  Thus, in

21   comparison to *Chen-Oster*, where Dr. Farber concluded that the disparity stemmed from the very corporate policies being challenged, Dr. Farber's analysis here does not as readily support an

22   inference of a policy of discrimination.  *See* 2018 WL 1609267, at *15.

1   following *Dukes* have similarly required a significant amount of anecdotal evidence.  *See*

2   *Brown*, 785 F.3d at 913 (1 for every 6.25 class members); *Rollins*, 2016 WL 258523, at

3   *5, 7-8 (about 1 for every 4 class members).  Here, by contrast, Plaintiffs offer 9

4   declarations for 8,630 class members, or about 1 for every 959 class members.[22]  (*See*

5   Farber Rep. ¶ 11; *see generally* Dkt.)  Thus, on the numbers alone, Plaintiffs' anecdotal

6   evidence is "too weak" to establish that the entire company operates under a general

7   policy of discrimination.  *See Dukes*, 564 U.S. at 358 n.9 ("[W]hen the claim is that a

8   company operates under a general policy of discrimination, a few anecdotes selected

9   from literally millions of employment decisions prove nothing at all.").

10          Moreover, the anecdotal evidence relates to only 5 of the 41 states in which

11   Microsoft has offices.  (*See generally* Miller Decl.; Underwood Decl.; Hutson Decl.)  For

12   four of those five states, Plaintiffs provide only one declaration.  (*See generally id.*)  Nor

13   do the declarations represent all the Stock Levels in the class.  There are no declarations

14   from Level 67 employees, only one declaration from a Level 66 employee, and only three

15   from Level 59 employees.  And lastly, it is difficult to imagine that these nine declarants

16   represent sufficiently the multitude of positions throughout the company.  *See supra*

17   § III.B.1.a.ii (noting over 8,000 unique positions in the challenged Professions).

18          The court does not, in any way, seek to minimize the gravity of these employees'

19   experiences.  To the contrary, they provide many examples of serious misconduct.  (*See,*

20   //

21          _____

        [22] Even including the named plaintiffs' declarations, Plaintiffs' total rises to 11
22   declarations for 8,630 class members, or about 1 for every 785 class members.  (*See* Farber Rep.
    ¶ 11; *see generally* Dkt.)

1 | *e.g.*, Boeh Decl. ¶ 5 (stating that a male manager refused to recommend her for a

2 | promotion because of her potential to take maternity leave).)  But even taking all the

3 | accounts as true, the nine accounts are simply not enough to demonstrate that Microsoft

4 | operated under a general policy of discrimination towards over 8,600 female employees

5 | across 41 states holding thousands of unique positions.[23]

6 |        iii.    Culture Evidence

7 |       Plaintiffs next assert that the declarations need to be considered in combination

8 | with a third category of evidence:  documents, such as internal Microsoft memoranda and

9 | employee correspondence, that exhibit Microsoft's culture of hostility towards women.

10 | (*See* Reply at 15; *see also* MCC at 13-27.)  These documents include employee reactions

11 | to Microsoft's announcements that it had achieved gender pay equity (MCC at

12 | 13-16); senior management's knowledge of gender bias (MCC at 16-18); and various

13 | complaints and charges regarding gender discrimination (MCC at 19-28).

14 |       But, viewed either individually or in combination, this evidence suffers from the

15 | same problem as the declarations:  the evidence does not rise to the level of a general,

16 | company-wide policy of discrimination that is tied to the challenged employment

17 | decisions.  *Dukes*, again, is illustrative.  The *Dukes* plaintiffs similarly relied on evidence

18 | of Wal-Mart's "strong corporate culture," which purportedly made the company

19 |

20 |     [23] Microsoft additionally argues that the declarations "suffer from many . . . evidentiary problems."  (Resp. at 31 n.21.)  But the Ninth Circuit recently held that "[i]nadmissibility alone

21 | is not a proper basis to reject evidence submitted in support of class certification."  *Sali*, 2018 WL 2049680, at *5.  Because the court's consideration "should not be limited to only admissible

22 | evidence," Microsoft's argument regarding the admissibility of Plaintiffs' declarations is misplaced.  *See id.*

1   vulnerable to gender bias.  564 U.S. at 353-54.  However, plaintiffs did not show "with

2   any specificity how regularly stereotypes play a meaningful role in employment

3   decisions" within the alleged culture of bias.  *Id.* at 354.  Without such evidence,

4   information regarding Wal-Mart's culture did "nothing to advance [the plaintiffs'] case,"

5   because the regularity with which employment decisions might be determined by biased

6   thinking "is the essential question on which [plaintiffs'] theory of commonality depends."

7   *Id.*

8           Here, Plaintiffs' evidence offer, at most, a glimpse into individual incidents that

9   are not sufficiently representative of the entire culture across Microsoft.  For instance,

10  Plaintiffs rely on employee reactions to two Microsoft announcements regarding its

11  progress in pay equity.  (*See, e.g.*, MCC Docs. at 516-17.)  But these reactions—while

12  they may be legitimate critiques of Microsoft's pay equity analysis—reflect only those

13  employees' belief regarding the pay equity issue; such personal beliefs fall short of

14  illustrating a common corporate culture.  Indeed, Plaintiffs' evidence reveals that

15  Microsoft CEO Satya Nadella, as well as others, responded to the critiques by

16  acknowledging the next steps Microsoft must take to further address the issue.  (*E.g.*, *id.*

17  at 516.)  Such a response does not reflect what Plaintiffs claim to be a culture of evasion

18  and refusal to acknowledge the problem.[24]  (*See* MCC at 16.)

19  //

---

[24] For this reason, the court also finds unpersuasive Plaintiffs' evidence regarding the
SLT's recognition of Microsoft's areas of growth when it comes to D&I matters.  (*See* MCC at
16-18.)  Apologizing for past missteps, acknowledging areas of improvement, and setting a
"Priorities and Action Plan" do not reflect inaction.  (*See, e.g.*, MCC Docs. at 38-39 (recognizing
three areas that Microsoft must immediately begin work on).)

1    The same goes for Plaintiffs' evidence of various gender discrimination

2    complaints.  Plaintiffs assert that the 238 internal complaints Microsoft received are

3    "shocking" but provide the court with no evidence regarding whether that number is

4    unusual for a company like Microsoft with hundreds of thousands of employees.  (*See*

5    MCC at 24.)  Plaintiffs additionally attack the efficacy of Microsoft's ERIT but, again,

6    provide the court no official evaluation of the team other than employee commentary.

7    (*See id.* at 24-25.)  And lastly, Plaintiffs point to a Notice of Violation issued by the

8    Department of Labor's OFCCP.  (*See* MCC at 11-13; *see also* MCC Docs. at 112-24.)

9    But the OFCCP had conducted several other audits of Microsoft offices and found no

10    violations on at least 18 other occasions.  (*See* Parris Decl. ¶ 21, Ex. 19.)  Thus, the

11    evidence regarding the complaints does not satisfy the "significant proof" needed at this

12    stage.[25]

13    On the whole, the court finds that Plaintiffs have not provided the "significant

14    proof" of Microsoft's "general policy of discrimination" necessary to demonstrate

15    commonality in their disparate treatment claims.  *See Dukes*, 564 U.S. at 353.  The

16    proffered statistical evidence, the anecdotal evidence, and the internal Microsoft

17    documents do not establish the existence of any common issue, and accordingly,

18    Plaintiffs have not satisfied commonality for their disparate treatment claims.  Because

19

20    [25] Even accepting the veracity of Plaintiffs' claims about Microsoft's culture, this
evidence is insufficient to establish commonality.  Like the plaintiffs' culture evidence in *Dukes*,

21    Plaintiffs here do not indicate "with any specificity" how the alleged gender stereotypes
stemming from Microsoft's culture play a meaningful role in employment decisions.  *See* 564
U.S. at 354.  Without answering this "essential question" upon which commonality depends, the

22    evidence of Microsoft's corporate culture is insufficient to establish commonality.  *See id.*

1  commonality is lacking for both Plaintiffs' disparate impact and disparate treatment

2  claims, Plaintiffs have failed to satisfy Rule 23(a)'s prerequisites.[26]

3      2.  Typicality

4      Rule 23(a)(3) requires that "the claims or defenses of the representative parties are

5  typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The purpose of

6  the typicality requirement is to assure that the interest of the named representative aligns

7  with the interest of the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.

8  1992).  Courts "do not insist that the named plaintiffs' injuries be identical with those of

9  the other class members."  *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001).

10  Instead, in determining typicality, the court asks "whether other members have the same

11  or similar injury, whether the action is based on conduct which is not unique to the

12  named plaintiffs, and whether other class members have been injured by the same course

13  of conduct."  *Ellis I*, 657 F.3d at 984 (internal quotation marks omitted) (quoting *Hanon*,

14  976 F.2d at 508).  Individualized defenses applicable to the class representatives do not

15  preclude a finding of typicality unless there is a danger that absent class members will

16  suffer if their representative is preoccupied with defenses unique to it.  *Hanon*, 976 F.2d

17  at 508.

18  //

19

20  [26] Because Plaintiffs have failed to satisfy commonality, they also have failed to show the
    "far more demanding" requirement that common questions predominate over any questions
    affecting only individual members.  *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 624

21  (1997); Fed. R. Civ. P. 23(b)(3); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th
    Cir. 1998) (noting that the Rule 23(b)(3) analysis "presumes that the existence of common issues
    of fact or law have been established . . . .  [T]he presence of commonality alone is not sufficient

22  to fulfill Rule 23(b)(3)").

1    The "commonality and typicality requirements of Rule 23(a) tend to merge."

2  *Falcon*, 457 U.S. at 157 n.13; *see Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014).

3  "Where the challenged conduct is a policy or practice that affects all class members, the

4  underlying issue presented with respect to typicality is similar to that presented with

5  respect to commonality, although the emphasis may be different."  *Armstrong*, 275 F.3d

6  at 868-69.  Thus, "if the plaintiffs cannot establish that they were injured by the same

7  conduct that injured other class members, then their claims cannot be typical of other

8  members of the class."  *Jones*, 34 F. Supp. 3d at 911; *see also Donaldson v. Microsoft

9  Corp.*, 205 F.R.D. 558, 568 (W.D. Wash. 2001) ("[W]here there is no evidence of a

10 common experience shared by all [class members] at Microsoft, there can also be no

11 'typical' class representative.").

12   Plaintiffs contend that Ms. Moussouris and Ms. Muenchow's claims are identical

13 to those of all other class members because they "[have] been paid less than comparable

14 male coworkers" and were passed over "for promotions in favor of less qualified and less

15 experienced men."  (MCC at 35.)  The court concludes otherwise and finds, consistent

16 with its commonality determinations, that Plaintiffs have not established typicality with

17 respect to their disparate impact and disparate treatment claims.

18   Although Plaintiffs have identified that all putative class members would be

19 challenging the same injury—lower pay or missed promotions—Plaintiffs' generalized

20 characterization obscures the many unique facets of the underlying conduct, stemming

21 from the discretion exercised by countless lower-level managers.  *See supra* § III.B.1.a.i.

22 In other words, Plaintiffs have not shown that "other class members have been injured by

1    the same course of conduct." *See Ellis I*, 657 F.3d at 984.  Some individual class

2    members may want to argue that their initial performance rating was flawed.  Or some

3    may want to argue that their accomplishments were not adequately represented in the

4    calibration meeting or people discussion.  Others may have substantial evidence that their

5    particular manager was biased.  And still others may have no qualms with their initial

6    performance rating, the first calibration meeting, or their direct manager, but wish to

7    challenge how successive discussions unfolded in the roll-up process.

8           Indeed, Plaintiffs' proffered declarations illustrate the many differences among

9    individual class members' challenges.  For instance, Ms. Dove may challenge the forced

10   comparison process in calibration meetings, because "someone had to receive zero

11   rewards, and that someone became [her] because of [her] gender."  (Dove Decl. ¶ 5.)  Ms.

12   Dove's discrimination claim, then, would center on those calibration meetings, the

13   managers present, and the specific peer group to which she was compared.  *See id.*  Ms.

14   Boeh, on the other hand, would challenge her manager's initial recommendation—or lack

15   thereof—when the manager "did not want to 'waste' a promotion" on her after her return

16   from maternity leave.  (Boeh Decl. ¶ 5.)  Thus, Ms. Boeh's discrimination claim would

17   not concern the forced comparison in calibration meetings but instead, the initial

18   recommendation process and the specific manager who refused to recommend her for a

19   promotion.  Both claims may well have merit, but the very nature of these claims—that

20   is, the conduct that injured these declarants—differs from that of Plaintiffs' claims and

21   from each other.  *See Jones*, 34 F. Supp. 3d at 911.

22   //

1    In short, the court agrees with the *Valerino* court's analysis on how a discretionary

2    pay and promotion system defeated typicality:

3    > This is all to say nothing of the different facts plaintiffs would rely on to
     > prove their disparate claims—different ranking lists, different [manager]

4    > notes, different characteristics of individuals like years on the job, district
     > assignments, and collateral duties, different number of applicant

5    > applications, etc. . . . And it is clear that [Plaintiffs'] claims at least involve
     > different [managers]. This alone is sufficient to demonstrate that their claims

6    > are not typical of other members of the class.

7    283 F.R.D. at 318. The conduct underlying Plaintiffs' action necessarily differs from the

8    conduct that caused other class members' injuries in this system of unrestrained

9    discretion. Given the discretion-based system, the individualized inquiry will vary for

10   each plaintiff, foreclosing any contention that the named plaintiffs' claims are typical.

11   Thus, the court concludes that Plaintiffs have also failed to establish typicality.

12       3. Adequacy

13       Rule 23(a)(4) requires Plaintiffs to demonstrate that they will fairly and adequately

14   protect the interests of their class. Fed. R. Civ. P. 23(a)(4). To determine adequacy, the

15   court must resolve two questions: "(1) do the named plaintiffs and their counsel have any

16   conflicts of interest with other class members[;] and (2) will the named plaintiffs and

17   their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d

18   at 1020.

19       Microsoft does not dispute the second issue—that Plaintiffs and counsel will

20   prosecute the action vigorously—nor is the court aware of any reason to doubt Plaintiffs

21   and their counsel on this point. (*See* Resp.) Microsoft instead argues that adequacy is

22   lacking because the proposed class presents irreconcilable conflicts of interest. (*See id.* at

39-41.)  Specifically, Microsoft maintains that because the proposed class consists of females employees who participated as managers in the Calibration Process—the very process being challenged—Plaintiffs must "impugn[] the input of thousands of class members who participated in calibration."  (*Id.* at 41.)  The court agrees.

Although there is no *per se* rule regarding adequacy where a class includes "employees at different levels of an employment hierarchy," "[the] concern about classes that involve both supervisors and rank-and-file workers can be a valid one in some circumstances."  *Staton v. Boeing Co.*, 327 F.3d 938, 958 (9th Cir. 2003).  Courts have not only held that "supervisors may not be appropriate representatives of their subordinates" but have also extended that logic "to prevent a subordinate from representing a supervisor."  *Pena v. Taylor Farms Pac., Inc.*, 305 F.R.D. 197, 215 (E.D. Cal. 2015).  "[W]hether employees at different levels of the internal hierarchy have potentially conflicting interests is context-specific and depends upon the particular claims alleged in a case."  *Staton*, 327 F.3d at 958.

*Donaldson v. Microsoft Corp.* presented circumstances where such a conflict existed.  *See* 205 F.R.D. at 568.  In that case, the court expressed "serious concerns" because two named plaintiffs were former supervisors who "were obligated to implement the very supervisory system which this litigation challenges."  *Id.*  Moreover, class members were potentially "in conflict with each other" because of the "significant number of potential class members who are current or former managers."  *Id.*  Because the allegations of disparate impact and disparate treatment arose "directly from the evaluation system," the court was "unable to envision a class which would include both

those who implemented the ratings system and those who allegedly suffered under it." *Id.*; *see also Valerino*, 283 F.R.D. at 318 (recognizing potential conflicts amongst class members if two putative class members were seeking the same promotion).

By contrast, in *Pena v. Taylor Farms Pacific, Inc.*, the fact that the class included both supervisors and their subordinates did not defeat adequacy. *See* 305 F.R.D. at 215. The class in that case alleged that the company implemented uniform policies to withhold pay, deny meal and rest breaks, and issue erroneous paychecks. *Id.* at 203-04, 215. The court observed that if these uniform policies required hourly employees to work without compensation and breaks, "both supervisors and subordinates would have been affected similarly" because both were hourly employees. *Id.* at 215. The class member's title therefore had no relevance to the challenged policies; supervisor or subordinate, the class member would have been denied compensation and break time. *See id.* Additionally, there was no evidence that the supervisors would be liable for the alleged violations— that is, they had not implemented the policies. *Id.* Thus, the court concluded that "[n]o conflict is sufficient to call adequacy into question." *Id.*

The case at hand more closely resembles *Donaldson*. As in *Donaldson*, Ms. Moussouris, a named plaintiff, participated in the Calibration Process as a manager and thus was "obligated to implement" the very system that Plaintiffs challenge. (*See* Saad Rep. ¶ 18; Moussouris Dep. at 103:16-23, 104:19-21.); 205 F.R.D. at 568. Indeed, Ms. Moussouris recalls some of her subordinates' ratings being downgraded during the Calibration Process. (Moussouris Dep. at 119:4-18.) Furthermore, 2,126 putative class members were managers at least once during the class period, and 3,457 members were

1    either leads or managers; 472 qualified as "managers of managers."[27]  (Saad Rep. ¶ 17.)

2    Thus, as in *Donaldson*, a "significant number of potential class members" here

3    participated in the very system and the very decisions that are alleged to be

4    discriminatory.  *See* 205 F.R.D. at 568.  The direct involvement of the managers, and the

5    extent of that involvement, distinguish the circumstances here from those in *Pena*, where

6    the supervisors had no say in the challenged policies.  *See* 305 F.R.D. at 215.  Because

7    Plaintiffs' disparate impact and disparate treatment claims stem directly from the system

8    that many putative class members—including a named plaintiff—took part in, the class

9    "include[s] both those who implemented the ratings system and those who allegedly

10   suffered under it."  *See Donaldson*, 205 F.R.D. at 568.  The court agrees with *Donaldson*

11   that "[t]his conflict appears insurmountable."  *See id.*

12          Plaintiffs' only response to *Donaldson* is that the Ninth Circuit's subsequent

13   *Staton v. Boeing Co.* decision limited *Donaldson*'s applicability.  (*See* Reply at 20.)  Not

14   so.  *Staton* did not abrogate *Donaldson* or call into doubt *Donaldson*'s reasoning.  *Staton*,

15   327 F.3d at 958.  Instead, *Staton* merely affirmed that for the purposes of adequacy, the

16   significance of a class with employees at different levels depends on the circumstances of

17   the case.  *Id.*  Like the circumstances presented in *Donaldson*, 205 F.R.D. at 568, and

18   contrary to those in *Pena*, 305 F.R.D. at 215, the context and claims presented here lead

19   //

20   //

21   _____

22          [27] At least three of the nine declarants also participated in the Calibration Process as
     managers.  (*See* Parris Decl. ¶ 4, Ex. 2 ("Alberts Dep.") at 69:14-18; *id.* ¶ 8, Ex. 6 ("Dove Dep.")
     at 44:3-22; *id.* ¶ 15, Ex. 15 ("Sowinska Dep.") at 54:22-55:8.)

1 the court to conclude that Plaintiffs and absent class members' interests will often

2 conflict. Those conflicts of interest further undermine class certification.

3      In summary, after careful review, the court finds that Plaintiffs have failed to carry

4 their burden of satisfying the Rule 23(a) prerequisites. First, Plaintiffs have not

5 demonstrated a common question to be resolved on behalf of the putative class. *See* Fed.

6 R. Civ. P. 23(a)(2). Additionally, Plaintiffs have failed to establish that the Plaintiffs'

7 claims are typical of those of the class members, *see id.* 23(a)(3), or that the Plaintiffs are

8 adequate representatives of absent class members, *see id.* 23(a)(4). For all of these

9 reasons, the court denies Plaintiffs' motion for class certification.

10 **IV.   CONCLUSION**

11      For the foregoing reasons, the court DENIES Plaintiffs' motion for class

12 certification (Dkt. ## 228 (sealed), 381 (redacted)). The court DIRECTS the Clerk to

13 provisionally file this order under seal and ORDERS the parties to meet and confer

14 regarding the need for redaction. The court further ORDERS the parties to jointly file a

15 statement within ten (10) days of the date of this order to indicate any need for redaction.

16      Dated this 25th day of June, 2018.

17

18

19 JAMES L. ROBART
United States District Judge

20

21

22